Nos. 24-3776, 24-5009, 24-5227

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

L.A. INTERNATIONAL CORP., ET AL.

*Plaintiffs-Appellees*

v.

PRESTIGE BRANDS HOLDINGS, INC. AND MEDTECH
PRODUCTS, INC.

*Defendants-Appellants.*

Appeal from the U.S. District Court for the Central District of
California, Case No. 2:18-cv-06809-MWF-MRW
Hon. Michael W. Fitzgerald

**Brief of Appellants
Prestige Consumer Healthcare Inc. (fka Prestige Brands
Holdings, Inc.) and Medtech Products, Inc.**

Michael L. Fox
C. Sean Patterson
Christine Cusick Ross
DUANE MORRIS LLP
One Market Plaza, Ste. 2200
San Francisco, CA 94105
(415) 957-3092

Robert M. Palumbos
William Shotzbarger
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1111

*Counsel for Appellants Prestige Consumer Healthcare Inc. (fka
Prestige Brands Holdings, Inc.) and Medtech Products, Inc.*

## APPELLANTS' DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellant Prestige Consumer Healthcare Inc. (fka "Prestige Brands Holdings, Inc.") is a New York Corporation, and is publicly traded on the New York Stock Exchange under the ticker symbol PBH. Defendant-Appellant Medtech Products, Inc. is a wholly-owned indirect subsidiary of Prestige Consumer Healthcare, Inc.

Date: October 10, 2024

/s/ Michael L. Fox
Michael L. Fox

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................... 1

JURISDICTIONAL STATEMENT ..................................................... 2

ISSUES PRESENTED ........................................................................ 3

STATEMENT OF THE CASE ........................................................... 4

I.  The Parties ................................................................................. 4

II.  Prestige's Sale of Clear Eyes ................................................... 6

III.  Prestige's Advertising and Other Promotional Services ......... 7

IV.  Plaintiffs' Claims ...................................................................... 9

SUMMARY OF THE ARGUMENT ................................................. 14

STANDARD OF REVIEW ............................................................... 16

ARGUMENT ...................................................................................... 17

I.  The District Court's Instructional Errors and Incorrect
    Application of Law Warrant a New Trial. ............................... 17

    A.  The District Court's Functional Discounts Instruction
        Was in Error. ........................................................................ 17

        1.  Error in District Court's Initial Instructions ............. 18

            a.  Failure to follow the Model Instruction ............. 20

            b.  The district court's instructions misstated
                the law ................................................................. 22

        2.  Error in Supplemental Instructions ........................... 24

        3.  Error in Verdict Form ................................................ 25

ii

B.    The District Court Erred by Failing to Instruct the Jury that Plaintiffs Must Show Substantial Harm to Competition. ............................................................ 27

    1.    The Weight of Authority Rejects the Disjunctive Interpretation ................................................ 28

    2.    The Actual Instructions Did Not Reflect the District Court's Reasoning ......................................... 34

    3.    The Damages Awarded by the Jury Show No Finding of Substantial Harm ....................................... 35

II.    The District Court Misapplied Supreme Court Precedent Applicable to Secondary Line RPA Cases ...................................... 37

A.    The Supreme Court's Decision in *Volvo*. ............................. 37

B.    *Volvo* is Directly Analogous to the Club Member Store Paradigm. ................................................................ 40

III.    The District Court Erred in Instructing the Jury That the Value of the Instant Redeemable Coupons Must Count Toward Net Price as a Matter of Law ........................................... 44

IV.    The District Court's Errors Justify Vacating the Verdict on Plaintiffs' UPA Claims. ............................................... 52

V.    Plaintiffs' Permanent Injunction Should be Reversed. ................ 54

VI.    The Award of Attorneys' Fees Vastly Larger than the Relief Obtained Was Unreasonable and an Abuse of Discretion. .......... 59

CONCLUSION ............................................................. 63

CERTIFICATES OF COMPLIANCE ..................................... 65

STATEMENT OF RELATED CASES ................................... 66

iii

# TABLE OF AUTHORITIES

## Cases

*ABC Distributing, Inc. v. Living Essentials LLC*
No. 15-CV-02064-NC, 2017 WL 3838443 (N.D. Cal. Sept.
1, 2017) ................................................................. 49

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*
135 F. Supp. 2d 1031 (N.D. Cal. 2001) .............................. 53

*BladeRoom Grp. Ltd. v. Emerson Elec. Co.*
20 F.4th 1231, 1243 (9th Cir. 2021) ................................ 21

*Branch Banking & Trust Co. v. D.M.S.I., LLC*
871 F.3d 751 (9th Cir. 2017) ....................................... 16

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*
799 F.3d 202 (2d Cir. 2015) .................................. 31,32,36

*Coston v. Nangalama*
13 F.4th 729 (9th Cir. 2021) ....................................... 29

*Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego,*
*Inc.*
16 Cal. App. 4th 202, 212 (1993) ................................... 52

*DL v. District of Columbia*
187 F. Supp. 3d 1 (D.D.C. 2016) .................................... 57

*eBay Inc. v. MercExchange, L.L.C.*
547 U.S. 388 (2006) ............................................. 54,55

*Enrico's Inc. v. Rice*
730 F.2d 125 (9th Cir. 1984) ....................................... 57

*Envtl. Prot. Info. Ctr. v. California Dep't of Forestry & Fire*
*Prot.*
190 Cal. App. 4th 217 (2010) ....................................... 60

*Feesers, Inc. v. Michael Foods, Inc.*
591 F.3d 191 (3d Cir. 2010) ........................................ 37

iv

*Fierro v. Smith*
39 F.4th 640 (9th Cir. 2022) ........................................................ 35,36

*In re Fine Paper Antitrust Litig.*
751 F.2d 562 (3d Cir. 1984) ............................................................ 63

*Fred Meyer, Inc. v. F.T.C.*
359 F.2d 351 (9th Cir. 1966) .................................................. 46,48,49

*FTC v. Evans Prods. Co.*
775 F.2d 1084 (9th Cir. 1985) ..................................................... 56,57

*FTC v. Morton Salt Co.*
334 U.S. 37 (1948) ..................................................................... 29,32

*G.H.I.I. v. MTS, Inc.*
147 Cal. App. 3d 256, 271 (1983) ..................................................... 52

*Gizoni v. Southwest Marine Inc.*
56 F.3d 1138 (9th Cir. 1995) ............................................................ 16

*Hasbrouck v. Texaco, Inc.*
842 F.2d 1034 (9th Cir. 1987) ..................................................... 28,31

*Hensley v. Eckerhart*
461 U.S. 424, 440 (1983) ................................................................. 60

*Hiken v. Dep't of Defense*
836 F.3d 1037 (9th Cir. 2016) .......................................................... 62

*Hoard v. Hartman*
904 F.3d 780 (9th Cir. 2018) ............................................................ 16

*Indian Coffee Corp. v. Procter & Gamble Co.*
482 F. Supp. 1104 (W.D. Pa. 1980) ........................................... *Passim*

*Jerden v. Amstutz*
430 F.3d 1231 (9th Cir. 2005) .......................................................... 21

*Loper Bright Enters. v. Raimondo*
— U.S. —, 144 S. Ct. 2244, 2281, 219 L.Ed.2d 832 (2024) .......... 40,50

*McCown v. City of Fontana*
565 F.3d 1097 (9th Cir. 2009) ............................................................. 62

*Murray v. Mayo Clinic*
934 F.3d 1101 (9th Cir. 2019) ............................................................. 16

*Nat'l Music Ctrs. of Am., Inc., v. Kimball Int'l, Inc.*
1990 WL 157374 (M.D. Pa. Aug. 29, 1990) ....................................... 33

*Olympia Co., Inc. v. Celotex Corp.*
597 F. Supp. 285, 297 (E.D. La. 1984), *aff'd and
remanded*, 771 F.2d 888 (5th Cir. 1985) ...................................... 31,33

*Packaging Sys., Inc. v. PRC–Desoto Int'l, Inc.*
268 F. Supp. 3d 1071 (C.D. Cal. 2017) .............................................. 52

*People v. Martin*
78 Cal.App.4th 1107 (2000) ................................................................ 53

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*
793 F.2d 1132 (9th Cir. 1986) ............................................................. 58

*Rebel Oil Co., Inc. v. Atlantic Richfield Co.*
51 F.3d 1421 (9th Cir. 1995) ............................................................... 28

*Ridgeway v. Walmart Inc.*
946 F.3d 1066 (9th Cir. 2020) ...................................................*Passim*

*Shorter v. Baca*
895 F.3d 1176, 1182 (9th Cir. 2018) .................................................. 34

*Sidibe v. Sutter Health*
103 F.4th 675 (9th Cir. 2024) ....................................................... 20,21

*Stein v. Kaiser Found. Health Plan, Inc.*
__ F.4th ___, 2024 WL 4271950 (9th Cir. 2024) ........................... 40,50

*Texaco, Inc. v. Hasbrouck*
496 U.S. 543 (1990) ................................................................. 17,24,30

*Trepco Imports and Distrib., Ltd. v. Ariz. Beverages USA,
LLC*

No. 5:18-cv-02605-JGB-SP, 2020 WL 1921790 (C.D. Cal.
April 16, 2020) ........................................................................ 33

*TRW Inc. v. Andrews*
534 U.S. 19 (2001) ............................................................ 29,30

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*
676 F.2d 1291 (9th Cir. 1982) ............................................. 17

*U.S. v. W. T. Grant Co.*
345 U.S. 629 (1953) ............................................................. 57

*U.S. Wholesale Outlet & Distribution, Inc. et al. v. Living
Essentials, LLC, et. al.*
Case No. 2:18-cv-01077-CBM-E (C.D. Cal. Oct. 21, 2019) ............... 21

*U.S. Wholesale Outlet & Distribution, Inc. v. Innovation
Ventures, LLC*
89 F.4th 1126 (9th Cir. 2023) ...................................... *Passim*

*United States v. Ross*
206 F.3d 896, 898–99 (9th Cir. 2000) ................................. 17

*United States v. Youssef*
547 F.3d 1090 (9th Cir. 2008) ............................................. 16

*Universal-Rundle Corp. v. F.T.C.*
382 F.2d 285 (7th Cir. 1967) ............................................... 33

*Van Buren v. United States*
593 U.S. 374 (2021) ............................................................. 28

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*
546 U.S. 164 (2006) ..................................................... *Passim*

*Whitaker Cable Corp. v. FTC*
239 F.2d 253 (7th Cir. 1956), *cert. denied*, 353 U.S. 938
(1957) ...................................................................................... 31

*Yonemoto v. Dep't of Veterans Affs.*
549 Fed. Appx. 627 (9th Cir. 2023) .................................... 60

**Statutes**

15 U.S.C § 13(a)................................................................*Passim*

15 U.S.C § 13(d)...................................................................9

15 U.S.C. § 15(a)...............................................................60,61

15 U.S.C. § 26(a)..................................................................60

28 U.S.C. § 1291....................................................................3

28 U.S.C. § 1331....................................................................2

28 U.S.C. § 1367....................................................................2

Cal. Bus. & Prof. Code § 17045.............................................9,53

Cal. Bus. & Prof. Code § 17200................................................9

**Other Authorities**

16 C.F.R. § 240.10(b)(6).........................................................58

14 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law §
   2331c (4th ed. 2019)..........................................................30

Fed. R. Civ. P. 68..................................................................61

## INTRODUCTION

There is a reason it has been a long time since any plaintiff obtained a jury verdict in a Robinson-Patman Act ("RPA") case. The defenses in RPA actions have been heavily litigated and are usually easily met. But for the district court's errors, the evidence presented at trial in this case would have defeated Plaintiffs' RPA (and derivative UPA) claims.

Since first entering the market, Defendants Prestige Consumer Healthcare, Inc. (f.k.a. Prestige Brands Holdings, Inc.) and Medtech Products, Inc. (collectively "Prestige") has faced sharp competition from other manufacturers selling products comparable to its product at issue: Clear Eyes Redness Relief eye drops in the trial sized 0.2 ounce Pocket Pal container ("Clear Eyes"). Costco and Sam's Club have millions of members across the county. In an effort to protect and increase its market share, Prestige negotiated specific discounts and redemptions with Costco and Sam's Club to reach these club stores' members. Costco and Sam's Club also performed services for Prestige that only companies of their size and reach could deliver—*i.e.*, access and multi-front advertising to millions of their members.

1

Prior to trial, the district court's erroneous rulings significantly restricted the evidence and argument that Prestige could present regarding discounts and redemptions available for Clear Eyes. At trial, further erroneous rulings resulted in incomplete and inaccurate instructions to the jury on the applicable standard for finding harm to competition, as well as Prestige's critical "functional discount" defense. As a result, the jury returned a verdict for Plaintiffs—despite awarding nominal amounts in damages.

Relying heavily on this unjust verdict, the district court then entered a permanent injunction against Prestige—despite substantial, unrefuted evidence that changes to Prestige's pricing structure eliminated any likelihood of future irreparable injury. Finally, the district court abused its discretion in awarding attorneys' fees that were divorced from Plaintiffs' minimal jury verdict and limited success. The Court should order a new trial and vacate the district court's attorneys' fee award.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331, and § 1367. On May 28, 2024, following a jury trial, the district court

entered a final judgment against Prestige and in Plaintiffs' favor. (1-ER-0027.) The district court amended the final judgment on June 5, 2024. (1-ER-0016.) Prestige filed a timely notice of appeal from the final judgment and amended final judgment on June 17, 2024. (15-ER-3830.)

Plaintiffs filed a motion for attorneys' fees and costs, which the district court granted in part on August 2, 2024. (1-ER-0002.) Plaintiffs' filed a timely notice of appeal from the order granting in part attorneys' fees and costs on August 8, 2024. (15-ER-3828.) Prestige filed a timely cross-appeal of the attorneys' fees order on August 20, 2024. (15-ER-3825.) The two appeals were consolidated on September 13, 2024. (Case No. 24-3776, Dkt. 11.1.)

This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

1.     Whether the district court improperly denied Prestige's motion for a new trial when it incorrectly instructed the jury on the functional discounts defense under the RPA, disregarded the text of Section 2(a) of the RPA, and misapplied Supreme Court precedent applicable to secondary line RPA cases.

2.      Whether the district court improperly granted in part Plaintiffs' *Daubert* motion on the calculation of net price by including the value of the instant rebates to Costco's customers in Costco's net price, which the jury should not have considered and would void the permanent injunction.

3.      Whether the district court's erroneous jury instructions tainted the California UPA claim.

4.      Whether the district court improperly entered a permanent injunction against Prestige, where there was no irreparable harm to Plaintiffs, and undisputed evidence of Prestige's changes rendered the injunction moot.

5.      Whether the district court's attorneys' fees and cost order should be overturned for abuse of discretion because the ordered fees are too high, and if Prestige prevails on appeal, the fee award should be vacated.

## STATEMENT OF THE CASE

### I.      The Parties

Prestige manufactures and distributes Clear Eyes. (4-ER-0886.)

Plaintiffs are regional wholesalers that sell Clear Eyes: L.A. International, L.A. Top, U.S. Wholesale, and Value Distributor (Los

4

Angeles); Pitco (San Francisco); AKR, Excel Wholesale, and Manhattan Wholesalers (New York); and Border Cash & Carry (Texas). (4-ER-0886.)

Unlike Costco or Sam's Club, Plaintiffs never offered a fee-based membership or cash-back program of any kind to their customers during the relevant time period (August 2014 through post-trial briefing). (10-ER-2569; 11-ER-2952.) Some do not accept credit cards. (10-ER-2663, -66.) Those that offer delivery either deliver only locally or charge customers for shipping, regardless of the order price. (9-ER-2310; 10-ER-2456; 10-ER-2632; 11-ER-2926.) Plaintiffs only sell to other businesses—no individual consumer can buy products from any plaintiff without being licensed to resell product to the public. (9-ER-2360-61; 10-ER-2482; 10-ER-2661-62; 11-ER-2945; 12-ER-2993.) Plaintiffs do not prominently display their products; instead the products are in boxes or simply stored on shelves or on the ground with no signage. (10-ER-2663.) Many Plaintiffs do not even display the prices of their products in their stores, and Plaintiffs negotiate prices with each of their customers. (10-ER-2477; 10-ER-2663) Border does not even have a showroom to display its merchandise. (11-ER-2708.)

5

## II. Prestige's Sale of Clear Eyes

Clear Eyes is sold in a 0.2-ounce bottle that comes in paperboard boxes of twelve units, referred to as "display units" or "counter displays." (4-ER-0886.) Four display units make up a "case" of Clear Eyes. (*Id.*) Clear Eyes was sometimes sold and shipped in a pallet configuration, with (at different points) 70 or 81 cases to a pallet. (*Id.*) Prestige sells Clear Eyes directly to Plaintiffs, typically by the case. (*Id.*)

Among Prestige's other direct-purchasing customers of Clear Eyes are Costco, and, since March 2017, Sam's Club. (*Id.*) Costco and Sam's Club are large retailers who sell exclusively to their "club" members. (9-ER-2162-63; 11-ER-2793.)

One division of Costco is the Costco Business Center ("CBC"), which focuses its sales to members who run small businesses. (15-ER-3799.) But anyone with a regular Costco card can shop in the business center. (9-ER-2360.) Throughout the relevant time period, Costco has only sold Clear Eyes Pocket Pal through its CBC division. (4-ER-0886-87.) At the time of trial, Costco operated 24 CBCs nationwide. (11-ER-2805.) In California, there are four CBCs in Los Angeles, three in San

6

Francisco, and one in Sacramento. (4-ER-0886-87.) Costco also has a CBC in Hackensack, New Jersey, outside New York City. (*Id.*) The Hackensack, New Jersey location was not open until 2016. (10-ER-2533; 11-ER-2931.) Plaintiffs themselves are Costco members. (*See, e.g.*, 10-ER-2666.)

By shipping Clear Eyes directly to Costco, Prestige enjoys a "very significant" savings in labor costs. (11-ER-2812.) Because Prestige ships more product to a single Costco location, they can fit more on a truck. (11-ER-2811.) Additionally, Costco demands a specially configured pallet that can hold more display units of Clear Eyes (81 units). (11-ER-2810-12.) This efficiency equates to significant savings for Prestige on its shipping. (11-ER-2811-12.)

Like Costco, Sam's Club is a membership-only club store that also has a division focused on sales to small businesses, which also sells Clear Eyes to its members. (9-ER-2186, 2324.) Sam's Club's first sales of Clear Eyes were in December 2016. (5-ER-1083.)

## III. Prestige's Advertising and Other Promotional Services

From August 2014 onward, Prestige made promotional payments to Costco to support and facilitate Costco's sales to its members of Clear

Eyes, including advertising payments, payments to participate in Costco's periodic "Business Savings Events" featuring "Instant Redeemable Coupons," payments to appear in the Business Saving Events flier that advertised the Instant Redeemable Coupons, and payments for better in-store product placement. (4-ER-0887.) Prestige also paid Costco for "e-mail blasts," "ad space," and to appear on Costco's website. (*Id.*) Prestige's Senior Director of Sales, Jacob Grehn, testified that these were "promotional and advertising" payments. (*Id.*) Grehn testified that in exchange for payment, Prestige received advertising and promotional services from Costco in the form of ad space and coupons in Costco's coupon book, and being featured on Costco's website. (11-ER-2784.)

In 2015, Costco debuted what it called the DOW program for "delivery, operations, and web services." (4-ER-0887-88.) Grehn testified that Costco's "DOW allowance" was intended to eliminate the piecemeal payments that Prestige and other vendors had previously made to Costco for Costco's advertising and promotional services. (*Id.*) He explained that, under the DOW program, Prestige makes quarterly payments to Costco for its various advertising and promotional services,

8

amounting to payments of 3.95% of Costco's acquisition cost for Clear Eyes. (4-ER-0887-88.) He also testified that negotiating with Costco over the DOW once each quarter—instead of for every purchase—makes it more efficient for Prestige. (11-ER-2816.) The evidence at trial was undisputed that *Costco* initiated the DOW program for all of its suppliers.

## IV.  Plaintiffs' Claims

Plaintiffs filed this lawsuit against Prestige in August 2018. Plaintiffs asserted four claims: (1) damages claims for violations of Section 2(a) of the RPA, 15 U.S.C § 13(a); (2) injunctive relief claims for violations of Section 2(d) of the RPA, 15 U.S.C § 13(d); (3) damages claims for violations of California's Unfair Practices Act ("UPA"), Cal. Bus. & Prof. Code § 17045; and (4) injunctive relief claims for violations of California's Unfair Competition Law, ("UCL"), Cal. Bus. & Prof. Code § 17200. (8-ER-1817-19.) Plaintiffs also sought treble damages, injunctive relief, and attorneys' fees and costs.  (*Id.*)

Prestige asserted a number of defenses including, for purposes of this appeal, that any difference in price was justified as a "functional discount." (*See generally* 7-ER-1546.) Both sides subsequently filed

motions for summary judgment and *Daubert* motions. The district court partially granted Plaintiffs' *Daubert* motion on the effect of Costco's Instant Redeemable Coupons, holding that "rebates must be ***included*** in damages calculations for RPA cases, and therefore in [defense expert] Dr. Meitzen's opinions, as a matter of law." (1-ER-0066.) The district court relied on its holding "that the rebates must count toward Costco's net price as a matter of law" in denying Prestige's motion for summary judgment on Plaintiffs' Section 2(a) claims. (1-ER-0084.) The district court extended this decision by granting Plaintiffs' Motion in Limine No. 3, and thereby excluded "evidence or argument that the rebates did not affect the net price paid by [Costco] [and] that they are not discounts, consistent with the MSJ Order." (5-ER-1145.) The district court also granted partial summary judgment in Prestige's favor on the non-California Plaintiffs' UPA and UCL claims.[1] (1-ER-0086.)

The case proceeded to trial in December 2023. The parties presented over a dozen fact witnesses. Plaintiffs and Prestige also called economists to testify as experts. Plaintiffs' economist opined that

---

[1] The non-California Plaintiffs are Manhattan Wholesalers, AKR, Excel Wholesale Distributors, and Border Cash & Carry.

Plaintiffs competed with Costco and Sam's Club for the sale of Clear Eyes. (12-ER-3030.) He also testified that Plaintiffs suffered millions of dollars of damages on their RPA Section 2(a) and California UPA claims. (12-ER-3088-3115; 15-ER-3820, -23.) Prestige's economist opined that Plaintiffs were not harmed by any price discrimination by Prestige, and damages were not warranted. (13-ER-3337.) He also made substantial downward corrections to Plaintiffs' damages calculations. (13-ER-3370-84.)

Plaintiffs' testimony on the alleged harm to competition—*i.e.*, the customers and/or sales they lost to Costco or Sam's Club—was self-serving and vague. For instance, David Luttway of Pitco relied on his own sales records, stating that the records of customers *who bought from Pitco* were evidence of *lost* customers. (9-ER-2169.) Similarly, Javid Sharifi of Manhattan Wholesalers claimed that he lost sales from all or nearly all of his customers to Costco. (12-ER-3014.)

Meanwhile, during a two-week trial with over a dozen witnesses, Plaintiffs only called two actual customers to testify in support of their alleged lost sales. The first witness, Anas Farooq of Jadi Enterprises, a distributor or "jobber," was called to testify as a "lost customer" for L.A.

11

International. Farooq testified that he still buys Clear Eyes from L.A. International, along with "100 other products" and that the only time he buys Clear Eyes from Costco is when he can redeem the IRC offered by Costco during Costco's promotional events. (10-ER-2507-11, -14-15.) In fact, Mr. Farooq testified that during the promotional events, he and his employees would visit their CBC daily, and buy Clear Eyes up to the customer limit. (10-ER-2508-10.) The second witness, Jeff Mansour of San Diego Cash & Carry, also a distributor and at times a competitor of some Plaintiffs, testified that he also still buys Clear Eyes from L.A. Top and L.A. International—along with other products—and that he also only buys Clear Eyes from Costco when he can redeem the IRC (in a similar manner to Jadi Enterprises). (11-ER-2737-38, 2740-41, 2748-50.)

The jury ultimately found that Plaintiffs prevailed on their RPA Section 2(a) claims for price discrimination, and the California Plaintiffs prevailed on their UPA claims. (5-ER-1021.) The jury awarded minimal damages:

| Plaintiff | RPA Section 2(a) Damages | UPA Damages |
|---|---|---|
| AKR | $25,000 | N/A |
| Border Cash & Carry | $0 | N/A |

| Excel Wholesale | $25,000 | N/A |
| L.A. International | $95,000 | $90,000 |
| L.A. Top Distributor | $25,000 | $30,000 |
| Manhattan Wholesalers | $25,000 | N/A |
| Pitco Foods | $30,000 | $75,000 |
| U.S. Wholesale | $25,000 | $5,000 |
| Value Distributor | $100,000 | $130,000 |

The district court allowed the California Plaintiffs to take the greater of RPA Section 2(a) or UPA damages, but not both. Only two Plaintiffs obtained a verdict on the Section 2(a) claim greater than $30,000. (5-ER-1025.) For the five Plaintiffs who were awarded $25,000 on the RPA claim, that award (before trebling) averages out over the nine-year damages period to $2,777.78 per year, per plaintiff. For Pitco, who was awarded $30,000 on the RPA claim, it averages out to $3,333.33 per year. Only two of the five California Plaintiffs, L.A. Top and Value Distributor Inc., were awarded more on their UPA claims than their RPA claims. (5-ER-1028.) As a non-California Plaintiff, Border Cash & Carry only sought RPA damages at trial. (12-ER-3106 (seeking $7,681 in RPA damages).) The jury ultimately awarded Border no damages. (5-ER-1025.)

Prestige moved for a new trial on February 12, 2024, which the district court denied. (1-ER-0038.) At the same time, Plaintiffs moved for a permanent injunction, which the district court granted. (1-ER-0038.) The district court entered findings of fact and conclusions of law on Plaintiffs' claim under Section 2(d) of the RPA, the UPA, and the UCL on May 20, 2024. (4-ER-0884.) It then entered judgment on May 28, 2024 (1-ER-0027), and an amended judgment on June 5, 2024 (1-ER-0016).

Plaintiffs moved for attorneys' fees and costs. (2-ER-0097.) In that motion, Plaintiff sought $7,651,766.80 in attorneys' fees after a lodestar multiplier, as well as $35,546.99 in costs. (1-ER-0002, -12.) The district court awarded 41% of the requested fees and all of the requested costs. (1-ER-0002, -15.)

## SUMMARY OF THE ARGUMENT

Prestige is entitled to a new trial on the merits on the RPA claims for three reasons:

First, the district court's instructions on the functional discounts defense were in error. These errors occurred in the initial instructions, supplemental instructions in response to a juror question, and the

14

verdict form, as the district court repeatedly instructed the jury that functional discounts were merely a "concept," and not a complete defense.

Second, the district court committed error by failing to instruct the jury that Plaintiffs had to show substantial harm to competition as mandated by the text of Section 2(a) of the RPA, and the clear weight of controlling authority. And this error is demonstrated by the jury's award of nominal damages to Plaintiffs, which represent a mere fraction of their sales of the product at issue. This error equally tainted the jury's understanding of what was needed to be found to return a verdict on the California Plaintiffs' derivative UPA claim.

Third, the district court misapplied the Supreme Court's binding precedent in *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 180 (2006), which is applicable to secondary line RPA cases such as this one. Prestige submits that the district court should have applied *Volvo* to the facts of this case rather than blindly applying this Court's opinion in *U.S. Wholesale Outlet & Distribution, Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1138–39 (9th Cir. 2023).

Additionally, the district court improperly entered a permanent injunction against Prestige, which should be vacated whether or not a new trial is granted. It also issued an award of attorneys' fees that was excessive when compared to the jury's minimal verdict for each Plaintiff and overcompensated Plaintiffs' counsel for the nominal outcome.

## STANDARD OF REVIEW

Questions of statutory interpretation are reviewed *de novo*. *United States v. Youssef*, 547 F.3d 1090, 1093 (9th Cir. 2008) (per curiam).

The standard of review for challenging a jury instruction as a misstatement of the law is *de novo*. *Murray v. Mayo Clinic*, 934 F.3d 1101, 1103 (9th Cir. 2019); *see also Hoard v. Hartman*, 904 F.3d 780, 786, n.7 (9th Cir. 2018) ("The standard of review is identical for jury instructions and supplemental jury instructions given in response to a jury's questions"); *Gizoni v. Southwest Marine Inc.,* 56 F.3d 1138, 1142 (9th Cir. 1995) ("We review *de novo* whether the district court misstated the elements to be proved at trial.").

Ordinarily, rulings on evidentiary issues are reviewed for an abuse of discretion, but when an evidentiary issue ruling has the effect of precluding a defense, review is *de novo*. *Branch Banking & Trust Co.*

*v. D.M.S.I., LLC*, 871 F.3d 751, 759–60 (9th Cir. 2017), citing *United States v. Ross*, 206 F.3d 896, 898–99 (9th Cir. 2000).

The Court reviews an award of attorneys' fees for abuse of discretion. *Twin City Sportservice, Inc. v. Charles O. Finley & Co.*, 676 F.2d 1291, 1312 (9th Cir. 1982).

## ARGUMENT

## I. The District Court's Instructional Errors and Incorrect Application of Law Warrant a New Trial.

### A. The District Court's Functional Discounts Instruction Was in Error.

At trial, Plaintiffs bore the burden of proving that certain discounts provided to Costco and Sam's Club were not a "'reasonable' reimbursement, or a 'functional discount,' to compensate the purchaser for 'its role in the supplier's distributive system, reflecting, at least in a generalized sense, the services performed by the purchaser for the supplier.'" *U.S. Wholesale Outlet & Distribution, Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1138–39 (9th Cir. 2023) (quoting *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 571 (1990) ("At the least, a functional discount that constitutes a reasonable reimbursement for the purchaser's actual marketing functions will not violate the Act.")). If

17

Plaintiffs failed to meet this initial threshold, then the jury must understand that the law requires a verdict for Prestige.

### 1. Error in District Court's Initial Instructions

Prior to trial, Prestige submitted a proposed jury instruction modeled on the ABA instruction on functional discounts. (5-ER-1175-1176.) Prestige also proposed a verdict form that included a functional discount question. (5-ER-1127.) Both of these proposals plainly directed the jury that—if it found that the price difference was a functional discount—it must find for Prestige. After the conclusion of trial, the district court acknowledged that Prestige had submitted substantial evidence that would support a finding of functional discounts. (14-ER-3537-39.) Despite so doing, however, the district court rejected Prestige's proposed jury instruction and verdict form on functional discounts.

Instead, the district court crafted its own set of instructions (5-ER-1030), which failed to clearly and adequately state the law on functional discounts. The district court further erred in supplemental instructions to the jury's sole question on these instructions. (5-ER-1029.) The district court's initial and supplemental instructions erroneously

18

suggested that functional discounts were merely a "concept" that the jury could consider in evaluating Plaintiffs' claims. This clear error resulted in an unjust verdict for Plaintiffs.

These errors were raised in Prestige's motion for a new trial. In denying Prestige's motion, the district court concluded that: (a) "no reasonable reading of the instructions, taken as a whole, would permit the jury to come to an erroneous understanding of the functional discount defense"; (b) the jury's question was not indicative of any confusion "about the functional discount defense specifically"; (c) the response to the jury's question was sufficient because the district court "explained that the jurors had to address each 'subpoint' under the third element"; and (d) there was no error in rejecting the use of the model jury instructions, as the instructions "when 'viewed as a whole. . . fairly and adequately cover the issues presented, correctly state the law, and are not misleading.'" (1-ER-0050 [citing *Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1081 (9th Cir. 2020)].) The district court's reliance on the holding in *Ridgeway*, however, demonstrates why these assertions do not withstand review.

19

In *Ridgeway*, this Court found that errors by the district court in the instructions provided to the jury were subsequently cured in supplemental instructions, giving rise to the language cited by this district court. *Id.* at 1082 ("Still, even if the initial [] instruction was erroneous, the supplemental instruction that was issued in response to a jury question provided an accurate statement of the law and cured any defects in the initial instruction. . . . Ultimately, the initial jury instruction . . ., paired with the supplemental jury instruction . . ., provided a complete, clear, accurate, and adequate statement of the applicable law . . .") Here, the instructions on functional discounts were erroneous, and that error was not cured in the supplemental instructions.

### a.   Failure to follow the Model Instruction

The first indication of error in the district court's instructions arise from its decision to deviate from the model instruction. While not dispositive proof of error on its own, it is well established that model instructions are helpful tools for determining whether a district court has adequately instructed the jury. *See, e.g.*, *Sidibe v. Sutter Health*, 103 F.4th 675, 682 (9th Cir. 2024).

20

As set forth therein, this Court found that the district court erred in changing language in the CACI instruction on anticompetitive purpose, which—when read with omissions in other instructions—"failed to instruct the jury that it could consider evidence of the appellee's anticompetitive purpose." *Id*. at 682. This Court further concluded that "not following CACI misstated the law" and "[b]ecause legal error is established, we 'presume prejudice' and [appellee] has the burden to demonstrate that it is 'more probably than not that the jury would have reached the same verdict had it been properly instructed.'" *Id.*, citing *BladeRoom Grp. Ltd. v. Emerson Elec. Co.,* 20 F.4th 1231, 1243 (9th Cir. 2021). This Court "and many of our sister circuits similarly held that cumulative error in a civil trial may suffice to warrant a new trial even if each error standing alone may not be prejudicial." *Jerden v. Amstutz,* 430 F.3d 1231, 1240-41 (9th Cir. 2005).

And indeed, evidence that deviation from the model instruction was a substantial error can be taken from the outcome in *U.S. Wholesale Outlet & Distribution, Inc. et al. v. Living Essentials, LLC, et. al.*, Case No. 2:18-cv-01077-CBM-E (C.D. Cal. Oct. 21, 2019). In that case, the model instruction on functional discounts was given (6-ER-

21

1243), the jury returned a defense verdict, and the district court's functional discounts instruction was affirmed on appeal. *See U.S. Wholesale*, 89 F.4th at 1139. That same instruction should have been given here.

But instead, the instructions actually provided to the jury failed to accurately and clearly state the law.

### b. The district court's instructions misstated the law

At trial, the jury was instructed that Plaintiffs must prove, in part, that "there is a reasonable possibility that the discriminatory pricing may harm competition." (5-ER-1049.) Problematically, however, the instruction on this element further stated that: "[This element] includes the concepts of (a) actual competition (Instruction No. 20); (b) competitive injury (Instruction Nos. 21–22); and (c) functional discounts (Instruction No. 23)." (5-ER-1049.) Any juror who attempted to review the functional discount instruction, however, would find the same circuitous language: *i.e.*, that "if you find that the differences in prices here were functional discounts, then any "discriminatory pricing did not have a reasonable possibility of harming competition." (5-ER-1055.)

22

By comparison, Prestige's proposed jury instruction on functional discounts (modeled on the ABA's instruction) explicitly instructs that: "Plaintiff bears the ultimate burden to prove that Defendants' lower prices were not justified as a functional discount. If you find that the lower prices granted by Defendants to Costco Wholesale Corporation, Sam's Club and Select Corporation were justified as a functional discount, then ***you must return a verdict for Defendants*** on the Robinson-Patman Act claim." (5-ER-1175-1176 (emphasis added); *see, e.g.*, Am. Bar Ass'n, Model Jury Instructions in Civil Antitrust Cases, RPA Seller Liability—Section 2(a), Instruction No. 11 (Functional Discounts) (2016 ed.) ["If you find that the lower prices granted by defendant to [*customer A*] were justified as a functional discount, ***then you must return a verdict for defendant*** on the Robinson-Patman Act claim."].

Any juror attempting to understand and apply the actual instructions given would be left with, at best, the impression that functional discounts were merely a "concept" that may be relevant to whether Plaintiffs could prove the third element of their Section 2(a) claim. Such a conclusion is contrary to the law, which mandates a

verdict in Prestige's favor. *Texaco*, 496 U.S. at 571 n.11. Accordingly, the district court's initial instructions on functional discounts were erroneous, and that error was not harmless.

### 2. Error in Supplemental Instructions

The inevitable likelihood of confusion was realized here, as evidenced by the jury's sole question during deliberation. (5-ER-1029 ["Regarding Jury Instruction # 17, p. 19, lines 9-20, does the jury have to be in unanimous agreement on each point and sub-point?"].) And contrary to the district court's subsequent conclusion, it was well understood at the time that this confusion was indeed "about the functional discount defense specifically." (1-ER-0051.)

When the jury's question was presented, the district court and Plaintiffs acknowledged that it likely resulted from confusion on how to apply the question of functional discounts. (14-ER-3748-3757.) Critically, the district court and Plaintiffs also acknowledged that the inclusion of functional discounts as a "concept" or "subpart," was the likely obstacle for the jury. (14-ER-3749-51, -54.) Yet, despite this recognition, the district court's supplemental instructions to the jury did not provide a "clear, accurate, and adequate statement of the applicable

law. . ." *Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1081 (9th Cir. 2020).)

Instead, the district court's supplemental instructions again reiterated the misleading and erroneous assertion that—even if the jury found that price differences were functional discounts—this finding would not mandate a verdict for Prestige. (14-ER-3757-59 ("But as to the subpoints, those are – that is how the law is defining that third element. So that is why I refer to them as concepts instead of as elements. They are just ways to guide you in answering the ultimate question of has this element, Number 3, been proved by the Plaintiff?") As a result, the initial and supplemental instructions on functional discounts—even when read as a whole—misstated the law and resulted in an unjust verdict.

### 3. Error in Verdict Form

The failure to plainly instruct on this critical defense for Prestige was further exacerbated by the district court's refusal to include a separate question on functional discounts in the verdict form—despite doing so for other defenses that the district court labeled as "concepts" in Jury Instruction No. 17 (Element No. 3) (*i.e.*, actual competition, Inst.

No. 20; and competitive injury Inst. Nos. 21-22).  (5-ER-1053-1055.)
Post-trial, the district court asserted that there was no abuse of
discretion in rejecting Prestige's request because "the jury found in
favor of Plaintiffs on their Section 2(a) claim, the jurors necessarily had
to unanimously agree that Plaintiffs met their burden of showing that
the price differences did not serve as a functional discount."  (1-ER-
0051.)  Again, this post-trial reasoning belies the district court's
acknowledgment during trial that its decision to omit a question on
functional discounts may confuse the jury.  (14-ER-3752-53.)  It also
ignores the fact that questions on other defenses raised by Prestige—
meeting competition and competitive injury—were included on the
verdict form (5-ER-1022-23), and the omission of a similar question for
functional discounts further reinforced the mistaken conclusion by the
jury that a finding of functional discounts was not a complete defense.

As such, when considered as a whole, the district court's
instructions and refusal to include functional discounts on the verdict
form were in error, and resulted in a miscarriage of justice requiring
that this Court reverse the judgment and order a new trial on Plaintiffs'
2(a) claim.

**B.   The District Court Erred by Failing to Instruct the Jury that Plaintiffs Must Show Substantial Harm to Competition.**

The district court also committed clear error in failing to instruct the jury that it must find *substantial* harm to competition before they can return a verdict for Plaintiffs.  As a result, the jury mistakenly believed that any finding of harm to competition—no matter how *de minimis*—would mandate a verdict for Plaintiffs.  However, such a belief is contrary to the express language of Section 2(a) of the RPA, which states:

> It shall be unlawful for any person . . . to discriminate in price between different purchasers of commodities . . . where the effect of such discrimination may be ***substantially*** to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them[.]

15 U.S.C. § 13(a) (emphasis added).

Prior to and throughout trial, Prestige urged the district court to instruct the jury that Plaintiffs must demonstrate "substantial" harm to competition.  (5-ER-1115, 1155-64, 1195-1203; 14-ER-3533-34.)

Over Prestige's objections, the district court concluded that there was no need to include the term "substantial" in the jury instructions.

27

(13-ER-3236; 14-ER-3534, 3567-3272.) In support, the district court adopted Plaintiffs' erroneous argument that the term "substantial" was unnecessary because the use of this term in the statute was "intended to be read in the disjunctive," such that merely "injuring, destroying, or preventing competition" is sufficient. (*Id.*; *see also* 1-ER-0043.)

When Prestige raised this issue post-trial, the district court acknowledged "there was no controlling authority on this point," but concluded "that cases interpreting Section 2(a) suggest that no showing of substantial harm is required." (1-ER-0043.) In support, the district court cited to three decisions: *Hasbrouck v. Texaco, Inc.*, 842 F.2d 1034, 1041 (9th Cir. 1987); *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1446 n.18 (9th Cir. 1995); and *U.S. Wholesale Outlet & Dist., Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1134 (9th Cir. 2023). The district court's reliance on these decisions is misplaced.

### 1. The Weight of Authority Rejects the Disjunctive Interpretation

First, the district court erred in omitting "substantial" because it is explicitly stated in the text of Section 2(a). When it comes to interpreting legislation, the Supreme Court has recently instructed to "start where we always do: with the text of the statute." *See Van Buren*

*v. United States*, 593 U.S. 374, 381 (2021). "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). A court's jury instructions must accurately state the law. *See Coston v. Nangalama*, 13 F.4th 729, 732 (9th Cir. 2021). Accordingly, the law requires that this term cannot be ignored.

Next, the statutory history of Section 2(a) does not support the district court or Plaintiffs' reading. As explained in *FTC v. Morton Salt Co.,* 334 U.S. 37 (1948), Congress added the "to injure, destroy or prevent competition" clause to address competitive harm to the individual *competitor* as opposed to *competition generally*. *See id.* at 49-50, n. 18 ("The new provision, here controlling, was intended to justify a finding of injury to competition by a showing of 'injury to the competitor victimized by the discrimination.'"). There is nothing to suggest that the amendment to the RPA somehow removed the importance of the modifier "substantially," or that "substantially" was not intended to modify all three clauses.

29

Indeed, under the district court's faulty reading, the phrase "substantially to lessen competition" would be superfluous because it would be subsumed within the "to injure" prong of the statute. *See TRW Inc.*, 534 U.S. at 29 (rejecting an interpretation that "would in practical effect render [a statutory provision] superfluous in all but the most unusual circumstances"). Under the district court's construction, there would presumably never be a scenario where the term "substantial" would be applicable to a secondary line claim, which goes against the explicit intent of Congress and authority on statutory interpretation. *Id.* Leading secondary authority also supported Prestige's position, *i.e.*, that courts have "assumed that the word 'substantially' modifies all three forms of injury.'" 14 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law § 2331c (4th ed. 2019).

In line with the text of the RPA, the Supreme Court, this Court, and courts in other circuits have repeatedly noted that liability under Section 2(a) requires *substantial* harm to competition. *See, e.g., Texaco, Inc. v. Hasbrouck*, 496 U.S. at 561 & n.18 ("A legitimate functional discount will not cause any *substantial* lessening of competition. The concept of *substantiality* permits the causation inquiry to accommodate

a notion of economic reasonableness with respect to the pass-through effects of functional discounts, and so provides a latitude denied by the cost justification defense."); *Hasbrouck*, 842 F.2d at 1041 n.6, *aff'd supra* ("The district court in fact instructed the jury that plaintiffs needed to 'establish by a preponderance of the evidence that the effect of the discrimination in price . . . had the reasonable *probability of substantially lessening competition*, or of injuring or destroying or preventing competition.'"); *Volvo*, 546 U.S. at 180 ("[I]f price discrimination between two purchasers existed at all, it was not of such magnitude as *to affect substantially competition* between [the plaintiff] and the 'favored' Volvo dealer."); *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 212 (2d Cir. 2015) ("The Act itself thus requires at least the potential for *substantial* harm to competition."); *Whitaker Cable Corp. v. FTC*, 239 F.2d 253, 256 (7th Cir. 1956) ("The Act was not intended to reach every remote, adverse effect on competition. The *effect must be substantial.*"), *cert. denied*, 353 U.S. 938 (1957); *see also Olympia Co., Inc. v. Celotex Corp.*, 597 F. Supp. 285, 297 (E.D. La. 1984) ("As previously stated, the Robinson-Patman Act is only violated where the effect of price discrimination may be to

31

*substantially* lessen competition. It is inconceivable that the de

minimus price differential at issue could be said to have such a

*substantial*, if any, effect on competition."), *aff'd and remanded*, 771

F.2d 888 (5th Cir. 1985).

In *Cash & Henderson Drugs*, the Second Circuit explained that

the Supreme Court's discussion of substantiality in *Volvo* focused "on

the existence and degree of actual competition among different

purchasers." *Cash & Henderson Drugs*, 799 F.3d at 210 (citing *Volvo*,

546 U.S. at 177, 179–80). In making this point, the Second Circuit

specifically relied on the language in Section 2(a) prohibiting price

discrimination where the effect "may be substantially to lessen

competition . . . ." *Id.* (quoting 15 U.S.C. § 13(a)). The Second Circuit

further explained that "that if the loss attributable to impaired

competition is *de minimis*, then the challenged practice cannot be said

to have had a 'substantial' affect on competition." A *Morton Salt*

inference "may be rebutted by evidence that favored purchasers were

diverting only a *de minimis* number of customers." *Id.* at 212. District

courts in this Circuit have relied on *Cash & Henderson Drugs* in

analyzing competitive injury (and antitrust injury) in Section 2(a) cases.

*See, e.g.*, *Trepco Imports and Distrib., Ltd. v. Ariz. Beverages USA, LLC*, No. 5:18-cv-02605-JGB-SP, 2020 WL 1921790,*3 (C.D. Cal. April 16, 2020).

Other courts have also recognized the need to find substantial harm (*e.g.*, more than de minimis) to competition. *See Nat'l Music Ctrs. of Am., Inc., v. Kimball Int'l, Inc.*, 1990 WL 157374, *6 (M.D. Pa. Aug. 29, 1990) ("The wording of Section 2(a) allows the conclusion that de minimis violations are not actionable unless the price discrimination is substantial."); *Olympia Co., Inc. v. Celotex Corp.*, 597 F. Supp. 285, 297(E.D. La. 1984), *aff'd and remanded*, 771 F.2d 888 (5th Cir. 1985); *Universal-Rundle Corp. v. F.T.C.*, 382 F.2d 285 (7th Cir. 1967) (FTC could not properly find petitioner guilty of price discrimination in view of the *de minimis* nature of the alleged competition.)

This Court's most recent decision on the issue, *U.S. Wholesale*, demonstrates the import of the use of substantial in the jury's instructions. In the underlying trial, the plaintiffs (represented by the same plaintiffs' counsel as here) made the same exact argument—*i.e.*, that "substantial" should be read in the disjunctive, and should not be included in the instructions to the jury. (6-ER-1504-06.) The district

33

court rejected this argument, and the terms "substantially" and "substantial" were included in the jury instructions in that action.  (*See* 6-ER-1237*,* 41-42.)

Indeed, the court ultimately declared—on the record—that the word "substantial" appears in the statute and that is why it is included in the jury instructions.  (6-ER-1506.)  And, as noted above, the jury returned a verdict in favor of the defendants in that action, and the plaintiffs did not challenge the use of "substantial" in the instructions on appeal.  *U.S. Wholesale*, 89 F.4th at 1136.

## 2.    The Actual Instructions Did Not Reflect the District Court's Reasoning

The district court next held that the ABA model jury instructions support the district court's interpretation because the term "substantial" does not appear in the applicable instruction on elements. (1-ER-0044, citing ABA Model Instructions, Robinson-Patman Act, Seller Liability—Section 2(a), Instruction No. 2, Elements.)  However, as the district court noted elsewhere in its order, "the 'use of a model jury instruction does not preclude a finding of error.'"  (1-ER-0050, citing *Ridgeway*, 946 F.3d at 1081 (quoting *Shorter v. Baca*, 895 F.3d

1176, 1182 (9th Cir. 2018)). Thus, in this instance, the ABA Model Instructions do not control—the RPA does.

Accordingly, the express terms of the RPA, the law on statutory construction, and the clear weight of controlling authority demonstrate that the district court erred in omitting substantial from the instructions.

### 3. The Damages Awarded by the Jury Show No Finding of Substantial Harm

Once an error in instruction is found, a verdict will only be affirmed if "it is more probable than not that the jury would have reached the same verdict had it been properly instructed." *Fierro v. Smith*, 39 F.4th 640, 651 (9th Cir. 2022)

The district court held that "even if the court erred, any error was harmless." (1-ER-0045.) In support, the court cited to the damages awarded by the jury, as proof that "[Prestige's] price discrimination had a substantial impact on Plaintiffs." (*Id.*) In fact, the jury's verdict *confirms* the prejudice to Prestige because it demonstrates that the jury found no substantial harm to competition.

First, Plaintiff Border Cash & Carry was awarded no damages, demonstrating that the jury found no harm to competition for that

wholesaler. (5-ER-1025.) For the Plaintiffs who were awarded monetary damages, the amounts ranged from $2,777.78 to $3,333.33, per year. (*Id*.) Plaintiffs acknowledged that—by their own accounting—the total "lost sales" equaled less than 10 pallets (700 cases) per year. (4-ER-0900 ["$2,777 in lost profits equates to 8.5 pallets of lost Clear Eyes sales."].) In contrast, Plaintiffs were selling tens of thousands of cases of Clear Eyes each year. (15-ER-3823 (In 2017, before suit was filed, Manhattan Wholesalers purchased over 250,000 cases of Clear Eyes from Prestige.) Thus, by Plaintiffs' own best estimates, the jury's award represents nothing more than a tiny fraction of their sales.

The damages awarded to Plaintiffs demonstrate that the jury did not find any substantial harm to competition. *See also Volvo*, 546 U.S. at 180 (concluding that the loss of one sale of 12 custom trucks was insubstantial); *Cash & Henderson Drugs,* 799 F.3d at 211 (finding that the loss of eighteen customers per year and a 1% decline in transactions was not substantial). Thus, the district court's error was not harmless, as the jury's verdict indicates that proper instructions would—more probably than not—result in a different outcome.

## II.    The District Court Misapplied Supreme Court Precedent Applicable to Secondary Line RPA Cases.

At trial, Prestige was severely limited on the argument in closing about what Plaintiffs must prove to establish whether they were actually competing with the alleged favored purchasers (Costco and Sam's Club) for the "same dollar." *See Feesers, Inc. v. Michael Foods, Inc.*, 591 F.3d 191, 197 (3d Cir. 2010) ("two parties are in competition only where, after a 'careful analysis of each party's customers,' we determine that the parties are 'each directly after the same dollar.'"). Relying on the same incorrect interpretation of this Court's ruling in *U.S. Wholesale*, the district court also rejected Prestige's request for an instruction that would accurately instruct the jury that they must find that Plaintiffs were competing "after the same dollar" with Costco or Sam's Club.  (5-ER-1208, -1052.).  The district court's ruling and instructions are directly contradicted by controlling authority.

### A.    The Supreme Court's Decision in *Volvo*.

To prevail on a secondary line RPA Section 2(a) case, such as here, the Supreme Court has made clear that the hallmark of the requisite competitive injury is the diversion of sales from a disfavored purchaser to a favored purchaser.  *Volvo*, 546 U.S. at 181.  The RPA "does not 'ban

37

all price differences charged to different purchasers of commodities of like grade and quality"; rather, the Act proscribes "price discrimination only to the extent that it threatens to injure competition."' *Id.* at 175 (internal citations omitted). "Secondary-line cases, of which this is one, involve price discrimination that injures competition among the discriminating seller's customers . . .; cases in this category typically refer to 'favored' and 'disfavored' purchasers." *Id.* at 176.

In *Volvo*, the Supreme Court granted review "to resolve the question of whether a manufacturer offering its dealers different wholesale prices may be held liable for price discrimination proscribed by Robinson-Patman, absent a showing that the manufacturer discriminated between dealers contemporaneously competing to resell to the same retail customer." *Id.* at 175. The Supreme Court concluded that alleged disfavored purchaser, Reeder, did not meet this standard, as Reeder failed to satisfy the third and fourth prongs required to prove a secondary-line claim: *i.e.*, "Reeder has not identified any differentially priced transaction in which it was both a 'purchaser' under the Act and 'in actual competition' with a favored purchaser for the same customer." *Id.,* at 177 ("We decline to permit an inference of

38

competitive injury from evidence of such a mix-and-match, manipulable quality.").

Critically, the Supreme Court concluded that Reeder and other Volvo dealers may have competed at the initial bidding stage, but that "competition is not affected by differential pricing." *Volvo*, 546 U.S. at 179. Moreover, competition at this stage "is based on a variety of factors, including the existence vel non of a relationship between the potential bidder and the customer." *Id.* ("Once a retail customer has chosen the particular dealers from which it will solicit bids, 'the relevant market becomes limited to the needs and demands of a particular end user, with only a handful of dealers competing for the ultimate sale.'") This is directly applicable to membership-based purchasers such as Costco and Sam's Club.

After the Ninth Circuit decided *U.S. Wholesale*, however, the district court essentially held that *Volvo* no longer controls the applicable law in RPA cases, particularly as it relates to the actual competition element—*U.S. Wholesale* does. (5-ER-1124 ["Plaintiffs contend that *U.S. Wholesale* is on point and, therefore, *Volvo*'s framework for determining whether two customers are in competition is

39

inapplicable. Based on the factual and legal similarities between *U.S. Wholesale* and this action, the Court agrees."].)  As one judge of this Court has recently pointed out, the Court "should heed the caution against 'reading judicial opinions like statutes.'" *Stein v. Kaiser Found. Health Plan, Inc.*, __ F.4th ___, 2024 WL 4271950, *8 (9th Cir. 2024) (Forrest, J., concurring) (quoting *Loper Bright Enters. v. Raimondo*, — U.S. —, 144 S. Ct. 2244, 2281, 219 L.Ed.2d 832 (2024) (Gorsuch, J., concurring)). Prestige contends that—based on the evidence presented at trial here—club stores such as Costco and Sam's Club are directly analogous to the retained dealer considered in *Volvo*, not the framework set forth in *U.S. Wholesale.*

### B. *Volvo* is Directly Analogous to the Club Member Store Paradigm.

In its order denying Plaintiffs' motion, the district court merely stated that "many" of the facts introduced at trial "were similar to those in *U.S. Wholesale* as it also involved Costco as a favored buyer;" and "the differences between Plaintiffs and the Favored Purchasers that Defendants highlight are exactly the 'operational differences' that the Ninth Circuit ignored in *U.S. Wholesale*."  (1-ER-0053.)

40

The district court's conclusion ignores a key difference between the evidence and argument advanced **at trial in this case**, which was not raised or addressed by this Court in *U.S. Wholesale*: *i.e.*, that— unlike Plaintiffs' customers—the members of Costco and Sam's Club pay those purchasers a membership fee to go out and secure the best price for the goods the members are interested in purchasing.

In other words, the members engage in a collective bargaining power through payment of their membership fees, which also subsidize the club member stores such as Costco and Sam's Club to secure their members a unique price on products that is not replicable by non-member fee stores.

At trial, Prestige presented significant evidence that Costco and Sam's Club act like unique buyers and therefore do not fit within the "typical chainstore-paradigm" as contemplated in *U.S. Wholesale*. This evidence included the testimony of Plaintiffs **and their purported "lost" customers**, which established that people become members of Costco and Sam's Club to use the collective bargaining power subsidized by their membership fees they paid to procure the lowest price on the goods they want to buy. (*See e.g.*, 10-ER-2516-2517, 2571-2572, 2666;

11-ER-2697, 2741-2742, 2752-2753, 2799-2800; 12-ER-2992-93.) The evidence also showed that Sam's Club acts like a broker for Prestige in assisting with distribution of large amounts of the Clear Eyes 0.2 oz Pocket Pal. (11-ER-2794-95 [Clear Eyes is sold to Sam's Club once a quarter through a truckload program if there is supply to support the sale].)

The collective bargaining power created and used by club member stores such as Costco and Sam's Club is much more akin to the model considered by the Supreme Court in *Volvo*, where a retail buyer would engage a dealer to go out and get that buyer the best price on the vehicle from the manufacturer. *See Volvo*, 546 U.S. at 1164. Based on this process, the Supreme Court correctly concluded that the plaintiff dealer could not establish the necessary element of direct competition. *Id.* at 1166 ("Because the purchase-to-purchase and offer-to-purchase comparisons fail to show that Volvo sold at a lower price to Reeder's 'competitors,' those comparisons do not support an inference of competitive injury.")

The analogous bargaining power based on club membership was not advanced in the trial of *U.S. Wholesale*, much less raised and

42

considered by the Ninth Circuit in reaching its decision. Indeed, it is clear from the dissent by Justice Miller in that decision, who discussed at length why *Volvo* controls, that no such evidence or argument was present on appeal. *See U.S. Wholesale*, 89 F.4th at 1151-1154. Rather, in addressing the claim that Costco falls within the "typical chainstore paradigm," both the majority and dissent focused almost exclusively on the evidence or argument of "operational differences" between Costco and the plaintiffs (*e.g.*, online sales, set prices, sales to end-consumers, credit and inventory differences). *U.S. Wholesale,* at 1151-1152. And indeed, the district court incorrectly focused only on this same question of "operational differences" in addressing Prestige's motion for new trial. (1-ER-0053 ["[M]any of these facts were similar to those in *U.S. Wholesale* as it also involved Costco as a favored buyer. Additionally, the differences between Plaintiffs and the Favored Purchasers that Prestige highlights are exactly the "operational differences" that the Ninth Circuit ignored in *U.S. Wholesale*."] (internal citations omitted).)

Thus, Prestige respectfully contends that the "typical chainstore-paradigm" characterization in *U.S. Wholesale* is inapplicable based on the evidence and argument advanced ***in this case***, and the district

43

court erred in relying on the dicta in *U.S. Wholesale* to preclude application of *Volvo* and instructing the jury accordingly.

## III. The District Court Erred in Instructing the Jury That the Value of the Instant Redeemable Coupons Must Count Toward Net Price as a Matter of Law.

The district court erred in holding that the Costco Instant Redeemable Coupons—the value of which were *fully* passed on to and redeemed by Costco's member—were to be included in the Section 2(a) analysis of determining the net price. This error started in the denial of Prestige's Motion for Summary Judgment and persisted throughout the case, including the rulings on motions in limine and jury instructions. The impact was monumental, because including the value of the coupons into net price meant that Plaintiffs *quadrupled* their alleged damages from around $350,000 to over $1.4 million. (7-ER-1611, Table 4.)

The coupons at issue are periodic manufacturer rebates (offered through Costco's "Business Savings Events" two to four times a year for about a four-week period), whereby Costco's members received the agreed-to manufacturer rebate (usually around $3.00 per 12-pack of Clear Eyes) at the register at the time of purchase. (11-ER-2761, 2820-

44

2821 and 15-ER-3824.)  Costco's members could only buy Clear Eyes through Costco's Business Centers or its Ecommerce site, and there was a limit on the total number 12-packs that by any member could purchase during the promotional event.  (11-ER-2820-22 and 15-ER-3824.)  Thus, the monetary value of the rebate went to the Costco customer, not Costco itself.

The parties dispute whether the value of these coupons should be included in the net price when comparing the price differential between the "favored purchasers" of Costco and the "disfavored purchasers" of Plaintiff wholesalers.  If the coupon value is included in the calculation of net price, there is a price difference of 16.8%, whereas if it is excluded, the difference is only 2.4%. (7-ER-1602 at Table 2.)

At the summary judgment stage, the district court held "that the rebates must count toward Costco's net price as a matter of law."  (1-ER-0084.)  This meant that "rebates must be *included* in damages calculations for RPA cases, and therefore in [defense expert] Dr. Meitzen's opinions, as a matter of law."  (1-ER-0078.)   The district court extended this decision by granting Plaintiffs' Motion in Limine No. 3, and thereby excluded "evidence or argument that the rebates did not

45

affect the net price paid by [Costco] [and] that they are not discounts, consistent with the MSJ Order." (5-ER-1145.) Finally, the district court infused this ruling into the jury instructions regarding the elements of the RPA, when the district court, over Prestige's objections, refused to include two elements listed in the ABA Model instruction based on the "ruling on the summary judgment motions and, further, in ruling on the motions in limine." (14-ER-3532-33.)

The district court based its holding that rebates must be included in damages calculations on a misapplication of *Fred Meyer, Inc. v. F.T.C.*, 359 F.2d 351 (9th Cir. 1966) and two district court decisions that also misapplied *Fred Meyer.* (*See* 1-ER-0078.)

It is not unlawful price discrimination under the RPA for Prestige to distribute consumer coupons that are presented by consumers to retailers to receive price reductions. *See Indian Coffee Corp. v. Procter & Gamble Co.,* 482 F. Supp. 1104 (W.D. Pa. 1980). In *Indian Coffee,* the court addressed "[w]hether a common marketing device known as a 'consumer coupon' is an element of 'price' under s 2(a) of Robinson-Patman." *Id.* at 1105. The "consumer coupon" was described as an ad offering a certain value off the good that the consumer presents at the

46

checkout line. *Id.* at 1106. "The retailer then returns the coupon to the manufacturer and is reimbursed for the reduction he has given the consumer." *Id.* That is precisely what is occurring in this case, albeit with digital scan downs as opposed to physical paper coupons.

The court in *Indian Coffee* "noted that it is the consumer who receives the reduced price and the manufacturer, not the retailer, who underwrites that reduction." *Id.* The court ultimately granted the defendants' motion for partial summary judgment, holding "that the consumer coupons as utilized by the defendants in this case were not such an element of 'price'" *Id.* Notably, in *Indian Coffee,* the consumer coupons at issue "reduced the price of coffee solely to the ultimate Consumer, and not to Folger's customers, who under § 2(a) are the retailers, since those retailers received absolutely no price concession and *served merely as redemption agents* for Folger." *Id.* at 1109 (emphasis added). The court reasoned that "[t]here were simply no price reductions to retailers who might thereafter choose between increasing their own profit margin or voluntarily passing along the savings to consumers" and that "[o]n the contrary, the retailer received nothing from Folger until that retailer had first made a refund to a coupon-

47

bearing consumer." *Id.* As a result, "[t]he retailer's margin of profit remained the same regardless of whether the featured product was purchased with or without a coupon" such that "the consumer coupon promotion was a transaction between Folger and the consuming public, not Folger and its retail customers." *Id.* at 1109-10.

So too here. Prestige, like Folgers in *Indian Coffee*, offered rebates to Costco's members, *i.e.*, their consumers. Costco could not choose to lower prices without passing those savings on to the consumer and instead acted as a redemption agent for Prestige.

In contrast, in *Fred Meyer*, unlike the facts in this case, there was no indication that the *full promotional value* of goods at issue were passed on to the supermarket's customers. The defendant in *Fred Meyer* was a chain of supermarkets that was alleged to have received discriminatory promotional allowances from four suppliers. 359 F.2d at 356-57. Two of the suppliers provided a "buy two, get one free" offer, whereby the defendant Fred Meyer received a free can for every two it sold, reducing net price. *Id.* at 359, 362. But there was no mention of Fred Meyer passing on the full value of that promotion to its customers. The other two suppliers reduced the price of products to Fred Meyer

48

based on the volume of purchases. *Id.* at 357, 359. But again, there was no mention of Fred Meyer passing on the full value of those discounts to its customers.

Here, the district court adopted the reasoning of two other district courts within the Ninth Circuit as persuasive authority that the Costco rebates must be included in net price despite similar arguments that the rebates were fully passed through to customers. (1-ER-0078, citing to *ABC Distributing, Inc. v. Living Essentials LLC*, No. 15-CV-02064-NC, 2017 WL 3838443 (N.D. Cal. Sept. 1, 2017) and *U.S. Wholesale Outlet & Distribution, Inc. et al. v. Living Essentials, LLC, et. al.*, MSJ Order at 9.) Those two cases, in turn, relied on *Fred Meyer,* and concluded that "*[m]ost or all* of the value of the coupon books in *Fred Meyer* were also passed through to the favored purchaser's customers, but that did not free them of the RPA's reach." *ABC Distributing, Inc.,* 2017 WL 3838443 at *11. But those cases got it wrong. "Most" is not "all," and the proposed application of *Fred Meyer* is contrary to other better-reasoned RPA cases such as *Indian Coffee*. This blind application of *Fred Meyer* to different facts was erroneous. "Judicial opinions are supposed to be different than legislation because we

49

'render a judgment based only on the factual record and legal arguments the parties at hand have chosen to develop.'" *Stein*, 2024 WL 4271950, *8 (Forrest, J., concurring) (quoting *Loper Bright*, 144 S. Ct. at 2281 (Gorsuch, J., concurring)).

Here, the district court erred as a matter of law in holding that the rebates at issue, which acted as consumer coupons, should be included in net price for purposes of a Section 2(a) analysis and therefore unjustly prejudiced Prestige's defense of this case. The district court indicated at summary judgment that Plaintiffs did not meet their burden of showing competitive injury *but for* the inclusion of rebates counting towards net price. (1-ER-0084.) If rebates properly had not counted towards net price, Prestige would have prevailed on summary judgment because the Plaintiffs failed to show competitive injury.

Even assuming Prestige's summary judgment was still otherwise denied, if the rebates had not counted towards net price Prestige would have been able to present evidence and argument at trial that rebates are not discounts because they are passed through to the customers. But that was precluded by the Court's ruling on Motion in Limine No. 3

50

for the same erroneous reason.  (5-ER-1144 ["Plaintiffs rely on the MSJ Order where the Court concluded that the rebates offered to Favored Purchasers must count towards their net price and to Plaintiffs' damages calculation. ….For the reasons already discussed at length in the MSJ Order, the Court agrees with Plaintiffs' position."].)

Finally, the error was magnified in jury instructions.  Prestige's proposed alternative jury instruction regarding "net prices" explains to the jury that a minimal difference in net price is not actionable and that differences in price based on differences available to customers in different sales channels do not alter the net price.  (5-ER-1171-72.)  The district court not only refused to include that instruction, but went a step further by excluding the entire element of "price discrimination" from the jury's decision via Jury Instruction No. 17 because "no rational jury could find that there weren't differences in prices, *given that the net price is what is meant to be used*."  (14-ER-3532, emphasis added.)

This error was prejudicial because during deliberations, the jury asked a question about Instruction No. 17, clearly confused on how to interpret the listed elements as described.  (14-ER-3748.)  In reflection, the district court noted, "You know, maybe the jury instructions should

51

be revised where there would be this long list of elements of saying you have to find actual competition, you have to find competitive injury, you have to find that it's not a functional discount." (14-ER-3750.) Prestige noted that its "initial verdict form did have each of these questions spelled out for each plaintiff for exactly this purpose." (14-ER-3752.) Refusing to give the instructions regarding net prices and the element of price discrimination ended up confusing the jury and impacting their decision.

Ultimately, this error in jury instructions was a misstatement of law that unduly prejudiced Prestige's defense and should be reversed.

## IV. The District Court's Errors Justify Vacating the Verdict on Plaintiffs' UPA Claims.

As noted by the district court, the UPA codifies a similar policy to the RPA, and "the cases and principles arising under one often are persuasive on similar issues affecting the other." *Packaging Sys., Inc. v. PRC–Desoto Int'l, Inc.*, 268 F. Supp. 3d 1071, 1088-89 (C.D. Cal. 2017) (citing *G.H.I.I. v. MTS, Inc.*, 147 Cal. App. 3d 256, 271 (1983); *Diesel Elec. Sales & Serv., Inc. v. Marco Marine San Diego, Inc.*, 16 Cal. App. 4th 202, 212 (1993)).

52

Courts have also held the "injury to a competitor" element of Section 17045 mirrors the "competitive injury" and "antitrust injury" elements of the RPA. *See Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1043 (N.D. Cal. 2001); *see also* CACI 3320 (requiring plaintiff to establish that it was actually harmed and that defendant's conduct was a substantial factor in causing that harm). In *American Booksellers*, the court held that because plaintiffs could not show they suffered actual injury for purposes of the RPA, the UPA claims likewise failed. 135 F. Supp. 2d at 1043.

As set forth above, the district court erred in failing to instruct the jury that they must find substantial harm, and that error was not harmless—given the nominal damages awarded to Plaintiffs. This error is directly applicable here as well, as it hopelessly tainted the jury's findings on Plaintiffs' derivative UPA claim and the district court's award of injunctive relief under the UPA and the UCL. *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111 ("In determining whether error has been committed in giving or not giving jury instructions, we must consider the instructions as a whole …").

Accordingly, this Court should vacate the jury's findings and remand this action for a new trial on the state law claim as well.

## V. Plaintiffs' Permanent Injunction Should be Reversed.

The Court should vacate the permanent injunction entered by the district court because the verdict cannot stand for the reasons discussed above. But even if the verdict survives, the district court abused its discretion in entering the injunction because Plaintiffs failed to establish that they are likely to suffer an irreparable injury. *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

*First*, the majority of Plaintiffs stopped purchasing Clear Eyes from Prestige years before they sought an injunction. For instance:

- L.A. International stopped purchasing Clear Eyes from Prestige in 2018 (12-ER-3096), and stopped selling the product entirely by 2021 (12-ER-3098). (*See also* 15-ER-3821.)

- Border and U.S. Wholesale stopped purchasing the product from Prestige in 2018 as well. (12-ER-3052, -81, -3114.)

- LA Top and Value Distributor last purchased from Prestige in 2019. (12-ER-3080, -3114-15.) (*See also* 15-ER-3822.)

According to Plaintiffs' own expert, Plaintiffs suffer no damage if they do not buy Clear Eyes from Prestige. (12-ER-3035-36, -99-100; 3130-31.) Not surprisingly, Plaintiffs did not contend or seek damages for

any alleged discriminatory pricing in 2023, further showing that there is no ongoing or future likelihood of irreparable injury justifying the need for an injunction. (*See e.g.*, 15-ER-3817; 15-ER-3818-19; 12-ER-3105-06, -80-81.)

*Second*, even if Plaintiffs were still buying Clear Eyes from Prestige, the undisputed evidence showed that changes in Prestige's pricing structure have eliminated the alleged discriminatory pricing differences. Over the last year, Prestige has faced severe challenges in obtaining necessary stock of Clear Eyes from its suppliers, as a result of "(1) increased demand on the limited number of ophthalmic manufacturing suppliers who can meet Prestige's quality requirements for Clear Eyes; (2) delays caused by end-of-year production line maintenance; and (3) loss of in-stock product resulting from a labeling error on a large production run." (5-ER-0989.) Additionally, Prestige's ability to stock and sell Clear Eyes was impacted by "increased scrutiny by the Federal Drug Administration for all products in the eye care category." (*Id.*) As a result, Prestige was unable to fill any order for Clear Eyes until at least May 17, 2024. (*Id.*)

In response to this supply shortage, Prestige instituted major changes in its pricing structure. Prestige opted out of participating in Costco's BSE promotional program, starting on February 9, 2024. (5-ER-0987.) Next, Prestige also eliminated the 5% discount off list price offered to Costco on Clear Eyes. (5-ER-0987-88.) The only discount that would be available to Costco was a 3.95% discount off list price, as payment to continue participating in Costco's DOW program (see discussion below). On February 12, 2024, Prestige gave notice to the brokers selling to Plaintiffs and other wholesalers that it was launching a promotional program through which qualifying purchasers could receive a 4% discount on purchases of Clear Eyes, starting on April 1, 2024 (the first quarter of Prestige's fiscal year). (5-ER-0987-88.) Accordingly, Prestige's undisputed evidence demonstrated that—if Plaintiffs resumed purchasing from Prestige—they could also qualify for the same discount available to Costco, the alleged favored purchaser.

*Third*, there is no evidence that the alleged price discrimination is "likely to recur." *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985). The undisputed evidence showed that most of Plaintiffs no longer buy Clear Eyes from Prestige, and that Prestige has completely

56

revamped its pricing structure in response to changing market conditions. Given that record, the district court was required to determine the likelihood that Prestige would subsequently change its pricing structure back to a format that could conceivably harm Plaintiffs before entering an injunction. *FTC v. Evans Prods. Co.*, 775 F.2d at 1087. ("We therefore consider whether [defendant's] alleged violations have completely ceased; if they have, we consider whether they are likely to recur."); *see also Enrico's Inc. v. Rice*, 730 F.2d 125, 1253 (9th Cir. 1984) ("Past wrongs are not enough for the grant of an injunction."); *U.S. v. W. T. Grant Co.*, 345 U.S. 629, 633 (1953) ("The case may nevertheless be moot if the defendant can demonstrate that 'there is no reasonable expectation that the wrong will be repeated.'"); *DL v. District of Columbia*, 187 F.Supp.3d 1, 10 (May 18, 2016) ("[W]hether or not defendants have met their burden is a factual inquiry, and courts have found that under certain circumstances, a broad change in policy or a period of sustained compliance may go a long way to assist the defendant in meeting its heavy burden."). The district court's grant of an injunction despite evidence of changes that were "irrefutably demonstrated and total'" was an abuse of discretion.

57

*Polo Fashions, Inc. v. Dick Bruhn, Inc.*, 793 F.2d 1132, 1135 (9th Cir. 1986).

Plaintiffs' only challenge to Prestige's evidence of its pricing changes is their assertion that they would not be aware of any future changes in Prestige's pricing structure because these prices are kept "secret." (5-ER-0946.) This claim ignores that Plaintiffs—many of whom are Costco members themselves—are fully aware of the programs and discounts available to Costco's members. (9-ER-2162-63, 9-ER-2359; 10-ER-2571-72; 11-ER-2741; 12-ER-2991-92.) Accordingly, any assertion that Plaintiffs would not be immediately aware of subsequent changes in Costco's pricing on Clear Eyes is, on its face, not credible. *See* 16 C.F.R. § 240.10(b)(6) ("The following is a non-exhaustive list of acceptable methods of notification:… If the competing customers belong to an identifiable group on a specific mailing list, by providing relevant information of promotional offers to customers on that list."). And, as demonstrated by the jury's verdict and award of damages, Plaintiffs would have immediate recourse to challenge such changes through future litigation.

The evidence established that Prestige had completely changed its pricing structure as a result of ongoing external challenges, and there was no threat of continuing or future anticompetitive harm. Nothing in Plaintiffs' response or the district court's findings undercut that evidence, much less establish that some future wrong could occur. (1-ER-0060.) Accordingly, the order granting the injunction was in error, and justice requires that this Court vacate the district court's judgment. In the alternative, this Court should remand this matter for an evidentiary hearing, as was requested by Prestige, but rejected by the district court.

## VI. The Award of Attorneys' Fees Vastly Larger than the Relief Obtained Was Unreasonable and an Abuse of Discretion.

If this Court grants Prestige relief on any of the issues above, then the Plaintiffs' attorneys' fees award will be vacated, and Plaintiffs' appeal of that award would have to be dismissed. But even if this Court affirms on the merits, it should still vacate the fee award given that the jury awarded less than $30,000 to most of the Plaintiffs to compensate them for a nine-year damages period. (5-ER-1025.) Even with trebling, the total award for the Plaintiffs' and the real-world effects of the judgment do not justify the unreasonably high fee award. Allowing this

59

award to stand in comparison to such limited success with no real evidence of substantial harm to competition would lead to an absurd result. *See, e.g.*, 15 U.S.C. §§ 15(a), 26(a) (Attorneys' fees are available "in any action . . . in which the plaintiff *substantially* prevails, . . .") (emphasis added).

Notably, "the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees .... [W]here the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." *Yonemoto v. Dep't of Veterans Affs.*, 549 Fed. Appx. 627, 630  (9th Cir. 2023) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983)); *see also Envtl. Prot. Info. Ctr. v. California Dep't of Forestry & Fire Prot.*, 190 Cal. App. 4th 217, 238 (2010), *as modified on denial of reh'g* (Dec. 15, 2010) ("California law, like federal law, considers the extent of a plaintiff's success a crucial factor in determining the amount of a prevailing party's attorney fees.").

Here, the district court failed to account for Plaintiffs' limited degree of success when determining their fee award.  The district court dismissed Prestige's arguments on this issue only by focusing on the

fact that Prestige's Rule 68 offer of $450,000 was technically less than the total amount awarded by the jury (before trebling). (1-ER-0014.) But even if Rule 68 itself does not reduce the fees to be awarded, the fact that the offer of judgment amount was so close to the total awarded *four years later* underscores that the ultimate monetary award was minimal compared to what was sought. (1-ER-0002 (noting that Plaintiffs sought $7,651,766.80 in attorneys' fees).) Plaintiffs were awarded fractions of their claimed damages, and Border took nothing, so they likely would have been better off accepting the offer of judgment. (1-ER-0020-22.) The jury verdict in this case indicated that there was no substantial harm to competition under the RPA or injury in the form that the Clayton Act was designed to prevent. *See, e.g.*, 15 U.S.C. § 13(a), § 15(a); 12-ER-3010 (Javid Sahrifi of Manhattan Wholesale) ( "Q. So whether you got the product cheaper or not, you kept the price to them the same? A. Yes. Looks like it."). Indeed, rather than deliver fair pricing to their clients, the price of Clear Eyes has actually *increased* for Plaintiffs *and* their customers post-judgment given that Prestige changed its pricing for Clear Eyes to avoid facing

potential liability to other customers pending appeal. (2-ER-0094-96, 5-ER-0988, -1002.)

This failure to account for the limited success warrants reversal of the fee award. In *McCown v. City of Fontana*, 565 F.3d 1097 (9th Cir. 2009), this Court reversed a fee award that failed to take into account the plaintiff's limited success. *Id.* at 1104-05. Noting that the plaintiff received roughly 25% of the amount he originally demanded and less than 10% of the amount requested during settlement, and no other relief, the Court held that because the plaintiff's "victory clearly fell far short of his goal," it was "unreasonable to grant his attorneys more than a comparable portion of the fees and costs they requested." *Id.*

Finally, the attorneys' fees award was unjustified for two additional reasons. The hourly rate awarded ($975 – $1,070/per hour)—even though reduced from Plaintiffs' outrageous starting point – were not reasonable under the controlling standard, especially in light of the outcome for Plaintiffs. *See, e.g.*, *Hiken v. Dep't of Defense*, 836 F.3d 1037, 1044 (9th Cir. 2016) (citation omitted). Second, as recognized by the district court (1-ER-0011), Plaintiffs' counsel overbilled the case by

using partners to perform associate-level work. *See, e.g.*, *In re Fine Paper Antitrust Litig.*, 751 F.2d 562, 593 (3d Cir. 1984).

The fee award here is an unjustified windfall that bears no relationship to the degree of actual success at trial and should be reversed and reduced accordingly.

## CONCLUSION

For the foregoing reasons, this Court should remand for a new trial and reverse the award of fees. If the Court does not remand for a new trial in Prestige's favor, this Court should still vacate the fee award and remand with instructions to the district court to determine a reasonable fee in light of the limited success on Plaintiffs' claims.

Respectfully submitted,

October 9, 2024

*/s/ Michael L. Fox*
Michael L. Fox
C. Sean Patterson
Christine Cusick Ross
DUANE MORRIS LLP
One Market Plaza, Suite 2200
San Francisco, CA 94105

Robert M. Palumbos
William Shotzbarger
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103

*Counsel for Defendants-*
*Appellants Prestige Consumer*
*Healthcare Inc. (fka Prestige*
*Brands Holdings, Inc.) and*
*Medtech Products, Inc.*

64

## CERTIFICATES OF COMPLIANCE

1.     I certify that this document complies with the word limit of Federal Rule of Appellate Procedure 32 because, excluding the parts of the document exempted by Rule 32(f), this document contains 11,970 words.

2.     I certify that this filing complies with the formatting requirements of Federal Rule of Appellate Procedure 32(c)(2) and Circuit Rule 32(b) because this brief has been prepared in 14-point Century Schoolbook font.

October 9, 2024

*/s/ Michael L. Fox*
Michael L. Fox
C. Sean Patterson
Christine Cusick Ross
DUANE MORRIS LLP
One Market Plaza, Suite 2200
San Francisco, CA 94105

## STATEMENT OF RELATED CASES

Other than the three appeals that have been consolidated in this case, counsel is unaware of any other related cases pending in the Ninth Circuit.

October 9, 2024

*/s/ Michael L. Fox*
Michael L. Fox
C. Sean Patterson
Christine Cusick Ross
DUANE MORRIS LLP
One Market Plaza, Suite 2200
San Francisco, CA 94105