Nos. 24-3776, 24-5009, 24-5227

# In the United States Court of Appeals

## for the Ninth Circuit

L.A. INTERNATIONAL CORP., ET. AL.,

*Plaintiff-Appellees,*

v.

PRESTIGE BRANDS HOLDINGS, INC., MEDTECH PRODUCTS, INC.,

*Defendant-Appellants.*

On Appeal from the United States District Court
for the Central District of California
No. 2:18-cv-06809-MWF-MRW
Hon. Michael W. Fitzgerald

## PLAINTIFF-APPELLEE WHOLESALERS' COMBINED ANSWERING BRIEF AND OPENING BRIEF ON CROSS-APPEAL

Mark Poe
Randolph Gaw
GAW | POE LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
415.766.7451 (tel)
415.737.0642 (fax)

*Attorney for Plaintiffs - Appellees*

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ...................................................i

TABLE OF AUTHORITIES ...............................................iv

PLAINTIFF-APPELLEE WHOLESALERS' COMBINED
ANSWERING BRIEF AND OPENING BRIEF ON CROSS-
APPEAL ................................................................. 1

   INTRODUCTION .................................................... 1

   JURISDICTIONAL STATEMENT ................................. 3

   ISSUES PRESENTED ............................................... 3

   STATEMENT OF THE CASE ...................................... 4

      A.  Legal Framework ........................................ 4

      B.  The Plaintiff-Wholesalers and the Favored Chains. ................6

      C.  Prestige's Price Discrimination Against Wholesalers. ..............7

      D.  The Verdict and Permanent Injunction. ................... 10

      E.  Facts Pertinent to Wholesalers' Cross-Appeal of the
         Fee Award. ................................................ 10

   SUMMARY OF THE ARGUMENT ................................. 12

      A.  Prestige's Appeal ........................................ 12

      B.  Wholesalers' Cross-Appeal ............................... 14

   ARGUMENT ........................................................ 16

   I.  NONE OF PRESTIGE'S COMPLAINTS ABOUT THE
      JURY INSTRUCTIONS IS VALID. ........................... 16

      A.  Standard of Review ..................................... 16

      B.  The District Court's Formulation of the "Functional
         Discount" Instruction was Not an Abuse of Discretion. ..........16

         1.  Nor was there error in the district court's oral
            "supplemental instruction." ................................ 18

         2.  Nor was there error in the verdict form. .............................. 19

         3.  Any error was harmless. .................................... 20

C. The District Court Followed Supreme Court Precedent and the ABA's Model Instructions in Declining to Include the Word "Substantial" in the Instructions. ..................................................... 22

   1. Prestige's claim to the "weight of authority" is meaningless. .................................................... 25

   2. Even if omitting the word "substantial" were error, it was harmless. ................................................ 27

D. The District Court's Instruction on Competition was Required By *U.S. Wholesale*. .................................... 29

II. THE DISTRICT COURT CORRECTLY COUNTED THE $3.00/UNIT IRC REBATE TOWARD THE "NET PRICE" PAID BY COSTCO. ...................................... 33

A. Standard of Review ...................................... 33

B. Rebates Count Toward Net Price As a Matter of Law. ........... 34

III. PRESTIGE DOES NOT CLAIM ANY ERROR IN THE JUDGMENT ON WHOLESALERS' UPA CLAIM. ................... 39

IV. PRESTIGE DOES NOT CHALLENGE THE SECTION 2(D) JUDGMENT. ............................................... 40

V. THE COURT DID NOT ABUSE ITS DISCRETION IN ISSUING A PERMANENT INJUNCTION TO PROHIBIT FUTURE VIOLATIONS. ......................... 41

A. Standard of Review ...................................... 41

B. Prestige's Antitrust Violations Warranted Injunctive Relief. 41

VI. NO PRECEDENT REQUIRES ANTITRUST FEE AWARDS TO BE PROPORTIONAL TO DAMAGES. ................ 46

VII. THE DISTRICT COURT ERRED BY NOT AWARDING THE HOURLY RATES THAT PREVAIL IN THE CENTRAL DISTRICT FOR ANTITRUST LITIGATION. ............................................. 49

A. The Basis for Counsel's Requested Rates. ................... 50

B. The District Court's Fees Order .......................... 53

C. It Was Reversible Error Not to Identify the Prevailing Rate in the Central District for Antitrust Work. ................... 55

D.  The Court Erred by Reducing the Requested Rates Based on the Size of the Wholesalers' Law Firm, and the Size of the Wholesalers Themselves. .................................. 57

E.  The District Court Erred by Relying on Hourly Rates for "General Litigation," and by "Holding the Line" at Historic Rates. .......................................................... 60

VIII.  THE DISTRICT COURT MISAPPLIED ALL FOUR FACTORS FOR EVALUATING THE PROPRIETY OF A FEE ENHANCEMENT UNDER CALIFORNIA LAW. .......... 62

A.  Standard of Review ..................................................... 62

B.  Fee Enhancements Under California Law ............................. 62

C.  The District Court Failed to Evaluate the Novelty and Difficulty of the Questions Involved, or Counsel's Skill in Presenting Them. ............................................. 64

D.  This Was a Contingency Case, and Contingent Risk Is Not Subsumed Within the Lodestar Under California Law. ...................................................................... 66

E.  Attorneys Need Not Forgo Hourly Work, or Work in Different Practice Areas, to Satisfy the "Precluded Other Employment" Factor. ...................................... 68

CONCLUSION ........................................................................ 70

FORM 8. CERTIFICATE OF COMPLIANCE FOR BRIEFS ............... 71

CERTIFICATE OF SERVICE .................................................... 73

# Table of Authorities

Page

**Cases:**

*ABC Distrib., Inc. v. Living Essentials LLC*
  2017 WL 3838443 (N.D. Cal. Sept. 1, 2017) ................................... 38

*AdTrader, Inc. v. Google LLC*
  2020 WL 1921774 (N.D. Cal. Mar. 24, 2020) ................................. 51

*Amaral v. Cintas Corp. No. 2*
  163 Cal. App. 4th 1157 (2008) ......................................... 68

*Blum v. Stenson*
  465 U.S. 886 (1984) ................................................... 49, 57

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*
  799 F.3d 202 (2d Cir. 2015) ....................................... 26, 29

*Cates v. Chiang*
  213 Cal. App. 4th 791 (2013) ........................................ 62

*Chalmers v. City of Los Angeles*
  796 F.2d 1205 (9th Cir. 1986) ....................................... 64

*Charlebois v. Angels Baseball LP*
  993 F. Supp. 2d 1109 (C.D. Cal. 2012) ................................. 57, 58

*Chaudhry v. City of Los Angeles*
  751 F.3d 1096 (9th Cir. 2014) ....................................... 62, 67

*Christensen v. Stevedoring Servs. of Am.*
  557 F.3d 1049 (9th Cir. 2009) ...................................... 49

*City of Burlington v. Dague*
  505 U.S. 557 (1992) .................................................. 67

*Costco Wholesale Corp. v. Hoen*
  538 F.3d 1128 (9th Cir. 2008) ...................................... 47, 48

*Coston v. Nangalama*
  13 F.4th 729 (9th Cir. 2021) ........................................ 20

*CSX Transp., Inc. v. Hensley*
  556 U.S. 838 (2009) ................................................. 17

*Dang v. Cross*
  422 F.3d 800 (9th Cir. 2005)  .......................................................... 58

*Desire, LLC v. Manna Textiles, Inc.*
  986 F.3d 1253 (9th Cir. 2021)  ....................................................... 34

*DL v. Dist. of Columbia*
  187 F. Supp. 3d 1 (2016)  ............................................................... 46

*E.E.O.C. v. Bruno's Rest.*
  13 F.3d 285 (9th Cir. 1993)  ........................................................... 62

*Epic Sys. Corp. v. Lewis*
  584 U.S. 497 (2018)  ...................................................................... 33

*Exxon Corp. v. Governor of Maryland*
  437 U.S. 117 (1978)  ........................................................................ 4

*Fierro v. Smith*
  39 F.4th 640 (9th Cir. 2022)  .......................................................... 27

*Ford Motor Co. v. U.S.*
  405 U.S. 562 (1972)  ...................................................................... 14

*Fred Meyer, Inc. v. FTC*
  359 F.2d 351 (9th Cir. 1966)  ............................................ 13, 36, 37

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC) Inc.*
  528 U.S. 167 (2000)  ...................................................................... 46

*FTC v. Affordable Media*
  179 F.3d 1228 (9th Cir. 1999)  ....................................................... 45

*FTC v. Evans Prods. Co.*
  775 F.2d 1084 (9th Cir. 1985)  ....................................................... 44

*FTC v. Morton Salt Co.*
  334 U.S. 37 (1948)  ........................................................................ 33

*FTC v. Sun Oil Co.*
  371 U.S. 505 (1963)  .................................................................. 4, 33

*Gonzalez v. City of Maywood*
  729 F.3d 1196 (9th Cir. 2013)  ................................... 56, 57, 58, 61, 64

*Gonzalez v. U.S. Immigr. & Customs Enf't*
  975 F.3d 788 (9th Cir. 2020)  ......................................................... 41

*Greene v. Dillingham Constr., N.A., Inc.*
  101 Cal. App. 4th 418 (2002)  ........................................................ 66

*Grey Fox, LLC v. Plains All-Am. Pipeline, L.P.*
  2024 WL 4267431 (C.D. Cal. Sept. 17, 2024)  ............................... 51

*Guebara v. Allstate Ins. Co.*
  237 F.3d 987 (9th Cir. 2001)  ...................................................... 12

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*
  136 F.3d 1354 (9th Cir. 1998)  .................................................... 48

*In re Lithium Ion Batteries Antitrust Litig.*
  2020 WL 7264559 (N.D. Cal. Dec. 10, 2020)  ............................... 60

*In re Outlaw Lab'y, LP Litig.*
  2023 WL 6522383 (S.D. Cal. Oct. 5, 2023)  ................................. 51

*Indian Coffee Corp. v. Procter & Gamble Co.*
  482 F. Supp. 1104 (W.D. Pa. 1980)  ........................................... 38

*Indian Coffee Corp. v. Procter & Gamble Co.*
  752 F.2d 891 (3d Cir. 1985)  ............................................ 13, 38, 39

*J. Truett Payne Co. v. Chrysler Motors Corp.*
  451 U.S. 557 (1981)  ......................................................... 5, 28, 36

*Ketchum v. Moses*
  24 Cal. 4th 1122 (2001)  ............................... 63, 66, 67, 68, 69

*Lipson v. Socony Vacuum Corp.*
  76 F.2d 213 (1st Cir. 1935)  ........................................................ 23

*McGrath v. Cnty. of Nevada*
  67 F.3d 248 (9th Cir. 1995)  ........................................................ 64

*Minor v. Christie's, Inc.*
  2011 WL 902235 (N.D. Cal. Jan. 29, 2011)  ................................. 57

*Moreno v. City of Sacramento*
  534 F.3d 1106 (9th Cir. 2008)  .............................. 2, 15, 50, 59, 61

*Muniz v. United Parcel Serv., Inc.*
  738 F.3d 214 (9th Cir. 2013)  .................................................... 63

*Murray v. Mayo Clinic*
  934 F.3d 1101 (9th Cir. 2019)  ................................................... 16

*Myles v. Cnty. of San Diego*
    2023 WL 6391481 (S.D. Cal. Sept. 29, 2023) .................................... 57

*Olympia Co., Inc. v. Celotex Corp.*
    597 F. Supp. 285 (E.D. La. 1984) .................................... 26

*Pellegrino v. Robert Half Int'l, Inc.*
    182 Cal. App. 4th 278 (2010) .......................................... 68

*Peraza v. Ford Motor Co.*
    2022 WL 3098062 (C.D. Cal. May 27, 2022) .................................... 66

*Precision Printing Co. v. Unisource Worldwide, Inc.*
    993 F. Supp. 338 (W.D. Pa. 1998) ......................................... 61

*Rebel Oil Co., Inc. v. Atl. Richfield Co.*
    51 F.3d 1421 (9th Cir. 1995) ................................... 22, 24

*Roberts v. City of Honolulu*
    938 F.3d 1020 (9th Cir. 2019) ....................... 14, 61, 64, 65

*Seachris v. Brady-Hamilton Stevedore Co.*
    994 F.3d 1066 (9th Cir. 2021) ............... 2, 49, 56, 59, 60, 61

*Sidney Morris & Co. v. Nat'l Ass'n of Stationers, Off. Outfitters & Mfr's*
    40 F.2d 620 (7th Cir. 1930) .......................................... 23

*Skidmore. v. Led Zeppelin*
    952 F.3d 1051 (9th Cir. 2020) ....................................... 40

*Smith v. CMTA-IAM Pension Tr.*
    746 F.2d 587 (9th Cir. 1984) ........................................ 62

*Spencer v. Peters*
    857 F.3d 789 (9th Cir. 2017) ........................................ 20

*Su v. Bowers*
    89 F.4th 1169 (9th Cir. 2024) ....................................... 65

*Texaco v. Hasbrouck*
    496 U.S. 543 (1990) ............................................ 18, 21

*Trendsettah v. Swisher*
    2017 WL 11477621 (C.D. Cal. Feb. 27, 2017) .................................... 52

*Trendsettah v. Swisher*
    2023 WL 8263365 (C.D. Cal. Nov. 17, 2023) ............... 11, 51, 55, 60

*Tri-Valley Packing Ass'n v. FTC*
   329 F.2d 694 (9th Cir. 1964)  ............................................................ 30

*U.S. v. Collazo*
   984 F.3d 1308 (9th Cir. 2021)  ......................................................... 22

*U.S. v. Real Prop. Located at 20832 Big Rock Drive, Malibu*
   51 F.3d 1402 (9th Cir. 1995)  ........................................................... 19

*U.S. Wholesale Outlet & Distrib., Inc. v. Living Essentials, LLC,*
   2021 WL 3418584 (C.D. Cal. Aug. 5, 2021)  ................................. 30

*U.S. Wholesale Outlet & Distribution, Inc. v. Innovation Ventures, LLC*
   89 F.4th 1126 (9th Cir. 2023)  .............. 1, 5, 13, 18, 19, 29, 30, 31, 32

*U.S. Wholesale Outlet & Distribution, Inc. v. Living Essentials, LLC*
   2019 WL 4452966 (C.D. Cal. Aug. 7, 2019)  ............................. 30, 37

*Van Camp Sons v. Am. Can Co.*
   278 U.S. 245 (1929)  ......................................................................... 23

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*
   546 U.S. 164 (2006)  ............................................................... 5, 25, 31

*Weeks v. Baker & McKenzie*
   63 Cal. App. 4th 1128 (1998)  ......................................................... 66

*Whitaker Cable Corp. v. Fed. Trade Com'n*
   239 F.2d 253 (7th Cir. 1957)  ......................................................... 26

**Statutes:**

15 U.S.C. § 13  ......................................................................... 4, 5, 25

15 U.S.C. § 15  ................................................................. 2, 14, 47, 48

15 U.S.C. § 26  ...................................................................... 2, 14, 47

28 U.S.C. § 1291  ................................................................................ 3

28 U.S.C. § 1331  ................................................................................ 3

28 U.S.C. § 1367  ................................................................................ 3

42 U.S.C. § 1988  .............................................................................. 47

Cal. Bus. & Prof. Code § 17045  .............................................. 6, 11, 65

Cal. Civ. Proc. Code § 1021.5 ................................................................ 47

**Other:**

14 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law
  § 2331c (4th ed. 2019) ................................................................ 27

38 Stat. 730 (1914) ................................................................ 22, 24

Antitrust Law, § 2331c (4th ed. 2019) ................................................. 27

CACI No. 3320 ................................................................ 39

H.R. Report No. 2287 (1936) ................................................................ 24

Ninth Cir. Model Civ. Jury Inst. § 14 (2017 ed) ................................................. 12

Richard Posner, Economic Analysis of Law 534 (4th ed. 1992) .......... 67

S. Rep. No. 1502 (1936) ................................................................ 24

**PLAINTIFF-APPELLEE WHOLESALERS' COMBINED
ANSWERING BRIEF AND OPENING BRIEF ON
CROSS-APPEAL**

## INTRODUCTION

None of the issues Defendants raise on appeal warrants a new trial, so the judgment below should be affirmed. To begin, there was no instructional error. With respect to the "functional discount" instruction, Defendants quibble only with the district court's *formulation* of that instruction, not its substance. Second, Defendants' desire to inject the word "substantial" into the elements instruction of Plaintiffs' Robinson-Patman Act ("RPA") claim is contrary to Supreme Court precedent and the ABA's 2016 model jury instructions. Third, Defendants' complaint about the "competition" instruction is foreclosed by *U.S. Wholesale Outlet & Distribution, Inc. v. Innovation Ventures, LLC*, which involved the same competitive market that is at issue in this case. 89 F.4th 1126 (9th Cir. 2023).

Next, Defendants argue that the $3.00/unit rebate they paid to Costco should not count toward the "net price" Costco paid for Clear Eyes. But their argument hinges entirely on a 1980 district court case from Pennsylvania that was explicitly overruled by the Third Circuit in 1985. Finally, Defendants' half-hearted argument against the fee award to

Wholesalers is based entirely on cases involving *discretionary* fee awards; they do not cite a single case involving the mandatory fee-shifting provisions that govern antitrust claims. 15 U.S.C. §§ 15, 26.

The district court *did* err in the fee award, but in the other direction. It determined the hourly rates for Wholesalers' counsel without ever making a finding as to the "prevailing rate" in the Central District for antitrust work by counsel of skill, experience, and reputation similar to that of Wholesalers' counsel. The court instead based counsel's rates on a then-two-year-old rate that counsel had been awarded in a *contract* case, adjusting that rate upward by just 2% "to account for the complexity of this action and inflation" over the intervening two years. 1-ER-9.

The district court expressly reasoned that limiting counsel's rate to the historic rates they had been awarded in contract disputes was necessary to avoid creating "a new benchmark for Plaintiffs' fee requests in the future." 1-ER-8. This despite controlling directives that: (1) "the adjudicator's function 'is not to 'hold the line' at a particular rate,'" *Seachris v. Brady-Hamilton Stevedore Co.*, 994 F.3d 1066, 1079 (9th Cir. 2021) *(Seachris)* (quoting *Moreno v. City of Sacramento*, 534 F.3d 1106, 1115 (9th Cir. 2008)), and (2) "[i]f the lodestar leads to an hourly rate that is higher than past practice, the court *must* award that rate." *Moreno*, at 1115 (emphasis added).

The judgment below should be affirmed, but the fees order should be vacated and remanded for further proceedings.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction under 28 U.S.C. § 1331 and § 1367. This Court has jurisdiction under 28 U.S.C. § 1291 over: (1) Defendants' appeal based on the May 28, 2024 judgment and Defendants' associated June 17 notice of appeal, 15-ER-3830, and (2) Wholesalers' cross-appeal based on the August 2, 2024 fees order and Wholesalers' associated August 8 notice of appeal. 15-ER-3828.

# ISSUES PRESENTED

Wholesalers' cross-appeal adds the following issues to those identified by Prestige:

1. Did the district court err by not awarding Wholesalers the prevailing market rate for antitrust litigation in the Central District, but instead awarding a lower rate based on: (1) the two-year old rates awarded to Wholesalers' counsel in a contract case, (2) the number of lawyers in counsel's firm, and (3) the court's concern that awarding counsel the true prevailing market rate for antitrust work would "create a new benchmark for Plaintiffs' fee requests in the future." 1-ER-8.

2. Did the district court err by misapplying the "*Ketchum* factors" that govern Wholesalers' request for a fee enhancement, stemming from their unprecedented success on their California state-law claim?

## STATEMENT OF THE CASE

This case concerns distortions to the competitive landscape of a significant sector of the economy that is rarely observed by the public: competition among the wholesalers that supply merchandise to independent corner and convenience stores. The case concerns "price discrimination" under the Robinson-Patman Act, 15 U.S.C. § 13, and California's "mini-RPA," section 17045 of the California Unfair Practices Act. Cal. Bus. & Prof. Code § 17045.

### A. Legal Framework

Because price discrimination cases are uncommon, it is necessary to set the table before jumping into the facts. In enacting the RPA, "Congress intended to assure, to the extent reasonably practicable, that businessmen at the same functional level would start on equal competitive footing so far as price is concerned." *FTC v. Sun Oil Co.*, 371 U.S. 505, 520 (1963). It was enacted out of the "perceived need to protect independent retail stores from 'chain stores,'" and thus evinces "a policy choice favoring the interest in equal treatment of all customers over the interest in allowing sellers freedom to make selective competitive decisions." *Exxon Corp. v. Governor of Maryland*, 437 U.S. 117, 132–33 & n.25 (1978).

In evaluating price discrimination claims under the RPA, the caselaw speaks of "favored" and "disfavored" customers of the "supplier" (typically the manufacturer). *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 176 (2006). Two provisions of the RPA were at issue in this case. First, Section 2(a)[1] prohibits suppliers from charging "discriminatory" prices to disfavored purchasers, where "'the effect of such discrimination may be … to injure, destroy, or prevent competition' to the advantage of a favored purchaser." *Id.* at 173, 176–77 (quoting 15 U.S.C. § 13(a)). The word "may" is important. The Supreme Court has consistently described the RPA as a "prophylactic statute," that "does not 'require that the discriminations must in fact have harmed competition.'" *J. Truett Payne Co. v. Chrysler Motors Corp.*, 451 U.S. 557, 562 (1981) (citations omitted).

Second, Wholesalers sought injunctive relief under section 2(d), which "makes it unlawful for a manufacturer" to make promotional payments to a favored purchaser "'unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products.'" *U.S. Wholesale*, 89 F.4th at 1134 (quoting 15 U.S.C. § 13(d)).

Here, nine family-owned Wholesalers alleged that Prestige Consumer Healthcare, Inc. and Medtech Products, Inc. (together "Prestige")

---

[1]  The caselaw typically refers to RPA provisions by reference to the "section" of the Clayton Act in which they appear.

5

harmed Wholesalers' ability to compete with Costco Wholesale Corporation and Sam's Club, by (1) charging Wholesalers illegally high prices compared to what Prestige charged those chains (in violation of section 2(a)), and (2) by making promotional payments to Costco that were never offered to Wholesalers (in violation of section 2(d)). The five California-based Wholesalers also brought a claim under section 17045 of the Unfair Practices Act ("UPA"), which is similar to section 2(a), with the additional requirement that the discrimination must have been "secret." Cal. Bus. & Prof. Code § 17045.

## B. The Plaintiff-Wholesalers and the Favored Chains.

Wholesalers are regional wholesalers who cater to a variety of businesses—convenience stores, gas stations, liquor stores, and other smaller wholesalers. 1-ER-69. Among the products they sell is Clear Eyes, which they purchase from Prestige. *Id.* Prestige also sells Clear Eyes to the Costco Business Center division of Costco Wholesale Corporation, and to the Sam's Club division of Walmart, Inc. Prestige Br. ("Br.") at 6. Like Wholesalers, the Costco Business Centers (hereafter, "Costco") focus on sales to small businesses, including convenience stores, gas stations, and liquor stores. *Id.*; 15-ER-3799. Sam's Club likewise sells Clear Eyes, and "focuse[s] on sales to small businesses." Br. 7.

## C. Prestige's Price Discrimination Against Wholesalers.

Prestige suggests that the only manner of price discrimination at issue in this case concerned its "promotional payments to Costco." Br. 7-8. That is not true. In addition to the discriminatory promotional payments, "Plaintiffs have always been charged a higher invoice price"—as the district court found at summary judgment. 1-ER-70. Prior to 2016, Prestige's list price to Wholesalers was $1.14/bottle (or $13.68 per 12-pack unit), SER-112 while its list price to Costco was just $1.08/bottle (or $12.96 per 12-pack). SER-120. Thereafter, the list price to Wholesalers was $14.76/12-pack unit, SER-112, while the list price to Costco was $14.04/12-pack unit. SER-120. Prestige admits this discrimination favoring Costco, describing it as "the 5% discount off list price offered to Costco." Br. 56.

Prestige's brief suggests that it was more "efficient" for Prestige to sell to Costco than to Wholesalers. Br. 7–9. This is untrue in two ways. Prestige's own documents show that (1) it cost Prestige $.07/bottle *more* to sell to Costco than to Wholesalers, SER-115; SER-83 (testimony of Prestige VP of Sales), and (2) its sales to Costco were $.12/bottle *less* profitable than its sales to Wholesalers. SER-115. Prestige's brief purports to quote one of its witness's description of the virtues of selling to Costco, writing: "Prestige enjoys a 'very significant' saving in labor costs." Br. 7. But the witness actually said "I would *assume* a very significant one,"

without reference to any analysis or numbers to support his "assumption." 11-ER-2812. And by the close of evidence, Prestige had presented no analysis or quantification of any kind to substantiate the (wholly assumed) labor cost savings. 1-ER-0002–15-ER-3882.

Beyond the 5% list-price discrimination, Prestige also gave Instant Rebate[2] Coupons ("IRCs") to Costco of $3.00 per 12-pack (equal to a further 23% discount on Costco's $12.96 list price). Br. 44. The IRCs functioned as follows: During several four-week "Business Savings Events" at Costco each year, customers who purchased a box of Clear Eyes would receive $3.00 off when the item was scanned at the register. Br. 44. Prestige then reimbursed Costco that $3.00. 13-ER-3299–300 (testimony of Prestige EVP of Sales). So after netting the rebate, Costco paid a net $9.96 per unit to Prestige, rather than its already-favored list price of $12.96 per unit. That net price enabled Costco to *sell* Clear Eyes at $11.99, while Wholesalers' *acquisition cost* remained $14.76. 9-ER-2229 (testimony of Prestige VP of Field Sales). In other words, Costco could sell to convenience stores, gas stations, and liquor stores at $11.99 (at a profit of $2.03/unit). On the other hand, Wholesalers' best possible price to those same customers was $14.77—assuming that they wanted to achieve even a $0.01 profit above their acquisition cost. Just as the law

---

[2]    Prestige's brief uses the phrase Instant "Redeemable" Coupon. Br. 8-10. But that formulation was nowhere used at trial, where IRCs were always called "Instant Rebate Coupons." 13-ER-2106–3454.

of demand would predict, Costco's sales of Clear Eyes during IRC months were ten-fold higher than they were during non-IRC months. SER-88–89 (testimony of Costco's witness).

The consequence to Costco's and Wholesalers' respective volume of Clear Eyes was predictable. In 2014–15 when the discrimination began, Wholesalers purchased nearly twice as much Clear Eyes from Prestige as *all* the Costco Business Centers combined. 15-ER-3820 (chart). But within seven years Costco's volume had skyrocketed, while Wholesalers' had plummeted. *Id.* Prestige's years-long discrimination against Wholesalers via the list price and the IRCs was the basis of Wholesalers' 2(a) claim for price discrimination.

Prestige's discrimination in favor of Costco and against Wholesalers took an additional form called the "DOW Allowance," calculated as 3.95% of Costco's acquisition price. Br. 8–9. The DOW Allowance was the basis of Wholesalers' section 2(d) claim. 4-ER-887–90. As Prestige explains, it paid this money to Costco for the "various advertising and promotional services" Costco performed. Br. 8. In fact, as Prestige's VP of Sales in charge of the Costco account testified, that 3.95% DOW Allowance *alone* was "a reasonable amount of compensation for the various functions that Costco performs for Prestige." 11-ER-2842. In other words, the evidence was that whatever "functions" Costco supposedly performed were fully

compensated by the 3.95% DOW Allowance, but on top of that it received an additional 5% list-price advantage and a further 23% cost advantage via the IRCs.

### D. The Verdict and Permanent Injunction.

The jury returned a verdict in favor of all Wholesalers, on both their 2(a) and UPA claims. 5-ER-1021–28. It awarded varying amounts to each Wholesaler under each claim, except Border Cash & Carry to which it awarded no damages. *Id.* After automatic trebling was applied, the other eight Wholesalers were awarded between $75,000 and $325,000, for a total award of $1,172,500. 1-ER-23–24.

Upon Wholesalers' post-trial motion, the district court further entered a permanent injunction requiring Prestige to offer Wholesalers the same Clear Eyes prices it offers to Costco or Sam's Club as required by 2(a), and to offer proportionally equal promotional payments as required by 2(d). 1-ER-25–26.

### E. Facts Pertinent to Wholesalers' Cross-Appeal of the Fee Award.

Wholesalers moved for attorneys' fees after entry of judgment. The district court awarded an hourly rate of $1,070 for the named partners of Gaw | Poe LLP, and $975 for their slightly more junior colleagues. 1-ER-9. This despite the fact that the only (and undisputed) evidence be-

fore the court as to the prevailing rate for antitrust litigation in the Central District was $1,314/hour. SER-69. It was further undisputed that Gaw | Poe is the most experienced RPA litigation counsel in the country. SER-40–42 (describing background); SER-9–25 (Prestige not disputing). The district court recognized that "Plaintiffs' counsel has extensive experience litigating antitrust actions," and that "this case involved complex legal issues and relied on an underutilized provision of the [Clayton] Act." 1-ER-7, 9.

Nevertheless, without making any finding as to the prevailing rate for antitrust litigation in the Central District for attorneys of comparable skill, experience, and reputation, the court refused to award the requested rates, based on (1) the number of lawyers in the firm, (2) the rates awarded to Wholesalers' counsel years ago, in non-antitrust cases, and (3) the court's concern that awarding the prevailing rate would "create a new benchmark for Plaintiffs' fee requests in the future." 1-ER-7–9. Ultimately, "the Court relie[d] on the rates awarded in *Trendsettah*," which was a contract dispute that Gaw | Poe had won in the Central District in 2023, wherein the rates awarded had been based on fee data from 2022. 1-ER-9; *Trendsettah v. Swisher*, 2023 WL 8263365, at *14 (C.D. Cal. Nov. 17, 2023) (referencing 2022 "Real Rate Report").

The court further declined to award a fee enhancement under California law, despite the fact that counsel had obtained the first known plaintiff-side jury victory in the 83-year history of section 17045.

11

## SUMMARY OF THE ARGUMENT

### A. Prestige's Appeal

The district court's judgment should be affirmed, because none of Prestige's arguments warrants a new trial. Prestige first claims three instructional errors. With respect to "functional discounts," Prestige got exactly the instruction it asked for, except the concluding sentence it preferred. But the import of that sentence was fully embodied in the RPA elements instruction the court gave. The court did not abuse its discretion by choosing an alternative formulation that logically meant the exact same thing as Prestige's preferred formulation. *Guebara v. Allstate Ins. Co.*, 237 F.3d 987, 992 (9th Cir. 2001).

Second, the court did not err in omitting the word "substantial" from the jury instructions. The Supreme Court itself does not use that word when reciting the elements of an RPA violation, nor is it used in the model instructions propagated by the ABA's Antitrust Committee, which this Court recommends. *See* Ninth Cir. Model Civ. Jury Inst. § 14 (2017 ed). Prestige claims the word "substantial" is required by the text of the statute, but an examination of the history by which the RPA was inserted into the pre-existing Clayton Act completely undermines that assertion. Finally, even if the omission of "substantial" had been error, the jury's substantial damages verdict (along with the evidence showing how

12

Prestige's discrimination decimated Wholesalers' sales volume) shows that the jury would have reached the same verdict with or without including the word.

Third, Prestige argues that the court should not have given the "actual competition" instruction it gave. But that instruction was required by this Court's decision in *U.S. Wholesale*—a very similar case from just last year, where several family-owned wholesalers (including three of these Wholesalers) sued the maker of 5-hour Energy, likewise for discriminating against them in favor of the Costco Business Center chain. *See* 89 F.4th at 1133–34. Prestige's argument that this fact pattern is actually more similar to the bid-based sales of the custom-built heavy trucks at issue in *Volvo* is borderline frivolous.

Prestige next claims the district court erred when it held that the $3.00 IRCs Prestige paid to Costco count toward Costco's "net price" as a matter of law. But every court to have examined that issue has reached the same conclusion that IRCs count toward net price, which conclusion is compelled by *Fred Meyer, Inc. v. FTC*, 359 F.2d 351 (9th Cir. 1966). Moreover, the only authority Prestige can muster in support of its argument (a 1980 district court case from Pennsylvania) was explicitly reversed on appeal. *See Indian Coffee Corp. v. Procter & Gamble Co.*, 752 F.2d 891, 901–02 (3d Cir. 1985).

Finally, Prestige claims it was error to issue a permanent injunction against future violations of the RPA against these family businesses.

13

Prestige says the court should have instead left Prestige to its own de-
vices, and that if Wholesalers are able to detect discrimination in the
(secret) pricing and promotions Prestige gives to Costco in future, they
"would have immediate recourse" through filing another lawsuit. Br. 58.
But "[t]he relief in an antitrust case must be 'effective to redress the vi-
olations' and 'to restore competition.'" *Ford Motor Co. v. U.S.*, 405 U.S.
562, 573 (1972) (citation omitted). The district court certainly did not
abuse its discretion in concluding that an injunction would be more "ef-
fective to redress the violations," *id.*, than serial litigation of the same
claims.

## B. Wholesalers' Cross-Appeal

Where the district court did err, however, was in setting an artificially
low hourly rate in awarding fees to Wholesalers' counsel under 15 U.S.C.
§ 15 and § 26, and in denying a fee enhancement for counsel's (literally)
unprecedented success on the California UPA claim.

The district court cited no authority for reducing counsel's prevailing
hourly rate based on the number of lawyers in their firm. Numerous dis-
trict courts have correctly ruled that firm-size is not relevant in deter-
mining "the prevailing hourly rate in the local legal community for simi-
lar work by *attorneys* of comparable skill and experience." *Roberts v. City
of Honolulu*, 938 F.3d 1020, 1025 (9th Cir. 2019) (emphasis added).

It was further error to tie counsel's rates to those they had been awarded in a prior breach of contract action, both because those rates are no longer current, and because everyone agrees that antitrust work (especially under the RPA) is more complex than breach-of-contract work. Finally, the court's refusal to award the rate that actually prevails for antitrust work out of fear that counsel might use that rate as "a new benchmark for Plaintiffs' fee requests in the future" was an abuse of discretion. 1-ER-8. This Court holds that a "policy—even an informal one—of 'holding the line' on fees at a certain level goes well beyond the discretion of the district court." *Moreno*, 534 F.3d at 1115. Counsel's potential future income in other cases is not a proper concern of a trial court.

Independent of the hourly rate, the court further erred in refusing to grant an enhancement to the basic lodestar, under the "*Ketchum* factors" that govern enhancements under California law. The district court failed to properly apply any of the four factors that the California Supreme Court requires trial courts to consider. The court's error is exemplified by its conclusion that this was "not truly" a contingency case given that Wholesalers *won*, and were therefore "guaranteed recovery of fees for the reasonable hours worked." 1-ER-13. That is an exceedingly strange rationale—the very *definition* of a contingency case is one in which the attorneys only get paid if they win. So by the court's own description, this was clearly a contingency case.

15

## ARGUMENT

## I.  NONE OF PRESTIGE'S COMPLAINTS ABOUT THE JURY INSTRUCTIONS IS VALID.

### A.  Standard of Review

"A district court's formulation of the jury instructions is reviewed for abuse of discretion." *Murray v. Mayo Clinic*, 934 F.3d 1101, 1103 (9th Cir. 2019) (citation omitted). Whether a given instruction constitutes a "misstatement of law," in contrast, it is reviewed de novo. *Id.*

### B.  The District Court's Formulation of the "Functional Discount" Instruction was Not an Abuse of Discretion.

The court did not abuse its discretion by declining Prestige's preferred formulation of the "functional discount" instruction. Prestige's argument on this point is muddled, because it nowhere juxtaposes the instruction it requested with that one that was given. Prestige's proposed instruction is at 5-ER-1175–76, and the given instruction is at 5-ER-1055. Comparing them side-by-side, the Court will see that the only difference between them is in the final sentence of the given instruction, compared to the penultimate sentence in Prestige's proposed instruction.[3] Prestige preferred a framing under which the jury would be told that if its prices to

---

[3]  Prestige's proposed instruction looks longer, due to its references to "Select Corporation" as a favored purchaser, but Wholesalers dropped Select from the mix before trial. SER-92.

16

Costco and Sam's were a functional discount, "then you must return a verdict for Defendants." 5-ER-1175. The district court instead instructed the jury that if it found the pricing to be a legitimate functional discount, "then any discriminatory pricing did not have a reasonable possibility of harming competition." 5-ER-1055.

Those two formulations mean exactly the same thing, because the jury was told in the main elements instruction that each Plaintiff "must prove … there is a reasonable possibility that the discriminatory pricing may harm competition," and that if they did not, "then you must find for the Defendants." 5-ER-1049. It is well settled that "juries are presumed to follow the court's instructions." *CSX Transp., Inc. v. Hensley*, 556 U.S. 838, 841 (2009). Prestige got the exact description of the "functional discounts" doctrine it wanted in the body of the instruction. C*ompare* 5-ER-1055 *with* 5-ER-1175. If the jury believed that Prestige's favoritism to Costco and Sam's was merely "reasonable reimbursement for the actual functions performed," *id.*, it would have concluded that "the pricing did not have a reasonable possibility of harming competition," 5-ER-1055, and thereby followed Instruction 17's command to "find for the Defendants and against the Plaintiff." 5-ER-1049.

That should be the end of the matter, but it is worth noting that the district court's formulation more closely tracks Ninth Circuit and Supreme Court precedent than Prestige's preferred formulation does. As both Courts have explained, the functional discount doctrine is not an

affirmative defense, but a potential avenue to "'negate the probability of competitive injury, an element of a prima facie case of violation.'" *U.S. Wholesale*, 89 F.4th at 1139 (quoting *Texaco v. Hasbrouck*, 496 U.S. 543, 561 n.18 (1990)). That is exactly how Judge Fitzgerald instructed the jury, and was his explicit rationale for formulating the instruction that way. *See* 14-ER-3750–51. It cannot be error to correctly instruct the jury according to Supreme Court and Circuit precedent.

### 1. Nor was there error in the district court's oral "supplemental instruction."

Prestige next claims error in the verbal response the court gave to a jury note, in which the jury referenced the elements instruction (No. 17), and queried, "does the jury have to be in unanimous agreement on each point and sub-point?" 5-ER-1029. Prestige claims that the note evinces the jury's confusion about the functional discount doctrine, but as the district court correctly observed in denying a new trial, "nothing in the question suggests that the jurors were confused about the functional discount defense specifically." 1-ER-50.

In any event, Prestige's description of the court's verbal response to the jury is a complete fabrication. It describes Judge Fitzgerald as having instructed the jurors that "even if the jury found that price differences were functional discounts—this finding would not mandate a verdict for Prestige." Br. 25. The transcript shows the exact opposite. In

18

reality, he instructed them "as to the subpoints … those instructions are to explain the law to you, so you can determine whether Element 3 has been proven by the plaintiffs or not." 14-ER-3759. As *U.S. Wholesale* explains, that is exactly what a successful functional discount argument would do; it would "negate the probability of competitive injury," 89 F.4th at 1139, and therefore Wholesalers would have failed to prove Element 3. Nowhere did the district court suggest, as Prestige claims, that "even if the jury found that price differences were functional discounts," it "would not mandate a verdict for Prestige." Br. 25.

### 2.  Nor was there error in the verdict form.

Last, Prestige claims that the court erred in "refus[ing] to include a separate question on functional discounts in the verdict form." Br. 25. Notably, its brief does not cite a single authority about verdict forms. But it is well established that trial judges have "broad discretion" in crafting verdict forms, and that "[t]his discretion extends to determining the content and layout of the verdict form, and any interrogatories submitted to the jury." *U.S. v. Real Prop. Located at 20832 Big Rock Drive, Malibu*, 51 F.3d 1402, 1408 (9th Cir. 1995).

Nevertheless, Prestige criticizes the court for declining to include a specific question on functional discounts on the verdict form, "despite doing so for other defenses that the district court labeled as 'concepts' in Jury Instruction No. 17 … *i.e.*, actual competition, Inst. No. 20; and compet-

itive injury Inst. Nos. 21–22." Br. 25–26. Prestige makes two mistakes here. First, the verdict form did *not* include questions on actual competition or competitive injury, just like it did not include a question on functional discounts. 5-ER-1021–28. Second, none of functional discounts, actual competition, or competitive injury is a "defense," as Prestige erroneously describes them. *Id.* As each of the referenced instructions explicitly stated, each of those were things that the *plaintiffs* were required to prove. 5-ER-1052 (actual competition); 1054 (competitive injury); 1055 (functional discount).

In reality—and as is standard—the verdict form chosen by the court included two questions as to liability (Nos. 1, 7), one question for each of Prestige's five affirmative defenses (Nos. 2, 3, 5, 8, 9), one question on antitrust injury (No. 4), and two questions on damages (Nos. 6, 10). *Id.* That formatting was well within the district court's discretion.

### 3. Any error was harmless.

Even supposing the court was required to use Prestige's formulation for the functional discount instruction, any error was harmless, and thus not ground for a new trial. *Coston v. Nangalama*, 13 F.4th 729, 732 (9th Cir. 2021) ("'if any error relating to the jury instructions was harmless, we do not reverse.'") (quoting *Spencer v. Peters*, 857 F.3d 789, 797 (9th Cir. 2017)). For one thing, the instruction should not have been given in the first place, as Wholesalers explained in their 50(a) motion.

13-ER-3470–72. As noted *supra* at 9, Prestige's executive in charge of the Costco account had testified (without dispute by any other witness or exhibit), that the 3.95% DOW Allowance *alone* was "a reasonable amount of compensation for the various functions that Costco performs for Prestige." 11-ER-2842. A legitimate functional discount cannot exceed the "reasonable reimbursement for the purchasers' actual marketing functions." *Texaco*, 496 U.S. at 571; *see also* 5-ER-1055 (Inst. 23). Where the only evidence at trial was that the 3.95% DOW discount was "a reasonable amount of compensation for the various functions that Costco performs," 11-ER-2842, and where Costco also received a 5% list-price discount and IRCs worth (by Prestige's own calculation) another 14.4%, Br. 45, it was in fact error to send the "functional discount" issue to the jury in the first place. At a minimum (and as counsel explained to the jury in closing, 14-ER-3611–12) in light of Prestige's concession that the cost of Costco's supposed "functions" was fully compensated by the 3.95% DOW Allowance, no reasonable jury could have concluded that the *additional* 19.4% favoritism Costco received was *also* "reasonable reimbursement for the actual functions performed." 5-ER-1055, 1175.

### C. The District Court Followed Supreme Court Precedent and the ABA's Model Instructions in Declining to Include the Word "Substantial" in the Instructions.

For its second instructional error, Prestige argues that the district court was required to "instruct the jury that it must find *substantial* harm to competition" to find liability under the RPA. Br. 27. There are many problems with this argument, beginning with the structure and history of section 2(a) itself.

As this Court has explained, what we call the "Robinson-Patman Act" is just an amendment to section 2 of the preexisting Clayton Act. *Rebel Oil Co., Inc. v. Atl. Richfield Co.*, 51 F.3d 1421, 1446 n.18 (9th Cir. 1995); *see also* 38 Stat. 730 (1914). The original Section 2 of the Clayton Act had only prohibited price discrimination where "the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce." *Id.* In that original formulation, it is clear that "substantially" modifies only the "lessen competition" route to liability, since "substantially to tend to create a monopoly" is an awkward phrasing, and because "substantially to tend to," and "tend to" mean the same thing. *See U.S. v. Collazo*, 984 F.3d 1308, 1322 (9th Cir. 2021) (statutory interpretation "starts 'as always, with the language of the statute,' and considers the natural reading of the language using 'ordinary English grammar[].'") (internal citations omitted).

22

Unsurprisingly, caselaw from that era attached the adverb "substantially" only to the "lessen competition" prong, not to the "tend to create a monopoly" prong. For example, in *George Van Camp & Sons Company v. American Can Company*, the Court described the defendant's conduct thusly: "The effect of the discrimination is to substantially lessen competition, and its tendency is to create a monopoly." 278 U.S. 245, 253 (1929). And the First Circuit explained that Section 2 was designed to reach "only such acts as would probably substantially lessen competition, or disclose an actual tendency to create a monopoly." *Lipson v. Socony Vacuum Corp.*, 76 F.2d 213, 218 (1st Cir. 1935). Similarly, the Seventh Circuit summarized:

> If the effect of such discrimination is to substantially lessen competition, there is no necessity for plaintiff to establish the alternative, to wit, that the effect tended to create a monopoly. Likewise if the effect was to 'tend to create a monopoly' it would not be necessary to show that such effect 'substantially lessened competition.'

*Sidney Morris & Co. v. Nat'l Ass'n of Stationers, Off. Outfitters & Mfr's*, 40 F.2d 620, 625 (7th Cir. 1930).

Significantly, of the 105 section 2(a) cases on Westlaw that pre-date the RPA, not one uses the phrase "substantially to tend to create a monopoly," or any other formulation that applied the "substantially" modi-

fier to *both* routes for liability. Those precedents show very clearly that "substantially to lessen competition" was read in the disjunctive from "or tend to create a monopoly in any line of commerce." 38 Stat. 730 (1914).

Returning to the advent of the RPA, *Rebel Oil* explained that "the new law added the following crucial passage: 'or to injure, destroy, or prevent competition with any person ...'" to the end of the sentence that contained the two pre-existing routes to liability. 51 F.3d at 1446 n.18. Both the House and Senate Reports explained that the new language had been appended because the Clayton Act's standard of "substantially to lessen competition" had been "too restrictive, in requiring a showing of general injury to competitive conditions." S. Rep. No. 1502 (1936); H.R. Report No. 2287 (1936) (same); *Rebel Oil*, 51 F.3d at 1446 n.18 (quoting House Report). The Senate Report explained that the innovation of the RPA was to protect "the competitor victimized by the discrimination," based on Congress's belief that doing so would help "catch the weed in the seed [to] keep it from coming to flower." *Id*.

This history shows that under the new section 2(a), as amended by the RPA, a price discrimination can be unlawful in three different ways: (1) by substantially lessening competition; (2) by tending to create a monopoly; or (3) by injuring, destroying, or preventing competition with any person.

The Supreme Court's most recent RPA decision is consistent with this legislative history, and contrary to Prestige's argument. There, the Court

did not include "substantially" when reciting the elements that an RPA plaintiff must prove. In *Volvo*'s formulation, the relevant element is: "(4) 'the effect of such discrimination may be … to injure, destroy, or prevent competition' to the advantage of a favored purchaser." 546 U.S. at 175 (quoting 15 U.S.C. § 13(a)). The Court's placement of the ellipsis is key. The statutory text excised by the ellipsis begins with the word "substantially," with the quotation picking back up at "'to injure, destroy or prevent competition.'" *Compare* 15 U.S.C. § 13(a) *with Volvo*, 546 U.S. at 175. Had the Supreme Court shared Prestige's belief that the word "substantially" applies to all three means of establishing the violation, it would have inserted the ellipsis *after* "substantially," not before it. The Supreme Court does not have a reputation for being careless with its wording. Consistent with that analysis—and as the district court also observed—the word "substantial" is not included in the ABA Antitrust Committee's model instructions, either. 1-ER-44.

### 1. Prestige's claim to the "weight of authority" is meaningless.

Under the heading "The Weight of Authority Rejects the Disjunctive Interpretation," Prestige spends four pages cataloging authority that it believes supports its argument. Br. 30–34. But Prestige overtly juxtaposes those cases against the *three* Ninth Circuit opinions the district court relied upon for its own correct reading. Br. 28 (listing cases).

Even then, none of the cases Prestige cites suggests that the word "substantial" must be included in the instructions that are given to a *jury*. Many of Prestige's cited cases simply rule as a matter of law that the alleged discrimination was insufficiently substantial to survive summary judgment. Prestige relies heavily on *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202 (2d Cir. 2015), for example. But that court did not say that juries should decide "substantiality." Rather, the court affirmed summary judgment against the plaintiffs, reasoning that the Act requires "the potential for substantial harm to competition," and that the "de minimis" number of lost sales adduced in discovery was insufficient to send the case to the jury. 799 F.3d at 211–12.

The reasoning in others of Prestige's cases is invalid. As support for the proposition that "the effect must be substantial," the Seventh Circuit in *Whitaker Cable Corp. v. FTC* cited a 1921 case from the Supreme Court, *i.e.*, a case decided *prior to* section 2(a)'s amendment by the RPA. 239 F.2d 253, 256 (7th Cir. 1956). Likewise, *Olympia Co., Inc. v. Celotex Corp.*, plainly failed to appreciate that the RPA had *added* language to the preexisting Clayton Act—it reasoned that "the Robinson-Patman Act is only violated where the effect of price discrimination may be to substantially lessen competition." 597 F. Supp. 285, 297 (E.D. La. 1984). In other words, that district court considered only the language of the 1914 version of Section 2(a)—as if the RPA had never amended it.

26

Perhaps more significantly, all of Prestige's cases perfectly match Areeda & Hovenkamp's observation—they are courts that have "*assumed* that the word 'substantially' modifies all three forms of injury." 14 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law § 2331c (4th ed. 2019) (emphasis added). None of them undertook the statutory analysis above, *supra* at 22–24, so their "assumption" should be entitled to no weight.

### 2. Even if omitting the word "substantial" were error, it was harmless.

Even if RPA jury instructions *should* include the word "substantial," here "it is more probable than not that the jury would have reached the same verdict" either way. *Fierro v. Smith*, 39 F.4th 640, 651 (9th Cir. 2022). As an initial matter, the experienced trial judge who observed the witnesses, the presentations, and the jury, concluded that they would have. 1-ER-45. And as he observed, Areeda and Hovenkamp reason that any substantiality requirement does "not require that the injury be all that 'substantial.'"[4] 1-ER-45 (quoting Antitrust Law, § 2331c (4th ed. 2019)).

---

[4] The word "substantial" is further problematic as a jury instruction, because it is almost a contranym. "Substantial" alternately means either: (1) "Real and not imaginary; having actual, not fictitious, existence," or (2) "Important, essential, and material; of real worth and importance." Black's Law Dictionary (12th ed. 2024) Bryan A. Garner, Ed. Including the word "substantial" in the jury instructions would further

As the court further reasoned: "The jury's verdict demonstrates that Defendants' price discrimination had a substantial impact on Plaintiffs with the exception of Border Cash & Carry."[5] 1-ER-45. In arguing the purported harmfulness, Prestige makes another factual mistake. It claims that "[f]or the Plaintiffs who were awarded monetary damages, the amounts ranged from $2,777.78 to $3,333.33, per year." Br. 36. Setting aside Prestige's unspoken (and unsupported) assumption that "substantiality" should be measured only by dollars, and only using the *average annual* injury over an eight-year damages period, L.A. International and Value Distributor were awarded $95,000 and $100,000 in single damages. Using Prestige's metric, that would be $11,875 and $12,500 in lost profits per year. Accepting that such amounts are "insubstantial" to a public conglomerate like Prestige, they are "substantial" to a family business.

Moreover, Prestige's view of substantiality would lead to bizarre results. If this Court were to accept Prestige's view that liability under

---

necessitate telling the jury which definition of the word it should use. Areeda and Hovenkamp seem to believe it is the first, while Prestige seems to believe it is the second.

[5]    In considering this "impact on Plaintiffs," *id.*, it is crucial to appreciate that an RPA plaintiff need not show any *actual* injury at all. *J. Truett Payne*, 451 U.S. at 561-62 (1981) (the RPA "does not 'require that the discriminations must in fact have harmed competition.'") (citations omitted). Actual injury is required only to recover *damages* via section 4 of the Clayton Act. *Id.* at 562. There is thus no inconsistency in the jury deeming Prestige liable to Border, but nevertheless awarding it zero damages.

the RPA requires a "substantial" injury, and that $25,000 in lost profits is not "substantial," then Prestige would be entitled to judgment in its favor. That ruling would present two insurmountable problems: (1) it could not be reconciled with the Supreme Court's repeated holding that an RPA plaintiff need not establish *any* actual injury to prove liability under the RPA, *supra* at 28 n.5, and (2) this Court would need to announce a "substantiality" threshold for RPA liability. Even if the Court decides to create a first-in-the-nation rule that a jury evaluating an RPA claim must be instructed on "substantiality," it should affirm the district court's harmlessness ruling.[6]

### D. The District Court's Instruction on Competition was Required By *U.S. Wholesale*.

For its final claim of instructional error, Prestige argues that the district court erred by following the longstanding test for competition that this Court recently reaffirmed in *U.S. Wholesale*. 89 F.4th at 1142

---

[6] It should be noted that contrary to Prestige's belief, *Cash & Henderson* illustrates that Wholesalers had suffered "substantial" injury from price discrimination. In *Cash & Henderson*, the evidence was that the average plaintiff pharmacy had lost an average of 54 transactions out of 22,000-28,000 prescriptions per year, or "one quarter of one percent of the average number of transactions of such pharmacies during that period[.]" 799 F.3d at 208. Here, each Wholesaler showed that its sales of Clear Eyes had precipitously declined over time as their customers permanently changed their buying habits in response to the persistent and predictable Costco Business Savings Events. 15-ER-3820–23; SER-122–29.

(quoting and following *Tri-Valley Packing Ass'n v. FTC*, 329 F.2d 694, 708 (9th Cir. 1964)). *U.S. Wholesale* arose in indistinguishable circumstances, where seven independent wholesalers (including three of these plaintiffs) sued the maker of 5-hour Energy for charging them higher prices than it charged to Costco, and for denying them proportionally equal promotional payments. *Id.* at 1133–34. At summary judgment, the defendant had persuaded the trial court that *Volvo* sets forth the test for actual competition in all RPA cases. *See U.S. Wholesale Outlet & Distribution, Inc. v. Living Essentials, LLC*, 2019 WL 4452966, at *2 (C.D. Cal. Aug. 7, 2019). The trial court repeated that view of competition when denying the wholesalers' section 2(d) claim, which concerned (as here) the disproportional promotional payments that the supplier had larded upon Costco. *U.S. Wholesale*, 2021 WL 3418584, at *3 (C.D. Cal. Aug. 5, 2021).

This Court reversed the trial court's ruling that *Volvo* dictates the proper test for competition. 89 F.4th at 1147. As *U.S. Wholesale* explained, *Volvo* addressed a market in which Volvo dealers "resold trucks through a competitive bidding process, where retail buyers described their specific product requirements and invited bids from selected dealers of different manufacturers." *Id.* at 1144. In contrast to a normal consumer-goods market in which merchants stock goods in inventory for sale to all comers, in *Volvo* the trucking companies (who were the end-purchasers) would first submit their desired truck specifications to an

array of truck dealers, and it was "[o]nly after a Volvo dealer was invited to bid did it request discounts or concessions from Volvo as part of preparing the bid." *Id.* In that unusual market, "Volvo dealers typically did not compete with each other." *Id.* But when they did, "Volvo's policy was 'to provide the same price concession to each dealer competing head-to-head for the same sale.'" *Id.* & n.4 (quoting *Volvo*, 546 U.S. at 171). As *U.S. Wholesale* observed, the text of *Volvo* itself distinguished its analysis of that unique market from "a traditional Robinson-Patman Act 'chainstore paradigm' case, where large chain stores were competing with small businesses for buyers." *Id.* (quoting *Volvo*, 546 U.S. at 178). This Court concluded that because "this case is a typical chainstore paradigm case," the competition standard discussed in *Volvo* is "inapposite." *Id.* at 1147. It accordingly held that the longstanding test for RPA competition that this Circuit had described in *Tri-Valley* controls. *Id.*[7]

Prestige nevertheless argues that the district court should have adopted a jury instruction based loosely on the standard for competition described in *Volvo*. Its argument for how this case is more like *Volvo* than *U.S. Wholesale* is almost unintelligible. Br. 40–44. It argues that "unlike Plaintiffs' customers," "the members of Costco and Sam's Club pay

---

[7]  The defendants in *U.S. Wholesale* petitioned for *certiorari*, specifically on their contention that *Volvo* had established a new test for competition in all RPA cases. *See* S. Ct. No. 23-1099 (Apr. 5, 2024). The Supreme Court took the uncommon step of calling for a brief in opposition from the respondent wholesalers, and then denied the petition. *Id.* (May 7, 2024); -- S. Ct. --, 2024 WL 4426552 (Oct. 7, 2024).

those purchasers a membership fee to go out and secure the best price for the goods the members are interested in purchasing." Br. 41. There are many problems here. For one, the notion that members pay annual fees to Costco and Sam's Club so that they will "go out and secure the best price" on merchandise requested by the members is unsupported by any record citation. *Id.* That is because it is just rank speculation by appellate counsel. This case would only be like *Volvo* if there were evidence that Costco's customers first submitted a bid to Costco for Clear Eyes, and then Costco turned around and petitioned Prestige for discounts to fulfill each such bid as it came in. *See* 89 F.4th at 1144 (describing the *Volvo* market). But of course this market is not like that. Just like any other chainstore, Costco bought Clear Eyes for its sales inventory, and sold it to all comers. 11-ER-2827–28; 14-ER-3657.

More fundamentally, Prestige's suggestion that it should be permitted to charge higher prices to family businesses to accommodate the "bargaining power created and used by club member stores such as Costco and Sam's Club," Br. 42, is antithetical to the RPA's very purpose. As the Supreme Court explained in its foundational RPA opinion:

> The legislative history of the Robinson-Patman Act makes it abundantly clear that Congress considered it to be an evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability. The Robinson-Patman Act was passed to deprive a large buyer of such advantages except to the extent that a lower price could be justified by reason of a seller's di-

> minished costs due to quantity manufacture, delivery or sale, or by reason of the seller's good faith effort to meet a competitor's equally low price.

*FTC v. Morton Salt Co.*, 334 U.S. 37, 43 (1948).

Where Congress passed the RPA for the specific purpose of "depriv[ing] a large buyer of [the] advantages" it could obtain by virtue of its "quantity purchasing ability," *id.*, that directive must be honored. As the Supreme Court recently reiterated in *Epic Systems Corporation v. Lewis*: "This Court is not free to substitute its preferred economic policies for those chosen by the people's representatives. *That*, we had always understood, was *Lochner*'s sin." 584 U.S. 497, 525 (2018). In that case as here, "[t]he policy may be debatable but the law is clear." *Id.* Here, the law is simply that because Wholesalers, Costco, and Sam's Club compete for the same pool of customers, Prestige was required to treat them equally in pricing and promotional payments. *FTC v. Sun Oil Co.*, 371 U.S. at 520.

## II. THE DISTRICT COURT CORRECTLY COUNTED THE $3.00/UNIT IRC REBATE TOWARD THE "NET PRICE" PAID BY COSTCO.

### A. Standard of Review

Prestige alleges three categories of error associated with the district court's ruling that the $3.00/unit rebate Prestige paid to Costco must be counted toward the "net price" paid by Costco. Br. 44–52. The district

court's ruling at summary judgment underlies them all, so *de novo* review applies. *Desire, LLC v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021).

## B. Rebates Count Toward Net Price As a Matter of Law.

Prestige elides the truth in describing how the $3.00 IRC rebates operated. According to it: "Costco's members received the agreed-to manufacturer rebate (usually around $3.00 per 12-pack of Clear Eyes) at the register at the time of purchase." Br. 44. This is correct, but Prestige jumps the rails in the next sentence: "Thus, the monetary value of the rebate went to the Costco customer, *not Costco itself*." Br. 44–45 (emphasis added). Prestige knows the italicized part isn't true. At summary judgment, Prestige conceded it to be an "undisputed fact" that after the $3.00 rebate was taken at the register, Costco was "reimbursed for the IRC amount." SER-109. Similarly at trial, Prestige's Executive Vice President of Sales and Marketing agreed that the IRC rebate operates by "Costco at the end of the month tallying up the number of boxes it sold, it sends that to Prestige, and then Prestige multiplies that number by three and gives that money to Costco." 13-ER-3299.

That the $3.00/unit rebate reduced Costco's net price for a box of Clear Eyes is mathematically obvious. After the 2016 price increase, Prestige's

list price to Costco was $14.04/box. SER-120. Upon Costco selling that box during an IRC period, Prestige then paid Costco $3.00. 13-ER-3299. That means Costco's *net* price for the box was $11.04.

Prestige seems to nevertheless reason that the IRCs should not count toward the net price Costco paid because the same $3.00 was "*fully* passed on to and redeemed by Costco's member." Br. 44 (emphasis in original). This argument is completely nonsensical. A favored purchaser "passing on" the discriminatory pricing it receives from a supplier is precisely *how* the competitive injury in an RPA case occurs. That is, by virtue of the rebate, Clear Eyes could be bought at Costco for $11.99 (down from Costco's standard sell price of $14.99). 9-ER-2135–36. At the same time, Wholesalers' *acquisition* cost for a box of Clear Eyes remained $14.76. 9-ER-2229. If Wholesalers desired to make even $0.01/box profit, they could offer Clear Eyes for no less than $14.77. It is precisely *because* the IRC rebates were "fully passed on," that every economically rational owner of a convenience store would buy Clear Eyes from Costco instead of from Wholesalers. And even if Wholesalers could manage to sell a box of Clear Eyes at $14.77, they would make a profit of just $0.01/box, while Costco—even on the IRC—would make $0.95/box.

It is useful to contrast this customer-diverting effect with what Prestige seems to envision. In Prestige's view—under which the IRC would count toward Costco's net price only if Costco did *not* pass along the lower price to its customer—it is much harder to see how that discrimination

35

would injure Wholesalers in the *competitive* sense. Costco would be able to line its pockets with the $3.00/box rebate, but it would still be selling Clear Eyes at the relatively competitive price of $14.99.[8]

Beyond mathematics and logic, the district court's ruling that the IRC rebates must be counted toward Costco's net price is compelled by Circuit precedent. In *Fred Meyer, Inc. v. FTC*, 359 F.2d 351 (9th Cir. 1966), various suppliers offered coupons in a Fred Meyer coupon book, just like Prestige and other suppliers offered coupons in Costco's "Business Savings Events flier that advertised the Instant Redeemable Coupons." Br. 8. Among the participating suppliers in Fred Meyer's coupon book was Tri-Valley Packing Association, which inserted a "'Buy two cans and get one free'" coupon for peaches. *Id.* at 359. The Fred Meyer customer who redeemed the coupon got the third can free after buying two cans, and Tri-Valley agreed "to redeem [to Fred Meyer], in merchandise, every third can sold." *Id.* In other words, the free "third can" was 'fully passed on' to Fred Meyer's customer, just like the $3.00 IRC rebate was 'fully passed on' to Costco's customer. Also just as here, "[n]o such offer was made" to Tri-Valley's disfavored purchasers who competed with Fred Meyer. *Id.*

---

[8]   The Supreme Court has specifically reserved the question of whether a disfavored purchaser can establish an RPA injury to competition where the favored purchaser uses the price favoritism it receives only to maximize its profits, without lowering its sell price to attract customers. *J. Truett Payne*, 451 U.S. at 564 n.4.

This Court concluded that the free cans given to Fred Meyer and passed along to its customers "were 'outright price concessions' and, since the amounts were directly related to and dependent upon the amount of goods purchased and resold by Meyer, price concessions cognizable under section 2(a)." 359 F.2d at 362.

There is no daylight between Tri-Valley's price concessions to Fred Meyer and Prestige's price concessions to Costco. Prestige unwittingly concedes as much. It says that the rebate in *Fred Meyer* counted toward net price because "the defendant Fred Meyer received a free can for every two it sold, reducing net price." Br. 48. Replace "free can" with "$3.00," and "two it sold" with "box of Clear Eyes it sold," and you get: "Costco received $3.00 for every box of Clear Eyes it sold, reducing net price." Precisely.

Nevertheless, in its next sentence Prestige oddly asserts that "there was no mention of Fred Meyer passing on the full value of that promotion to its customers." Br. 48. Prestige seems to have not read the case closely. The opinion describes the coupon as reading, "[b]uy two cans and get one free," and "entitles the customer to the specially reduced price there stated." *Fred Meyer*, 359 F.2d at 355, 359.

Unsurprisingly, prior to this case, both district courts to have considered Costco's IRCs in the context of *Fred Meyer* have concluded that the value of the IRCs count toward Costco's net price as a matter of law. *See U.S. Wholesale*, 2019 WL 4452966, at *4 ("the Court finds as

a matter of law that the instant rebates constitute price discrimination and no expert may testify to the contrary at trial"); *ABC Distrib., Inc. v. Living Essentials LLC*, 2017 WL 3838443, at *4 (N.D. Cal. Sept. 1, 2017) ("[R]ebates must be factored into the net price for purposes of RPA § 2(a)").

On the other side of the ledger, the only supporting authority Prestige can offer is *Indian Coffee Corp. v. Procter & Gamble Co.*, 482 F. Supp. 1104 (W.D. Pa. 1980). There, Prestige correctly explains how on partial summary judgment, "the court addressed '[w]hether a common marketing device known as a 'consumer coupon' is an element of 'price' under s 2(a) of Robinson-Patman,'" and concluded that because the value of the coupon was passed through to the consumer, they "'were not such an element of price.'" Br. at 46–47 (quoting 482 F. Supp. at 1105–06).

Just one problem with Prestige's reliance on *Indian Coffee*: The Third Circuit expressly reversed that aspect of the trial court's ruling in 1985, after the case had gone to trial. As the Third Circuit explained, "[i]n a preliminary ruling on a motion for partial summary judgment," the trial court had "adopted an extremely narrow definition of price, by excluding from the calculation of price promotional allowances in the form of coupons." *Indian Coffee Corp. v. Procter & Gamble Co.*, 752 F.2d 891, 901 (3d Cir. 1985). It ruled that the trial court's view had been "entirely too narrow," because "[a] price discrimination granted to a retailer on condi-

tion that he pass it on to a consumer … is nevertheless a price discrimination." *Id.* at 902. That is the same rationale followed by *Fred Meyer*, and by the district court here.

Thus, because the IRCs count toward Costco's net price as a matter of law, the district court clearly did not abuse its discretion in barring Prestige and its expert from arguing to the jury that the IRCs should *not* count toward Costco's net price. *See* Br. 51–52.

## III. PRESTIGE DOES NOT CLAIM ANY ERROR IN THE JUDGMENT ON WHOLESALERS' UPA CLAIM.

The only argument Prestige makes as to why Wholesalers' UPA judgment should be vacated concerns the district court's omission of the word "substantial" from the jury instruction on the *RPA* claim. Br. 53 ("As set forth above, the district court erred in failing to instruct the jury that they must find substantial harm"). Prestige asserts that "[t]his error is directly applicable here as well, as it hopelessly tainted the jury's findings." *Id.* The problem with this argument is that the California statute at issue does not include the word "substantial." Cal. Bus. & Prof. Code § 17045. Nor do the associated CACI jury instructions. *See* CACI No. 3320. Indeed, Prestige joined with Wholesalers in proposing that the district court use the standard CACI instructions on the UPA claim. SER-103–06. Even assuming that a litigant can object to an instruction

that it requested, review would be for plain error at most. *Skidmore. v. Led Zeppelin*, 952 F.3d 1051, 1065 (9th Cir. 2020). Prestige makes no such argument.

## IV. PRESTIGE DOES NOT CHALLENGE THE SECTION 2(D) JUDGMENT.

Related to the UPA point above, it is important to recognize that Prestige nowhere contests its liability for violating section 2(d), which claim was simultaneously tried to the court. 4-ER-889–90. And none of its arguments about (1) the functional discount doctrine, (2) whether section 2(a) instructions should require "substantial" harm, or (3) the proper accounting of the IRCs, have anything to do with Prestige's section 2(d) liability, which was based only on the 3.95% DOW Allowance it discriminatorily paid to Costco. 4-ER-890.

Prestige's only argument that would have any bearing on the section 2(d) judgment is its contention that the fact pattern here is more like the *Volvo* than *U.S. Wholesale*. Since that argument is dead on arrival, the 2(d) judgment would stand even if Prestige won every other argument it makes.

## V. THE COURT DID NOT ABUSE ITS DISCRETION IN ISSU-ING A PERMANENT INJUNCTION TO PROHIBIT FU-TURE VIOLATIONS.

### A. Standard of Review

A district court's decision to grant permanent injunctive relief is reviewed for an abuse of discretion *See Gonzalez v. U.S. Immigr. & Customs Enf't*, 975 F.3d 788, 802 (9th Cir. 2020).

### B. Prestige's Antitrust Violations Warranted Injunctive Relief.

Prestige's argument against the injunction begins with a mix of irrelevant or mischaracterized facts, then moves to inapt legal arguments. With respect to the facts, it asserts that five of the nine plaintiffs last purchased Clear Eyes from Prestige in 2018 and 2019. Br. 54. Beyond the irrelevance of this fact to the four *other* plaintiffs, Prestige offers no argument or authority to support the implied proposition: That where a supplier favors chainstores to such a degree that it drives their independent competitors out of the market before judgment is entered, it will have immunized itself from injunctive relief. The charts of Costco's and the Wholesalers' respective Clear Eyes volumes over time show that this is exactly what happened. 15-ER-3820–23; SER-122–29.

Illustrating this pattern, the owner of Border Cash & Carry Hussain Nasafi testified that he had sold 4,500 cases of Clear Eyes (64 pallets,

or 2.3 tractor-trailers full) in 2017. 11-ER-2701, 2695. But when Sam's Club began receiving discriminatory pricing, it was able to sell to Border's customers: "cheaper than our price, that is why our customers declined to buy from us. They didn't want to buy from us, could be 5, 10 percent cheaper." 11-ER-2697. Mr. Nasafi testified that Prestige refused to give Border the price it gave to Sam's Club, and therefore "we cannot compete, because their price is much cheaper." 11-ER-2697–99. He explained that Border "stopped selling" because "there was no margin, and there – we cannot make money." 11-ER-2699. His testimony ended with the exchange:

> Q. Would you buy Pocket Pals from the defendants if they gave you the same price that they do to Sam's Club?
>
> A. Definitely, yes.

11-ER-2703.

For at least four of the Wholesalers whom Prestige claims are not entitled to an injunction, their owners testified that they stopped purchasing directly from Prestige because they began purchasing from Costco instead, given its lower price. 9-ER-2352–53 (LA International); 10-ER-2551–52 (AKR); 10-ER-2655–56 (LA Top); 11-ER-2936 (Excel). In other words, Prestige argues that because its discrimination was so pro-

nounced that it converted Costco's independent *competitors* into *customers* of the Goliath, it should be free from an injunction requiring future RPA compliance.

Prestige further mischaracterizes the record by claiming that Wholesalers' expert testified that they "suffer no damage if they do not buy Clear Eyes from Prestige." Br. 54. This is knowingly false. The expert actually explained that *one* of the two damages models he used would show no damages because it relied on a price elasticity metric, and "the elasticity approach takes the actual sales and adjusts it upward[;] so when [purchases are] zero, it adjusts up from zero." 12-ER-3096. He further explained that "[w]e know in actuality that there is harm there because they would have been selling the product" had they been able to compete with Costco on price. *Id.* He then explained that under his alternative "Costco benchmark" model (*i.e.*, had Wholesalers' sales trended in the same way as Costco's), Wholesalers would have had damages in every year "[f]rom 2014 to 2022." 12-ER-3102.

In a similarly deceptive vein, Prestige states that "[n]ot surprisingly, Plaintiffs did not contend or seek damages for any alleged discriminatory pricing in 2023, further showing that there is no ongoing or future" harm. Br. 54–55. It knows this is false. The reason damages were not calculated for 2023 was because the parties had last exchanged sales data and expert reports in the summer of 2022, in advance of the trial that was scheduled for December 2022. SER-97–100. But the trial was con-

tinued two more times due to the court's pandemic backlog (SER-93–95), finally convening in December 2023, at which time it proceeded based on the damages calculations that had been exchanged halfway through 2022.

Prestige's legal arguments against the injunction are even worse. It describes a series of supply-chain problems it faced at the end of 2023, and says that "*[i]n response to this supply shortage*," it "instituted major changes in its pricing structure," eliminating its favoritism of Costco and Sam's. Br. 56 (emphasis added). On that ground, it asserts that "there is no evidence that the alleged price discrimination is 'likely to recur.'" Br. 56 (quoting *FTC v. Evans Prods. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985)). The argument is self-defeating: Accepting that Prestige decided to grant equal pricing and promotions to Wholesalers only "[i]n response to this supply shortage," *id.*, what does Prestige plan to do once the supply shortage is over? One can see from the arguments in its brief that it still maintains that it did nothing illegal, and that it should be permitted to continue favoring giant chains due to the "bargaining power" they wield. Br. 41–42.

In fact, two pages later Prestige basically previews what it would do if the injunction were not in place: It says that if it decides to resume discriminating in favor of Costco, Wholesalers would "be immediately aware of" those changes, because "many of [them] are Costco members themselves." Br. 58. It says that Wholesalers would thereby have "imme-

diate recourse to challenge such changes through future litigation." *Id.* This is ridiculous for many reasons. For one, how exactly would Wholesalers know that Costco was receiving a better price? As shown from the fact that Prestige insisted on a strict protective order, and that Costco and Prestige marked virtually every document (including Prestige's price announcements to Costco, SER-119–121) as "Confidential" or "Attorneys' Eyes Only," Prestige plainly does not publicize the pricing that it gives to the chains. Indeed, in ruling for Wholesalers on their UPA claim, the jury necessarily found that Prestige kept its pricing to Costco "secret." 5-ER-1068 (Inst. No. 33). Moreover, a second lawsuit is not "immediate recourse"—this one took six-and-a-half years from filing to judgment. 15-ER-3838–77 (docket). As Prestige itself points out, that period was long enough to drive several Wholesalers out of the market, at least temporarily. Br. 54–55.

Doctrinally, Prestige's argument seems to be based on the "voluntary cessation" doctrine—that the pricing changes it made "[i]n response to this supply shortage" mooted the need for injunctive relief. Br. 56, 64. But as the district court noted when issuing the injunction, "'the test for mootness in cases such as this is a stringent one.'" 1-ER-54 (quoting *FTC v. Affordable Media*, 179 F.3d 1228, 1328 (9th Cir. 1999)). It further quoted the Supreme Court's rule that "'a defendant claiming that its voluntary compliance moots a case bears the formidable burden of showing that it is absolutely clear the allegedly wrongful behavior could not rea-

sonably be expected to recur.'" 1-ER-54–55 (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC) Inc.*, 528 U.S. 167, 190 (2000)). Far from even arguing that it is "absolutely clear" that it will not resume its discrimination in the absence of the injunction, Prestige explicitly charts out such a course, and recommends that Wholesalers should file another lawsuit when it does. Br. 58.

Citing other precedents, the district court concluded that "Defendants fail to meet this high burden of showing that their conduct moots the need for injunctive relief." 1-ER-55. Prestige itself quotes authority that "'whether or not defendants have met their burden is a factual inquiry.'" Br. 57 (quoting *DL v. Dist. of Columbia*, 187 F. Supp. 3d 1, 10 (2016). And yet it offers no serious argument for how the district court not only got the facts *wrong*, but abused its discretion in finding them as it did. *Id.*

## VI. NO PRECEDENT REQUIRES ANTITRUST FEE AWARDS TO BE PROPORTIONAL TO DAMAGES.

Prestige's final argument is that the district court abused its discretion by not reducing the lodestar fee award to Wholesalers "to account for Plaintiffs' limited success." Br. 60–61. As an initial matter, Prestige's assertion of "limited success" is confounding. Wholesalers won all four causes of action alleged in their complaint, over $1 million in trebled damages, and the injunctive relief they sought. Moreover, the relief they

obtained has now been shared with every one of their peer family-owned wholesalers throughout the country—as Prestige explains, it "changed its pricing for Clear Eyes to avoid facing potential liability to other customers." Br. 61–62. Prestige might deem Wholesalers' success "limited," but the businesses victimized by its decade-long favoritism of Costco and Sam's Club do not.

Moving to Prestige's legal argument, in arguing that the court "failed to account for Plaintiffs' limited degree of success when determining the award," Br. 60, Prestige does not cite a single antitrust case, let alone one concerning fee awards under 15 U.S.C. § 15 or § 26. Instead, it cites only *discretionary* fee awards pursuant to FOIA, 42 U.S.C. § 1988, and California Code of Civil Procedure § 1021.5. Br. 67, 69. As this Court explained in *Costco Wholesale Corp. v. Hoen*, in contrast to discretionary fee awards, the antitrust statutes "make[] such an award mandatory," and "[t]his difference is important." 538 F.3d 1128, 1136 (9th Cir. 2008). As *Costco* explained, rules governing discretionary fee awards are inapt, because "[w]e see little basis for extending a rule intended to limit the exercise of discretion[,] to a statute that leaves no room for discretion in the first place." *Id.*

*Costco* further explained that applying discretionary-fee principles to antitrust fee awards "would conflict with the purpose of the statute," because "Congress made fee awards mandatory under § 26 to 'encourage [ ] … private parties to bring and maintain meritorious antitrust injunc-

tion cases.'" 538 F.3d at 1136 (quoting legislative history). This rationale echoed earlier precedent, where this Court explained that fee awards are mandatory under § 15 because:

> The purpose of such an award in antitrust cases is threefold: 1) to encourage private enforcement of the antitrust laws, 2) to insulate the treble damages award from the costs of obtaining recovery, and 3) to deter violations of the antitrust laws by requiring the payment of that fee by a losing defendant as part of his penalty for having violated the antitrust laws.

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354, 1357 (9th Cir. 1998) (citations omitted).

Given that Prestige's arguments are based on the wrong body of authority and how poorly developed they are, little more need be said. While there could theoretically be a case in which an antitrust plaintiff's extremely limited success warrants a reduction to the lodestar (for example, a damages award of $1.00, with no injunctive relief), this is not such a case.

Where the district court did go wrong with respect to fees, however, was in setting the reasonable hourly rate for Wholesalers' counsel, and by misapprehending California law regarding fee enhancements. Those issues are the subject of Wholesalers' cross-appeal, which begins below.

## VII. THE DISTRICT COURT ERRED BY NOT AWARDING THE HOURLY RATES THAT PREVAIL IN THE CENTRAL DISTRICT FOR ANTITRUST LITIGATION.

The district court erred in setting the hourly rates for Wholesalers' counsel. In setting those rates, the court disregarded numerous important principles set forth in the precedent, while making its own adjustments on bases that are legally irrelevant.

This Court recently summarized the principles of rate setting in *Seachris v Brady-Hamilton Stevedore Co.*, 994 F.3d 1066 (9th Cir. 2021). As *Seachris* explained, the fundamental touchstone is that "the rates awarded must be 'in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation.'" *Id.* at 1076 (quoting *Blum v. Stenson*, 465 U.S. 886, 896 n.11 (1984)). In addition, "fee awards must be 'based on current rather than merely historical market conditions,'" and "the adjudicator should rely on the most current information available." *Seachris*, at 1077 (quoting *Christensen v. Stevedoring Servs. of Am.*, 557 F.3d 1049, 1055 (9th Cir. 2009)). If the evidence shows that the prevailing rate is higher than what a trial judge thinks it *should be*, then so be it: "As we explained in *Moreno v. City of Sacramento*, 534 F.3d 1106, 1115 (9th Cir. 2008), the adjudicator's function 'is not to 'hold the line' at a particular rate.'" *Seachris*, at 1079. In other words, courts are to "compensate counsel at the prevailing rate in the community for similar work; no more, no less."

*Moreno*, 534 F.3d at 1111. As a result, "[i]f the lodestar leads to an hourly rate that is higher than past practice, the court *must* award that rate." *Id.* at 1115 (emphasis added).

### A. The Basis for Counsel's Requested Rates.

Here, Wholesalers requested rates of $1,314 for the named partners of Gaw | Poe, and $1,001 for their three slightly more junior colleagues who worked on the case. 1-ER-6. The requested rates were supported by a detailed declaration and analysis from Mr. Gerald Knapton, a senior partner in Ropers Majeski's Los Angeles office, who has 30 years' of experience in offering expert opinion on attorneys' fees, with "particular experience in antitrust cases." SER-48. Approximately half of Mr. Knapton's opinions are in support of fee requests, with the other half in opposition. SER-49. He has been qualified to testify as an attorneys' fees expert approximately 70 times. SER-50.

Mr. Knapton's opinion on rates was based largely on the 2023 edition of the Real Rate Report. SER-62–65. As he explained, the Real Rate Report is a Wolters Kluwer publication that compiles rates from actual law-firm invoicing, taking into account any discounts granted by those firms. SER-63. It is a "more than $160 billion-dollar database," and the rates captured in the 2023 edition of the Report are "taken from invoices for legal work performed from 7/1/2020 through 6/30/2023." *Id.* Westlaw reports dozens of Central District cases that have relied on the Real Rate

Report. It is deemed reliable because in contrast to surveys and self-reported rates, it identifies rates by location and specific practice area, and is "based on actual legal billing, matter information, and paid and processed invoices." *Grey Fox, LLC v. Plains All-Am. Pipeline, L.P.*, 2024 WL 4267431, at *5 (C.D. Cal. Sept. 17, 2024).

Mr. Knapton arrived at his recommended rates by beginning with the rates in the Report's "Corporate" bucket for Los Angeles, which includes "Antitrust and Competition" work. SER-68–69. Based on counsel's professional backgrounds and lengthy experience with antitrust litigation, Mr. Knapton proposed that the appropriate rate for the firm's named partners was the "third quartile" rate for antitrust work, with their junior colleagues at the median rate. SER-69. Because the invoices compiled in the Report only extended up through June 2023, Mr. Knapton applied a 6% upward adjustment to account for the June 2024 filing date of their fees motion. SER-65. That 6% adjustment was based on multiple sources of reporting for the growth trajectory in 2024 billing rates. SER-63–64. Prestige did not dispute that rates grew at 6% over 2024. SER-18.

Notably, Wholesalers' counsel had been approved at the Real Rate Report's third-quartile level in four prior cases, stretching back seven years. *See Trendsettah*, 2023 WL 8263365, at *14 (breach of contract); *In re Outlaw Lab'y, LP Litig.*, 2023 WL 6522383, at *4 (S.D. Cal. Oct. 5, 2023) (civil RICO); *AdTrader, Inc. v. Google LLC*, 2020 WL 1921774, at

*8 (N.D. Cal. Mar. 24, 2020) (breach of contract); *Trendsettah v. Swisher*, 2017 WL 11477621, at *9 (C.D. Cal. Feb. 27, 2017) (breach of contract). Indeed, Prestige engaged its *own* fees expert, who agreed that "[c]onsidering their experience and qualifications, not to mention the results they obtained in this matter, I do not dispute counsel's classification as 'third quartile' lawyers." SER-28.

The third quartile is more than justified. Counsel's experience with Robinson-Patman Act litigation is unrivaled by any firm in the country. SER-40. After spending almost a decade at Morrison & Foerster, Wilson Sonsini, and O'Melveny, the firm's founders filed their first RPA case in 2015, and since then the firm has litigated five other RPA cases. SER-38–41. They were trial counsel and lead appellate counsel in *U.S. Wholesale*, resulting in this Circuit's most significant RPA opinion in more than three decades. The firm has frequently been consulted by the FTC in its own efforts to revive RPA enforcement, and Mr. Poe is a frequent speaker on ABA panels concerning the RPA. SER-41–42. He is also the author of an article titled "*The Critics Are Wrong: How the Robinson-Patman Act Has Been Misunderstood By Its Detractors*," in the Spring 2024 edition of Antitrust Magazine, the ABA Antitrust Law Section's publication. SER-42.

## B.   The District Court's Fees Order

In its order on Wholesalers' fees motion, the district court nowhere made a finding as to what the prevailing hourly rate for antitrust work in the Central District *is*. ER 2–14. Rather than begin its analysis from that fundamental baseline (or even identifying it), the court used its own methodology to arrive at an hourly rate. First, it noted that in conjunction with fee-shifting on a discovery motion in 2019, counsel had proposed hourly rates of $744/$510. 1-ER-7. In making that observation, the court wholly disregarded the explicit caveat that accompanied that five-year-old request—that counsel were proposing those rates in that small discovery dispute sheerly for the sake of expediency, but that they had been awarded *seven years prior to* the instant motion, and in a contract dispute. SER-8. Next, the court observed that "no district court has awarded Plaintiffs' counsel the rates requested here," listing certain fee orders in *non-antitrust* cases in which counsel had prevailed in various localities between 2020 and 2023, ranging from $996 to $1,045/hour. 1-ER-7. Apparently believing that those historic rates for *non-antitrust work* should control, the court declared that it "declines to award a rate that is far above what has previously been awarded, especially given that it could create a new benchmark for Plaintiffs' fee requests in the future." 1-ER-7–8.

Still without reference to prevailing rates for antitrust work in the Central District, the court turned to other fee orders Wholesalers had cited in their briefing, where Central District courts had approved rates higher than those requested here, for non-antitrust work. 1-ER-8. It deemed the rates awarded in those orders irrelevant because they "concern fee awards to 'big law' firms representing large corporate clients." *Id.* The court seemingly reasoned that the size of the firm and the size of its clients is more important than whether the firms do similar work, concluding that "[n]otwithstanding Plaintiffs' counsel's background, accolades, and expertise in this area of the law, it is simply unreasonable to award big law rates to a four-person firm representing mom-and-pop warehouses." *Id.* (emphasis added). To support that view, the court reasoned that "big law firms usually work for large corporate entities who are generally willing and able to pay higher fees than Plaintiffs here." 1-ER-8–9.

Accordingly—and without relying on any of the governing legal principles described *supra* at 49–50—the court concluded that it "relies on the rates awarded in *Trendsettah*, a 2023 decision, to which the Court applies a small upward adjustment to account for the complexity of this action and inflation since 2023," and awarded rates of $1,070 and $975/hour. 1-ER-9. As Wholesalers had pointed out in their briefing, *Trendset-*

54

*tah* was a contract dispute, and the rates adopted there were based on the third quartile for "general litigation" in the 2022 Real Rate Report. SER-31; *see Trendsettah*, 2023 WL 8263365, at *14 (noting same).

In other words, without reference either to the prevailing rate for antitrust work, or to the (undisputed) 6% growth in legal fees in 2024, the district court added $25/hour to the two-year-old rate awarded in a contract dispute. 1-ER-9. That amounts to a 2% increase "to account for the complexity of this action and inflation." 1-ER-9. "Inflation" alone was 6.2% in 2022, 4.8% in 2023, and has not yet been reported for 2024.[9] So the 2% increase over two years was a fraction even of "inflation," let alone an adjustment for antitrust versus contract work.

## C. It Was Reversible Error Not to Identify the Prevailing Rate in the Central District for Antitrust Work.

The district court's first error is entirely controlled by this Court's opinion in *Gonzalez v. City of Maywood*:

> Here, there is no indication that the district court computed Plaintiffs' lodestar figure using the market rate prevailing in the Central District of California for attorneys and paralegals of similar "experience, skill, and reputation" to members of Plaintiffs' legal team working on similarly complex matters. This alone requires us to vacate the fee award and remand. *See Camacho v. Bridgeport Financial, Inc.,* 523 F.3d 973, 980–81 (9th Cir. 2008).

---

[9]  *See* https://data.bls.gov/pdq/SurveyOutputServlet.

729 F.3d 1196, 1206 (9th Cir. 2013). As that opinion elaborated, "no Ninth Circuit case law supports the district court's apparent position that it could determine the hourly rates for the members of Plaintiffs' legal team, without relying on evidence of prevailing market rates." *Id.*

Here, the district court did not set counsel's rates based on what "private attorneys of an ability and reputation comparable to that of prevailing counsel charge their paying clients for legal work of *similar complexity*." *Seachris*, 994 F.3d at 1079 (emphasis in original, citation omitted). Instead, it explicitly set a counsel-specific rate, based on what they had been awarded in a prior contract dispute, with a 1%/year upward adjustment "to account for the complexity of this action and inflation," but which did not account for either. 1-ER-9.

Indeed, to even have a proper sense for what the adjustment for "complexity" would be, the court would first need to ascertain the prevailing rate "for legal work of *similar complexity*." *Seachris*, 994 F.3d at 1079. While "[t]his alone requires us to vacate the fee award and remand," *Gonzalez*, 729 F.3d at at 1206, this Court's analysis should not stop there, lest the district court repeat its other errors in ascertaining the prevailing rate on remand.

### D. The Court Erred by Reducing the Requested Rates Based on the Size of the Wholesalers' Law Firm, and the Size of the Wholesalers Themselves.

While the district court's award was most specifically tied to a prior firm-specific contract award, it seems to have further declined to award the rates that actually prevail for antitrust work due to the size of counsel's firm. 1-ER-8–9. While this Court has not expressly decided whether firm-size is relevant to rates, *Gonzalez*, 729 F.3d at 1208 n.9, numerous district courts have held that it is not. In *Charlebois v. Angels Baseball LP*, for example, the court reasoned that "the Supreme Court and Ninth Circuit have expressly endorsed comparisons to '*lawyers* of reasonably comparable skill, experience, and reputation' and have never required prevailing party's counsel to *also* prove that their *firm* is the same size or has the same level of prestige as that of comparator attorneys." 993 F. Supp. 2d 1109, 1120 (C.D. Cal. 2012) (quoting *Blum v. Stenson*, 465 U.S. at 896 n. 11) (emphasis in *Charlebois*); *see also Minor v. Christie's, Inc.*, 2011 WL 902235, at *7 n.3 (N.D. Cal. Jan. 29, 2011) ("In determining reasonable rates, however, the relevant test is 'comparable expertise, education and reputation'—there is no reference to size and scope of the large firm [and] there is no direct correlation between size of the firm and the expertise of the lawyer."); *Myles v. Cnty. of San Diego*, 2023 WL

6391481, at *3–4 (S.D. Cal. Sept. 29, 2023) ("The Court is not persuaded by Mr. Schratz's opinion which is based on criteria the Court finds irrelevant, namely the size of the firm.").

As *Charlebois* noted, the controlling precedent all refers to "attorneys" of similar skill, experience, and reputation, not to "firms" of a given reputation. 993 F. Supp. 2d at 1120; *see, e.g.*, *Gonzalez*, 729 F.3d at 1205–06 ("Within this geographic community, the district court should 'tak[e] into consideration the experience, skill, and reputation of the *attorney*'") (emphasis added, quoting *Dang v. Cross*, 422 F.3d 800, 813 (9th Cir. 2005)). Nevertheless, while acknowledging "counsel's background, accolades, and expertise in this area of the law," the court declared that "it is simply unreasonable to award [them] big law rates." 1-ER-8. The court reasoned that "firm size serves as a proxy," because "big law firms usually work for large corporate entities who are generally willing and able to pay higher fees than Plaintiffs here." 1-ER-08–9. It contrasted such firms with firms like Wholesalers' counsel, and their clientele of "mom-and-pop warehouses." 1-ER-08.

As an initial matter, the court's pejorative "mom-and-pop" description is grossly inaccurate. Plaintiff Pitco Foods has averaged $620-$650 million in sales over the last five years, and employs 450 people. 9-ER-2113. Even if Wholesalers were two-person businesses however, the court's reasoning is plainly erroneous. Trial courts are not to award fees based on the size of the *client* being represented. Rates are set based on pre-

vailing rates for "legal work of *similar complexity*," *Seachris*, 994 F.3d at 1079, and prevailing counsel are entitled to "no more, no less." *Moreno*, 534 F.3d at 1111.

Importantly, adopting the district court's view would create a directional disparity in the rates that are paid for *identical* legal work, depending on whether the work was performed by a member of the plaintiffs' antitrust bar, or the defense bar. It is very unusual for antitrust plaintiffs to be represented by "big law firms," and equally unusual for "large corporate entities" to appear as antitrust plaintiffs. 1-ER-8–9. So while the judiciary has no ability to oversee the free-market rates that "large corporate entities" pay defense counsel, applying a downward adjustment against small firms and their "mom and pop" plaintiffs would constitute a thumb on the scale, such that members of the antitrust plaintiffs' bar would almost never be awarded the paid hourly rates that *actually* prevail in a given locality for identical work. *Cf. Seachris*, 994 F.3d at 1076 (holding that fee awards "must be based on the rates charged to clients of private law firms for *similar* work."). This would be a particular oddity given that—by definition in this posture—the plaintiffs' lawyers were the ones who *prevailed* over the "big firms" and their "large corporate" clients. Suffice it to say, the district court's rationale is not condoned by any precedent, and would dis-serve the purposes of fee-shifting in antitrust cases. *Supra* at 47–48.

### E. The District Court Erred by Relying on Hourly Rates for "General Litigation," and by "Holding the Line" at Historic Rates.

As noted, the district court tied its approved rates to the rates counsel had been awarded in *Trendsettah*, a breach of contract case. 1-ER-9 ("the Court relies on the rates awarded in *Trendsettah*"). But that award was expressly based on *2022* rates, and for "general litigation." *Trendsettah*, 2023 WL 8263365, at *14 ("the Court finds the 2022 Real Rate Report third quartile Los Angeles rate for general litigation to be a reasonable basis for Gaw|Poe's rates."). Even supposing that the district court here was permitted to award "general litigation" rates rather than antitrust rates, courts are required to use "the most current information available." *Seachris*, 994 F.3d at 1077. The 2023 Real Rate Report was presented to the court, and it reported the third-quartile rate for "general litigation" partners in Los Angeles to be $1,159 even as of 2023, a full year prior to Wholesalers' 2024 fees motion. SER-80.

But this was doubly error because the district court was *not* permitted to award only the rate for "general litigation." Antitrust cases are "widely acknowledged to be among the most complex actions to prosecute." *In re Lithium Ion Batteries Antitrust Litig.*, 2020 WL 7264559, at *15 (N.D. Cal. Dec. 10, 2020), *aff'd*, 2022 WL 16959377 (9th Cir. Nov. 16, 2022) (collecting citations). And even among the three antitrust statutes, "numerous courts and commentators have noted that Robinson-Patman is

one of the most difficult, if not inscrutable, antitrust laws in existence." *Precision Printing Co. v. Unisource Worldwide, Inc.*, 993 F. Supp. 338, 345 (W.D. Pa. 1998) (collecting sources). The district court itself acknowledged counsel's "background, accolades, and expertise in this area of the law," 1-ER-8, and rates must be tied to those paid to "attorneys … of similar 'experience, skill, and reputation' … working on similarly complex matters." *Gonzalez*, 729 F.3d at at 1206; *see also Seachris*, 994 F.3d at 1078–79; *Roberts*, 938 F.3d at 1024–25.

Disregarding the controlling authorities for rate-setting, the district court seems to have been overly concerned with the future income of Wholesalers' counsel. The court worried that if counsel were awarded the rate that actually prevails for antitrust work, they would be able to cite that rate as "a new benchmark for Plaintiffs' fee requests in the future." 1-ER-8. This was improper. This Court's precedents are very clear that "the adjudicator's function 'is not to 'hold the line' at a particular rate,'" *Seachris*, 994 F.3d at 1079 (quoting *Moreno*, 534 F.3d at 1115), but to simply award the prevailing rate for similar work, "no more, no less." *Moreno*, 534 F.3d at 1111.

## VIII. THE DISTRICT COURT MISAPPLIED ALL FOUR FAC-TORS FOR EVALUATING THE PROPRIETY OF A FEE ENHANCEMENT UNDER CALIFORNIA LAW.

In addition to rates, the Court should remand for a proper analysis of whether Wholesalers are entitled to an enhancement to their raw lodestar for succeeding on their California cause of action.

### A. Standard of Review

A trial court's decision of whether to apply an enhancement to the raw lodestar is reviewed for abuse of discretion. *Cates v. Chiang*, 213 Cal. App. 4th 791, 823 (2013). "A court may abuse its discretion if it uses incorrect legal standards, which we review de novo." *E.E.O.C. v. Bruno's Rest.*, 13 F.3d 285, 287 (9th Cir. 1993); *see also Smith v. CMTA-IAM Pension Tr.*, 746 F.2d 587 (9th Cir. 1984) (district court abused its discretion by misapplying factors to be considered in making fee award).

### B. Fee Enhancements Under California Law

"[W]hen a plaintiff succeeds on both federal and state claims that support a fee award, the state-law multiplier is available." *Chaudhry v. City of Los Angeles*, 751 F.3d 1096, 1112 (9th Cir. 2014). The framework for evaluating fee enhancements under California law is very different from the high bar for enhancements under federal law. Due to those differences, "[a]n upward or downward adjustment from the lodestar figure

62

will be far more common under California law than under federal law." *Muniz v. United Parcel Serv., Inc.*, 738 F.3d 214, 221 n.4 (9th Cir. 2013) (citation omitted).

Unlike federal law, under California law "the unadorned lodestar reflects the general local hourly rate for a *fee-bearing* case; it does *not* include any compensation for contingent risk, extraordinary skill, or any other factors a trial court may consider." *Ketchum v. Moses*, 24 Cal. 4th 1122, 1138 (2001) (emphasis in original). In *Ketchum*, the California Supreme Court set out four particular factors for trial courts to evaluate in determining the propriety of an enhancement: "(1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the contingent nature of the fee award." *Id.* at 1132.

Here, the district court's discussion of the four *Ketchum* factors misapplied all four. After quoting the foregoing list, the court referenced its preceding discussion of the propriety of a *federal* enhancement, stating: "As already noted, most of the factors have already been considered in the Court's lodestar calculation." 1-ER-14. The final two sentences of its one-paragraph discussion addressed only the third factor above: whether pursuing this case had precluded counsel from taking other cases. *Id.* This was error as to all four factors.

## C. The District Court Failed to Evaluate the Novelty and Difficulty of the Questions Involved, or Counsel's Skill in Presenting Them.

In discussing the propriety of a *federal* enhancement, the district court recited the "novelty and complexity" and "counsel's skill" factors, and flatly stated that it had "already taken these factors into account in its lodestar determination and therefore cannot rely on them to award a multiplier." 1-ER-13. But merely saying that those factors were "taken into account" is different from actually taking them into account. The court did not actually address or evaluate either factor, but instead pinned its rate award to *Trendsettah*, while making no mention of the novelty or complexity of *this* case, or counsel's skill in pursuing it. 1-ER-8–11. As this Court has explained, "'[a]bsent some indication of how the district court's discretion was exercised, we have no way of knowing whether that discretion was abused.'" *Gonzalez*, 729 F.3d at 1211 (quoting *Chalmers v. City of Los Angeles*, 796 F.2d 1205 (9th Cir. 1986)); *see also Roberts*, 938 F.3d at 1025 ("'If the district court fails to provide a clear indication of how it exercised its discretion, we will remand the fee award for the court to provide an explanation.'") (quoting *McGrath v. Cnty. of Nevada*, 67 F.3d 248, 253 (9th Cir. 1995)).

With particular respect to the UPA claim that was the basis of Wholesalers' request for a state-based enhancement, the district court nowhere accounted for the fact that counsel's success was truly "novel"—in the

literal sense: As Wholesalers emphasized without dispute from Prestige, their jury verdict is apparently the first plaintiff-side jury verdict in the 83-year history of section 17045. SER-33, SER-44. Even if the district court had included a discussion of the topic, concluding that the "novelty and complexity" of obtaining a first-in-history victory on a state-law antitrust claim is "accounted" for by awarding the same rates counsel had received in a garden-variety contract case (with a 1%/year true-up) would itself be an abuse of discretion, in the sense of being "illogical, implausible or without support in inferences that may be drawn from the facts in the record." *Su v. Bowers*, 89 F.4th 1169, 1177 (9th Cir. 2024) (citations omitted). In any event, since "the district court fail[ed] to provide a clear indication of how" either the number of approved hours or the *Trendsettah* rate had *already* accounted for the novelty and complexity of the issues in *this* case (or counsel's skill in presenting them) this Court should "remand the fee award for the court to provide an explanation." *Roberts*, 938 F.3d at 1025 (citation omitted).

### D. This Was a Contingency Case, and Contingent Risk Is Not Subsumed Within the Lodestar Under California Law.

As with the first two factors, the district court suggested that its discussion of federal enhancement principles disposed of the need to evaluate "the contingent nature of the fee award," under *California* law. *Ketchum*, 24 Cal. 4th at 1132, 1-ER-14. Its error here was two-fold.

First, the court's preceding discussion had reasoned that this case was "not truly contingent" since "[s]o long as Plaintiffs were the prevailing party, counsel was guaranteed recovery of fees for the reasonable hours worked." 1-ER-13. This reasoning makes no sense. The words "so long as Plaintiffs were the prevailing party," *id.*, are precisely what constituted "the contingent nature of the fee award." *Ketchum*, 24 Cal. 4th at 1132. The district court cited *Peraza v. Ford Motor Co.*, 2022 WL 3098062, at *1 (C.D. Cal. May 27, 2022) to support the view that a case is not contingent if the plaintiff is entitled to statutory fees if it prevails. 1-ER-13. For that proposition, *Peraza* had cited *Weeks v. Baker & McKenzie*, 63 Cal. App. 4th 1128, 1175 (1998). But the unpublished *Peraza* opinion failed to appreciate that *Weeks* had been decided four years before *Ketchum*, and that post-*Ketchum* California authority holds that *Ketchum* abrogated that aspect of *Weeks* by "reaffirm[ing] that contingent risk is a valid consideration … in cases where attorney fees are authorized by statute." *Greene v. Dillingham Constr., N.A., Inc.*, 101 Cal. App. 4th 418, 428–29

(2002) (reversing a *Weeks*-based enhancement denial). It was plainly erroneous for the district court to rely on an unpublished federal case to deny enhancement based on the view that this case was "not truly contingent," 1-ER-13, where controlling California authority holds otherwise.

Second, the court erred in reasoning that "the hourly rate calculation already accounts for the contingency risk." *Id.* While that is true under federal law,[10] "[u]nlike federal law, California law allows for a multiplier of the lodestar to compensate for the risk of contingent representation." *Chaudhry*, 751 F.3d at 1112 (citing *Ketchum*). As *Chaudhry* indicates, the district court's rationale that the unadorned lodestar already accounts for contingent risk is squarely contradicted by *Ketchum*. As that case explains: "[u]nder our precedents, the unadorned lodestar reflects the general local hourly rate for a *fee-bearing case*; it does *not* include any compensation for contingent risk." *Ketchum*, 24 Cal. 4th at 1138. *Ketchum* further explained: "'A contingent fee must be higher than a fee for the same legal services paid as they are performed. The contingent fee compensates the lawyer not only for the legal services he renders but for the loan of those services.'" *Id.* at 1132 (quoting Richard Posner, Economic Analysis of Law 534, 567 (4th ed. 1992)). While a contingency-based enhancement remains discretionary, more recent authority strongly suggests that some degree of enhancement is essential: "'Our courts have recognized that an enhanced fee award *is necessary* to com-

---

[10]   *City of Burlington v. Dague*, 505 U.S. 557, 566 (1992).

pensate attorneys for taking such risks: A contingent fee *must be higher* than a fee for the same legal services paid as they are performed.'" *Pellegrino v. Robert Half Int'l, Inc.*, 182 Cal. App. 4th 278, 292 (2010) (quoting *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1217 (2008)) (emphasis added). The district court's manifest failure to consider any of this controlling authority was an abuse of discretion.

### E. Attorneys Need Not Forgo Hourly Work, or Work in Different Practice Areas, to Satisfy the "Precluded Other Employment" Factor.

The only one of the four *Ketchum* factors that the district court specifically considered in its one-paragraph discussion of California enhancement principles was "'the extent to which the nature of the litigation precluded other employment by the attorneys.'" 1-ER-14 (quoting 24 Cal. 4th at 1132). And it erred there also. It reasoned that this factor had not been demonstrated because "[t]he cases that Plaintiffs had to forego are all RPA cases . . . and likely would have involved similarly complicated legal issues, protracted years of litigation, and contingency risks." *Id.* The court cited no authority for that rationale, which is entirely illogical. Substitute "RPA" with "civil rights" and the district court's rationale would mean that a firm specializing in civil rights work could only satisfy this factor by showing that to pursue the civil rights case at bar, it had forgone the opportunity to take on hourly-paid, *non*-civil

rights work. The same with plaintiff-side employment firms, personal injury firms, and all other practice areas that primarily or exclusively focus on contingency litigation. The court's reasoning is doubly irrational because those are precisely the practices for which fee enhancements are *designed*. *Ketchum*, at 1133 ("Such fee enhancements are intended to compensate for the risk of loss generally in contingency cases *as a class*.").

Moreover, the district court's rationale evinces an unconscious bias favoring hourly-paid work. Under the court's rationale, forgone contingency cases would not count as forgone work, while paid hourly cases would. This despite the factor making *less* sense in the hourly context than in the contingent. That is, forgoing hourly work means that an attorney passes up on earning only her unadorned lodestar, meaning that she didn't *forgo* anything by taking on the case at bar since—by definition in this posture—she is *already* being awarded at least that same hourly rate. But where an attorney forgoes one contingency case to work on another, one can never know whether the forgone case would have settled more quickly and profitably, or have gone to trial and been a homerun, in either event potentially yielding a contingent fee far higher than the corresponding hourly rate. Since there is neither precedential nor logical support for the district court's ruling that forgone contingency cases cannot satisfy this *Ketchum* factor, this factor too should be remanded for evaluation under the correct rules.

# CONCLUSION

For the foregoing reasons, this Court should affirm the judgment below, affirm the district court's permanent injunction, but vacate and remand the award of attorneys' fees with instructions for the district court to (1) set hourly rates for Wholesalers' counsel commensurate with the prevailing rate for antitrust work in the Central District of California by attorneys of comparable skill, experience, and reputation; and (2) evaluate the propriety of a fee enhancement associated with counsel's success on Wholesalers' UPA claim pursuant to the factors set forth in *Ketchum*.

Gaw | Poe LLP

Respectfully submitted,

Dated: December 9, 2024     By: /s/ Mark Poe
_____

Attorney for Plaintiffs - Appellees

## Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**   24–3776, 24–5009, 24–5227

I am the attorney or self-represented party.

**This brief contains 16,100 words,** including zero words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32–1.

[X] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1–1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29–2(c)(2), or Cir. R. 29–2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32–4.

[ ] complies with the longer length limit permitted by Cir. R. 32–2(b) because *(select only one)*:

[ ] it is a joint brief submitted by separately represented parties.

[ ] a party or parties are filing a single brief in response to multiple briefs.

71

[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32–2(a).

Dated: December 9, 2024         By: /s/ Mark Poe

                                    Attorney for Plaintiffs - Appellees

## Certificate of Service

I hereby certify that I electronically filed the foregoing **PLAINTIFF-APPELLEE WHOLESALERS' COMBINED ANSWERING BRIEF AND OPENING BRIEF ON CROSS-APPEAL** with the Clerk of the Court by using the Appellate CM/ECF system on **December 9, 2024**. I further certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated: December 9, 2024                    By: /s/ Mark Poe

                                                     Attorney for Plaintiffs - Appellees