**Nos. 24-3776, 24-5009, 24-5227**

_____

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

L.A. INTERNATIONAL CORP., ET AL.,

*Plaintiffs-Appellees*,

v.

PRESTIGE BRANDS HOLDINGS, INC. AND MEDTECH PRODUCTS, INC.

*Defendants-Appellants*.

On Appeal from the United States District Court
for the Central District of California
No. 2:18-cv-06809-MWF-MRW
Hon. Michael W. Fitzgerald

_____

**PLAINTIFF-APPELLEE WHOLESALERS' SUPPLEMENTAL EXCERPTS OF RECORD**

_____

Mark Poe
Randolph Gaw
GAW | POE LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
415.766.7451
mpoe@gawpoe.com
*Attorneys for Plaintiffs-Appellees*

**INDEX**

| Document | Date | Dkt. No | SER |
|---|---|---|---|
| Excerpts of Wholesalers' Reply Brief ISO Mot. for Attorneys' Fees | 6/24/2024 | 386 | 5 |
| Excerpts of Prestige's Brief in Opp. to Wholesalers' Mot. for Attorney's Fees | 6/17/2024 | 384 | 9 |
| Excerpts of Decl. of Grant Stiefel in Opp. to Wholesalers' Mot. for Attorney's Fees | 6/17/2024 | 384-1 | 26 |
| Excerpts of Wholesalers' Mot. for Attorneys' Fees | 6/3/2024 | 377 | 29 |
| Decl. of Mark Poe ISO Wholesalers' Mot. for Attorneys' Fees | 6/3/2024 | 377-1 | 35 |
| Decl. of Gerald Knapton ISO Wholesalers' Mot. for Attorneys' Fees | 6/3/2024 | 377-9 | 47 |
| Excerpts of 2023 Real Rate Report (Ex. 3 to Knapton Decl.) | 6/3/2024 | 377-12 | 74 |
| Excerpts of Deposition Testimony of Prestige witness Bill Maher (played at trial) | 12/14/2023 | 319-1 | 81 |
| Excerpts of Deposition Testimony of Costco witness Jonathan Christian (played at trial) | 12/9/2023 | 310-2 | 85 |
| Proposed Jury Instructions dropping Select Corporation | 12/4/2023 | 298 | 91 |
| Order Setting Jury Trial for Dec. 5, 2023 | 4/21/2023 | 278 | 93 |
| Order Setting Jury Trial for April 25, 2023 | 11/30/2022 | 275 | 95 |
| Order Setting Jury Trial for Dec. 6, 2022 | 5/10/2022 | 271 | 97 |
| Joint Status Report | 4/22/2022 | 265 | 98 |

| | | | |
|---|---|---|---|
| Excerpts of Jointly Proposed Jury Instructions | 12/9/2019 | 236 | 102 |
| Excerpts of Prestige Statement of Genuine Material Facts in Opp. to Summ. J. | 9/16/2019 | 126-15 | 108 |
| **Exhibits Admitted at Trial** | | | |
| Ex. 5 (Mar. 31, 2016 email attaching price increase letter to Wholesalers) | 11/5/2023 | | 111 |
| Ex. 26 (June 12, 2018 email reporting Costco sell price) | 11/5/2023 | | 113 |
| Ex. 46 (Table reporting relative cost and margin for Clear Eyes sold to Wholesalers vs. Costco) | 11/5/2023 | | 114 |
| Ex. 71 (Sep. 15, 2016 email re Costco inventory) | 11/5/2023 | | 117 |
| Ex. 75 (June 28, 2018 email re Costco inventory) | 11/5/2023 | | 118 |
| Ex. 110 (June 30, 2016 email attaching price increase letter to Costco) | 11/5/2023 | | 119 |
| Ex. 477 (May 7, 2021 price increase letter to Costco) | 11/5/2023 | | 121 |
| Ex. 491 (Chart of Clear Eyes sales for AKR Corp.) | 11/5/2023 | | 122 |
| Ex. 494 (Chart of Clear Eyes sales for Border Cash & Carry) | 11/5/2023 | | 123 |
| Ex. 498 (Chart of Clear Eyes sales for Excel Wholesale) | 11/5/2023 | | 124 |
| Ex. 500 (Chart of Clear Eyes sales for LA International) | 11/5/2023 | | 125 |
| Ex. 507 (Chart of Clear Eyes sales for LA Top) | 11/5/2023 | | 126 |
| Ex. 511 (Chart of Clear Eyes sales for Manhattan Wholesalers) | 11/5/2023 | | 127 |

| | | | |
|---|---|---|---|
| Ex. 515 (Chart of Clear Eyes sales for Pitco Foods) | 11/5/2023 | | 128 |
| Ex. 518 (Chart of Clear Eyes sales for Value Distributor) | 11/5/2023 | | 129 |

1   MARK POE (S.B. #223714)
      mpoe@gawpoe.com
2   RANDOLPH GAW (S.B. #223718)
      rgaw@gawpoe.com
3   VICTOR MENG (S.B. #254102)
      vmeng@gawpoe.com
4   GAW | POE LLP
5   4 Embarcadero, Suite 1400
    San Francisco, CA 94111
6   Telephone: (415) 766-7451
    Facsimile: (415) 737-0642
7

8   Attorneys for Plaintiffs

9

10

11                  **UNITED STATES DISTRICT COURT**

                    **CENTRAL DISTRICT OF CALIFORNIA**
12

13  L.A. INTERNATIONAL CORP., et      Case No. 2:18-cv-06809-MWF-MRW
    al.,
14                                     **PLAINTIFFS' REPLY IN**
                  Plaintiffs,          **SUPPORT OF THEIR MOTION**
15                                     **FOR ATTORNEYS' FEES AND**
          v.                           **COSTS**
16
    PRESTIGE BRANDS HOLDINGS,
17  INC., et al.,                      Date:        July 8, 2024
                                       Time:        10:00 a.m.
18                Defendants.          Courtroom:   5A
19

20

21

22

23

24

25

26

27

28

Prestige's short brief offers five arguments in opposition to Plaintiffs' motion for attorneys' fees and costs.  Plaintiffs respond to those arguments in the same order as Prestige presents them.

## I.   THE COURT SHOULD REJECT ALL OF PRESTIGE'S ARGUMENTS FOR REDUCING PLAINTIFFS' REQUESTED FEE AWARD.

### A.   Prestige's Arguments Against Mr. Knapton's Proposed Rates are Misplaced.

Prestige's arguments against Mr. Knapton's proposed rates are divided between its brief, and the declaration of its expert, Mr. Grant Stiefel.  Because the contentions in those filings differ in some important respects, Plaintiffs address them separately.

#### 1.   Prestige's arguments misapply the governing law.

Prestige accurately recites the legal standard for determining a reasonable hourly rate in fee-shifting cases, Opp. at 2-3, but every one of its ensuing arguments against the rates proposed by Mr. Knapton is wrong.

First, it cites two fee decisions this Court made in lemon law cases to argue that Mr. Knapton's proposed rates are too high.  Beginning with *Matevosyan v. Mercedes-Benz USA, LLC*, No. 22-CV-4679-MWF-JEMX, 2023 WL 8125448 (C.D. Cal. July 10, 2023), Prestige contends that "*the actual rates charged by the attorneys* in non-contingent cases are equally, if not more influential" in rate-setting than the prevailing rates set forth in the Real Rate Report.  Opp. at 3 (emphasis in original).  But *Matevosyan* does not say that.  This Court instead noted the conflicting evidence between the rate approved for the attorney in a past lemon law case, and the rate he claimed as his rack rate, and "a*nswer[ed] that question* by turning to a third source, the Real Rate Report."  *Matevosyan*, 2023 WL 8125448, at __[1] (emphasis added). Furthermore, even assuming that an attorney's actual rate charged to hourly clients

---

[1]  Westlaw's online version of *Matevosyan* does not include pagination, but this appears at page 6 of the opinion when printed to .pdf.

1    is relevant to rate-setting under state law, the Ninth Circuit squarely holds that it is

2    irrelevant under federal law.  *See Welch v. Metro. Life Ins. Co.*, 480 F.3d 942, 946

3    (9th Cir. 2007) ("We have repeatedly held that the determination of a reasonable

4    hourly rate 'is not made by reference to the rates actually charged the prevailing

5    party.'") (quoting *Mendenhall v. Nat'l Transp. Safety Bd.*, 213 F.3d 464, 471 (9th

6    Cir. 2000)).

7        Second, Prestige argues that Plaintiffs' counsel are not entitled to the

8    prevailing rate for antitrust attorneys of similar skill and experience because "Gaw |

9    Poe is not a large firm," referencing the Real Rate Report's data for "small firms in

10   the Los Angeles market."  Opp. at 3-4.  It cites no authority supporting the relevance

11   of firm-size, probably because that argument has been roundly rejected.  As explained

12   in *Charlebois v. Angels Baseball LP*, "the Supreme Court and Ninth Circuit have

13   expressly endorsed comparisons to '*lawyers* of reasonably comparable skill,

14   experience, and reputation' and have never required prevailing party's counsel to

15   *also* prove that their *firm* is the same size or has the same level of prestige as that of

16   comparator attorneys." 993 F. Supp. 2d 1109, 1120 (C.D. Cal. 2012) (quoting *Blum*

17   *v. Stenson*, 465 U.S. 886, 896 n. 11 (1984)) (emphasis in *Charlebois*); *see also Pierce*

18   *v. Cnty. of Orange*, 905 F. Supp. 2d 1017, 1037 n.17 (C.D. Cal. 2012) ("a firm's size

19   is not relevant to considering the reasonableness of hourly rates without evidence that

20   the work done by attorneys at smaller firms is meaningfully different from the work

21   done by attorneys at large firms.").

22       Other districts in California agree.  *See, e.g.*, *Minor v. Christie's, Inc.*, 2011

23   WL 902235, at *7 (N.D. Cal. Jan. 29, 2011) ("In determining reasonable rates,

24   however, the relevant test is 'comparable expertise, education and reputation'—there

25   is no reference to size and scope of the large firm [and] there is no direct correlation

26   between size of the firm and the expertise of the lawyer."); *Myles v. Cnty. of San*

27   *Diego*, 2023 WL 6391481, at *3–4 (S.D. Cal. Sept. 29, 2023) ("The Court is not

28   persuaded by Mr. Schratz's opinion which is based on criteria the Court finds

1   irrelevant, namely the size of the firm.").

2        Next, Prestige and its expert find significance in Plaintiffs' omission of the

3   $1,000/hour rate awarded to Gaw | Poe on a sanctions motion in *Silicon Genesis*

4   *Corp. v. Ev Grp. E. Thallner GmbH*, No. 22-CV-04986-JSC (N.D. Cal. Apr. 15,

5   2024) (order attached as Ex. D to Decl. of Grant Stiefel).  Had either the lawyers or

6   the expert reviewed the associated motion papers, however, they would have seen

7   that counsel requested that rate as a matter of expedience, noting that it had been

8   awarded "[m]ore than three years ago" by another judge in the Northern District, and

9   that upon prevailing on the merits at trial, Gaw | Poe "intends to obtain expert opinion

10  as to the reasonable rate that prevails in this District at the time of such motion."  *See*

11  Reply Decl. of Mark Poe, Ex. H at ¶ 3 & n.1 (Decl. of Mark Poe Re: Contempt

12  Sanctions).  The same pattern holds for Prestige's excitement at counsel having

13  proposed a $744/hour rate in conjunction with a discovery motion in this case five

14  years ago.  Opp. at 5-6.  That supporting declaration explained that counsel were

15  relying on the rate that had been awarded by Judge Selna in a contract dispute "[o]ver

16  two years ago, in February 2017."  Decl. of Mark Poe ISO Pls.' Mot. to Compel ¶ 16

17  (ECF No. 78-2).  That is now *seven* years ago, counsel all have seven years' more

18  experience, and are entitled to antitrust rates, not contract-dispute rates.  Moreover,

19  on those motions there was only $66,000 and $13,000 at stake respectively, so it

20  would have made little economic sense to engage a fees expert to opine on the precise

21  hourly rate prevailing at the time, in the forum, for "similar work."

22        As another challenge to Mr. Knapton's proposed rates, Prestige complains:

23  "Nor do Plaintiffs cite any Central District case where an attorney was awarded

24  $1,314 per hour."  Opp. at 4.  Prestige must have overlooked the paragraph at page

25  14 of Plaintiffs' brief, where Plaintiffs cited three Central District cases from the last

26  two years, where courts awarded hourly rates of $1,364.70, $1,370, and $1,295—all

27  in cases of significantly less complex subject matters.  *See* Mot. at 14 (collecting

28  cases).  Adding to that list, last year Judge Selna approved hourly rates to Gaw | Poe's

- 3 -

1   Michael L. Fox (SBN 173355)
    Sean Patterson (SBN 234565)
2   Christine C. Ross (SBN 280646)
    **DUANE MORRIS LLP**
3   Spear Tower
    One Market Plaza, Suite 2200
4   San Francisco, CA  94105-1127
    Telephone: +1 415 957 3000
5   Fax: +1 415 957 3001

6   Robert Kum (SBN 185530)
    **DUANE MORRIS LLP**
7   865 South Figueroa Street, Suite 3100
    Los Angeles, CA  90017-5450
8   Telephone: +1 213 689 7400
    Fax: +1 213 689 7401
9   E-mail: mlfox@duanemorris.com
             rkum@duanemorris.com
10            cspatterson@duanemorris.com
             ccross@duanemorris.com
11
    Attorneys for Defendants
12  PRESTIGE CONSUMER HEALTHCARE INC.
    (fka "Prestige Brands Holdings, Inc.") and
13  MEDTECH PRODUCTS INC.

14
                  **UNITED STATES DISTRICT COURT**
15
                  **CENTRAL DISTRICT OF CALIFORNIA**
16

17
    L.A. INTERNATIONAL CORP.,            Case No.: 2:18-cv-06809-MWF-MRW
18  MANHATTAN WHOLESALERS INC.,
    EXCEL WHOLESALE DISTRIBUTORS         **DEFENDANTS' OPPOSITION TO**
19  INC., VALUE DISTRIBUTOR, INC.,       **PLAINTIFFS' MOTION FOR**
    BORDER CASH & CARRY, INC., AKR       **ATTORNEYS' FEES AND COSTS**
20  CORPORATION, U.S. WHOLESALE
    OUTLET & DISTRIBUTION, INC.;         Date:      July 8, 2024
21  SANOOR, INC. (d/b/a L.A. TOP         Time:      10:00 a.m.
    DISTRIBUTOR); PITTSBURG              Judge:     Hon. Michael W. Fitzgerald
22  WHOLESALE GROCERS, INC.; and         Courtroom:  5A
    PACIFIC GROSERVICE, INC.
23
                      Plaintiffs,
24
25           v.

26  PRESTIGE BRANDS HOLDINGS, INC.
    and MEDTECH PRODUCTS INC.,
27
                      Defendants.
28

DM1\15429162.4

OPP. TO MOTION FOR ATTORNEYS' FEES          CASE NO.: 2:18-CV-06809-MWF-MRW

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................. 1

II.     ARGUMENT........................................................................................ 2

     A.     Plaintiffs' Proposed Hourly Rates are Far from Reasonable. .................. 2

     B.     Plaintiffs' Counsel—and Especially the Gaw | Poe Partners—
Billed an Unreasonable Amount of Hours. ............................................... 6

     C.     Given the Relatively Low Verdict, No Enhancement is Warranted. ........ 7

     D.     Plaintiffs' Rejection of Defendants' Rule 68 Offer of Judgment
Warrants a Reduction in Fees. ................................................................. 10

     E.     The Court Should Not Order Reimbursement of Non-Taxable
Costs. ......................................................................................................... 12

III.    CONCLUSION ................................................................................. 12

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Anaheim Union High Sch. Dist. v. J.E.*
    2:12-cv-6588-MWF (C.D. Cal. July 11, 2013) ........................................................... 4

*Antoninetti v. Chipotle Mexican Grill, Inc.*
    49 F. Supp. 3d 710 (S.D. Cal. 2014) ........................................................... 8

*Avery v. Pac. Coachworks, Inc.*
    2020 WL 8461471 (C.D. Cal. Nov. 13, 2020) ........................................................... 4

*Beauchamp v. Anaheim Union High Sch. Dist.*
    816 F.3d 1216 (9th Cir. 2016) ........................................................... 2

*Bridgeport Music, Inc. v. WB Music Corp.*
    520 F.3d 588 (6th Cir. 2008) ........................................................... 7

*Chaudhry v. City of L.A.*
    751 F.3d 1096 (9th Cir. 2014) ........................................................... 3

*In re Fine Paper Antitrust Litigation*
    751 F.2d 562 (3d Cir. 1984) ........................................................... 7

*Gold v. NCO Financial Systems, Inc.*
    No. 09cv1646-LAB (CAB), (S.D. Cal. Aug. 20, 2010) ........................................................... 7

*Haworth v. State of Nev.*
    56 F.3d 1048 (9th Cir. 1995) ........................................................... 10-12

*Hensley v. Eckhart*
    461 U.S. 424 (1983) ........................................................... 9

*Hiken v. Dep't of Def.*
    836 F.3d 1037 (9th Cir. 2016) ........................................................... 2

*Kerr v. Screen Extras Guild, Inc.*
    526 F.2d 67 (9th Cir. 1975) ........................................................... 8

*Liang v. AWG Remarketing, Inc.*
    2016 WL 428294 (S.D. Ohio Feb. 4, 2016) ........................................................... 7

*Magic Laundry Services, Inc. v. Workers United Service Emp. Int'l Union*
  2:12-cv-09654-MWF-AJW (C.D. Cal. June 21, 2013) .............................................. 4

*Matevosyan v. Mercedes-Benz USA, LLC*
  2023 WL 8125448 (C.D. Cal. Jul. 10, 2023) ....................................................... 3, 7

*Run Guo Zhang v. Lin Kumo Japanese Restaurant Inc.*
  2015 WL 5122530 (S.D.N.Y. Aug. 31, 2015) ......................................................... 7

*Russell v. Walmart Inc.*
  2024 WL 305388 (C.D. Cal. Jan. 2, 2024) ........................................................... 11

*Silicon Genesis Corp. v. Ev Grp. E. Thallner Gmbh*
  Case No. 22-cv-04986-JSC (N.D. Cal. April 15, 2024) ........................................... 4

*Stanger v. China Elec. Motor, Inc.*
  812 F.3d 734 (9th Cir. 2016) ............................................................................. 8

*Zeigler v. Cnty. of San Luis Obispo*
  2023 WL 3432238 (C.D. Cal. Mar. 1, 2023) .................................................... 5, 11

**California Cases**

*Chavez v. City of Los Angeles*
  47 Cal. 4th 970, 104 Cal. Rptr. 3d 710 (2010) ................................................... 8-9

*Envtl. Prot. Info. Ctr. v. California Dep't of Forestry & Fire Prot.*
  190 Cal. App. 4th 217, 118 Cal. Rptr. 3d 352 (2010) .......................................... 8-9

*Sokolow v. Cty. of San Mateo*
  213 Cal. App. 3d 231, 261 Cal. Rptr. 520 (Ct. App. 1989) ...................................... 9

*Thayer v. Wells Fargo Bank*
  92 Cal. App. 4th 819, 112 Cal. Rptr. 2d 284 (2001) ............................................ 10

*Weeks v. Baker & McKenzie*
  63 Cal. App. 4th 1128, 74 Cal. Rptr. 2d 510 (1998) ............................................ 10

Defendants Prestige Consumer Healthcare Inc. (fka "Prestige Brands Holdings, Inc.") and Medtech Products Inc. ("Defendants") hereby submit this Opposition to Plaintiffs' Motion Attorneys' Fees and Costs (ECF No. 377) (the "Motion"):

## I. INTRODUCTION

Plaintiffs' Motion should be denied in part for five reasons. First, the requested hourly rates for Plaintiffs' counsel are too high and do not reflect a reasonable rate. This position is supported by the expert opinion of Grant D. Stiefel, whose declaration is submitted with this Opposition. In the instant litigation, Plaintiffs previously requested hourly rates of $744 per hour for partners. Tellingly, that previously requested rate almost exactly matches the highest hourly rate defense counsel has charged Defendants. Also, Plaintiffs' expert fails to account for the fact that Gaw | Poe is a small firm with four attorneys when comparing them some of the largest firms in Los Angeles.

Second, the fee award should be reduced because the Gaw | Poe partners billed too many hours. That is, by failing to delegate any tasks to associates and paralegals, a reduction to the lodestar is warranted.

Third, Plaintiffs' counsel do not deserve an enhancement (and especially not double their own inflated calculations). Plaintiffs overstated the jury's verdict and the Court's findings, which delivered nothing to one of the plaintiffs and higher prices for Clear Eyes Pocket Pal across the country.

Fourth, Plaintiffs rejected Prestige's December 2019 Rule 68 offer of judgment in the amount of $450,000. When comparing this offer to the ultimate recovery to Plaintiffs, a further reduction is necessary.

Fifth, the Court should not order reimbursement of Plaintiffs' non-taxable costs. Plaintiffs cannot utilize a California statute to deliver cost-recovery to all Plaintiffs, including those whose businesses are in New York and elsewhere, with no applicability to the California Unfair Practices Act ("UPA").

## II.     ARGUMENT

The Motion should be denied in part. Defendants do not dispute counsel's qualifications, training, or years of experience. Defendants also do not dispute that the jury returned a verdict, and the Court issued findings and conclusions, both in Plaintiffs' favor. Plaintiffs' counsel's fee application includes inflated hourly rates and too many hours in an attempt to elevate their own remuneration over that of Plaintiffs, who will already be fully compensated for their alleged harm after paying a contingency fee out of the jury's award. Plaintiffs' 38% contingency fee, accounting for treble damages, provides a far more reasonable fee than the bounty their attorneys seek to extract.

### A.     Plaintiffs' Proposed Hourly Rates are Far from Reasonable.

Plaintiffs' counsel's proposed hourly rates of $1,314 for partners and $1,001 for "other attorneys" are inflated. Still, the proposed hourly rates have no legitimate basis in fact, law, or even expert opinion.

"To determine a 'reasonable hourly rate,' the district court should consider: 'experience, reputation, and ability of the attorney; the outcome of the results of the proceedings; the customary fees; and the novelty or the difficulty of the question presented.'" *Hiken v. Dep't of Def.*, 836 F.3d 1037, 1044 (9th Cir. 2016) (quoting *Chalmers v. City of L.A.*, 796 F.2d 1205, 1211 (9th Cir. 1986)). "Affidavits of the plaintiffs' attorney and other attorneys regarding prevailing fees in the community, and rate determinations in other cases, particularly those setting a rate for the plaintiffs' attorney, are satisfactory evidence of the prevailing market rate." *Beauchamp v. Anaheim Union High Sch. Dist.*, 816 F.3d 1216, 1224 (9th Cir. 2016) (quoting *United Steelworkers of Am. v. Phelps Dodge Corp.*, 896 F.2d 403, 407 (9th Cir. 1990)). "Once a fee applicant presents such evidence, the opposing party 'has a burden of rebuttal that requires submission of evidence . . . challenging the accuracy and reasonableness of the . . . facts asserted by the prevailing party in its submitted

affidavits.'" *Chaudhry v. City of L.A.*, 751 F.3d 1096, 1110–11 (9th Cir. 2014)
(quoting *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 980 (9th Cir. 2008)). "If an
applicant fails to meet its burden, the court may exercise its discretion to determine
reasonable hourly rates based on its experience and knowledge of prevailing rates in
the community." *Matevosyan v. Mercedes-Benz USA, LLC*, 2023 WL 8125448 (C.D.
Cal. Jul. 10, 2023) (quoting *Rolex Watch USA Inc. v. Zeotec Diamonds Inc.*, No. CV
21-089-PSG (VBKx), 2021 WL 4786889, at *2 (C.D. Cal. Aug. 24, 2021)).

Plaintiffs' fee expert, Gerald Knapton, cites *Matevosyan*, 2023 WL 8125448
(C.D. Cal. Jul. 10, 2023) in support of his reliance on the Real Rate Report. *See* Decl.
of Gerald G. Knapton at ¶ 64 (ECF No. 377-9). However, *Matevosyan* actually points
out that the Real Rate Report is not the end all, be all of a fee calculation. Instead, the
Real Rate Report was only one of three factors considered by the *Matevosyan* court in
calculating the award of fees to the plaintiff's counsel. There, the court first
considered (1) previous awards of fees to the plaintiff's counsel in a similar case, and
(2) the actual hourly rate which the plaintiff's counsel charged non-contingent clients.
When considering these factors, this Court ultimately reduced the plaintiff's requested
hourly rate. Accordingly, *Matevosyan* suggests that both previous fee awards *and the
actual rate charged by the attorneys* in non-contingent cases are equally, if not more
influential in determining the reasonable calculation of fees.

Here, Plaintiffs' counsel have not disclosed their actual hourly rates charged to
paying clients. If those real rates are as high as $1,300 per hour, they surely would
have said so. Additionally, like in *Matevosyan*, the contingent nature of this case does
not justify a higher hourly rate. And even if counsel had disclosed their real hourly
rates, the Court would be justified in awarding less than those. *See Matevosyan*, 2023
WL 8125448 (awarding plaintiff's counsel $515 per hour when he declared he
normally charged $550 per hour).

Moreover, the rate that Plaintiffs' counsel seeks is similar to what certain *large*
Los Angeles firms charge. But Gaw | Poe is not a large firm. In fact, it only has *four*

attorneys.

Similar to our case, *Avery v. Pac. Coachworks, Inc.*, No. EDCV 17-151-MWF (DTBx), 2020 WL 8461471 (C.D. Cal. Nov. 13, 2020), involved a California Unfair Competition Law ("UCL") claim. One of the plaintiff's attorneys requested $645 per hour and supported that request with a declaration from an expert witness in billing and fee disputes. *Id.* at *3. However, the Court gave the declaration little weight because it only referred to the rates that larger litigation firms charge and provided little justification as to why $645 was reasonable in the circumstances of the case. *Id.* at *4. The Court also refused a 15% enhancement award for one firm and a 1.1 multiplier for another firm as unjustified. *Id.* at *6.

Here, Mr. Knapton ignored the Real Rate Report's information for small firms in the Los Angeles market. As Mr. Stiefel opines, for a partner at a small firm in the Los Angeles market in the Real Rate Report, the more realistic hourly rate is $600.

As this Court has held, rates encroaching on the outer bounds of the fee range cannot be considered prevailing. *See* Order Granting in Part and Denying in Part Motion for Attorneys' Fees at 4, *Anaheim Union High Sch. Dist. v. J.E.*, 2:12-cv-6588-MWF (C.D. Cal. July 11, 2013) (ECF No. 50). Even despite a supporting declaration, fee requests with above-market rates for Los Angeles must be reduced. *See* Order Granting in Part Motion for Statutory Attorney's Fees and Costs at 2, *Magic Laundry Servs., Inc. v. Workers United Serv. Emp. Int'l Union*, 2:12-cv-09654-MWF-AJW (C.D. Cal. June 21, 2013) (ECF No. 66).

Plaintiffs' counsel and Knapton do not make any reference to Gaw | Poe's most recent fee award, an April 2024 order from the Northern District of California where the district court approved a billable rate of $1,000 per hour for Mr. Poe in a patent litigation dispute. *See Silicon Genesis Corp. v. Ev Grp. E. Thallner GmbH*, Case No. 22-cv-04986-JSC, at *2-3 (N.D. Cal. Apr. 15, 2024).[1] Mr. Poe's rate in *Silicon*

---

[1] A true and correct copy of this order is attached as Exhibit D to the Stiefel Declaration.

*Genesis*, which was decided only two months ago, was $314 per hour **lower** than the rate he seeks in this litigation, a difference of **31 percent**. Plaintiffs do not address these prior rates awards, much less justify why a 31 percent increase would be justified in this case.  Nor do Plaintiffs cite any Central District case where an attorney was awarded $1,314 per hour. *Compare Magic Laundry* Order at 2 (noting that requested rate was higher than any awarded in Central District cases cited in party's brief).

The Court should not place much weight on Plaintiffs' counsel's declaration given its self-serving nature. *See Zeigler v. Cnty. of San Luis Obispo*, 2023 WL 3432238, *4 (C.D. Cal. Mar. 1, 2023) (quoting *Kochenderfer v. Reliance Standard Life Ins. Co.*, No. 06-CV-620 JLS (NLS), 2010 WL 1912867, at *4 (S.D. Cal. Apr. 21, 2010) ("[T]he value of these declarations is questionable because they are both self-serving and self-perpetuating. Each of these attorneys works [in this area of the law] and claiming that the rates charged by Plaintiff's counsel, no matter how high, is in their own interest. A high award in this case would support the declarants' own high hourly rate requests in the future.")). Further, the billing records attached to Mr. Poe's declaration include the *proposed* hourly rate for him and his colleagues. Not only do they lack the actual hourly rate charged to Plaintiffs (if any), but the original billing records have been modified for purposes of the Motion. The Court should be skeptical of these records.

Plaintiffs' own filings in this case show that Plaintiffs' fee award—and the requested hourly rates—must be heavily reduced. Indeed, Magistrate Judge Wilner already held that Plaintiffs' waived their right to certain fees. In the summer of 2019, the parties were engaged in a discovery dispute over Prestige's ESI collection and certain issues with emails. On July 26, 2019, Plaintiffs filed their Motion to Compel Defendants to Produce Missing Emails (ECF No. 78). As part of that motion, Plaintiffs sought reimbursement of their attorneys' fees in bringing the motion. ECF No. 78 at 7 & n.2. At that time, Plaintiffs' counsel proposed a "conservative hourly

rate" for the Gaw | Poe partners of $744 per hour, and $510 per hour for Mr. Song. *Id.*; *see also* M. Poe Decl. at ¶¶ 17-19. But now Plaintiffs' counsel requests almost double those hourly rates for the same work, in the same litigation, for the same clients, by the same attorneys. Such a request is unreasonable on its face.[2] Moreover, Plaintiffs forewent their ability to recoup fees at the motion hearing, and Magistrate Judge Wilner was ostensibly taken aback: "At the hearing, Plaintiffs waived their right to seek fees under Rule 37(a)(5) (while tauntingly murmuring that they'll collect them later in the action - wow!)." Order re: Motion to Compel Electronic Discovery at 2 (Aug. 6, 2019) (ECF No. 83). This decision to forego fees in 2019—but now attempt to recoup them later—shows the case was never about a level playing field. Rather, it was actually about Plaintiffs' counsel being awarded attorneys' fees in an amount that dwarfs (i) the jury's verdict, and (ii) any recovery to be delivered to their clients after counsel deducts their contingency fee.

As a final point of comparison, undersigned counsel is charging Prestige nowhere near $1,300 per hour. Plaintiffs' requested recommended rate is 76 percent higher than the highest hourly rate ($745/hour) actually charged by Defendants' counsel in the underlying litigation. *See* Stiefel Decl. at ¶ 44. This rate is much more in line with Plaintiffs' counsel's prior fee awards than the astronomical rates proposed by Mr. Knapton.

### B. Plaintiffs' Counsel—and Especially the Gaw | Poe Partners—Billed an Unreasonable Amount of Hours.

Plaintiffs' counsel's fee request should also be denied because they failed to delegate hardly any work whatsoever to less experienced attorneys. As Mr. Stiefel opines, the Motion is the most top heavy fee application he has ever encountered in his 140 plus testifying assignments. Stiefel Decl. at ¶¶ 6, 48. By billing over 3,000 hours as partners, Plaintiffs' counsel failed to appropriately distribute the work the

---

[2] If Plaintiffs believe 6% per year rate increases are reasonable, *see* Mot. at 12, then a more reasonable hourly fee would be $939 (representing $744 per hour requested in 2019 plus four years of annual 6% increases).

way any other law firm would have: with associates and paralegals taking on much of

the drafting and day-to-day work. *Id.* at ¶ 50. Indeed, the average hourly billing rate of

$1,193 per hour is the highest Mr. Stiefel has ever seen—before requested

enhancement. *Id.*

Consistent with decisions across the country, this is not reasonable and requires

a downward adjustment to the lodestar amount. *See, e.g.*, *In re Fine Paper Antitrust

Litig.*, 751 F.2d 562, 593 (3d Cir. 1984) ("the court concluded that over 5,000 hours of

partner time was spent on tasks which should have been assigned to associates"); *Run

Guo Zhang v. Lin Kumo Japanese Restaurant Inc.*, No. 13cv6667 (PAE), 2015 WL

5122530, at *3 (S.D.N.Y. Aug. 31, 2015) (reducing partner rate where, in addition to

charging an unreasonably high rate, the partner also engaged in a substantial amount

of associate-level work); *H.B. Auto. Grp., Inc. v. Kia Motors Am., Inc.*, 13cv4441

(VEC) (DF), at *17 (S.D.N.Y. July 25, 2018) (court reduced partner's hourly rate

where partner engaged in a number of tasks typically performed by associates); *Gold

v. NCO Fin. Systems, Inc.*, No. 09cv1646-LAB (CAB), at *7 n.5 (S.D. Cal. Aug. 20,

2010); *Bridgeport Music, Inc. v. WB Music Corp.*, 520 F.3d 588, 596 (6th Cir. 2008)

(affirming the district court's decision to reduce the lodestar amount by 25% "to

account for top-heavy billing by partners for work that could have been performed by

associates"); *see also Liang v. AWG Remarketing, Inc.*, No. 2:14-cv-00099, 2016 WL

428294, at *15–16 (S.D. Ohio Feb. 4, 2016) (in a case where 82% of time was billed

by partners, the court reduced the lodestar "to account for the top-heavy billing

reflected in the invoices"). Mr. Stiefel opines that a reasonable lodestar reduction is

taking 50% of the partners' hours and reallocating them at an associate rate. *Id.* at

¶ 55. When applying these recommended (and required) rate adjustments, the

maximum recommended fee award is $2,711,197.50.

## C.  Given the Relatively Low Verdict, No Enhancement is Warranted.

Plaintiffs' request for a two-times enhancement should be denied. "[U]nder

Ninth Circuit precedent, multipliers are disfavored, as the Ninth Circuit has plainly

stated that the lodestar amount is 'presumptively the reasonable fee amount' and that a modification of the lodestar is appropriate only in 'rare' and 'exceptional' cases supported by both 'specific evidence on the record and detailed findings…that the lodestar amount is unreasonably low or unreasonably high.'" *Matevosyan*, 2023 WL 8125448 (citing *Zargarian v. BMW of N. Am., LLC*, 442 F. Supp. 3d 1216 (C.D. Cal. 2020)).

"Because there is a strong presumption that the lodestar amount represents a reasonable fee, adjustments to the lodestar 'are the exception rather than the rule.'" *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 738 (9th Cir. 2016) (per curiam) (quoting *Fischel v. Equitable Life Assurance Soc'y*, 307 F.3d 997, 1007 (9th Cir. 2002)). Nevertheless, the Court in its discretion may adjust the lodestar figure upward or downward based on the factors first enunciated in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), including:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the professional relationship with the client, and (12) awards in similar cases.

*Antoninetti v. Chipotle Mexican Grill, Inc.*, 49 F. Supp. 3d 710, 715–16 (S.D. Cal. 2014), *aff'd sub nom. Goldkorn v. Chipotle Mexican Grill, Inc.*, 669 F. App'x 920 (9th Cir. 2016).

"The most important factor, both in the view of the State of California and in the view of this Court under the current circumstances, is the plaintiff's success. *See Envtl. Prot. Info. Ctr. v. California Dep't of Forestry & Fire Prot.*, 190 Cal. App. 4th 217, 238, 118 Cal. Rptr. 3d 352 (2010), *as modified on denial of reh'g* (Dec. 15, 2010) ("*EPIC*") ("California law, like federal law, considers the extent of a plaintiff's success a crucial factor in determining the amount of a prevailing party's attorney fees."). "[U]nder state law as well as federal law, a reduced fee award is appropriate

when a claimant achieves only limited success." *Chavez v. City of L.A.*, 47 Cal. 4th 970, 989, 104 Cal. Rptr. 3d 710 (2010) (citations omitted). Where a plaintiff fails to obtain "important goals of" the action, even if she has technically prevailed on all of her claims, "the trial court should take into consideration the limited success achieved . . . ." *Sokolow v. Cnty. of San Mateo*, 213 Cal. App. 3d 231, 250, 261 Cal. Rptr. 520 (Ct. App. 1989).

In *Hensley v. Eckhart*, 461 U.S. 424 (1983), the Supreme Court set out a two-step test for determining whether a fee award should be reduced in light of the plaintiff's limited success. California applies the *Hensley* approach to fee requests under state statute. *See Chavez*, 47 Cal. 4th at 989. "The first step asks whether 'the plaintiff fail[ed] to prevail on claims that were unrelated to the claims on which he succeeded.'" *EPIC*, 190 Cal. App. 4th at 239. (quoting *Hensley*, 461 U.S. at 434). Here, both parties agreed that all of Plaintiff's claims were related. Accordingly, "the [C]ourt proceeds to the second step of *Hensley* inquiry, which asks whether 'the plaintiff achieved a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award.'" *Id.* (quoting *Hensley*, 461 U.S. at 434). "The court may appropriately reduce the lodestar calculation if the relief, however significant, is limited in comparison to the scope of the litigation as a whole." *Id.* (quoting *Harman v. City and Cnty. of S.F.*, 136 Cal. App. 4th 1279, 1312, 39 Cal. Rptr. 3d 589 (2006))." Order re: Motion for Attorneys' fees at 8-9, *Marine Bargas v. Rite Aid Corp.*, et al., Case No. 2:13-CV-03865 (C.D. Cal. July 10, 2017) (ECF No. 161).

Here, the Motion overstates the relief that Plaintiffs' counsel's efforts secured. Rather than deliver fair pricing to their clients, the price of Clear Eyes Pocket Pal has actually increased for Plaintiffs *and* their customers.[3] After the jury verdict (which

---

[3] The price of Clear Eyes Pocket Pal has indisputably increased. *See* Declaration of T. Holloway, ¶ 5 & Exhibit D (Feb. 12, 2024) (ECF No. 348-1). At trial, most of the Plaintiffs testified that they do not pass on any savings to their customers. *See, e.g.*, Dec. 12, 2023 Trial Tr. at 1047:21-23 (Javid Sahrifi of Manhattan Wholesale) ( "Q. So whether you got the product cheaper or not, you kept the price to them the same? A.

will be appealed), Prestige changed its pricing for Clear Eyes to avoid facing potential liability to other customers pending appeal. Even Plaintiffs' expert Dr. McDuff admitted that in the face of a requirement to charge the same price to all buyers, one option would be for the selling firm to increase the price to the higher price. Dec. 12, 2023 Trial Tr. at 1153:23-1154:2, 12-14, 17-18.  That is exactly what has happened in the real world.

Because the price has not gone down, Plaintiffs' counsel's efforts have not actually achieved a better result for all buyers in the market. The evidence shows that only two of the Plaintiffs—Value and PITCO—have placed orders since January 2024.  *See* Declaration of Jeffrey Burnett, ¶ 4. Additionally, no Plaintiffs or other wholesalers have taken advantage of Prestige's new 4% bill back promotion for the wholesale channel launched in April 2024. *Id.* at ¶ 5. The Court should not grant Plaintiffs' request for any enhancement.[4]

### D.    Plaintiffs' Rejection of Defendants' Rule 68 Offer of Judgment Warrants a Reduction in Fees.

Any award of attorneys' fees must take into account Plaintiffs' rejection of Prestige's offer of judgment pursuant to Fed. R. Civ. P. 68.

_____

Yes. Looks like it.").

[4] The Court should not award any fee enhancement here, since Plaintiffs' counsel's contingency fee will be disproportionately high due to the treble damages awarded in this case. *See Weeks v. Baker & McKenzie*, 63 Cal. App. 4th 1128, 1176, 74 Cal. Rptr. 2d 510 (1998) (citing *Serranno v. Priest*, 20 Cal.3d 25, 141 Cal.Rptr. 315, 569 P.2d 1303 (1977); *see also Thayer v. Wells Fargo Bank*, 92 Cal. App. 4th 819, 834, 112 Cal. Rptr. 2d 284 (2001) (noting that the list of potentially relevant factors identified by the California Supreme Court in *Serrano III* courts may consider in determining whether to award an enhancement to the lodestar is illustrative rather than exclusive). For example, *Weeks* determined that the amounts involved and the results obtained at trial, which included a windfall in the form of a substantial award of punitive damages, militated against enhancing a fee award. *Weeks*, 63 Cal. App. 4th at 1176. Here, trebling of the jury's awards for Robinson-Patman Act and UPA damages necessarily results in a windfall recovery that more than compensates Plaintiffs for their actual damages after payment of the 38% contingency fee.  The Court should also consider this factor in denying an enhancement to the lodestar here, particularly since the purpose of a fee award is not to punish Defendants, but to determine a "reasonable" fee and to ensure that Plaintiffs will be fully compensated and will not have to bear the expense of litigation. *Id.*

SER-022

When a plaintiff rejects a Rule 68 offer, the calculation of reasonable fees will depend in part on the judgment the plaintiff obtained at trial compared to the Rule 68 offer. *See Haworth v. State of Nev.*, 56 F.3d 1048 (9th Cir. 1995). Further:

> In determining what fee is reasonable in this circumstance, the district court must take into consideration the amount of the Rule 68 offer, the stage of the litigation at which the offer was made, what services were rendered thereafter, the amount obtained by judgment, and whether it was reasonable to continue litigating the case after the Rule 68 offer was made. The enumeration of these factors is not meant to be an exhaustive list. The district court may take into consideration such other factors as it deems appropriate in determining the amount of reasonable attorney fees to be awarded.

*Id.* at 1052-53.[5]

In our case, Plaintiffs rejected a $450,000 offer of judgment served in December 2019 after the close of discovery and before trial. This offer accounted for the strength of Defendants' affirmative and other defenses, such as functional discounts, which the Court recognized were supported by the trial evidence Defendants presented. Dec. 14, 2023 Trial Tr. at 1490:14-18. Also, that offer was actually higher than the damages secured at trial by all nine Plaintiffs combined, before trebling. And up to that point, Plaintiffs' counsel's time totaled 1,007.5 hours, which represent approximately one-third of the fees claimed now.

Based on statements in Mr. Poe's declaration, Plaintiffs' counsel are already receiving a payment of approximately 38% of the damages awarded to their clients. *See* Decl. of M. Poe at ¶ 38 (ECF No. 377-1) ("After deducting our contingency fee and the $216,121.72 in expenses that Mr. Gaw and I had advanced to date, that settlement offer would have left our clients with just over $7,000 apiece, and no remedy at all against future discrimination.").[6] Still, the "$7,000 apiece" that Plaintiffs

---

[5] *Haworth* also stands for the proposition that "the prevailing party is not automatically deemed to have attained complete rather than partial success. Rather, the partial success determination is part of the district court's secondary inquiry into what fee is reasonable in a given case." *Id.* at 1052 (quoting *Gates v. Deukmejian,* 987 F.2d 1392, 1403 (9th Cir. 1992)). Here, Plaintiffs were awarded fractions of their claimed damages, and Border took nothing. *See also Zeigler*, 2023 WL 3432238 at *1, 11-17.

[6] Thirty-eight percent of $1,172,500 is $445,550. But Defendants can only speculate

SER-023

turned down is not that far off from what the jury actually awarded. In fact, Border would have been much better off accepting Prestige's Rule 68 offer. Because Border was awarded $0 in damages, the Court should reduce the fee award for "Plaintiff's failure to prevail on certain claims at trial." *See Russell v. Walmart Inc.*, No. CV 19-5495-MWF (JCx), 2024 WL 305388 (C.D. Cal. Jan. 2, 2024) (citing *Garvey Sch. Dist. v. V.S.*, No. 2:19-CV-01248-CAS (JCx), 2020 WL 208807, at *6 (C.D. Cal. Jan. 13, 2020)).

Defendants' offer of judgment is relevant in considering the fees to be awarded because the Plaintiffs did not recover all the damages they sought. *See Haworth*, 56 F.3d at 1052. Further, Plaintiffs put in a damages case that went through 2022. Based on the jury's verdict that was a far cry from Dr. McDuff's damages opinion, the jury likely agreed with the defense that Plaintiffs' damages were inflated. If the Court deducts the thousands of hours that Plaintiffs' counsel expended after receiving the offer, Defendants' Rule 68 offer was pretty accurate at the time. Defendants put a significant offer on the table for Plaintiffs to consider, and they did not do much better at trial.

### E.    The Court Should Not Order Reimbursement of Non-Taxable Costs.

Plaintiffs cannot recover all non-taxable costs when not every Plaintiff had a UPA claim. In the Motion, Plaintiffs seek to use a California statute to deliver cost-recovery to all Plaintiffs, including those whose businesses are in New York and elsewhere. This would essentially apply the UPA to the benefit of those non-California Plaintiffs. The Court should reject Plaintiffs' request for reimbursement of $35,546.99 in non-taxable costs.

## III.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny in part Plaintiffs' request for attorneys' fees and costs.

---

because counsel did not include their actual contingent fee agreements with Plaintiffs in the Motion papers.

1    Dated:  June 17, 2024                    **DUANE MORRIS LLP**

2                                    By: */s/ Sean Patterson*

3                                        Michael L. Fox
                                         Robert Kum
4                                        Sean Patterson
                                         Christine Cusick Ross
5                                        William Shotzbarger (*pro hac vice*)
                                         Attorneys for Defendants
6                                        PRESTIGE CONSUMER HEALTHCARE
                                         INC. (fka "Prestige Brands Holdings, Inc.")
7                                        and MEDTECH PRODUCTS INC.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Michael L. Fox (SBN 173355)
Sean Patterson (SBN 234565)
Christine C. Ross (SBN 280646)
**DUANE MORRIS LLP**
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

Robert Kum (SBN 185530)
**DUANE MORRIS LLP**
865 South Figueroa Street, Suite 3100
Los Angeles, CA 90017-5450
Telephone: +1 213 689 7400
Fax: +1 213 689 7401
E-mail: mlfox@duanemorris.com
        rkum@duanemorris.com
        cspatterson@duanemorris.com
        ccross@duanemorris.com

Attorneys for Defendants
PRESTIGE CONSUMER HEALTHCARE INC.
(fka "Prestige Brands Holdings, Inc.") and
MEDTECH PRODUCTS INC.

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.A. INTERNATIONAL CORP., MANHATTAN WHOLESALERS INC., EXCEL WHOLESALE DISTRIBUTORS INC., VALUE DISTRIBUTOR, INC., BORDER CASH & CARRY, INC., AKR CORPORATION, U.S. WHOLESALE OUTLET & DISTRIBUTION, INC.; SANOOR, INC. (d/b/a L.A. TOP DISTRIBUTOR); PITTSBURG WHOLESALE GROCERS, INC.; and PACIFIC GROSERVICE, INC.<br><br>Plaintiffs,<br><br>v.<br><br>PRESTIGE BRANDS HOLDINGS, INC. and MEDTECH PRODUCTS INC.,<br><br>Defendants. | Case No.: 2:18-cv-06809-MWF-MRW<br><br>**DECLARATION OF GRANT D. STIEFEL IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR ATTORNEYS' FEES**<br><br>Judge: Hon. Michael W. Fitzgerald<br>Courtroom: 5A |

1

## DECLARATION OF GRANT STIEFEL

I, Grant Stiefel, declare:

1.    My name is Grant Stiefel. I am a consultant and testifying expert in the field of attorneys' fees and a member of the California State Bar, as described in more detail herein. I am the principal and founder of Litigation Limited, a legal fee auditing and consulting firm. I have been retained on behalf of Defendants to provide expert testimony regarding Plaintiffs' Motion for Attorneys' Fees. The conclusions set forth in this declaration are the products of my own analysis, as described below. Unless stated otherwise, I have personal knowledge of the facts stated herein and I am prepared to testify to the information and conclusions set forth herein if called as a witness in this matter.

## BACKGROUND AND QUALIFICATONS AS EXPERT

2.    As one of the only full-time legal fee consultants in the country, I am frequently retained by litigants and law firms to proffer opinion testimony in connection with attorneys' fee disputes and/or fee-shifting motions. Over the past two decades, I have reviewed over $1 billion in law firm billings and have testified as a fee expert in California state and federal courts, in JAMS and AAA arbitrations, in attorney-client fee arbitrations, and before the Court of Appeals for the Ninth Circuit.

3.    I have testified live on numerous occasions as a qualified attorney fee expert in trial courts, arbitrations, and State Bar proceedings. My *curriculum vitae* is attached hereto as **Exhibit A**. I have no financial interest in the outcome of this dispute and counsel's obligation to pay my fees is not contingent in any respect on the substance of my opinions or the ultimate determination of this matter.

4.    ***Attorney Fee Consulting Experience***. For more than a decade, Litigation Limited has assisted corporate clients across the United States and Canada with the review and audit of legal invoices, the selection and management of outside counsel, and the development and implementation of outside counsel

1

### **HOURLY RATE ANALYSIS**

2

34.   My review of Plaintiffs' fee motion and the supporting declarations of

3

counsel did not reveal any evidence of the hourly rates that Gaw|Poe typically

4

charges clients for work. According to the firm's website, the firm handles "both

5

companies and individuals… and are equally comfortable handling plaintiff or

6

defense-side work, so it is reasonable to assume that the firm presumably represents

7

defense clients on an hourly basis. According to the Gaw|Poe website, the firm

8

consists of four partners, all of whom billed time to this matter, and all of whom

9

claim billable rates in excess of $1,000 per hour.

10

35.   In his declaration, Mr. Poe testifies that "In recent years, three different

11

courts have determined that a touchstone for the "reasonable rate" for work

12

performed by Gaw|Poe attorneys is the "third-quartile partner" rate for general

13

litigation matters that is reported in the Real Rate Report." [Poe Declaration, at ¶ 7].

14

I frequently use the Real Rate Report in my analysis of reasonable hourly rates, and

15

have attached the relevant pages of the 2023 Real Rate Report as **Exhibit C** hereto.

16

36.   Considering their experience and qualifications, not to mention the

17

results they obtained in this matter, I do not dispute counsel's classification as

18

"third quartile" lawyers. I merely question whether they are entitled to hourly rates

19

that are equal to or higher than those charged by the world's largest law firms for

20

transactional (i.e., non-litigation) work.

21

37.   According to Plaintiffs' fee expert Gerald Knapton, "the rates paid for

22

antitrust *litigation* work in Los Angeles are shown at Exhibit 3's page 99 of the

23

2023 Real Rate Report" which reports rates for the "Corporate: Other" practice

24

area. [Knapton Declaration, at ¶ 71]. However, the cited rates on page 99 of the

25

Real Rate Report also reflect rate data for *transactional* attorneys from global law

26

firms, and not just for third quartile litigators from small firms like Gaw|Poe.

27

38.   The same section of the Real Rate Report shows that hourly rates for

28

litigators in the "Corporate: Other" practice area are substantially lower than for

MARK POE (S.B. #223714)
  mpoe@gawpoe.com
RANDOLPH GAW (S.B. #223718)
  rgaw@gawpoe.com
VICTOR MENG (S.B. #254102)
  vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.A. INTERNATIONAL CORP., et al., <br><br> Plaintiffs, <br><br> v. <br><br> PRESTIGE BRANDS HOLDINGS, INC., et al., <br><br> Defendants. | Case No. 2:18-cv-06809-MWF-MRW <br><br> **PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR ATTORNEYS' FEES AND COSTS; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT** <br><br> Date:     July 8, 2024 <br> Time:    10:00 a.m. <br> Courtroom:  5A |

1      Plaintiffs submit with their fee application a declaration from Mr. Gerald

2   Knapton, in which he analyzes both the number of hours counsel expended, and the

3   hourly billing rates that would reflect "'the fees that private attorneys of an ability

4   and reputation comparable to that of prevailing counsel charge their paying clients

5   for legal work of similar complexity.'" *Welch*, 480 F.3d at 946 (citation omitted).

6   Mr. Knapton is a senior partner in the Los Angeles office of Ropers Majeski, and has

7   nearly 30 years' of experience in analyzing and opining on the reasonableness of

8   attorney fee claims, equally divided on both sides of fee petitions.  Knapton Decl.

9   ¶¶ 2-4.  Mr. Knapton has "particular experience in antitrust cases," *id.* ¶ 2, and has

10  been qualified as a testifying expert on fees approximately 60 times.  *Id.* Ex. 1 at 3

11  (Mr. Knapton's *curriculum vitae*).

12      As Mr. Knapton declares, "I review legal bills almost every day and, because

13  of this, I have an understanding of what rates are for the Los Angeles area for legal

14  work over the period at issue from 2014 to the present time." *Id.* ¶ 50.  Mr. Knapton

15  cross-checks his personal knowledge by referencing the Real Rate Report published

16  by Wolters Kluwer as an objective source of the rates charged by similarly

17  experienced Los Angeles counsel.  *Id.* ¶¶ 50-52.  The hourly rates reported in the

18  Real Rate Report are calculated "from the actual rates charged by law firm

19  professionals as recorded on invoices submitted and approved for payment."

20  Knapton Decl. Ex. 3 at 5 (2023 Real Rate Report).  As this Court has observed, the

21  Real Rate Report is regularly relied on as a reliable source.  *See e.g.*, *Zeigler*, 2023

22  WL 3432238, at *5 (relying "primarily" on the Real Rate Report to establish rates in

23  a civil rights case, recognizing it as "'a much better reflection of true market rates

24  than self-reported rates in all practice areas.'") (quoting *Rolex Watch USA Inc. v.

25  Zeotec Diamonds Inc.*, No. 21-cv-089-PSG-VBKx, 2021 WL 4786889, at *2 (C.D.

26  Cal. Aug. 24, 2021)).

27      In establishing hourly rates, a district court can appropriately consider "'rate

28  determinations in other cases, particularly those setting a rate for the plaintiffs'

- 10 -

**SER-030**

attorney.'" *Hiken v. Dep't of Def.*, 836 F.3d 1037, 1044 (9th Cir. 2016) (citation omitted). On two other recent fee petitions in *non*-antitrust cases, district courts have held that the skill, experience, and reputation of Gaw | Poe's named partners warrants rates at the Real Rate Report's third quartile rates for litigation partners in the given forum. *See Trendsettah USA Inc. v. Swisher Int'l Inc.*, No. 14-cv-01664-JVS-DFMX, 2023 WL 8263365, at *14 (C.D. Cal. Nov. 17, 2023) ("the Court finds the 2022 Real Rate Report third quartile Los Angeles rate for general litigation to be a reasonable basis for Gaw | Poe's rates"); *In re Outlaw Laboratory, LP Litig.*, No. 18-cv-840-GPC-BGS, 2023 WL 6522383, at *4 (S.D. Cal. Oct. 5, 2023) ("Their backgrounds justify placing them in the third quartile for partner pay and compensating them at $996 per hour."). The Northern District has awarded rates somewhat higher than the Real Rate Report's third-quartile rates. Four years ago, Judge Freeman approved rates of $1,000/hour for Mr. Gaw and Mr. Poe, and $855/hour for their colleagues, deeming such amounts "reasonable and comparable to the fees generally charged by attorneys with similar experience, ability, and reputation." *AdTrader, Inc. v. Google LLC*, 2020 WL 1921774, at *8 (N.D. Cal. Mar. 24, 2020). The $1,000/$855 rates for Gaw | Poe attorneys were 7% and 10% higher, respectively, than the then-current third-quartile rate indicated by the Real Rate Report. Poe Decl. ¶ 23.

Those three cases, in contrast to this one, involved fairly routine subject matters. *Trendsettah* and *AdTrader* were primarily breach of contract cases,[5] and *In re: Outlaw Laboratory* was a civil RICO case. This case, in contrast, involved the notoriously complicated RPA and its convoluted body of precedent. *See Precision Printing Co. v. Unisource Worldwide, Inc.*, 993 F. Supp. 338, 345 (W.D. Pa. 1998) ("numerous courts and commentators have noted that Robinson–Patman is one of the

---

[5] While the *Trendsettah* case had originally included a $44.4 million Sherman Act verdict, the 2023 fee award was based only on the contract claims. *Trendsettah*, 2023 WL 8263365, at *9-10.

most difficult, if not inscrutable, antitrust laws in existence.") (collecting sources). Accordingly, and because rates are to be set based on fees charged for "similar work," *Ingram*, 647 F.3d at 928, Mr. Knapton opines that rather than the general "Litigation" rate awarded in simpler cases, the appropriate category for this case is the "Corporate: Other" category, which includes "Antitrust and Competition" matters.   Knapton Decl. ¶¶ 65-67, 70.   Mr. Knapton proposes that—commensurate with the past determinations in *Trendsettah*, *AdTrader*, and *In Re: Outlaw Laboratory*—Gaw | Poe's named partners be classified in the "third quartile," with its somewhat more junior attorneys classified at the "median" rate. *Id.* ¶ 72-73.  As of 2023, those rates were $1,240 and $944 per hour, respectively. *Id.* ¶ 71 (replicating Ex. 3 at 99).

As Mr. Knapton further explains, the 2023 edition of the Real Rate Report is based on invoices spanning from July 1, 2020 through June 30, 2023. *Id.* ¶ 54 (citing Ex. 3 at 221).  Because even the most recent data is now a year out-of-date, Mr. Knapton opines that the reported rates should be adjusted upward by an additional 6%.  *Id.* ¶ 61.  He proposes that annual increase based on information reported by Thomson Reuters, the Bureau of Labor Statistics, a report put out by Wells Fargo's "legal specialty group" that found an average rate increase of 9.5% between 2023 and 2024, and his personal observation that "[i]n my work reviewing invoices by law firms I observed that the first month of 2024 produced an unusually large increase of about 6% over the mid-year 2023 rates." *Id.* ¶¶ 56-60.  Upon making that adjustment to the rates reported as of mid-2023, Mr. Knapton opines that the reasonable rate for Gaw | Poe's named partners is $1,314, and for the firm's other attorneys is $1,001. *Id.* ¶ 80.[6]

There is yet another data point that serves as a cross-check on Mr. Knapton's

---

[6] Mr. Song departed Gaw Poe in May 2022 to join Palo Alto Networks, but that fact does not warrant a rate reduction. *See In re Washington Public Power*, 19 F.3d 1291, 1305 (9th Cir. 1994) (providing that where an attorney has left a firm prior to the fee petition, the court award either the current rate for that attorney, or his historic rate "coupled with a prime rate enhancement").

1    *Id.* (quoting *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001)).

2    While a lodestar enhancement lies within a court's discretion, caselaw

3    suggests that it should not be a rarity. As this Court recited in *Perona*, "'the

4    contingent and deferred nature of the fee award in a … case with statutory attorney

5    fees *requires* that the fee be adjusted in some manner to reflect the fact that the fair

6    market value of legal services provided on that basis is greater than the equivalent

7    noncontingent hourly rate.'" 2016 WL 8941101, at *12 (quoting *Horsford v Board

8    of Trustees of California State University*, 132 Cal. App. 4th 359, 394-95 (2005))

9    (emphasis added). Similarly, *Pellegrino v. Robert Half International, Inc.* explained

10   that "'[o]ur courts have recognized that an enhanced fee award *is necessary* to

11   compensate attorneys for taking such risks: A contingent fee *must be higher* than a

12   fee for the same legal services paid as they are performed.'" 182 Cal. App. 4th 278,

13   292 (2010) (quoting *Amaral v. Cintas Corp. No. 2*, 163 Cal. App. 4th 1157, 1217

14   (2008)) (emphasis added).

15   Although "'[a] multiplier may be based on a single relevant factor,'" *Withrow

16   v. Stryker Sales Corp.*, No. 16-CV-544-DSF(PLAX), 2018 WL 5858609, at *5 (C.D.

17   Cal. Mar. 27, 2018) (quoting *Krumme v. Mercury Ins.*, 123 Cal. App. 4th 924, 947

18   (2004)), all four *Ketchum* factors are present here.

19   First, the novelty and complexity of the issues is reflected by the fact that this

20   may be the first plaintiff-side § 17045 jury verdict ever returned—counsel are unable

21   to find any prior instance. Poe Decl. ¶ 30. The novelty of this verdict is highly

22   significant. In *ABC International Traders, Inc. v. Matsushita Elec. Corp.*, the

23   California Supreme Court did a deep dive into the legislative history and policy

24   motivations behind § 17045. 14 Cal. 4th 1247, 1254-63 (1997). It found that the

25   section was "intended mainly to restrain the quickly growing chain stores from

26   certain well-documented abuses of their buying power, abuses that, together with

27   other factors, were thought to have a highly destructive effect on wholesale and retail

28   competition in the food industry and other trades." *Id.* at 1258. This was important,

1    the court explained, because "[s]ocially, it was feared the result of chain store

2    domination would be the loss of an endangered middle class, the 'prosperous

3    *bourgeois* class [that] has been considered one of the mainstays of our civilization.'"

4    *Id.* at 1260 (citation omitted). This case was brought precisely to preserve the ability

5    of these family-owned businesses to compete with the giant chains. *See* Am. Compl.

6    ¶¶ 13-15 (ECF No. 10) (alleging Plaintiffs' motivations). Plaintiffs' counsel were

7    successful in that goal, and to the extent that they have established a roadmap for the

8    protection of independent merchants, they deserve an enhancement for "the novelty

9    and difficulty of the questions involved." *Ketchum*, 24 Cal. 4th at 1132.

10   Second, while Plaintiffs defer to the Court's assessment of their counsel's skill,

11   they submit that their success on all four claims against vigorous and experienced

12   defense counsel is instructive. Third, for a small firm like Gaw | Poe, a commitment

13   of 3,000+ hours is significant, and in fact precluded them from pursuing other matters

14   that may well have settled more easily. Poe Decl. ¶ 32; *see also, e.g.*, *Rodriguez v.*

15   *County of Los Angeles*, 891 F.3d 776, 809 (9th Cir. 2018) (affirming a 2x multiplier

16   and $5,378,174.66 in fees where plaintiffs faced "'aggressive opposition' from

17   [defendants]; and the opportunity costs the years-long litigation in this case

18   required.").

19   Fourth, the contingent nature of the representation cannot be overstated.

20   Plaintiffs' counsel have not received any compensation for their work on this case

21   for six years, and the named-partners have advanced over $360,000 in post-tax

22   money from their own pockets to prosecute this case on behalf of their clients. "'A

23   lawyer who both bears the risk of not being paid and provides legal services is not

24   receiving the fair market value of his work if he is paid only for the second of these

25   functions. If he is paid no more, competent counsel will be reluctant to accept fee

26   award cases.'" *Ketchum*, 24 Cal. 4th at 1133 (citation omitted). Plaintiffs further

27   submit that a significant contingent risk adjustment is necessary to attract competent

28   counsel to price-discrimination cases like this, where the odds of success are

- 19 -

1   MARK POE (S.B. #223714)
      mpoe@gawpoe.com
2   RANDOLPH GAW (S.B. #223718)
      rgaw@gawpoe.com
3   VICTOR MENG (S.B. #254102)
      vmeng@gawpoe.com
4   GAW | POE LLP
5   4 Embarcadero, Suite 1400
    San Francisco, CA 94111
6   Telephone: (415) 766-7451
    Facsimile: (415) 737-0642
7

8   Attorneys for Plaintiffs

9

10

11                  **UNITED STATES DISTRICT COURT**

12                  **CENTRAL DISTRICT OF CALIFORNIA**

13
    L.A. INTERNATIONAL CORP., et       Case No. 2:18-cv-06809-MWF-MRW
14  al.,
                                        **DECLARATION OF MARK POE
15                    Plaintiffs,       IN SUPPORT OF PLAINTIFFS'
                                        MOTION FOR ATTORNEYS'
16          v.                          FEES AND COSTS**

17  PRESTIGE BRANDS HOLDINGS,
    INC., et al.,
18                                      Date:         July 8, 2024
                      Defendants.       Time:         10:00 a.m.
19                                      Courtoom:     5A

20

21

22

23

24

25

26

27

28

I, Mark Poe, declare as follows:

1.      I am a partner in the law firm of Gaw | Poe LLP, counsel of record for Plaintiffs in the above-captioned case.  I submit this declaration in support of Plaintiffs' Motion for Attorneys' Fees and Costs.  If called to testify at a hearing or trial, I could and would testify to the following, which is based on my personal knowledge.

2.      My colleagues and I have expended more than 3,000 hours in bringing this case to trial and on post-trial matters.  My partner Randy Gaw and I have additionally incurred over $360,000 in litigation costs out of our own pockets to bring this matter to a successful conclusion for our clients.

3.      Defendants Prestige Brands and Medtech Products (together "Prestige") and their counsel mounted an admirably vigorous defense to Plaintiffs' claims, which is duly reflected in the docket.  The docket now exceeds 370 entries, and according to the "Page ID" field in the ECF header of filed documents, the record now exceeds 31,000 pages of filings.

4.      Gaw | Poe uses billing software to track the time spent by each of its attorneys on the firm's matters.  I exported from that software all billing entries recorded to this matter from July 25, 2018 through March 19, 2024 into an Excel spreadsheet and provided it to our fees expert Mr. Gerald Knapton and his team. Working in conjunction with Mr. Knapton, we identified approximately 35 hours recorded by our firm the were deemed to be impermissibly vague, duplicative, excessive, or clerical in nature.  The remaining 3,122.6 hours of attorney time, recorded by date with descriptions of the work performed, are reflected in **Exhibit 2** to Mr. Knapton's accompanying declaration.

5.      Discovery in this case was extensive.  We collected, reviewed, and produced over 5,800 pages of documents from our own clients, and reviewed and analyzed over 76,000 pages of documents that Prestige had made through fifteen separate productions.  Prestige's production included hundreds if not thousands of

1   lengthy Excel spreadsheets, which are reflected as only a single "page" in the

2   foregoing count. We also received and analyzed small productions from third parties

3   J&J sales and Costco Wholesale Corporation.

4        6.    By my count, we took or defended 18 depositions in this case, which

5   necessitated travel to eight different states: California, New York, New Jersey,

6   Arizona, North Carolina, Wisconsin, Washington, and Arkansas.

7        7.    Prestige's stingy defense also necessitated numerous formal discovery

8   disputes, including five that required initiation of the Local Rule 37.1 process, and

9   two of those resulted in formal discovery motions handled by Magistrate Wilner. The

10  formal discovery disputes included a dispute with Costco, when it refused to comply

11  with the document and deposition subpoena we had served upon it. Costco's

12  recalcitrance required our firm to engage at our own expense local counsel in the

13  Western District of Washington, who prepared and filed a motion to compel in that

14  district, which eventually forced Costco to acquiesce.

15       8.    Reviewing the categorization of time entries reported at paragraph 28 of

16  Mr. Knapton's declaration, the amount of time spent on each category strikes me as

17  very modest based on my long experience in complex litigation. The only outlier is

18  the 1,046.8 hours recorded in the category "Trial Preparation." That time, however,

19  was the inevitable result of our having to gear up for three separate trial dates. When

20  the trial preparation time is separately broken out, however, it is much more modest.

21  According to my review of the time records themselves, we spent 490.1 hours leading

22  up to the April 14, 2020 trial date, prior to it being vacated due to the pandemic on

23  March 18, 2020. Similarly, we recorded 145.2 hours to that category in anticipation

24  of the December 2022 trial date, before it was vacated on November 30, 2022. Then,

25  we finally recorded 396.5 hours leading up to the trial that took place in December

26  2023.

27       9.    Any duplication of effort over the start-and-stop course of our trial

28  preparation activity was strictly necessary to obtaining the results we did. The case

1    presented complicated legal issues and expert opinions, over 800 trial exhibits, and

2    nine separate plaintiffs. Because it is impossible for a lawyer to have perfect recall

3    across two-year (or even six-month) gaps of inactivity, each trial preparation push

4    essentially required starting from square one.

5         10.    The 3,122 hours that we recorded on this RPA case are exceedingly

6    modest compared to the time spent by other successful RPA plaintiffs. In the

7    landmark case of *Hasbrouck v. Texaco*, for example, the trial court noted that the

8    plaintiffs' counsel had expended 6,550 hours to get through the first trial in that

9    action, which it deemed a reasonable amount. 631 F. Supp. 258, 260 (E.D. Wash.

10   1986). And more recently in *Feeser's, Inc. v. Michael Foods, Inc.*, No. 04-cv-576

11   (M.D. Pa.), the successful plaintiffs' counsel submitted a fee petition claiming

12   23,351.75 hours through trial for all billers, 18,515 of which were billed by attorneys.

13   I have located the fee petition submitted in that action, a true and correct copy of

14   which is attached as **Exhibit A** hereto.

15              **Backgrounds of Plaintiffs' Counsel and Antitrust Experience**

16        11.    Gaw | Poe LLP practices mainly in the fields of antitrust and business

17   litigation. Gaw | Poe particularly prides itself in its trial practice. We have won

18   outright all but two of the dozen or so cases we have taken to trial, and both trial

19   losses have been at least partially reversed upon appeal to the Ninth Circuit. Before

20   appellate courts (the Fourth and Ninth Circuits, and the California Court of Appeals),

21   we have won outright all four times we represented the appellee, and either partially

22   or completely prevailed five out of the seven times we represented the appellant. The

23   firm was founded by myself and my partner Randolph Gaw in June 2014, and has

24   ranged between four and six attorneys over that period. A brief biography of each of

25   the Gaw | Poe attorneys who worked on this matter follows.

26        12.    I graduated with distinction from Stanford Law School in 2002 and after

27   spending one year at Morrison & Foerster LLP in San Francisco, I served as a clerk

28   for the Honorable Richard R. Clifton of the United States Court of Appeals for the

Ninth Circuit. Following my clerkship I spent two years in the Bozeman, Montana office of the nation's leading environmental law firm, Earthjustice. Before co-founding Gaw | Poe, I was Of Counsel in the litigation department of the international law firm Morrison & Foerster in San Francisco, where I had practiced for eight years before co-founding Gaw | Poe. At Morrison & Foerster I worked primarily on class action defense and financial services litigation matters. Having been a litigator for 22 years, I am a deeply experienced litigator with a broad range of experience, from plaintiff-side antitrust matters (under the Sherman Act and Robinson-Patman Act) to plaintiff-side and defense-side class actions, to patent litigation. I have been recognized as a Super Lawyer™ for Northern California in each year since 2020.

13. My partner Randolph Gaw had been my classmate at Stanford Law School, likewise graduating in 2002. Mr. Gaw was a Counsel in the litigation department of the law firm O'Melveny & Myers LLP where he had spent five years, and was an Associate in the litigation department of the law firm Wilson Sonsini Goodrich & Rosati P.C for five years prior to that. Mr. Gaw also had a solo litigation practice from 2012-2014, before co-founding Gaw | Poe. Mr. Gaw has been named a Fellow of the Litigation Counsel of America, a trial lawyer honorary society where fellowship is by invitation only and is limited to less than one-half of one percent of American lawyers. Mr. Gaw has also been recognized as a Super Lawyer™ for Northern California every year since 2018, and as a Rising Star™ for Northern California for 2016 and 2017, by Super Lawyers magazine.

14. My former partner Samuel Song joined Gaw | Poe in February 2016 as Of Counsel and was promoted to Partner on January 1, 2017. He departed the firm on May 31, 2022. Mr. Song is a litigator with a broad range of experience at the trial and appellate levels. Before joining Gaw | Poe LLP, Mr. Song worked for almost eight years in the San Francisco office of Morrison & Foerster LLP as an Associate in its litigation department, where he successfully represented clients in appellate litigation, securities fraud class actions, breach of fiduciary duty suits, commercial

litigation, and criminal matters.  Mr. Song graduated with distinction from UC Hastings College of the Law, where he was a Senior Articles Editor on the Hastings Law Journal, elected to the Thurston Society, and earned Witkin awards in four subjects.  While in law school, he served as a judicial extern for the Honorable Martin J. Jenkins at the United States District Court for the Northern District of California.

15.  My partner Victor Meng joined Gaw | Poe in September 2015 as Of Counsel, becoming partner in 2019.  He graduated from Loyola Law School, cum laude, in 2007.  From 2007-2014, Mr. Meng was an associate in the litigation department of Morrison & Foerster LLP, where he represented companies and their directors and officers in securities class actions and shareholder derivative suits, and financial institutions in actions challenging foreclosure and loan modification practices.  While in law school, he served as a judicial extern for the Honorable Dean D. Pregerson at the United States District Court for the Central District of California.

16.  My colleague Flora Vigo is also counsel of record in this action.  Ms. Vigo joined Gaw | Poe in September 2018 as Of Counsel.  She graduated from UC Hastings College of the Law, cum laude, in 2005, and where she was elected to the Thurston Society and earned the Witkin Award for Excellence.  For approximately seven years, Ms. Vigo was an Associate and then Counsel in the litigation department of O'Melveny & Myers LLP, where she represented clients in class actions, breach of fiduciary duty suits, and commercial litigation.  Ms. Vigo has been recognized as a Rising Star™ for Northern California for 2013 and 2014, by Super Lawyers magazine.

17.  Gaw | Poe's experience in litigating Robinson-Patman Act ("RPA") matters is unrivaled by any firm in the country.  I first became interested in the RPA while defending Plaintiff Pitco against a trademark infringement claim while still working at Morrison & Foerster.  From that point I became keenly interested in the Act, and spent six months reading RPA precedent during my daily commutes on San Francisco's BART system.  By coincidence, Mr. Gaw (who ran his own San

Francisco-based law firm at the time) represented a different C-Store wholesaler in that same action.  When that case resolved, I approached Mr. Gaw with a plan to revive the RPA to restore a level playing field to businesses like the ones we represented in that matter.  He was receptive, so I left Morrison & Foerster at the end of May 2014, and we co-founded Gaw | Poe LLP the following day.

18.  Since founding Gaw | Poe, we have brought the following RPA cases: *ABC Distributing, Inc., et al. v. Living Essentials*, No. 15-cv-02064-NC (N.D. Cal.) (filed May 7, 2015); *ABC Distributing, Inc. v. Scandinavian Tobacco Group Lane Ltd.*, 2:18-cv-00140-PA (C.D. Cal.) (filed Jan. 5, 2018); *Trepco Imports & Dist. Ltd v. Arizona Beverages USA, LLC*, 5:18-cv-02605-JGB (C.D. Cal.) (filed Dec. 14, 2018); *U.S. Wholesale Outlet & Dist., Inc., et al. v. Living Essentials, LLC et al.*, 2:18-cv-1077-CBM (C.D. Cal.) (filed Feb. 8, 2018); and *Roma Mikha, Inc. et al. v. Southern Glazers Wine and Spirits*, LLC, 22-cv-01187-FWS (C.D. Cal.) (filed Jun. 19, 2022).  All of those cases have settled, except for *U.S. Wholesale* and the *Southern Glazers* case.

19.  *Southern Glazers* is a class action against the country's largest liquor distributor, brought on behalf of independent liquor stores who are charged illegally high prices compared to their chain-store competitors.  As for the *U.S. Wholesale* case, we lost the jury's verdict and the court's decision on the section 2(d) claim, with the latter being reversed on appeal by the Ninth Circuit.  In that appeal, we partnered with the D.C. firm Goldstein & Russell PC as co-counsel.  However, I was the principal author of both appellate briefs, and argued the case at the hearing.

20.  Our firm's series of RPA cases was an impetus for the ABA's Antitrust Law Section to hold a panel at is 2022 Spring Meeting in Washington, D.C. titled "Is There a Robinson-Patman Act Revival?"  I was joined on that panel by a professor of economics from Johns Hopkins University and two defense-side antitrust practitioners.  I was also invited as a panelist on another panel hosted by the Antitrust Section titled "The Robinson-Patman Act; Practical Applications" in December

1 2021. I am also the author of an article titled "The Critics Are Wrong: How the

2 Robinson-Patman Act Has Been Misunderstood By Its Detractors," in the most

3 recent edition of the ABA Antitrust Law Section's "Antitrust Magazine."[1] Most

4 recently, I was asked to participate in a July webinar about the Robinson-Patman Act

5 by its organizer, Professor Daniel Sokol of USC Gould School of Law.

6       21. The FTC under the current administration has expressed an interest in

7 renewing its enforcement efforts regarding the RPA, as reflected in numerous recent

8 popular press and legal articles. To that end, the office of FTC Commissioner Alvaro

9 Bedoya contacted me in the fall of 2022 to discuss our experience with RPA actions.

10 In conjunction with that overture, I was asked to make a presentation to the

11 Commission (including Commissioner Bedoya and the Deputy Director of the FTC's

12 Bureau of Competition) which was also attended by over 80 FTC attorneys,

13 economists, and staff. In a similar vein, in the fall of 2023 my partner Mr. Gaw was

14 invited to attend an RPA discussion with the FTC Chair Lina Khan and a number of

15 industry representatives and trade groups, hosted by Plaintiff Pitco and its principal

16 David Luttway.

17       22. Approximately nine months after we filed our pending RPA class action

18 against Southern Glazers, Politico.com and other news sites reported that the FTC

19 had opened its own RPA investigation of the liquor distributor, which we understand

20 to be ongoing in parallel to our private action.

21 **Rates**

22       23. In recent years, three different courts have determined that a touchstone

23 for the "reasonable rate" for work performed by Gaw | Poe attorneys is the "third-

24 quartile partner" rate for general litigation matters that is reported in the Real Rate

25 Report. Those cases are *See Trendsettah USA Inc. v. Swisher Int'l Inc.*, No. 14-cv-

26 01664-JVS-DFMX, 2023 WL 8263365, at *14 (C.D. Cal. Nov. 17, 2023); *In re*

27

28 [1] https://www.americanbar.org/groups/antitrust_law/resources/magazine/2024-
spring/critics-are-wrong/

1  *Outlaw Laboratory, LP Litig.*, No. 18-cv-840-GPC-BGS, 2023 WL 6522383, at \*4

2  (S.D. Cal. Oct. 5, 2023); and *AdTrader, Inc. v. Google LLC*, 2020 WL 1921774, at

3  \*8 (N.D. Cal. Mar. 24, 2020).  In the *AdTrader* matter, the court awarded rates of

4  $1,000 and $855 for our firm's senior and junior attorneys respectively, which

5  equates to a 7% and 10% higher rate than had been reported in the then-current Real

6  Rate Report.

7       24.    The 2022 edition of the Real Rate Report had included a specific rate

8  category for "Antitrust and Competition – Litigation." It reported a third-quartile rate

9  of $1,321 per hour and a median rate of $1,068 per hour.  A true and correct copy of

10  that edition of the Real Rate Report is attached as **Exhibit B** hereto, and the antitrust

11  litigation rate appears at page 45 of that document.  The antitrust litigation rate

12  category was unfortunately not included in the 2023 edition of the Real Rate Report.

**Costs**

14       25.    Our firm paid $4,956.10 for the video recording of the Billelo, Maher,

15  Christian, Burnett, Grehn, and Quattlebaum depositions.  The receipts reflecting the

16  video portions of those depositions are attached as **Exhibit C** hereto.

17       26.    Our firm incurred $9,624.48 in travel expenses to attend depositions in

18  this case.  Receipts reflecting those expenses are attached as **Exhibit D** hereto.  Those

19  amounts do not include the travel expenses that I incurred to travel to New York City

20  to defend the depositions of several of the plaintiff-witnesses, since that testimony

21  did not implicate the UPA claim.

22       27.    Our firm paid $7,736.41 for three copies of Plaintiffs' trial exhibits, and

23  two copies of Defendants' trial exhibits.  The receipt reflecting that expense is

24  attached as **Exhibit E** hereto.  To keep expenses down, we refrained from printing

25  copies of the exhibits that were voluminous Excel spreadsheets, which would have

26  added thousands of additional pages.

27       28.    Our firm engaged Tom Beyer, a highly experienced trial technician, to

28  facilitate our presentation of exhibits, graphic aids, and video to the jury.  Mr. Beyer

charges $225 per hour for his services.  Including his pre-trial work, we paid Mr. Beyer's firm a total of $30,250.65.  Strictly for the 58.8 hours of work that Mr. Beyer spent in the courtroom, we paid him $13,230.  The receipt reflecting that amount, with the relevant entries highlighted, is attached as **Exhibit F** hereto.

29.  In total, the costs for which our firm seeks reimbursement under the state costs provision is $35,546.99.

### Facts Re: Enhancement Factors

30.  A Westlaw search for cases referencing Business & Professions Code section 17045 returns 96 cases.  Reviewing those cases, I am unable to find a single case where the plaintiff has won a jury verdict.  Indeed, the only instance where a plaintiff appears to have succeeded at trial was in a bench trial from 1966, where the judge concluded that both the plaintiff and defendant had violated section 17045. *Page v. Bakersfield Unif. & Towel Supply Co.*, 239 Cal. App. 2d 762, 766 (1966).

31.  Review of the cases reflected in those 96 results (many cases appeared multiple times) shows that a clear majority of section 17045 cases are dismissed upon the pleadings, at summary judgment, by non-suit or directed verdict, or via JMOL.  I found only two cases that went to jury trial, and the section 17045 claimants lost in both instances.  *See Specialized Clutch & Brake of Stockton, Inc. v. United Brake Sys., Inc.*, 2005 WL 459691, at *6 (Cal. Ct. App. Feb. 28, 2005); *Murphy Tugboat Co. v. Shipowners & Merchants Towboat Co.*, 467 F. Supp. 841, 846 n.1 (N.D. Cal. 1979).

32.  Spending over 3,000 hours on this case over the course of almost six years has been a significant challenge for our firm, which has ranged from four to six attorneys over that period.  The time commitment for this case in fact required our firm to pass up other cases, including other potential RPA cases on behalf of AKR Corporation against the company that makes Bicycle Playing Cards, and on behalf of our California wholesaler clients against Nestle Waters, GSK over its Chapstick

1   pricing, and Johnson & Johnson over Motrin pricing.  We would have pursued one

2   or more of those had we had the bandwidth to do so.

3       33.    Over the last nine years I have met many plaintiff-side antitrust

4   practitioners and have generally stayed abreast of RPA litigation.  I am not aware of

5   any other law firm in the country that takes on RPA cases on a purely contingent

6   basis.

7       34.    I have reviewed the 642 time entries on Mr. Knapton's spreadsheet

8   documenting the time we spent on this case.  I have identified those entries where the

9   time spent was (1) exclusive to the RPA (including the entirety of our summary

10   judgment motion, which concerned only section 2(a) liability), (2) performed solely

11   for the four out-of-state plaintiffs, and (3) spent seeking fees.  The excluded entries

12   are shown on **Exhibit G** hereto.  The column titled "Hours Deducted" shows the

13   number of hours deducted for each such entry.  I used the Excel multiplication

14   formula to multiply that number by Mr. Knapton's recommended hour rate, and that

15   product is shown in the "Fees Excluded" column.  In total I identified 304.3 hours

16   that should be deducted, and total fees of $422,730.20.

17       35.    As shown by Prestige's post-trial overhaul of its pricing and

18   promotional approach to Clear Eyes, this case resulted in Prestige creating a level

19   playing field between all the businesses in its wholesale channel and Costco and

20   Sam's Club.  That overhaul was solidified by this Court's grant of permanent

21   injunctive relief ensuring that (at least as to these nine plaintiffs) Prestige will not

22   revert to a discriminatory pricing strategy in the future.

23       36.    I had a handful of short settlement discussions with Mr. Fox before trial.

24   Two of those are reflected in our time entries dated July 13 and September 10, 2019.

25   My recollection is that we had a couple of additional calls on that topic, but I have a

26   tendency to under-record the amount of time I spend on this and other cases, so those

27   conversations are not reflected in our time records.  The parties also attended an

28   unsuccessful mediation before a retired superior court judge.

37. If Prestige agrees to do so in its opposition papers, Plaintiffs would welcome disclosure of the specifics of Prestige's settlement offers, but suffice it to say, none of them approached the value of the jury verdict, and in *all* of those discussions Prestige stalwartly refused to revise its pricing strategy to comply with the RPA and section 17045. Reflective of Prestige's appetite for settlement is the Rule 68 Offer of Judgment it sent to us on December 9, 2019, before the original trial date. Therein, it made an offer of judgment as follows:

> the aggregate amount of $450,000.00 in complete satisfaction of all claims by Plaintiffs against Defendants in the above-referenced action. The sum set out in this Offer is inclusive of all recoverable costs and attorneys' fees incurred to date by Plaintiffs.

38. After deducting our contingency fee and the $216,121.72 in expenses that Mr. Gaw and I had advanced to date, that settlement offer would have left our clients with just over $7,000 apiece, and no remedy at all against future discrimination. Instead, by going to trial, Plaintiffs achieved a $1.1 million verdict (after trebling), mandatory fees, and a permanent cure for Prestige's discriminatory pricing.

I declare under penalty of perjury under the laws of the United States and the state of California that the foregoing is true and correct. Executed on June 3, 2024, at Honolulu, Hawaii.

s/ *Mark Poe*

Mark Poe

1  MARK POE (S.B. #223714)
2  mpoe@gawpoe.com
   RANDOLPH GAW (S.B. #223718)
3  rgaw@gawpoe.com
4  VICTOR MENG (S.B. #254102)
   vmeng@gawpoe.com
5  GAW | POE LLP
6  4 Embarcadero Center, Suite 1400
   San Francisco, CA  94111
7  Telephone:  (415) 766-7451
8  Facsimile:  (415) 737-0642

9  Attorneys for Plaintiffs

10

11              UNITED STATES DISTRICT COURT

12            CENTRAL DISTRICT OF CALIFORNIA

13

14  L.A. INTERNATIONAL CORP., et al.      Case No.  2:18-cv-06809-MWF- MRW

15              Plaintiffs,        **DECLARATION OF GERALD G.**
                                   **KNAPTON; Exhibits 1 to 4**
16              v.

17  PRESTIGE BRANDS HOLDINGS,
18  INC., et al.                   Judge:      Hon. Michael W. Fitzgerald
                                   Courtroom:  Courtroom 5A
19              Defendants.        Date:       July 8, 2024
20                                 Time:       10:00 a.m.

21

22

23

24

25

26

27

28

1    I, Gerald G. Knapton, make this declaration in support of the Plaintiffs'

2  Motion for Attorneys' Fees and Costs.  I state and declare that the below sets forth

3  the opinions that I have reached at this time in this action:

4               **BACKGROUND AND EXPERT QUALIFICATIONS**

5        1.     My background, qualifications as an expert on attorneys' fees issues,

6  and relevant experience are fully set forth in **Exhibit 1**.  In brief, I received my

7  undergraduate education at Brown University and the University of California,

8  Berkeley.  I obtained my JD from the School of Law at the University of California,

9  Los Angeles.  Today, I am a senior partner of the law firm Ropers, Majeski APC,

10  which has offices in Los Angeles (where I am based), Costa Mesa, Seattle, San

11  Francisco, Menlo Park, San Jose, Las Vegas, New York City, Boston,  and Paris.  I

12  am licensed and admitted to practice law before all courts of the State of California

13  (since 1977), before all federal District Courts sitting in California, and before the

14  United States Courts of Appeals for the 9th and 3rd Circuits.

15        2.     For over 30 years, in connection with hundreds of litigation matters, I

16  have opined as an expert on the reasonableness and necessity of attorneys' fees.

17  My work as an attorneys' fees expert frequently involves reviewing legal invoices

18  and supporting work product.  I have personally reviewed thousands of invoices for

19  legal work, including numerous matters based in Los Angeles and Orange County,

20  totaling far in excess of $5 billion in fees.  Though I have opined as an attorneys'

21  fees expert in all variety of matters, I have particular experience in antitrust cases,

22  like this one that involved federal Robinson-Patman Act claims and two California

23  claims sounding in the Unfair Practices Act and an Unfair Competition claim.  I

24  have qualified and testified as an attorneys' fees expert in many lawsuits, including,

25  as here, substantial antitrust cases and jury trials.

26        3.     I have also acted as an attorneys' fees expert for many other kinds of

27  litigation, in both individual business disputes and class-action overtime cases,

28  commercial disputes, consumer products cases, wage and labor matters, individual

1   and class actions involving statutory interpretation, pharmaceutical cases, patent-

2   infringement suits, intellectual-property matters, environmental-contamination and

3   compliance matters, notice-compliance matters (for "clean water act" and "catalyst"

4   cases), accounting cases, "civil rights" cases, retail-credit compliance litigation,

5   truth-in-lending lawsuits, discrimination lawsuits, Brown Act matters, FEHA

6   matters, FSLA lawsuits, and a wide variety of individual actions.

7        4.     My client base is similarly diverse and expansive. I have been retained

8   as an attorneys' fees expert by law firms, judges (in bankruptcy matters),

9   corporations, partnerships, insurance companies, cities, counties, State of

10   California, trustees, plaintiffs, defendants, and individuals at both the trial and

11   appellate level. About half the time, I am retained to offer my opinion in support of

12   a fee request; in the other half, I am engaged to offer my opinion in opposition to a

13   fee request. Thus I have seen the time and fees from both sides of fee motions. Our

14   time is billed by the hour with no contingency or bonus depending on the outcome.

15   My time is billed at $1,115 per hour. I do not accept projects if I cannot offer my

16   honest opinion on the matter.

17        5.     In some cases, I only review hourly rates for "reasonableness" in light

18   of the work performed and comparable market rates. In other cases, I also review

19   invoices and work product submitted as part of a settlement or a motion for

20   attorneys' fees. I have performed each type of analysis in dozens of cases for

21   various clients, and I have reviewed hundreds of motions for attorneys' fees and

22   their supporting invoices, many based on "attorneys' fee provisions," codes,

23   statutes, or common law doctrines. Because of this work, I have deep experience

24   and knowledge regarding the rack rates and discounted rates charged for

25   commercial litigation work in state and federal Los Angeles and Orange County

26   courts. I have similarly deep experience and knowledge regarding the reasonable

27   amount of time needed to accomplish litigation and trial-related tasks as well as

28   related appeals.

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

6.      I write and lecture frequently on the issue of determining reasonable legal fees in fee-shifting matters.  My articles have been featured in the American Bar Association Magazine, National Law Journal, California Lawyer, Los Angeles Daily Journal, Law360, and numerous other publications.

7.      I have qualified and testified in person as an attorneys' fees expert on about 70 occasions before juries and judges (including two in the Central District), and have offered my declarations dozens of times to Central District federal and California courts evaluating a request for fees under many kinds of fee-shifting mechanisms.

8.      I was retained by Plaintiffs  to prepare my expert opinion on the reasonableness and necessity of the legal fees for counsel's work in this matter.

## INTRODUCTION AND SUMMARY OF CONCLUSIONS

9.      Clear Eyes® brand eye drops are purchased by the public at many retail stores that acquire the very same product through many intermediary wholesalers in many places and at varying prices - some of which were sold at lower prices for identical eye drops sold at major chain stores. It was  proved that some prices to intermediaries were set based on unfair discrimination to those wholesalers as they competed with other wholesalers and retailers who paid less for the very same product. The antitrust matter was worked up with 18 depositions (in 8 states), frequent discovery disputes, multiple document productions with over 81,000 pages -  extensive motion practice including *Daubert* and multiple motions for summary judgment. The case was set and re-set for jury trial to commence on four dates and was tried to a jury over eight days in December 2023. Those efforts resulted in a victory on all four causes of action alleged in the operative complaint, and the lawsuit's injunction has secured the level-playing field that was said to be the primary aim of this litigation.

10.      I understand that as a direct result of counsel's work, Defendants Prestige Brands Holdings, Inc. and Medtech Products, Inc. (together, "Prestige")

DECLARATION OF GERALD G. KNAPTON ISO PLAINTIFFS' MOTION FOR FEES

4891-9342-0720

have changed their pricing structure so that dozens of other similarly-situated,
family-owned wholesalers around the country will also be free from the
discriminatorily high prices they have been charged for Clear Eyes for over a
decade.

11.    The trial schedule was set and continued four times (partly as a result
of COVID concerns) before an eight day jury trial from 12/5 to 12/15/2023.  This
matter comes now before the Court for a determination of reasonable fees for the
litigation after an eight day jury trial and verdict.

12.    What is now in place after the denial of a motion for a new trial is an
award of what I understand to be $1,050,000.00 (after trebling) for violations of the
Robinson-Patman Act and the California Unfair Practices Act and a permanent
injunction. As a result I understand that Prestige ceased its practice of charging
discriminatorily higher prices to small competitors of Costco and Sam's Club
across the entire country, while also extending to those family-owned businesses
proportionally equal promotional payments.

13.    Plaintiffs present 3,122.6 hours of time by 5 lawyers for their work
from 7/25/2018 through 3/19/2024. That is shown in chronological order in an
Excel spreadsheet which shows the time and fees by ten categories or tasks in 643
rows or lines.

14.    Based on my review of the records in this matter, it is my opinion that
the reasonable and necessary fees lodestar for that work by counsel for plaintiffs is
$3,726,807.80.

15.    I understand that fees will be sought from Defendants under the fee-
shifting language in section 4 of the Clayton Act, 15 U.S.C. § 15(a): a successful
plaintiff "shall recover . . . the cost of suit, including a reasonable attorney's fee."

16.    I understand that Plaintiffs further seek fees under section 16 of the
Clayton Act which is the basis for injunctive relief in antitrust actions.  That section
provides that where "the plaintiff substantially prevails" in seeking injunctive relief,

1   the court "shall award" "a reasonable attorney's fee."  15 U.S.C. § 26.  Finally,

2   Plaintiffs seek fees on their California Unfair Practices Act claim under section

3   17082 of the Business & Professions Code, which likewise provides that "the

4   plaintiff shall be awarded a reasonable attorney's fee together with the costs of

5   suit."  Cal. Bus. & Prof. Code § 17082.

6       17.    Finally, I understand that Plaintiffs seek an enhancement of the basic

7   lodestar calculation of 2.0 to the lodestar, a multiplier that I have seen applied by

8   state courts to compensate for the contingency risk plus other factors.

9       <u>The Standard to Apply</u>:

10      18.    To determine a "reasonable attorney's fee," courts employ the

11  "lodestar" method.  *Morales v. City of San Rafael*, 96 F.3d 359, 363 (9th Cir. 1996).

12  Under that method, "the district court 'multiplies the number of hours the

13  prevailing party reasonably expended on the litigation by a reasonable hourly

14  rate.'"  *Gonzalez v. City of Maywood,* 729 F.3d 1196, 1202 (9th Cir. 2013) (citation

15  omitted).

16      19.    The burden is on plaintiffs to prove up their fees. "The party seeking

17  fees bears the burden of documenting the hours expended in the litigation and must

18  submit evidence supporting those hours and the rates claimed." *Welch v. Metro.*

19  *Life Ins. Co.*, 480 F.3d 942, 945-46 (9th Cir. 2007).

20      20.    Taking a Robinson-Patman Act case to trial has been exceedingly rare

21  in the Ninth Circuit for decades (and to my knowledge in all other Circuits as well).

22  In fact, in over four decades of my personal experience with litigation in California,

23  I am not aware of any firm that is willing to take a plaintiff-side RPA case on a

24  contingent basis.  But Mr. Poe is one of the more experienced RPA practitioners

25  who has helped in reviving the RPA from a long dormancy.  One case (not by him

26  but as a comparator for the time these matters take) from 35 years ago involved 12

27  gas station operators objecting to the sale of identical branded gasoline at various

28  costs and prices in the retail chain.  It  went to both a first trial and then a retrial. The

- 6 -

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

1   multiple trials consumed 6,550 hours for the first trial and then 5,000 hours of

2   attorney time for the second trial.  *Hasbrouck v. Texaco, Inc.* 879 F.2d 632, 634

3   (9th Cir. 1989). So the approximately 3,123 hours sought in this matter is modest by

4   comparison.

5           21.    If counsel for defendants will disclose their hours that would also be

6   helpful. I have done studies and found that there is near parity of time when

7   experienced firms litigate a matter.  As the Ninth Circuit has written, "there is one

8   particularly good indicator of how much time is necessary . . . and that is how much

9   time the other side's lawyers spent." *Democratic Party of Washington State v.*

10  *Reed*, 388 F.3d 1281, 1287 (9th Cir. 2004).

11          22.    The Ninth Circuit has adopted a multi-part test for evaluating a request

12  for reasonable legal fees, costs and expenses from one's opponents:

13          "In a case presenting a similar situation, *Johnson v. Georgia*

14          *Highway Express*,  [70]  Inc., 488 F.2d 714 (5th Cir. 1974), the Fifth

15          Circuit found it necessary to vacate the award of attorney's fees and

16          remand for reconsideration in light of the following guidelines: (1) the

17          time and labor required, (2) the novelty and difficulty of the questions

18          involved, (3) the skill requisite to perform the legal service properly,

19          (4) the preclusion of other employment by the attorney due to

20          acceptance of the case, (5) the customary fee, (6) whether the fee is

21          fixed or contingent, (7) time limitations imposed by the client or the

22          circumstances, (8) the amount involved and the results obtained, (9)

23          the experience, reputation, and ability of the attorneys, (10) the

24          "undesirability"" of the case, (11) the nature and length of the

25          professional relationship with the client, and (12) awards in similar

26          cases.  These guidelines are consistent with those recommended by

27          the Code of Professional Responsibility of the American Bar

28          Association, Disciplinary Rule 2-106.

1          We adopt these guidelines as appropriate factors to be

2     considered in the balancing process required in a determination of

3     reasonable attorney's fees. The failure to consider such factors

4     constitutes an abuse of discretion."

5 *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 69-70 (9th Cir. 1975).

6        23.    It is my understanding and assumption that most of the twelve "Kerr

7 Factors" remain in use in this Circuit:

8     "Whether these factors require an increase of the lodestar

9     amount is for the district court to decide in the first instance on

10     remand. We agree, however, that the court's failure explicitly to

11     consider the Kerr "reasonableness" factors, as well as the delay and

12     risk factors, was an abuse of discretion."

13 *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 740 (9th Cir. 2016).

14        24.    Enhancements are allowed for four reasons:

15     "Under Serrano III, the lodestar is the basic fee for comparable legal

16     services in the community; it may be adjusted by the court based on factors

17     including, as relevant herein, (1) the novelty and difficulty of the questions

18     involved, (2) the skill displayed in presenting them, (3) the extent to which

19     the nature of the litigation precluded other employment by the attorneys, (4)

20     the contingent nature of the fee award. (Serrano III, supra, 20 Cal. 3d at p.

21     49.) The purpose of such adjustment is to fix a fee at the fair market value for

22     the particular action. In effect, the court determines, retrospectively, whether

23     the litigation involved a contingent risk or required extraordinary legal skill

24     justifying augmentation of the unadorned lodestar in order to approximate the

25     fair market rate for such services."

26     *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001).

27

28

- 8 -

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

**Summary of opinion:**

25.     Based on my experience, review of the PACER docket and filings and other materials, and interviews with trial counsel, it is my opinion that the reasonable and necessary total lodestar is $3,726,807.80 in fees, for 3,122.6 hours of time for legal work from 7/25/2018 through 3/19/2024.

26.     The work descriptions that comprise this lodestar are shown in a MS Excel® spreadsheet of 643 rows that I prepared as **Exhibit 2**  - which I understand will be filed separately under seal, so is <u>not</u> attached to this declaration. The spreadsheet covers work over 57 months.

27.     This does not include any fees for time past 3/19/2024 that I understand will be submitted by one or more declarations with the Reply memo or as the Court directs.

28.      Counsel have requested a lodestar multiplier of 2.0 and if the Court agrees that would result in fees of $7,453,615.60.   In my opinion the enhancement of 2.0 is an appropriate enhancement for the contingency risk and the novelty of the law at issue and the resulting change in Clear Eyes pricing that will be of benefit to plaintiff and all consumers.

29.     I will develop this further in paragraphs 82 to 84 of this declaration.

**Staffing:**

30.     The entire matter including pre-trial and jury trial through post-trial motions were handled by three experienced Gaw | Poe partners (Messrs. Poe, Song and Gaw) , who were the core team, plus two colleagues who assisted for 5.8 hours (Mr. Meng) and 31.4 hours (Ms. Vigo) on the pre-trial motions and a hearing.

31.     Here, in order of hours worked, is a table of the Gaw | Poe team's hours, requested fees, dates of work and their major tasks:

//

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

4891-9342-0720

**SER-055**

| Name | Hours | Fees | Date Range | Major Role and Tasks |
|------|-------|------|-----------|----------------------|
| Mark Poe (MP) | 1,302.2 | $1,711,090.80 | 7.25.2018 to 3.19.2024 | Strategy; briefing; trial; post-trial |
| Samuel Song (SS) | 1,165.0 | $1,166,165.00 | 9.13.2018 to 4.22.2022 | Brief drafting; discovery; depositions |
| Randolph Gaw (RG) | 618.2 | $812,314.80 | 8.29.2018 to 3.19.2024 | Strategy; expert matters; trial; post-trial |
| Flora Vigo (FG) | 31.4 | $31,431.40 | 9.10.2018 to 10.9.2019 | Research; brief drafting and review |
| Victor Meng (VM) | 5.8 | $5,805.80 | 8.7.2018 to 10.22.2018 | Research; brief review |

32.    The 3,122.6 hours of time is allocated to 10 tasks as shown by the label in "Task Category" column G of the spreadsheet. Here is a table for the tasks in approximate chronological order listing the task, attorneys, time and requested fees:

| Task | Attorneys | Hours | Fees |
|------|-----------|-------|------|
| Pleadings | Poe - Meng - Vigo | 27.7 | $35,490.10 |
| Written Discovery | Poe - Gaw - Song - Meng - Vigo | 373.2 | $439,772.70 |
| Hearings | Gaw – Poe – Vigo - Song | 77.7 | $96,307.30 |
| Other Strategy | Poe - Gaw - Song | 20.7 | $25,634.80 |
| Expert Matters | Poe - Gaw - Song | 158.2 | $198,140.50 |
| Depositions | Poe - Gaw - Song | 347.9 | $410,096.70 |
| Settlement/Mediation | Poe - Song | 35.5 | $39,291.50 |
| Pre-trial Motions | Poe - Gaw - Song - Meng - Vigo | 563.7 | $582,386.40 |
| Trial preparation | Gaw - Poe - Song | 1,046.8 | $1,280,531.00 |
| Jury Trial | Gaw - Poe | 256.1 | $336,515.40 |
| Post-trial Motions | Poe - Gaw | 215.1 | $282,641.40 |
| Totals | | 3,122.6 | $3,726,807.80 |

//

DECLARATION OF GERALD G. KNAPTON ISO PLAINTIFFS' MOTION FOR FEES

4891-9342-0720

**OVERVIEW OF THE LITIGATION**

*The basic facts and gravamen of the lawsuit*:

33.    The PACER docket I reviewed contained 371 entries. I understand that the motion for a new trial was denied and that the plaintiffs' motion for a permanent injunction was granted.  Plaintiff L.A. International first filed this action on August 8, 2018.  ECF No. 1.  The other eight plaintiffs joined via an amended complaint filed twelve days later.  ECF No. 10.  That complaint alleged four causes of action, for violation of (1) section 2(a) of the Robinson-Patman Act ("RPA"), (2) section 2(d) of the RPA, (3) section 17045 of California's Unfair Practices Act ("UPA"), and (4) California's Unfair Competition Law ("UCL").  Id. ¶¶ 50-66.

34.    Prestige mounted a vigorous defense that resulted in hard-fought litigation, as reflected by a docket containing over 370 filings, and more than 31,000 written pages.  In the end, all nine Plaintiffs were successful on all four causes of action they prosecuted,  obtaining over $1 million in damages and a permanent injunction prohibiting Prestige from engaging in all of the acts that the amended complaint alleged to be illegal. I am informed that Prestige has promised to extend this parity of pricing to *all its wholesaler customers* throughout the United States.

35.    Depositions over 18 sessions in 8 states were prepared and taken from mid-2019 through  September of 2019.

*Attempts to Resolve the Matter*:

36.    Settlement was attempted:  A half-day formal mediation was held in Los Angeles on October 25, 2019. It was briefed by Plaintiffs and attended by counsel but this did not resolve the matter.

*The trial was re-scheduled and some months had no time expended:*

37.    A jury trial (projected to run for 8 days) was first scheduled for January 21, 2020 and was re-scheduled for April 14, 2020, then December 6, 2022 and finally December 5, 2023 when it got underway from then until 12/15/2023.

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

4891-9342-0720

While the continuances were required by the COVID restrictions they add to the
time required as the matter needed to be worked up for presentation four times.

38.    Here is a table in chronological order with the hours for each of the 57
months (by all timekeepers) with one task (or a few major tasks) shown for each
month:

| Year | Month | Hours | Main task(s) |
|------|-------|-------|--------------|
| 2018 | Jul   | 7.4   | Evaluate Clear Eyes |
| 2018 | Aug   | 19.5  | Prepare complaint |
| 2018 | Sept  | 4.3   | Personal jurisdiction |
| 2018 | Oct   | 38.5  | 12 b and motion to seal |
| 2018 | Nov   | 20.1  | Opp. mot to dismiss |
| 2018 | Dec   | 48.6  | Hearing - R26 report |
| 2019 | Jan   | 29.9  | Written discovery |
| 2019 | Feb   | 69.3  | Docs – Mot Compel |
| 2019 | Mar   | 61.9  | Mot Compel - Docs |
| 2019 | Apr   | 21.5  | Docs - rev and produce |
| 2019 | May   | 79.8  | Document review |
| 2019 | Jun   | 94.4  | Deposition prep |
| 2019 | Jul   | 133.5 | Discovery - Experts |
| 2019 | Aug   | 395.6 | Depositions |
| 2019 | Sept  | 406.2 | Pre-trial motions |
| 2019 | Oct   | 77.3  | Hearings - Mediation |
| 2019 | Nov   | 209.3 | MILs – Trial prep |
| 2019 | Dec   | 163.6 | Jury instr. - MILs |
| 2020 | Jan   | -     | - |
| 2021 | Feb   | 2.1   | Strategy |
| 2021 | Mar   | 83.4  | Witness prep  - Experts |
| 2021 | Apr   | 53.0  | Witness outlines |
| 2021 | May   | 11.3  | Witness outlines |
| 2021 | Jun   | -     | - |
| 2021 | Jul   | .1    | Strategy |
| 2021 | Aug   | -     | - |
| 2021 | Sept  | .7    | Status conference |
| 2021 | Oct   | -     | - |
| 2021 | Nov   | .3    | Trial setting |
| 2021 | Dec   | -     | - |
| 2022 | Jan   | -     | - |

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

| Year | Month | Hours | Main task(s) |
|------|-------|-------|--------------|
| 2022 | Feb | - | - |
| 2022 | Mar | - | - |
| 2022 | Apr | 1.5 | Joint status report |
| 2022 | May | .5 | Attend status conference |
| 2022 | Jun | - | - |
| 2022 | Jul | 3.2 | Sales data updates |
| 2022 | Aug | 27.0 | Update sales data |
| 2022 | Sept | 7.8 | Experts supplemental |
| 2022 | Oct | 54.6 | Trial preparation |
| 2022 | Nov | 92.3 | Trial prep.  - Hearing |
| 2022 | Dec | - | - |
| 2023 | Jan | 7.8 | Outlines and slides |
| 2023 | Feb | 5.6 | Outlines and slides |
| 2023 | Mar | - | - |
| 2023 | Apr | .8 | Experts |
| 2023 | May | - | - |
| 2023 | Jun | - | - |
| 2023 | Jul | 1.6 | Reconsideration mot |
| 2023 | Aug | 15.4 | Trial demonstratives |
| 2023 | Sept | 24.2 | Trial exam outlines |
| 2023 | Oct | 63.3 | Exam outlines - exhibits |
| 2023 | Nov | 243.6 | Outlines - demonstrative |
| 2023 | Dec | 336.2 | Jury trial – post-trial |
| 2024 | Jan | 86.9 | Post-trial - injunction |
| 2024 | Feb | 84.4 | Post-trial matters |
| 2024 | Mar | 36.1 | Post-trial matters |
| 2018-2024 | | 3,122.6 | All time to 3.19.2024 |

**Our Computer Reports:**

39.    My staff and I have prepared a chronological listing of all the time requested by Plaintiffs in one MS Excel® spreadsheet of 643 rows and 47 pages prepared under my supervision and control.

40.    The spreadsheet (that I understand will be filed under seal as it contains confidential information) is **Exhibit 2** for the time and work by the Gaw| Poe firm.

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

41. The spreadsheet has a number of columns showing the date of the legal work in chronological order, the total time for that date by that attorney (although parenthetical notations show the time for each discrete task so there is no "block billing"), the name of the attorney, the current rate requested for that time, the fee applying that current rate,  the full description of work performed with parenthetical notations of the time for each discrete item of legal work, and the task label for each line/row entry.

42. In my opinion the descriptions of the work performed are clear and inform the reader of what was done.

43. The high hours are for pre-trial motions, trial preparation and trial when the small team of Messrs. Song, Poe and Gaw exert the required efforts to meet court deadlines.

44. In my opinion the time for the tasks is reasonable.

## HOURLY RATES

*The background of the Plaintiffs' lawyers*:

45. The lawyers at Gaw | Poe LLP who worked on this matter were trained at "Big Law" firms after their clerkships, externships and law school educations. According to the California Bar on-line records I read they are all admitted to practice law at the dates shown below:

| Lawyer (SBN) Year admitted | Background | Prior Firms |
|---|---|---|
| Mark Poe (223714) 12/19/2002 | Stanford Law 9th Cir clerkship (Clifton) | Morrison & Foerster |
| Victor Meng (254102) 12/11/2007 | Loyola Law Extern Hon. Dean Pregerson | Morrison & Foerster |
| Randolph Gaw (2223718) 12/19/2002 | Stanford Law | O'Melveny & Myers Wilson Sonsini |

4891-9342-0720

**SER-060**

| Lawyer (SBN) Year admitted | Background | Prior Firms |
|---|---|---|
| | | |
| Samuel Song (245007) 12/5/2006 | UC Hastings Extern Hon. Martin Jenkins | Morrison & Foerster |
| Flora Vigo (239643) 12/7/2005 | UC Hastings | O'Melveny & Myers |

46.    The lawyers also have expertise in RPA antitrust matters.  Gaw | Poe have filed these cases:

- *ABC Distributing, Inc., et al. v. Living Essentials*, No. 15-cv-02064-NC (N.D. Cal.) (filed May 7, 2015, settled Nov. 12, 2017)

- *ABC Distributing, Inc. v. Scandanaivan Tobacco Group Lane Ltd.*, 2:18-cv-00140-PA (C.D. Cal.) (filed Jan. 5, 2018, settled Sep. 1, 2018)

- *Trepco Imports & Dist. Ltd v. Arizona Beverages USA, LLC*, 5:18-cv-02605-JGB (C.D. Cal.) (filed Dec. 14, 2018, settled Nov. 24, 2020)

- *U.S. Wholesale Outlet & Dist., Inc., et al. v. Living Essentials, LLC et al.*, 2:18-cv-1077-CBM (C.D. Cal.) (filed Feb. 8, 2018) (verdict lost Oct. 21, 2019)

  o  Appellate Opinion at *U.S. Wholesale v. Innovation Ventures*, 74 F.4th 960 (9th Cir. 2023), remanding for injunctive relief on section 2(d) claim, establishing that test for "competition" set forth in *Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164 (2006) does not govern "chainstore paradigm" cases.

- *Roma Mikha, Inc. et al. v. Southern Glazer's Wine and Spirits*, LLC, 22-cv-01187-FWS (C.D. Cal.) (filed Jun. 19, 2022)

  //

- 15 -

4891-9342-0720

**SER-061**

**THE RULES FOR RATES AND FEES**

47.     I understand that the settled and established guidance of the Ninth Circuit on what rates to apply in fee-shifting situations is this: "The established standard is the 'rate prevailing in the community for similar work performed by attorneys of comparable skill, experience, and reputation.' *Chalmers v. City of Los Angeles,* 796 F.2d 1205, 1210-11 (9th Cir. 1986)." *Barjon v. Dalton*, 132 F.3d 496, 502 (9th Cir. 1997).

48.     The staffing, efficiency and skill displayed by the Plaintiffs' small legal team is impressive.  The lawyers have considerable experience with antitrust litigation and with the RPA in particular.

***This is a contingency fee retention*:**

49.     I am informed that these lawyers are not charging for their time on an hourly basis for this matter.  The lawyers took this matter on a contingency fee basis and they will be compensated by the amount of fees that are awarded by the Court for the reasonable time.

50.     I review legal bills almost every day and, because of this, I have an understanding of what rates are paid for the Los Angeles area for legal work over the period at issue from 2014 to the present time.  While I have personally reviewed far more than $5 billion in fees and have come to know what rates are being paid for legal work, it is also helpful to have another objective source of information for rates. I have come to distrust most rate surveys if other, more reliable and relevant information is available. And one is.

**Real Rate Report**

51.     Starting in 2010 the TyMetrix/LegalVIEW actual "anonymized" billing data has been assembled and published each year by the Wolters Kluwer ELM Solutions company.  The data is gathered for the most part from the TyMetrix360° electronic invoicing system. I subscribe to those Reports.

- 16 -

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

52.     In years past I have used the TyMetrix system for my own invoicing, and I also worked directly with the TyMetrix program managers on a very large project. During that project I came to understand exactly how the program worked and the steps that they took to verify the accuracy of their data.  I am now familiar with the way the TyMetrix electronic billing system works, based on a set of rules that must be followed.  The program requires that a set of rules with budgets, staffing and rates be agreed to by the law firm before the system will allow an invoice to be processed.  If there are discounts (which is quite common) those discounts are factored in to the budget and rate data shown.  Once the invoices are submitted the program processes the invoice for compliance with the agreed-upon rules and recommends a payment to be made by the client.  **The payment data on hourly rates is what is captured by the Real Rate Report**.

53.     We must seek to find hourly rates for "similar work" and that is Antitrust and Competition law work. This is one of the categories for which hourly rate data is shown in the "2023 Real Rate Report."  The entire 2023 Report of 225 pages is attached as **Exhibit 3**.  It is said to be a more than  $160 billion-dollar database (Exhibit 3 at page 225).  These are not "insurance defense" rates (p. 221).

54.     The data in the 2023 Report is taken from invoices for legal work performed from **7/1/2020 through 6/30/2023** (p. 221). That data is about one year old now assuming that the fee hearing for this motion is in July or later in 2024.

55.     Based on my many conversations with Wolters Kluwer sales agents the next Real Rate Report will not be published until late 2024 or early 2025 so the "current rates" will need to be augmented by an adjustment.

56.     Thomson Reuters reports a 6% growth trajectory for hourly rates in 2024:

4891-9342-0720                                          **SER-063**

https://www.thomsonreuters.com/en-us/posts/legal/law-firm-rates-report-2023/



Except for 2022, the rate growth exceeds the rate of inflation shown by the yellow line.

57.    The Bureau of Labor Statistics reports that the CPI for "services less energy services" is 5.3% for the 12 months ended April 2024 (https://www.bls.gov/news.release/cpi.nr0.htm)

58.    Wells Fargo Bank's "legal specialty group" reported that attorney billing rates by 102 law firms in their group  increased by **9%** for the first quarter of 2024 as reported by LAW360 Pulse on May 1, 2024 (**Exhibit 4**).

59.    The federal Bureau of Labor Statistics tracks changes for the cost of services from August 2023 through February 2024 and shows "un-adjusted 12 mos. ended Feb. 2024" changes of 5.2, 5.7 and 9.9 percent. The raw BLS data for wages for Q2 2020 is 1,008 and 1,142 for Q4 2023. (https://www.bls.gov/charts/usual-weekly-earnings/usual-weekly-earnings-over-time-total-men-women.htm#)  That is a 13% change from mid-2020 through the end of 2023.

60.    In my work reviewing invoices by law firms I observed that the first month of 2024 produced an increase of slightly over 6% over the mid-year 2023 rates. Some Los Angeles commercial practice law firms raised rates in mid-2023 and then increased them again as of January 2024.

4891-9342-0720                                          **SER-064**

61.     Because of this I have used a 6% positive adjustment to the 2023 Real
Rate Report rates of $1,240 Third Quartile and $944 Median to **$1,314** as Adjusted
Third Quartile and **$1,001** as Adjusted Median for determining "current rates" as of
mid-2024.  Those are the rates shown in the Exhibit 2 spreadsheet.

62.     The Ninth Circuit has approved the use of the Real Rate Report as a
helpful source for rates in *Kohler v. Eddie Bauer LLC,* 792 Fed. Appx. 446 (9th Cir.
2019).

### *Many Central District Courts Accept the Real Rate Report:*

63.     Many Los Angeles trial courts have agreed with me that this Report is
a useful tool:  "The Court also turns to the 2016 Real Rate Report: Lawyer Rates,
Trends, and Analysis ("the Real Rate Report") as a useful guidepost to assess the
reasonableness of these hourly rates in the Central District.  *See Eksouzian v.
Albanese*, No. CV 13-728 PSG (AJWx), 2015 WL 12765585, at *4-5 (C.D. Cal.
Oct. 23, 2015).  The Real Rate Report identifies attorney rates by location,
experience, firm size, areas of expertise, and industry, as well as specific practice
areas, and is based on actual legal billing, matter information, and paid and
processed invoices from more than 80 companies.  *See Hicks v. Toys 'R' Us-Del.,
Inc.*, No. CV 13-1302 DSF JCG, 2014 WL 4670896, at *1 (C.D. Cal. Sept. 2,
2014).  Courts have found that the Real Rate Report is "a much better reflection of
true market rates than self-reported rates in all practice areas."  *Id*. at *1; *see also
Tallman v. CPS Sec. (USA), Inc.*, 23 F. Supp. 3d 1249, 1258 (D. Nev. 2014)
(considering the Real Rate Report); *G.B. ex rel. N.B. v. Tuxedo Union Free Sch.
Dist.*, 894 F. Supp. 2d 415, 433 (S.D.N.Y. 2012) (same).  *Grant & Eisenhofer, P.A.
v. Brown*, No. CV175968PSGAFMX, 2018 WL 4945303, at *2 (C.D. Cal. May 14,
2018).

64.     While not every court has accepted it, many experienced judges in the
Central District have found the Real Rate Report to be useful.  For example:

- 19 -

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

1   **Hon. Michael W. Fitzgerald**: "As such, the Court concludes that the

2   following three sources are particularly persuasive; (1) a recent Central District case

3   considering the reasonable rate for Mr. Margarian in a highly similar action (which

4   neither party saw fit to identify for the Court in their briefs); (2) Plaintiff's

5   declaration explaining his experience and non-contingent rate charged to paying

6   clients; and (3) the 2022 Real Rate Report: The Industry's Leading Analysis of Law

7   Firm Rates, Trends, and Practices ("Real Rate Report"), published by Wolters

8   Kluwer".

9   *Matevosyan v. Mercedes-Benz USA, LLC*, 2023 U.S. Dist. LEXIS 213774,

10  *11  (July 10, 2023)

11  **Hon. George H. Wu** has accepted the Real Rate Report in at least 3 matters:

12  *Nisbet v. Am. Nat'l Red Cross*, #2-16-cv-7342-GW (ASx) Docket 136 at 14, n.12

13  (June 7, 2018)).  *Harrison v. Archdiocese of Los Angeles* 2:13-cv-8257 GW (SSx),

14  Docket #115 at 9-10 (May 7, 2015).  In *Housing Works v County of Los Angeles*,

15  2:15-cv-08982 GW-RAO, Judge Wu made these comments on July 12, 2018 in his

16  written tentative:

17          "The Court finds that the Real Rate Report provides objective

18          empirical data that serves as a better benchmark of

19          reasonableness than scouring a litany of cases from within and

20          outside the judicial district." [Also citing the Downey Surgical

21          Clinic matter *Downey Surgical Clinic, Inc. v. Optuminsight,

22          Inc.*, 2016 WL 5938722, at *11 (C.D. Cal. May 16, 2016)

23          ("Courts have found that the Real Rate Report is a much better

24          reflection of true market rates than self-reported rates in all

25          practice areas.")" Alexa CURTIN, Plaintiff, v. COUNTY OF

26          ORANGE; Nicholas Lee Caropino, individually and as Deputy

27          Sheriff for the County of Orange; and Does 1 through 50,

28

- 20 -

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

Defendants., 2017 WL 3834631 (C.D. Cal.) No. 8-cv-00591-SVW-PLA (filed 8/27/2017).”].

**Hon. Dale S. Fisher**: “The Real Rate Report is more persuasive and gives a better reflection of true market rates than the National Law Journal survey because the National Law Journal Survey only lists the rates charged by the 350 largest national law firms according to the firm’s advertised rates.  The Real Rate Report, however, is based on actual legal billing, matter information, and paid and processed invoices.  *Don v. Unum Group*, 13-4502 DSF (VBK), 2016 WL 6804920 at *7-*8 (C.D. Cal. July 5, 2016); *Rivas v. ESA Mgmt. LLC*, No. 14-5767 DSF (AS), 2016 WL 7647670 at *2 (C.D. Cal. Apr. 28, 2016); *Cappuccio v. Pepperdine Univ.*, No. 13-3125 DSF (AJW), 2014 WL 12573366 at *3–*4 (C.D. Cal. Sept. 17, 2014); *Hicks v. Toys ‘R’ Us-Delaware, Inc.*, Nos. 13-1302-DSF (JCG), 13-01159 DSF (JCG), 2014 WL 4670896 at *1” (C.D. Cal. Sept. 2, 2014).

**Hon. Philip S. Gutierrez**:  “The Court turns to the Real Rate Report as a “useful guidepost” in assessing the reasonableness of hourly rates in the Central District.  It is persuasive and a better reflection of true market rates than self-reported rates in all practice areas.  Real Rate Report identifies attorney rates by location, experience, firm size, areas of expertise and industry, as well as specific practice areas.  *Zielke v. Rosenstiel*, 19-702 PSG (EM), 2019 WL 1718681 at *2 (C.D. Cal. Mar. 25, 2019); *Salazar v. Midwest Servicing Group, Inc.*, 17-0137 PSG (KS), 2018 WL 4802139 at *6–*7 (C.D. Cal. Oct. 2, 2018); *Grant & Eisenhofer, P.A. v. Brown*, No. 17-5968 PSG (AFM), 2018 WL 4945303 at *2 (C.D. Cal. May 14, 2018); *Sang Yong v. Torrance Unified School Dist.*, 17-5914 PSG (PLA), 2018 WL 6185986 at *7 (C.D. Cal. Feb. 23, 2018); *Tom v. Com Dev USA, LLC*, 16-1363 PSG (GJS), 2017 WL 10378629 at *7–*8 (C.D. Cal. Dec. 4, 2017); *Retta v. Millennium Products, Inc.*, Nos.15-1801 PSG (AJW), 16-3780 PSG AJW, 2017 WL 5479637 at *12” (C.D. Cal. Aug. 22, 2017).

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS’ MOTION FOR FEES

**Hon. S. James Otero**: "The Court found the requested rates were reasonable using the Real Rate Report, declarations from counsel, and the Court's own knowledge of reasonable rates in the district. *Mkay Inc. v. City of Huntington Park*, 17-01467 SJO (AFM), 2019 WL 1751823 at *3" (C.D. Cal. Mar. 7, 2019)

65.    Here the entire 235 pages of the 2023 Real Rate Report are attached as **Exhibit 3**, as this is the most recent Real Rate Report that breaks out rates for Antitrust and Competition litigation and it is my opinion that the rates shown are reflective of contemporaneous rates paid up to June 30, 2023.

66.    The explanation of how the rate data is derived is contained in pages 221 to 225 of Exhibit 3 and is summarized on page 222:

> "In short, the real rate is the rate appearing on an approved invoice at the invoice line-item level.
>
> Aggregations of data taken from millions of these line-item-level invoice entries are the core of the information analyzed."

67.    The Third Quartile Rate for partner time is $1,240 and the Median Rate for partner is $944 for antitrust work in Los Angeles up to June 30, 2023 as shown on page 99 of the 2023 Real Rate Report.

68.    As explained above at paragraphs 56 to 61, rates have increased by about 6% from mid-year 2023 to early 2024. Hourly rates that I have seen in invoices for legal work in 2024 are now sometimes over $2,000 per hour.

***The Report Provides Rates for Various Types of Legal Work***

69.    The Real Rate Report data is provided by type of legal work and for major venues as well.  The Clear Eyes lawsuit is an antitrust and unlawful competition matter.

70.    The relevant data methodology for Antitrust and Competition is mapped to the Corporate data "bucket" as explained at Exhibit 3's page 223:

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

4891-9342-0720                                    **SER-068**

**Corporate[1]**

Antitrust and Competition
Corporate Development
General/Other
Governance
Information and Technology
Mergers, Acquisitions, and Divestitures

Partnerships and Joint Ventures
Regulatory and Compliance
Tax
Treasury
White Collar/Fraud/Abuse

---

[1] All references to "Corporate: General/Other" in the 2023 Real Rate Report are the aggregation of all Corporate subareas excluding the Mergers, Acquisitions, and Divestitures sub-area and the Regulatory and Compliance sub-area.

71.    The rates paid for antitrust litigation work in Los Angeles are shown at Exhibit 3's page 99 of the 2023 Real Rate Report, an accurate composite of which is shown here for ease of reference:

## Section II: Practice Area Analysis

**Corporate: Other**
By City

**2023 – Real Rates for Associate and Partner**                    **Trend Analysis – Mean**

| City | Role | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|------|------|---|----------------|--------|----------------|------|------|------|
| Los Angeles CA | Partner | | | | | | | |
| | | 155 | $649 | $944 | $1,240 | $965 | $914 | $890 |
| | Associate | | | | | | | |
| | | 132 | $495 | $708 | $882 | $696 | $678 | $655 |

72.    The Third Quartile antitrust litigation rate of $1,240 for partner time and $944 for the Median partner time was for work up to mid-2023. After the 6% adjustment for use in mid-2024 the Adjusted Third Quartile rate would be **$1,314** and the Adjusted Median rate would be **$1,001 per hour**.

73.    The $1,314 Adjusted Third Quartile rate is appropriate for Messrs. Poe and Gaw while the Adjusted Median rate of $1,001 is appropriate for Mr. Song, Ms. Vigo and Mr. Meng.

74.     Here is a table that shows the total time by each attorney with fees at the two rate scenarios applied to their hours:

| Atty | Hours | 2020 to '23 | 20 to 23 Fees | 2024 Rates | 2024 Fees |
|---|---|---|---|---|---|
| Poe | 1,302.2 | $1,240.00 | $1,614,728.00 | $1,314.00 | $1,711,090.80 |
| Song | 1,165.0 | $944.00 | $1,099,760.00 | $1,001.00 | $1,166,165.00 |
| Gaw | 618.2 | $1,240.00 | $766,568.00 | $1,314.00 | $812,314.80 |
| Vigo | 31.4 | $944.00 | $29,641.60 | $1,001.00 | $31,431.40 |
| Meng | 5.8 | $944.00 | $5,475.20 | $1,001.00 | $5,805.80 |
| Totals: | 3,122.6 | | $3,516,172.80 | | $3,726,807.80 |
| Notes: 2020 to 2023 rates are from page 99 of the 2023 Real Rate Report | | | | | |
| 2024 rates adjust those to 106% to derive rates for 2024 | | | | | |

75.     The Median number is the mid-point of the data. The Third Quartile is another mid-point between the overall Median and the highest number in the dataset. That is, even the Third Quartile does not represent the top rate in the data. In my experience some lawyers in Los Angeles now bill at over $2,000 per hour.

76.     The Gaw | Poe lawyers are very well-credentialed lawyers who have demonstrated excellence in the work product that I have reviewed.  The overall results were very good.

77.     Mr. Poe's declaration also sets out further antitrust litigation experience by Gaw | Poe in five other matters similar to this one:  *ABC Distributing v. Living Essentials*, 15-cv-2064-NC (N.D. Cal.); *U.S. Wholesale v. Living Essentials*, 18-cv-1077-CBM (C.D. Cal.); *ABC Distributing v. Scandinavian Tobacco Gr.*, 18-cv-00140-PA (C.D. Cal.); *LA International v. Prestige Brands Holdings, Inc.*, 18-cv-06809-MWF (C.D. Cal.); and *Trepco Imports v. Arizona Beverages USA, LLC*, 18-cv-2605-JGB (C.D. Cal.).  Gaw | Poe uses billing software to track the time spent by each of its attorneys on the firm's matters.  I have reviewed the records generated by this billing software to assist me in preparing this declaration.  Based on those records, it is my understanding that the attorneys at Gaw | Poe have elected to deduct some of the time for the requested 3,122.6 hours.

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

4891-9342-0720

78.     Since this matter has been pending for over 57 months it is important to recognize that rates have increased about 3% to 6% each year during that time. The Gaw | Poe team worked on the matter from inception until the present and has not received any fees during those now over 57 months.  I read in Mr. Poe's declaration that they have also advanced over $360,000 in litigation expenses out of their own pockets.

79.     In matters that have been pending for a few years it is the usual custom to apply current rates to fee requests (*In re Coordinated Pretrial Proceedings in Petroleum Prod. Antitrust Litig.*, 109 F.3d 602, 609 (9th Cir. 1997); *Rutti v. Lojack Corp.*, No. 06-cv-350-DOC-JCX, 2012 WL 3151077, at *11 (C.D. Cal. July 31,2012)), so I have applied the most recent adjusted paid rates to all time.

80.     Given the delay in payment, the complex nature of RPA antitrust litigation, the high quality of the lawyers' work, the relative low number of hours proffered, the Adjusted Third Quartile of paid rates of $1,314 per hour is the appropriate rate for the two lead partners who tried the case to a jury.  The Adjusted Median rate of $1,001 per hour is applied for time by the slightly less-experienced (but also highly-qualified) Mr. Song (2006), Mr. Meng (2007) and Ms. Vigo (2005).

81.     I have applied those rates in column D for the time shown in **Exhibit 2**, resulting in the fees that are calculated in Column E of the Exhibit 2 spreadsheet for Gaw | Poe at line/row 643 at page 47.

**LODESTAR ENHANCEMENT**

82.      State and federal law allows the lodestar to be enhanced for four factors: "Under Serrano III, the lodestar is the basic fee for comparable legal services in the community; it may be adjusted by the court based on factors including, as relevant herein, (1) the novelty and difficulty of the questions involved, (2) the skill displayed in presenting them, (3) the extent to which the nature of the litigation precluded other employment by the attorneys, (4) the

**SER-071**

DECLARATION OF GERALD G. KNAPTON ISO PLAINTIFFS' MOTION FOR FEES

contingent nature of the fee award. (Serrano III, supra, 20 Cal. 3d at p. 49.) The

purpose of such adjustment is to fix a fee at the fair market value for the particular

action. In effect, the court determines, retrospectively, whether the litigation

involved a contingent risk or required extraordinary legal skill justifying

augmentation of the unadorned lodestar in order to approximate the fair market rate

for such services." *Ketchum v. Moses*, 24 Cal. 4th 1122, 1132 (2001).

83.    A 2.0 multiplier was applied and other enhancements were noted in a

recent award in the Los Angeles Superior Court, with the Court writing this helpful

summary:

"Upon considering these findings, the Court concludes that the requested

multiplier enhancement of 2.0 times is appropriate here, and the Court shall award

such an enhancement.

"The Court notes in passing that the application of a 2.0 multiplier is not

unusual and that California courts have often affirmed multipliers of 2.0 or above.

(E.g., Weshba v. Apple Computer, Inc. (2001) 91 Cal.App.4th 224, 255

["Multipliers can range from 2 to 4 or even higher."]; In re Sutter Health

Uninsured Pricing Cases (2009) 171 Cal.App.4th 495, 512 [affirming multiplier

of 2.52]; Chavez v. Netflix, Inc. (2008) 162 Cal.App.4th 43, 66 [affirming

multiplier of 2.5]; City of Oakland v. Oakland Raiders (1988) 203 Cal.App.3d 78

[affirming multiplier of 2.34]; Coalition for L.A. County Planning in the Public

Interest v. Board of Supervisors (1977) 76 Cal.App.3d 241, 251 [affirming

multiplier of 2.04].)"

*Baca v. City of L.A*., 2022 Cal. Super. LEXIS 55839, *17 (2022)

84.    The requested 2.0 lodestar multiplier for this matter would fall within

those guidelines and be an appropriate enhancement for this lodestar in my opinion.

- 26 -

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

1

**CONCLUSION**

2    85.    In my opinion the total reasonable and necessary lodestar is

3 $3,726,807.80 in fees for 3,122.6  hours of time for legal work from July 25, 2018

4 through March 19, 2024.  In my opinion the lodestar enhancement of 2.0 is an

5 appropriate enhancement for the contingency risk and the novelty of the law at

6 issue and the resulting change in Clear Eyes pricing that will be of benefit to

7 plaintiff and all consumers.

8

9 I declare under penalty of perjury under the laws of the United States of America

10 that the foregoing is true and correct.

11

12    Dated this 30th day of May, 2024 at Los Angeles, California.

13

14

15

16    _____

17        Gerald G. Knapton

18

19

20

21

22

23

24

25

26

27

28

DECLARATION OF GERALD G. KNAPTON ISO
PLAINTIFFS' MOTION FOR FEES

4891-9342-0720

**SER-073**

*ELM Solutions*

# 2023 Real Rate Report®

The industry's leading analysis of law firm rates, trends, and practices





**Report Editor**

**Jeffrey Solomon**
Vice President, Product Management Legal
Analytics, Wolters Kluwer ELM Solutions

**Lead Data Analysts**

**Carol Au**
Business Systems Quantitative Analyst
Wolters Kluwer ELM Solutions

**Anand Kumar Pathinettam Padian**
Software and Data Engineer
Wolters Kluwer ELM Solutions

**ELM Solutions Creative**

**David Andrews**
Senior Graphic Designer
Wolters Kluwer ELM Solutions

**Contributing Analysts and Authors**

**Jason Bender**
Legal Analytics Product Manager
Wolters Kluwer ELM Solutions

**Haemi Jung**
Strategic Business Intelligence Manager
Wolters Kluwer ELM Solutions

**Margie Sleboda**
Lead Technology Product Manager
Wolters Kluwer ELM Solutions

**Executive Sponsor**

**Barry Ader**
Vice President, Product Management and
Marketing
Wolters Kluwer ELM Solutions

© 2004 – 2023 Wolters Kluwer ELM Solutions. All rights reserved. This material may not be reproduced, displayed, modified, or distributed in any form without the express prior written permission of the copyright holders. To request permission, please contact:

ELM Solutions, a Wolters Kluwer business
20 Church Street
Hartford, CT 06103 United States
ATTN: Marketing
+1-860-549-8795

**LEGAL CAVEAT**

Wolters Kluwer ELM Solutions has worked to ensure the accuracy of the information in this report; however, Wolters Kluwer ELM Solutions cannot guarantee the accuracy of the information or analyses in all cases. Wolters Kluwer ELM Solutions is not engaged in rendering legal, accounting, or other professional services. This report should not be construed as professional advice on any particular set of facts or circumstances. Wolters Kluwer ELM Solutions is not responsible for any claims or losses that may arise from any errors or omissions in this report or from reliance upon any recommendation made in this report.

**SER-075**  wkelmsolutions.com

# Table of Contents - 2023 Real Rate Report

**A Letter to Our Readers • 4**

**Report Use Considerations • 5**

**Section I: High-Level Data Cuts • 8**

- Partners, Associates, and Paralegals
- Partners, Associates, and Paralegals by Practice Area and Matter Type
- Partners and Associates by City
- Partners and Associates by City and Matter Type
- Partners by City and Years of Experience
- Associates by City and Years of Experience
- Partners and Associates by Firm Size and Matter Type

**Section II: Industry Analysis • 62**

- Partners, Associates, and Paralegals by Industry Group
- Partners and Associates by Industry Group and Matter Type
- Basic Materials and Utilities
- Consumer Goods
- Consumer Services
- Financials (Excluding Insurance)
- Health Care
- Industrials
- Insurance
- Technology and Telecommunications

**Section III: Practice Area Analysis • 82**

- Bankruptcy and Collections
- Commercial
- Corporate: Mergers, Acquisitions, and Divestitures
- Corporate: Regulatory and Compliance
- Corporate: Other
- Employment and Labor
- Environmental
- Finance and Securities
- General Liability (Litigation Only)
- Insurance Defense (Litigation Only)
- Intellectual Property: Other
- Intellectual Property: Patents
- Intellectual Property: Trademarks
- Real Estate

**Section IV: In-Depth Analysis for Select US Cities • 164**

- Boston, MA
- Chicago, IL
- Los Angeles, CA
- New York, NY
- Philadelphia, PA
- San Francisco, CA
- Washington, DC

**Section V: International Analysis • 181**

**Section VI: Matter Staffing Analysis • 211**

# A Letter to Our Readers

**Welcome to the latest edition of Wolters Kluwer ELM Solutions Real Rate Report®, the industry's leading data-driven benchmark report for lawyer and paralegal rates.**

Our Real Rate Report has been a relied upon data analytics resource to the legal industry since its inception in 2010 and continues to evolve, providing you with the most comprehensive rate benchmarking insights, trends, and practices. The Real Rate Report is powered by the Wolters Kluwer ELM Solutions LegalVIEW® data warehouse, which has grown to include $160B+ in anonymized legal data.

The depth and granularity of the data within the Real Rate Report empowers users to benchmark and negotiate effectively and make well-informed investment and resourcing decisions for the organization.

As with previous Real Rate Reports, our data is sourced from corporations' and law firms' e-billing and time management solutions. We have included lawyer and paralegal rate data filtered by specific practice and sub-practice areas, metropolitan areas, and types of matters. This level of detail gives legal departments and law firms the precision they need to identify areas of opportunity. We strive to make the Real Rate Report a valuable and actionable reference tool for legal departments and law firms.

As always, we welcome your comments and suggestions on what information would make this publication more valuable to you. We thank our data contributors for participating in this program. And we thank you for making Wolters Kluwer ELM Solutions your trusted partner for legal industry domain expertise, data, and analytics and look forward to continuing to provide market-leading, expert solutions that deliver the best business outcomes for collaboration among legal departments and law firms.

Sincerely,

**Barry Ader**
Vice President, Product Management and Marketing
Wolters Kluwer ELM Solutions

SER-077

# Report Use Considerations

**2023 Real Rate Report**
- Examines law firm rates over time
- Identifies rates by location, experience, firm size, areas of expertise, industry, and timekeeper role (i.e., partner, associate, and paralegal)
- Itemizes variables that drive rates up or down

All the analyses included in the report derive from the actual rates charged by law firm professionals as recorded on invoices submitted and approved for payment.

Examining real, approved rate information, along with the ranges of those rates and their changes over time, highlights the role these variables play in driving aggregate legal cost and income. The analyses can energize questions for both corporate clients and law firm principals.

Clients might ask whether they are paying the right amount for different types of legal services, while law firm principals might ask whether they are charging the right amount for legal services and whether to modify their pricing approach.

**Some key factors[1] that drive rates[2]:**

**Attorney location** - Lawyers in urban and major metropolitan areas tend to charge more when compared with lawyers in rural areas or small towns.

**Litigation complexity** - The cost of representation will be higher if the case is particularly complex or time-consuming; for example, if there are a large number of documents to review, many witnesses to depose, and numerous procedural steps, the case is likely to cost more (regardless of other factors like the lawyer's level of experience).

**Years of experience and reputation** - A more experienced, higher-profile lawyer is often going to charge more, but absorbing this higher cost at the outset may make more sense than hiring a less expensive lawyer who will likely take time and billable hours to come up to speed on unfamiliar legal and procedural issues.

**Overhead** - The costs associated with the firm's support network (paralegals, clerks, and assistants), document preparation, consultants, research, and other expenses.

**Firm size** – The rates can increase if the firm is large and has various timekeeper roles at the firm. For example, the cost to work with an associate or partner at a larger firm will be higher compared to a firm that has one to two associates and a paralegal.

---

[1] **David Goguen, J.D., University of San Francisco School of Law (2020) Guide to Legal Services Billing Retrieved from:**
https://www.lawyers.com/legal-info/research/guide-to-legal-services-billing-rates.html
[2] **Source: 2018 RRR.** Factor order validated in multiple analyses since 2010

**SER-078**



# Section I: High-Level Data Cuts

All data and analysis based on data collected thru Q2 2023

# Section I: High-Level Data Cuts

## Cities
By Matter Type

**2023 - Real Rates for Associate and Partner**                    **Trend Analysis - Mean**

| City | Matter Type | Role | n | First Quartile | Median | Third Quartile | 2023 | 2022 | 2021 |
|------|-------------|------|---|----------------|--------|----------------|------|------|------|
| **Jackson MS** | Non-Litigation | Associate | | | | | | | |
| | | | 21 | $55 | $55 | $176 | $125 | $159 | $125 |
| **Jacksonville FL** | Litigation | Partner | | | | | | | |
| | | | 10 | $269 | $333 | $478 | $352 | $394 | $543 |
| **Kansas City MO** | Litigation | Partner | | | | | | | |
| | | | 59 | $415 | $466 | $596 | $511 | $473 | $450 |
| | | Associate | | | | | | | |
| | | | 48 | $277 | $350 | $385 | $331 | $316 | $316 |
| | Non-Litigation | Partner | | | | | | | |
| | | | 103 | $428 | $522 | $625 | $530 | $526 | $487 |
| | | Associate | | | | | | | |
| | | | 85 | $260 | $338 | $385 | $335 | $324 | $312 |
| **Las Vegas NV** | Litigation | Partner | | | | | | | |
| | | | 11 | $296 | $350 | $453 | $380 | $405 | $450 |
| | Non-Litigation | Partner | | | | | | | |
| | | | 16 | $420 | $502 | $601 | $502 | $450 | $422 |
| | | Associate | | | | | | | |
| | | | 16 | $250 | $282 | $348 | $300 | $305 | $297 |
| **Little Rock AR** | Non-Litigation | Partner | | | | | | | |
| | | | 12 | $215 | $250 | $315 | $284 | $260 | $256 |
| **Los Angeles CA** | Litigation | Partner | | | | | | | |
| | | | 302 | $525 | $840 | $1,159 | $867 | $815 | $739 |
| | | Associate | | | | | | | |
| | | | 353 | $431 | $680 | $880 | $674 | $650 | $606 |
| | Non-Litigation | Partner | | | | | | | |
| | | | 438 | $574 | $857 | $1,198 | $905 | $941 | $904 |
| | | Associate | | | | | | | |
| | | | 492 | $452 | $635 | $840 | $660 | $697 | $715 |

# toBePlayedin20231208

## Designation List Report

**Maher, William**                                    **2019-08-15**

| Plaintiff Designations | 00:29:18 |
|---|---|
| Defendant Counters | 00:58:37 |
| **TOTAL RUN TIME** | **01:27:55** |

Documents linked to video:

45

46

47

48

49

50

51

54

55

56

57

58

59

60

61

62

63

67



**ID: WMcomp**

**SER-081**

**WMcomp - toBePlayedin20231208**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| 8:11 - 8:13 | **Maher, William 2019-08-15** | 00:00:02 | WMcomp.1 |

| | 8:11 | BY MR. SONG: | | |
| | 8:12 | Q. | Good afternoon, Mr. Maher. | |
| | 8:13 | A. | Good afternoon. | |

| 10:19 - 10:22 | **Maher, William 2019-08-15** | 00:00:06 | WMcomp.2 |

| | 10:19 | Q. | And you understand you're testifying |
| | 10:20 | | under penalty of perjury just as if you were |
| | 10:21 | | testifying in a courtroom? |
| | 10:22 | A. | I do. |

| 14:04 - 14:09 | **Maher, William 2019-08-15** | 00:00:11 | WMcomp.3 |

| | 14:04 | Q. | And you are the Vice President of |
| | 14:05 | | Sales at Prestige, correct? |
| | 14:06 | A. | Correct. |
| | 14:07 | Q. | And you've been in that position |
| | 14:08 | | since February of 2011, correct? |
| | 14:09 | A. | That is correct, yes. |

| 16:02 - 17:19 | **Maher, William 2019-08-15** | 00:01:32 | WMcomp.52 |

| | 16:02 | Q. | And field sales, what is that |
| | 16:03 | | generally? |
| | 16:04 | A. | I call it field sales because it has |
| | 16:05 | | lots of different channels.  It has C store, |
| | 16:06 | | convenience store.  It has Dollar, it has the |
| | 16:07 | | military, it has drug wholesale, it has |
| | 16:08 | | wholesalers distributors that we'll talk about |
| | 16:09 | | today.  It has telesales.  It has alternate |
| | 16:10 | | channels which would be hotels and airport shops. |
| | 16:11 | | So it's lot more diverse, we call it field sales. |
| | 16:12 | Q. | I see.  And the wholesale or sales of |
| | 16:13 | | Clear Eyes to wholesalers falls under the umbrella |
| | 16:14 | | of field sales? |
| | 16:15 | A. | Of field sales. |
| | 16:16 | Q. | Got it, okay. |
| | 16:17 | | Is that separate from the C store |
| | 16:18 | | channel or does the C store channel also fall |
| | 16:19 | | under field sales? |
| | 16:20 | A. | The C store channel also falls under |
| | 16:21 | | field sales. |
| | 16:22 | Q. | And then you mentioned Joe Bilello |
| | 16:23 | | for telesales. |

**WMcomp - toBePlayedin20231208**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 66:12    Clear Eyes product sold to plaintiffs, correct? | | |
| | 66:13   A.   Repeat that one more time. | | |
| | 66:14   Q.   So the cost to Prestige for the Clear | | |
| | 66:15    Eyes product sold to Costco is higher than the | | |
| | 66:16    cost to Prestige for the Clear Eyes product sold | | |
| | 66:17    to plaintiffs, correct? | | |
| | 66:18   A.   I'm not sure of that -- I don't | | |
| | 66:19    follow that logic. | | |
| | 66:20   Q.   Why not? | | |
| | 66:21   A.   So the cost from South Africa to us | | |
| | 66:22    is the same for the product itself, the | | |
| | 66:23    individual .2 ounce Pocket Pal, okay? | | |
| | 66:24    The cost for us to repack it, there's | | |
| | 66:25    an incremental cost to Costco because of the | | |
| | 67:01    retail ready structure of the pallet which | | |
| | 67:02    retail ready structure of the pallet which | | |
| | 67:03    includes a lot of labor and marketing materials. | | |
| | 67:04   Q.   Are you finished? | | |
| | 67:05   A.   Yes. | | |
| | 67:06   Q.   So my question doesn't break up those | | |
| | 67:07    componentice costs.  Both of those things that | | |
| | 67:08    you're describing are costs to Prestige, correct? | | |
| | 67:09   A.   Correct. | | |
| 67:10 - 67:19 | **Maher, William 2019-08-15** | 00:00:20 | WMcomp.11 |
| | 67:10   Q.   Okay.  So let me ask it again. | | |
| | 67:11    So the cost to Prestige for the Clear | | |
| | 67:12    Eyes product sold to Costco is higher than the | | |
| | 67:13    cost to Prestige for the Clear Eyes product sold | | |
| | 67:14    to plaintiffs, correct? | | |
| | 67:15   A.   Correct. | | |
| | 67:16   Q.   Thank you. | | |
| 🔗 46.2.7 | 67:17    And to be exact, according to this | | |
| | 67:18    spreadsheet, it's .7 higher per unit, correct? | | |
| | 67:19   A.   Correct. | | |
| 67:21 - 68:06 | **Maher, William 2019-08-15** | 00:00:27 | WMcomp.63 |
| | 67:21    Why is the COGS higher for the Clear Eyes | | |
| | 67:22    product sold to Costco than it is for the Clear | | |
| | 67:23    Eyes product sold to the plaintiffs? | | |
| | 67:24   A.   So for the retail ready pallet, it | | |
| | 67:25    requires us to do shipping structure that's more | | |

**WMcomp – toBePlayedin20231208**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 68:01 | Proceedings | | |
| | 68:02 | expensive in corrugate and wrapping it and being | | |
| | 68:03 | sure it doesn't get damaged in transit and that | | |
| | 68:04 | it's -- we also have more material for branding | | |
| | 68:05 | when it's at the location so that the consumer can | | |
| | 68:06 | see it and the shopper can see it right away. | | |
| 68:07 - 68:20 | **Maher, William 2019-08-15** | | 00:00:37 | WMcomp.12 |
| | 68:07 | Q.  Okay.  And then looking back at the | | |
| | 68:08 | table here for the Costco Pocket Pal Club Pack, it | | |
| 🔗 46.2.8 | 68:09 | says that the gross margin is .15 and the gross | | |
| | 68:10 | margin percent is 16.3 percent, correct? | | |
| | 68:11 | A.  Yes, that's what I'm reading. | | |
| | 68:12 | Q.  So according to this chart, Prestige | | |
| | 68:13 | earns less profit per unit on its sales of Clear | | |
| | 68:14 | Eyes to Costco than on its sales of Clear Eyes to | | |
| | 68:15 | the plaintiffs, correct? | | |
| | 68:16 | A.  Correct. | | |
| 🔗 46.2.9 | 68:17 | Q.  Specifically, .12 per unit less, | | |
| | 68:18 | correct? | | |
| | 68:19 | A.  Based on the spreadsheet, that is | | |
| | 68:20 | correct. | | |
| 68:21 - 69:24 | **Maher, William 2019-08-15** | | 00:01:31 | WMcomp.64 |
| 🔗 46.2.10 | 68:21 | Q.  So let's look down at the row for | | |
| | 68:22 | Select Corp. Pocket Pal. | | |
| | 68:23 | A.  Okay. | | |
| | 68:24 | Q.  And Select Corp. is a distributor | | |
| | 68:25 | based in Texas, right? | | |
| | 69:01 | Proceedings | | |
| | 69:02 | A.  I believe so. | | |
| | 69:03 | Q.  Okay.  And they primarily sell | | |
| | 69:04 | online; is that right? | | |
| | 69:05 | A.  No, I'm not aware of that. | | |
| | 69:06 | Q.  Okay.  And Select sells Clear Eyes | | |
| | 69:07 | nationwide, correct? | | |
| | 69:08 | A.  They did in the past.  They're no | | |
| | 69:09 | longer a customer. | | |
| | 69:10 | Q.  Okay.  Do you know when they stopped | | |
| | 69:11 | selling Clear Eyes roughly? | | |
| | 69:12 | A.  I believe it was 2017. | | |
| | 69:13 | Q.  Okay.  Now, are there any differences | | |

# Played in Court 20231207

## Designation List Report

**Christian, Jonathan**                                    **2019-09-06**

| | |
|---|---|
| Plaintiff Designations | 00:55:22 |
| Defendant Counters | 00:28:38 |
| **TOTAL RUN TIME** | **01:24:00** |

Documents linked to video:

102

103

110

115

116

118

119

123

124

125

126

400



**ID: Christian_Jonathan**

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| 6:20 - 6:24 | **Christian, Jonathan 2019-09-06** | | 00:00:01 | Christian_Jonathan.1 |
| | 6:20 | JONATHAN CHRISTIAN,      witness herein, having been | | |
| | 6:21 | first duly sworn on oath, | | |
| | 6:22 | was examined and testified | | |
| | 6:23 | as follows: | | |
| | 6:24 | | | |
| 7:03 - 7:05 | **Christian, Jonathan 2019-09-06** | | 00:00:05 | Christian_Jonathan.2 |
| | 7:03 | Q. Good morning, Mr. Christian.  We met | | |
| | 7:04 | off the record, but of course as you heard, I'm Mark | | |
| | 7:05 | Poe and I represent the plaintiffs in this case. | | |
| 9:10 - 10:11 | **Christian, Jonathan 2019-09-06** | | 00:01:24 | Christian_Jonathan.3 |
| | 9:10 | Q. And what is your title currently? | | |
| | 9:11 | A. I'm an assistant buyer for the Costco | | |
| | 9:12 | Business Centers.  I handle many departments, | | |
| | 9:13 | including over-the-counter goods, office supplies, | | |
| | 9:14 | lawn and garden, stamps, and tickets, among the | | |
| | 9:15 | categories I'm responsible for the Business Centers. | | |
| | 9:16 | Q. When did you first begin working on the | | |
| | 9:17 | Business Center side of Costco? | | |
| | 9:18 | A. I was brought into the Business Centers | | |
| | 9:19 | in I believe it was September of 2000 as an assistant | | |
| | 9:20 | buyer at that time.  And I've worked almost in every | | |
| | 9:21 | area with the Business Center departments, foods and | | |
| | 9:22 | nonfoods, but I've been responsible for | | |
| | 9:23 | over-the-counter goods in other categories | | |
| | 9:24 | specifically since 2013 -- or '14, excuse me. | | |
| | 9:25 | Q. Do you recall how many Business Centers | | |
| | 10:01 | there were in 2000? | | |
| | 10:02 | A. I believe there were four.  We had the | | |
| | 10:03 | two up here that were actually the full-on Business | | |
| | 10:04 | Centers with the walk-in traffic and we still had I | | |
| | 10:05 | believe two delivery-only locations in Southern | | |
| | 10:06 | California. | | |
| | 10:07 | Q. And how many are there today? | | |
| | 10:08 | A. As of this week, in fact, we just | | |
| | 10:09 | opened our Dallas location yesterday, so we have, if | | |
| | 10:10 | you include the hybrid in Salt Lake City, we have 19 | | |
| | 10:11 | locations. | | |
| 10:12 - 10:18 | **Christian, Jonathan 2019-09-06** | | 00:00:26 | Christian_Jonathan |

**SER-086**

| DESIGNATION | SOURCE | DURATION | ID |
|---|---|---|---|
| | 10:12   Q.   Let me see, you may have mentioned this | | n.87 |
| | 10:13         already, but it went past me.  How many years have | | |
| | 10:14         you been in your current position? | | |
| | 10:15   A.   As an assistant buyer with the Costco | | |
| | 10:16         Business Centers, since 2000, September of 2000.  I | | |
| | 10:17         remember specifically because it was year one, day | | |
| | 10:18         one, period one of our fiscal year. | | |
| 13:11 - 13:19 | **Christian, Jonathan 2019-09-06** | 00:00:33 | Christian_Jonatha |
| | 13:11         should actually start there.  Costco, what is the | | n.88 |
| | 13:12         relationship between Costco Business Centers and | | |
| | 13:13         Costco Wholesale Corporation? | | |
| | 13:14   A.   We are a division of Costco.  We are | | |
| | 13:15         open to all Costco members.  Just like Costco has | | |
| | 13:16         various regions, like there's the Northwest region, a | | |
| | 13:17         Bay area region, Southeast region, we would be | | |
| | 13:18         considered the BD region, business delivery.  Yeah, | | |
| | 13:19         we're just a division of Costco. | | |
| 16:01 - 16:12 | **Christian, Jonathan 2019-09-06** | 00:00:49 | Christian_Jonatha |
| | 16:01   Q.   Have you had direct involvement with | | n.89 |
| | 16:02         Costco's purchases and sales of the Pocket Pal item? | | |
| | 16:03   A.   The item was set up by the time I came | | |
| | 16:04         to the department in 2014, so I was not involved with | | |
| | 16:05         the initial pricing negotiations when the product was | | |
| | 16:06         brought in.  But during my tenure, I do recall one | | |
| | 16:07         price increase in I believe September of 2016, and I | | |
| | 16:08         believe it was all channels including the club | | |
| | 16:09         channel at that time.  But yeah, I mean, that's -- as | | |
| | 16:10         far as the invoice pricing, that would have been a -- | | |
| | 16:11         yeah, there would have been discussions. | | |
| | 16:12         I don't recall the specific discussions | | |
| 16:13 - 16:21 | **Christian, Jonathan 2019-09-06** | 00:00:26 | Christian_Jonatha |
| | 16:13         about it, but as a practice, at Costco, we would, you | | n.4 |
| | 16:14         know, push back a little bit on a price or cost | | |
| | 16:15         increase or at least want to understand the | | |
| | 16:16         components of what's causing that cost increase. | | |
| | 16:17   Q.   Let me ask this.  Is there anyone at | | |
| | 16:18         Costco who you suspect is more familiar than you are | | |
| | 16:19         with Costco's history in purchasing and selling the | | |
| | 16:20         Pocket Pal item? | | |
| | 16:21   A.   No. | | |

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 107:09 | A.  Yes. | | |
| | 107:10 | Q.  Prestige nevertheless -- well, I should | | |
| | 107:11 | put it like this. | | |
| | 107:12 | Costco was nevertheless entitled to | | |
| | 107:13 | deduct the $3 rebate per unit for those 5,617 units | | |
| | 107:14 | by which the cap was exceeded, right? | | |
| | 107:15 | A.  Yes.  If a supplier agrees to do a | | |
| | 107:16 | promotion with a cap, any units sold outside of that | | |
| | 107:17 | cap, Costco would cover the cost of the coupon. | | |
| | 107:18 | Q.  Oh.  So for those 5,617, it's your | | |
| | 107:19 | belief that Costco itself covered the $3 per unit? | | |
| | 107:20 | A.  I don't know in this example. | | |
| | 107:21 | Sometimes we have -- suppliers are willing to | | |
| | 107:22 | increase the cap or let us go back and do a manual | | |
| | 107:23 | payback.  But systematically speaking, once we | | |
| | 107:24 | exceeded that cap, any more coupons sold would have | | |
| | 107:25 | been fulfilled by Costco, and then they wouldn't be | | |
| | 108:01 | deducted automatically.  It would be a more manual | | |
| | 108:02 | process. | | |
| | 108:03 | Q.  But in this particular instance, you | | |
| | 108:04 | don't recall one way or the other, I suppose, whether | | |
| | 108:05 | Costco or the vendor paid for those additional units? | | |
| | 108:06 | A.  I do not. | | |
| 🔗 116.2.2 | 108:07 | Q.  Let's look at the second page.  You'll | | |
| | 108:08 | see that it's reporting the unit sales in January of | | |
| 🔗 116.2.1 | 108:09 | 2015 of 13,872 during which month there was a | | |
| | 108:10 | business savings event, yes? | | |
| | 108:11 | A.  From the increase in sales I would -- | | |
| | 108:12 | Q.  Well, also because it's highlighted in | | |
| | 108:13 | blue? | | |
| | 108:14 | A.  Oh, yes, that's right, sorry. | | |
| 🔗 116.2.3 | 108:15 | Q.  The monthly sales in February reported | | |
| | 108:16 | at 1,078.  Do you see that? | | |
| | 108:17 | A.  Yes. | | |
| | 108:18 | Q.  I haven't done the exact math, but is | | |
| | 108:19 | it pretty typical in your experience that in the | | |
| | 108:20 | month in which the IRC program was run, the sales | | |
| | 108:21 | were approximately 10 times higher than they were in | | |
| | 108:22 | a similar period in which the sale is not run? | | |
| 108:25 - 109:04 | **Christian, Jonathan 2019-09-06** | | 00:00:12 | Christian_Jonatha |

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| 🔗 116.2.2 | 108:25 | A. This item does extremely well when it's | | n.40 |
| | 109:01 | promoted. | | |
| | 109:02 | Q. But is that pretty consistent with your | | |
| | 109:03 | recollection of maybe a 10-fold increase in the sales | | |
| | 109:04 | during the business savings event? | | |
| 109:06 - 109:10 | **Christian, Jonathan 2019-09-06** | | 00:00:10 | Christian_Jonatha |
| | 109:06 | A. It's consistent. I mean, it's not | | n.41 |
| | 109:07 | unusual. | | |
| | 109:08 | Q. What do you think causes that 10-fold | | |
| | 109:09 | increase in the sales during the business savings | | |
| | 109:10 | event? | | |
| 109:16 - 109:25 | **Christian, Jonathan 2019-09-06** | | 00:00:28 | Christian_Jonatha |
| | 109:16 | A. I would say $3 off. | | n.42 |
| | 109:17 | Q. The lower price? | | |
| | 109:18 | A. The lower price drives some sales for | | |
| | 109:19 | us. | | |
| | 109:20 | Q. As the person who is I think you said | | |
| | 109:21 | the most knowledgeable about Costco Business Center | | |
| | 109:22 | sales of the Pocket Pal item, who is it your | | |
| | 109:23 | understanding was buying all of that Pocket Pal | | |
| | 109:24 | during the promotional period, out of which category | | |
| | 109:25 | of Costco's customers? | | |
| 110:04 - 110:06 | **Christian, Jonathan 2019-09-06** | | 00:00:10 | Christian_Jonatha |
| | 110:04 | A. Of the three channels, I would suspect | | n.43 |
| | 110:05 | the convenience store channel, more so than food | | |
| 🗙 Clear | 110:06 | service or small office. | | |
| 116:24 - 117:05 | **Christian, Jonathan 2019-09-06** | | 00:00:16 | Christian_Jonatha |
| 🔗 118.3.1 | 116:24 | Q. Let me ask, on the contract, in the | | n.113 |
| | 116:25 | field, "Max vendor coverage," you'll see it's broken | | |
| | 117:01 | out for 40,000 units for walk-in and 5,000 for | | |
| | 117:02 | online. Do you see that? | | |
| | 117:03 | A. Yes. | | |
| | 117:04 | Q. How was that allocation determined, do | | |
| | 117:05 | you know? | | |
| 117:06 - 117:13 | **Christian, Jonathan 2019-09-06** | | 00:00:35 | Christian_Jonatha |
| | 117:06 | A. Based on the volume of our walk-in | | n.114 |
| | 117:07 | member versus the units that get delivered, the bulk | | |
| | 117:08 | of -- a fair portion of Clear Eyes is through our | | |
| | 117:09 | walk-in member. And our rebates department were -- | | |

| DESIGNATION | SOURCE | | DURATION | ID |
|---|---|---|---|---|
| | 170:19 | addresses. | | |
| | 170:20 Q. | So they're not designed for home | | |
| | 170:21 | deliveries, is that right, through the Business | | |
| | 170:22 | Centers? | | |
| | 170:23 A. | No, we're -- residential addresses are | | |
| | 170:24 | not -- yeah, are just not what we do, where we | | |
| | 170:25 | deliver to. | | |

| | |
|---|---|
| Plaintiff Designations | 00:55:22 |
| Defendant Counters | 00:28:38 |
| **TOTAL RUN TIME** | **01:24:00** |

Documents linked to video:

102

103

110

115

116

118

119

123

124

125

126

400

MARK POE (S.B. #223714)
  mpoe@gawpoe.com
RANDOLPH GAW (S.B. #223718)
  rgaw@gawpoe.com
VICTOR MENG (S.B. #254102)
  vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.A. INTERNATIONAL CORP., et al.,<br><br>    Plaintiffs,<br><br>  v.<br><br>PRESTIGE BRAND HOLDINGS, INC., et al.,<br><br>    Defendants. | Case No. 2:18-cv-06809-MWF-MRW<br><br>**PLAINTIFFS' NOTICE OF LODGING OF UPDATED JURY INSTRUCTIONS**<br><br><br>Final Pretrial Conf.: Nov. 6, 2023<br>Trial Date:    Dec. 5, 2023 |

1      Pursuant to the Court's November 30, 2023 "Order Re: Plaintiffs' and

2  Defendants' Trial Briefs," ECF No. 293, Plaintiffs hereby lodge their updated

3  substantive jury instructions in light of the *U.S. Wholesale* opinion.  Plaintiffs

4  propose three updates to the proposed instructions they filed on December 9, 2019

5  (ECF No. 237):

6      • removing references to Select Corporation as a favored competitor, in

7        light of the Ninth Circuit's reference to geographical proximity in

8        showing competition under the RPA;

9      • adding an instruction following the "Competitive Injury – Secondary

10        Line" instruction, to clarify the meaning of "competition" under the RPA;

11      • removing the jury instructions on section 2(d) liability, as Plaintiffs are

12        now seeking only injunctive relief under that section.

13      A redline of the proposed updates against Plaintiffs' prior proposal is

14  attached as **Exhibit A** hereto.  A clean version of the proposed updated instruction

15  is attached as **Exhibit B** hereto.

16

17  Dated:  December 4, 2023            GAW | POE LLP

18

19                            By:   *s/ Mark Poe*

20                                Mark Poe
                                  Attorneys for Plaintiffs

21

22

23

24

25

26

27

28

[External] Activity in Case 2:18-cv-06809-MWF-MRW L.A. International Corporation v. Prestige Brands Holdings, Inc. et al Text Only Scheduling Notice

cacd_ecfmail@cacd.uscourts.gov <cacd_ecfmail@cacd.uscourts.gov>

Fri 4/21/2023 1:05 PM

To: ecfnef@cacd.uscourts.gov <ecfnef@cacd.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**

The following transaction was entered on 4/21/2023 at 11:04 AM PDT and filed on 4/21/2023

**Case Name:** L.A. International Corporation v. Prestige Brands Holdings, Inc. et al
**Case Number:** 2:18-cv-06809-MWF-MRW
**Filer:**
**Document Number:** 278(No document attached)

**Docket Text:**
**SCHEDULING NOTICE and ORDER by Judge Michael W. Fitzgerald. On the Court's own motion and after conferring with counsel, the Jury Trial is continued to December 5, 2023 at 8:30 a.m. The Pretrial Conference and hearing on the Motions in Limine is continued to November 6, 2023 at 11:00 AM before Judge Michael W. Fitzgerald. IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (rs) TEXT ONLY ENTRY**

**2:18-cv-06809-MWF-MRW Notice has been electronically mailed to:**

Christopher Sean Patterson     cspatterson@duanemorris.com, AutodocketSFO@duanemorris.com, DLyons@duanemorris.com

James H Moon     jamesmoon@dwt.com, frankromero@dwt.com, lit-docket@dwt.com

Mark W Poe     mpoe@gawpoe.com

Michael Louis Fox     mlfox@duanemorris.com, AutodocketSFO@duanemorris.com, DLyons@duanemorris.com

Randolph Gaw     rgaw@gawpoe.com, 6884971420@filings.docketbird.com,

lisa@vashlegalservices.com

Robert Kum     rkum@duanemorris.com, aflores@duanemorris.com

Rudy R. Perrino     rudy.perrino@kutakrock.com, cristina.derendorf@kutakrock.com, desiree.singh@kutakrock.com, ginny.ulmer@kutakrock.com, kiara.p.garcia@kutakrock.com, marcia.ramirez@kutakrock.com

Victor Meng     vmeng@gawpoe.com

William Shotzbarger     wshotzbarger@duanemorris.com

**2:18-cv-06809-MWF-MRW Notice has been delivered by First Class U. S. Mail or by other means BY THE FILER to :**

[External] Activity in Case 2:18-cv-06809-MWF-MRW L.A. International Corporation v. Prestige Brands Holdings, Inc. et al Text Only Scheduling Notice

cacd_ecfmail@cacd.uscourts.gov <cacd_ecfmail@cacd.uscourts.gov>

Wed 11/30/2022 11:31 AM

To: noreply@ao.uscourts.gov <noreply@ao.uscourts.gov>

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### UNITED STATES DISTRICT COURT

### CENTRAL DISTRICT OF CALIFORNIA

**Notice of Electronic Filing**

The following transaction was entered on 11/30/2022 at 9:29 AM PST and filed on 11/30/2022

**Case Name:** L.A. International Corporation v. Prestige Brands Holdings, Inc. et al
**Case Number:** 2:18-cv-06809-MWF-MRW
**Filer:**
**Document Number:** 275(No document attached)

**Docket Text:**
**SCHEDULING NOTICE AND ORDER by Judge Michael W. Fitzgerald. On the Court's own motion and after conferring with counsel, the Jury Trial is continued to 4/25/2023 at 8:30 AM before Judge Michael W. Fitzgerald. The Pretrial Conference and hearing on the Motions in Limine is continued to 4/03/2023 at 11:00 a.m. IT IS SO ORDERED. THERE IS NO PDF DOCUMENT ASSOCIATED WITH THIS ENTRY. (rs) TEXT ONLY ENTRY**

**2:18-cv-06809-MWF-MRW Notice has been electronically mailed to:**

Christopher Sean Patterson     cspatterson@duanemorris.com, AutodocketSFO@duanemorris.com, DLyons@duanemorris.com

James H Moon     jamesmoon@dwt.com, frankromero@dwt.com, lit-docket@dwt.com

Mark W Poe     mpoe@gawpoe.com

Michael Louis Fox     mlfox@duanemorris.com, AutodocketSFO@duanemorris.com, DLyons@duanemorris.com

Randolph Gaw     rgaw@gawpoe.com, 6884971420@filings.docketbird.com,

lisa@vashlegalservices.com

Robert Kum    rkum@duanemorris.com, aflores@duanemorris.com

Rudy R. Perrino    rudy.perrino@kutakrock.com, cristina.derendorf@kutakrock.com, desiree.singh@kutakrock.com, ginny.ulmer@kutakrock.com, virginia.gomez@kutakrock.com

Victor Meng    vmeng@gawpoe.com

William Shotzbarger    wshotzbarger@duanemorris.com

**2:18-cv-06809-MWF-MRW Notice has been delivered by First Class U. S. Mail or by other means <u>BY THE FILER</u> to :**

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES – GENERAL**

Case No.   **CV 18-6809 MWF (MRWx)**                    Date: May 10, 2022

Title      **L.A. International Corporation v. Prestige Brands Holdings, Inc., et al.**

Present: The Honorable:    MICHAEL W. FITZGERALD, United States District Judge

|  |  |
|---|---|
| Rita Sanchez | Not Reported |
| Deputy Clerk | Court Reporter / Recorder |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:  (IN CHAMBERS) ORDER SETTING FINAL PRETRIAL CONFERENCE / HEARING ON MOTIONS IN LIMINE, AND TRIAL DATES**

The Court has reviewed the parties' Joint Statement Re Trial Date, filed May 9, 2022.  (Docket No. 270).  Based on the parties' agreement, the Court sets the following dates:

- Final Pretrial Conference/Hearing on Motions in Limine (Docket Nos. 194, 196, 198 to 205, and 212):  **November 21, 2022 at 11:00 a.m.**

- Jury Trial:  **December 6, 2022** at 8:30 a.m.

IT IS SO ORDERED.

Initials of Preparer:  RS/sjm

MARK POE (S.B. #223714)
   mpoe@gawpoe.com
RANDOLPH GAW (S.B. #223718)
   rgaw@gawpoe.com
SAMUEL SONG (S.B. #245007)
   ssong@gawpoe.com
GAW | POE LLP
4 Embarcadero Center, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiffs

Michael L. Fox (SB# 173355)
Sean Patterson (SB# 234565)
DUANE MORRIS LLP
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA  94105-1127
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

Robert Kum (SB# 185530)
DUANE MORRIS LLP
865 South Figueroa Street, Suite 3100
Los Angeles, CA  90017-5450
Telephone: +1 213 689 7400
Fax: +1 213 689 7401
E-mail:   mlfox@duanemorris.com
              rkum@duanemorris.com
              cspatterson@duanemorris.com

Attorneys for Defendants
PRESTIGE CONSUMER
HEALTHCARE INC. (fka "Prestige
Brands Holdings, Inc.") and
MEDTECH PRODUCTS INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.A. INTERNATIONAL CORP., et al.<br><br>                          Plaintiffs,<br><br>       v.<br><br>PRESTIGE BRANDS<br>HOLDINGS, INC., et al.;<br><br>                          Defendants. | Case No. 2:18-cv-06809-MWF-MRW<br><br>**JOINT STATUS REPORT**<br><br>Court:    Courtroom 5A<br>Judge:   Hon. Michael W. Fitzgerald |

On April 5, 2022 the Court issued an order requiring the parties to meet and confer and file a Joint Status Report describing "the current status of discovery and any remaining pretrial matters, and the parties' proposed dates for the Final Pretrial Conference/hearing on Motions in Limine and Jury Trial." ECF No. 264. Counsel for the parties have met and conferred, and state their positions as follows:

## I. PROPOSED PRETRIAL CONFERENCE AND JURY TRIAL DATES

The parties propose the trial commence on either October 4 or 11, with a pretrial conference to be held early in September, on a date that is convenient to the Court. Should those trial dates not be available, the parties are available for the trial to commence on any Tuesday through the end of the year, except for November 1, 8, and 15. As a reminder, the parties have estimated the trial to take 8 to 10 court days, from jury selection through closing. *See* Proposed Final Pretrial Conference Order at 2 (ECF No. 241-1).

## II. STATUS OF DISCOVERY AND REMAINING PRETRIAL MATTERS

### A. Discovery

The parties have agreed to mutually update their discovery with the following information through **June 30, 2022**:

Plaintiffs

- updated sales data of the Clear Eyes product at issue, including purchaser, units, and dollar amounts;
- updated purchase data of the Clear Eyes product at issue;
- updated gross annual sales of all products by each Plaintiff;
- Second Supplemental Report of DeForest McDuff, updating damages calculations.

The supplement for each category will begin at the end-date of each Plaintiff's prior production of such data, and to the extent possible will be produced in the same format as each Plaintiff's prior production.

Plaintiffs will produce the updated data no later than **July 29, 2022**, and Dr.

1    McDuff will issue a second supplemental report by **August 26, 2022**.

2          Defendants

3          • updated sales data of the Clear Eyes product at issue to all customers,

4            including Plaintiffs, Costco, Sam's Club, and Select;

5          • updated spreadsheets of payments/billbacks associated with the Clear

6            Eyes Product at issue to Plaintiffs, Costco, Sam's Club, and Select;

7          • updated price announcements to Plaintiffs, Costco, Sam's Club, and

8            Select for Clear Eyes product at issue.

9          Defendants' supplemental data production will similarly extend from the end-

10   date of their prior production(s) through **June 30, 2022**, and to the extent possible will

11   be produced in the same format as their prior production(s).  Defendants will produce

12   the data no later than **July 29, 2022**.  Dr. Meitzen may issue a supplemental rebuttal

13   report by **September 26, 2022**.

14         **B.    Other Pretrial Matters**

15         Defendants request that, upon setting a trial date, the Court also grant leave for

16   Defendants' investigator to approach and communicate with potential witnesses.  *See*

17   Order Re: Plaintiffs' Ex Parte Application for Temporary Restraining Order and Order

18   to Show Cause Enjoining Defendants from Further Dissuading Plaintiffs' Customers

19   From Testifying at Trial at 3 (ECF No. 258).

20         Regarding Defendants' statement above, Plaintiffs request that the prohibition

21   on Defendants' investigator contacting Plaintiffs' trial witnesses should be continued

22   pending the evidentiary hearing contemplated in the Court's order temporarily

23   prohibiting such contact.  *See* ECF No. 258 at 2.

24

25

26

27

28

Dated:  April 22, 2022                    GAW | POE LLP


                                          By:    s/ Mark Poe
                                                 Mark Poe
                                                 Attorneys for Plaintiffs


Dated:  April 22, 2022                    DUANE MORRIS LLP


                                          By:    s/ Michael L. Fox

                                                 Michael L. Fox
                                                 Robert Kum
                                                 Sean Patterson
                                                 Attorneys for Defendants
                                                 PRESTIGE CONSUMER
                                                 HEALTHCARE INC. (fka
                                                 "Prestige Brands Holdings, Inc.")
                                                 and MEDTECH PRODUCTS
                                                 INC.

MARK POE (S.B. #223714)
 mpoe@gawpoe.com
RANDOLPH GAW (S.B. #223718)
 rgaw@gawpoe.com
SAMUEL SONG (S.B. #245007)
 ssong@gawpoe.com
VICTOR MENG (S.B. #254102)
 vmeng@gawpoe.com
GAW | POE LLP
4 Embarcadero, Suite 1400
San Francisco, CA 94111
Telephone: (415) 766-7451
Facsimile: (415) 737-0642

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.A. INTERNATIONAL CORP., et al.,<br><br>                    Plaintiffs,<br><br>     v.<br><br>PRESTIGE BRAND HOLDINGS, INC., et al.,<br><br>                    Defendants. | Case No. 2:18-cv-06809-MWF-MRW<br><br>**JOINTLY PROPOSED JURY INSTRUCTIONS**<br><br>Trial Date:     Jan. 21, 2020<br>Time:     8:30 a.m.<br>Courtroom:     First Street Courthouse, Courtroom 5A, 5th Floor<br><br>Final Pretrial Conf.:     Dec. 23, 2019 |

# UNFAIR PRACTICES ACT INSTRUCTIONS

## **JOINT PROPOSED** INSTRUCTION NO. 33,

### *SECRET REBATES—ESSENTIAL FACTUAL ELEMENTS*

Plaintiffs LA International, Value Distributor, LA Top, U.S. Wholesale, and PITCO claim that Defendants secretly gave rebates and unearned discounts or secretly gave services or privileges to some buyers that were not given to other buyers purchasing on like terms and conditions.  None of the other Plaintiffs can assert this claim as a matter of law.

To establish this claim, a Plaintiff must prove all of the following:

1. That Defendants secretly gave rebates or unearned discounts or secretly gave services or privileges to some buyers that were not given to other buyers purchasing on like terms and conditions;

2. That a competitor was harmed;

3. That the payment/allowance had a tendency to destroy competition;

4. That the Plaintiff was harmed; and

5. That Defendants' conduct was a substantial factor in causing the Plaintiff's harm.

## SOURCE

Judicial Council of California, Civil Jury Instructions, 2019 ed., CACI 3320.

## JOINT PROPOSED INSTRUCTION NO. 34,

### *SECRET PRICING—DEFINITION OF "SECRET"*

Payments, rebates, unearned discounts, services, or privileges are "secret" if they are concealed from or not disclosed to other buyers.

### SOURCE

Judicial Council of California, Civil Jury Instructions, 2019 ed., CACI 3321

## JOINT PROPOSED INSTRUCTION NO. 35,

### *SECRET PRICING—ACTUAL INJURY*

If you find that Defendants have violated the Unfair Practices Act, then you must decide if Plaintiffs are entitled to recover damages from Living Essentials.

A Plaintiff is entitled to recover damages for an injury to its business or property if it can establish:

1. That the Plaintiff was harmed by the secret rebates, unearned discounts, services, or privileges that Defendants gave to other buyers and not to the Plaintiff; and

2. That Defendants' conduct was a substantial factor in causing the Plaintiff's harm.

## SOURCE

Judicial Council of California, Civil Jury Instructions, 2019 ed., CACI 3320 (modified)

American Bar Association, Model Jury Instructions in Civil Antitrust Cases, 2016 Edition; *Causation and Damages*, Instruction 1

Cal. Bus. & Prof. Code § 17082 ("In any action under this chapter, it is not necessary to allege or prove actual damages or the threat thereof, or actual injury or the threat thereof, to the plaintiff.  But, in addition to injunctive relief, any plaintiff in any such action shall be entitled to recover three times the amount of the actual damages, if any, sustained by the plaintiff . . . resulting from a violation of this chapter.")

1

2

3

## JOINT PROPOSED INSTRUCTION NO. 36,

### *AFFIRMATIVE DEFENSE TO SECRET REBATES—FUNCTIONAL*
### *CLASSIFICATIONS*

4

5

6

7

Defendants claim that any alleged secret rebates, unearned discounts, services, or privileges proven by any Plaintiff are within the law because they apply to different classes of customers.  To succeed, Defendants must prove all of the following:

8

9

1.  That Defendants created different classes of customers, such as convenience store wholesalers, club stores and kit packers;

10

11

2.  That customers in the different classes performed different functions and assumed the risk, investment, and costs involved;

12

13

14

3.  That the difference in price, rebates, discounts, services, or privileges for Clear Eyes® was given only in those sales where the favored buyer performed the function on which the claim of a different class is based; and

15

16

4.  That the difference in price was reasonably related to the value of such function.

17

## SOURCE

18

Judicial Council of California, Civil Jury Instructions, 2019 ed., CACI 3332.

19

20

21

22

23

24

25

26

27

28

Dated:  December 9, 2019                    GAW | POE LLP


                                           By:  _____
                                                Mark Poe
                                                Attorneys for Plaintiffs


Dated:  December 9, 2019                    DUANE MORRIS LLP


                                           By:  _/s/ Michael L. Fox_____
                                                Michael L. Fox
                                                Attorneys for Defendants

Michael L. Fox (SBN 173355)
Sean Patterson (SBN 234565)
**DUANE MORRIS LLP**
Spear Tower
One Market Plaza, Suite 2200
San Francisco, CA 94105-1127
Telephone: +1 415 957 3000
Fax: +1 415 957 3001

Robert Kum (SBN 185530)
**DUANE MORRIS LLP**
865 South Figueroa Street, Suite 3100
Los Angeles, CA 90017-5450
Telephone: +1 213 689 7400
Fax: +1 213 689 7401
E-mail: mlfox@duanemorris.com
        rkum@duanemorris.com
        cspatterson@duanemorris.com

Attorneys for Defendants
PRESTIGE CONSUMER HEALTHCARE INC.
(fka "Prestige Brands Holdings, Inc.") and
MEDTECH PRODUCTS INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| L.A. INTERNATIONAL CORP., MANHATTAN WHOLESALERS INC., EXCEL WHOLESALE DISTRIBUTORS INC., VALUE DISTRIBUTOR, INC., BORDER CASH & CARRY, INC., AKR CORPORATION, U.S. WHOLESALE OUTLET & DISTRIBUTION, INC.; SANOOR, INC. (d/b/a L.A. TOP DISTRIBUTOR); PITTSBURG WHOLESALE GROCERS, INC.; and PACIFIC GROSERVICE, INC.<br><br>Plaintiffs,<br><br>v.<br><br>PRESTIGE BRANDS HOLDINGS, INC. and MEDTECH PRODUCTS INC.,<br><br>Defendants. | Case No.: 2:18-cv-06809-MWF-MRW<br><br>**UNREDACTED VERSION OF DOCUMENT FILED UNDER SEAL**<br><br>**STATEMENT OF GENUINE DISPUTE OF MATERIAL FACTS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>Date:  October 7, 2019<br>Time:  10:00 a.m.<br>Judge:  Hon. Michael W. Fitzgerald<br>Courtroom:  5A<br><br>Complaint Filed:  August 8, 2018<br>FAC Filed:  August 20, 2018<br>Trial Date:  January 21, 2020 |

DM1\9964658.1

| Plaintiffs' Asserted Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| 16. With the IRC or "scan" discount, when a Clear Eyes bar code was scanned at Costco's register, the amount of the rebate ($3.00) was deducted from the sale price, and Costco subsequently submitted the number of units scanned to Prestige to be reimbursed for the IRC amount.<br><br>**Supporting Evidence**:<br>Poe Decl. Ex. 213 (Grehn Dep.) at 45:5-46:10, 115:18-24 | 16. Undisputed. |
| 17. When the $3.00 IRC is in effect, the associated reimbursement means that Costco pays a net price of between $9.96 to $11.04 per 12-pack, while Plaintiffs' pays a net price of between $13.68 to $14.78 for the same 12-pack.<br><br>**Supporting Evidence**:<br>Poe Decl. Ex. 216 (Meitzen Report Appx. D.1)<br><br>Id. Ex. 214 (Meitzen Dep.) at 118:22-119:3 | 17. **Objection: Irrelevant, lacks foundation, misstates testimony.**<br><br>**Disputed.** The calculation of net price for purposes of an RPA analysis does not incorporate periodic manufacturer rebates provided to the ultimate consumer as a matter of law. The rebate amount is passed on to the ultimate consumer, not Costco. Moreover, these rebates were only offered a few times a year and were capped in quantity.<br><br>**Supporting Evidence:**<br>Poe Dec. Ex. 214 (Meitzen Dep.) at 89:24-91:5, 100:14-101:3, 103:15-104:1 (IRCs should not be factored into the calculation of net price)<br><br>Poe Dec. Ex. 213 (Grehn Dep.) at 44:6-46:20 (explaining $3.00 IRC) |
| 18. Plaintiffs were never offered IRCs.<br><br>**Supporting Evidence**: | 18. **Disputed.**<br><br>Plaintiffs never indicated that they were |

| Plaintiffs' Asserted Uncontroverted Fact and Supporting Evidence | Defendants' Response and Supporting Evidence |
|---|---|
| | options with them.") |

Dated: September 16, 2019       **DUANE MORRIS** LLP


By: */s/ Sean Patterson*
    Michael L. Fox
    Robert Kum
    Sean Patterson
    Attorneys for Defendants
    PRESTIGE CONSUMER HEALTHCARE
    INC. (fka "Prestige Brands Holdings, Inc.")
    and MEDTECH PRODUCTS INC.

| Date | : 3/31/2016 5:53:42 AM |
| From | : "Danielle Gurrieri" |
| To | : "dgurrieri@jj-sales.com" |
| Subject | : FW: Clear Eyes Pocket Pal Price Increase - Effective 4/1/16 |
| Attachment | : PRICE JUSTIFICATION CE POCKET PAL PI EFF 4 1 2016.pdf; |



Hi All,
Please see attached Letter from Medtech regarding a price increase on Clear Eyes. Effective 4/1/16

Thanks,
Danielle Gurrieri
J&J Sales Co.
210 Malapardis Rd. Ste 206
Cedar Knolls, NJ 07927
Phone: 973-257-0440
Fax: 973-257-8881

CONFIDENTIAL

LAINTL000151



**MEDTECH**

A **Prestige**Brands COMPANY

February 1, 2016

Dear Medtech Customer:

The purpose of this letter is to announce a price increase on Clear Eyes® Pocket Pal® items, effective April 1st, 2016.

To meet increasing consumer demands, Prestige Brands Inc., has made investments over the past year which has required additional capital. These investment plans have included expanding our current lines to provide as much throughput as possible resulting in higher costs overall.

While our costs have continued to increase, we have absorbed these additional costs. However, it has now become necessary for us to pass along this increase to our customers.

Therefore, the following items will be affected by the April price increase:

| | | | | | | | Current | | New | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Product | Form | Size | Item Code | Item UPC # | Case UPC # | Case Pack | Case | Unit | Case | Unit | % Increase |
| CLEAR EYES ® | | | | | | | | | | | |
| Pocket Pal Counter Unit | Drops | 0.2 oz. | 106254122A | 6-78112-25418-7 | 106-78112-25412-2 | 48 | $54.72 | $1.14 | $59.04 | $1.23 | 8% |
| Pocket Pal Bulk Pack | Drops | 0.2 oz. | 106254184A | 6-78112-25418-7 | 106-78112-25418-4 | 48 | $54.72 | $1.14 | $59.04 | $1.23 | 8% |

These price increases will be implemented with all customers.

Thank you for your continued support of our brands.

Sincerely,

Bill Maher
Vice President, Sales

CONFIDENTIAL

LAINTL000152

**SER-112**

| From: | Joseph Bilello <jbilello@prestigebrands.com> |
|---|---|
| Sent: | Tuesday, June 12, 2018 1:04 PM |
| To: | Jeff Burnett <jbernett@PrestigeBrands.com> |
| Subject: | Clear Eyes Pocket Pal |

Jeff,

This is not new news, just keeping you in the loop as we look to close the quarter with City Lights. Our large CE Pocket Pal customers are aware of the Costco deal, which is about 20% better than list and 15% better than our City Lights deal.

Costco running 6/18 to 7/22 with two more 5 week promotions at same price planned for Oct/Nov and Jan/Feb (not yet confirmed).

Thanks,
Joe

Joseph S. Bilello
Regional VP Sales
PrestigeBrands
386 N. Montgomery St.| Newburgh, NY 12550
t: 845-585-9063 | Cell: 914-715-0196
jbilello@prestigebrands.com
www.prestigebrands.com

**From:** Jacob Grehn
**Sent:** Tuesday, June 12, 2018 7:47 AM
**To:** Joseph Bilello
**Subject:** RE: CE PP

Hi Joe,

We are running our next savings event 6/18-7/22. $3.00 coupon
$14.99 in-store less the $3 coupon.
$15.69 online less $3 coupon.

Thanks,

Jacob



Jacob Grehn
Director Of Sales
PrestigeBrands
7224 Logan Ave N | Brooklyn Center, MN 55430
t: 763-657-7664 | m: 651-271-9047
jgrehn@prestigebrands.com
www.prestigebrands.com

**From:** Joseph Bilello
**Sent:** Monday, June 11, 2018 8:48 AM
**To:** Jacob Grehn
**Subject:** CE PP

Hi Jacob,

Hope all is well with you.

Can you let me know what Clear Eyes Pocket Pal will be running at Costco and the offer? Is it $16.99 less $3.00 Rebate?

Thanks,
Joe

Joseph S. Bilello
Regional VP Sales
PrestigeBrands
386 N. Montgomery St.| Newburgh, NY 12550
t: 845-585-9063 | Cell: 914-715-0196
jbilello@prestigebrands.com
www.prestigebrands.com



**Internal Considerations**

Pocket Pal is an increasingly important part of the Clear Eyes portfolio, representing almost a third of the total brand unit volumes and over 20% of dollar sales

Presently, demand is outpacing our supply capacity, and we are investing, with incremental costs, in an additional source of supply

Especially with on costs associated with incremental supply, Pocket Pal is cost challenged and margin decretive to the brand (Pocket Pal GM% = 22.5%; Brand Total @ AOP = 64.4%)

Several cost savings projects are underway, including bulk ship of loose, labeled bottles to distributors and adding feet to blister card to reduce counter unit tray materials

Price increase is needed to drive incremental margin and profit benefit beyond cost savings initiatives alone

Initial internal communications were 5% PI, but did not review details of Pocket Pal lineup, with 6 different SKUs (including Select Corp.)

Combination of cost savings and price increase must deliver minimum benefit comparable to 5% PI (Estimated $612K in Gross Profit - Annually)

Price increase is now planned for Jan 1st, 2016; Given shifts in timing, this needs to be a firm date for execution

We will ideally move our distributors to the bulk pack by the Jan 1st price increase

Need to complete site audits and execute quality agreements

Distributors will need approved artworks in their own blister cards and/or take existing WIP inventory of blister cards and leverage existing artwork if existing card dieline can work for them

Given lead time associated with above considerations on bulk pack, we should initiate conversation with distributors as soon as possible so that we can transition to bulk pack no later than Jan 1st

Bulk Pack of loose bottles will be set up as a new item. Pricing should incentivize distributors to move to Bulk Pack instead of us continuing to provide unique artwork and inventory of these separate items

We discussed ideally getting distributors to order in pallet quantities instead of per case. Keith K. estimates this to be a $0.10 cost benefit, although we won't see this track against the P&L

Need to finalize pricing ahead of conversations with distributors

**Notes on current Pocket Pal pricing**

6 different SKUs with 4 different prices

Open Stock and Counter Unit are priced the same so we do not currently recoup any costs for the counter unit tray

Rebate structure in place with Little Drug

Current pricing represents inconsistent discount by size

| Size | Gross Price | $ / oz | % Diff. vs 0.5 oz |
|------|-------------|--------|-------------------|
| 1.0 oz | $4.04 | $4.04 | -30% |
| 0.5 oz | $2.89 | $5.78 | 0% |
| 0.2 oz | $1.14 | $5.70 | -1% |
| 0.2 oz | $0.93 | $4.65 | -20% |

Pocket Pal @ same price per ounce of 0.5 oz = $1.156

**Need to manage PI against**

Price at shelf, target <$2.00

Visine 0.28oz pricing, with key objective of protecting distribution

MEDTECH002530 CONFIDENTIAL - ATTORNEY'S EYES ONLY

## Current Financials

| | GTN% | | | 85.9% | Other COGS% | |
|---|---|---|---|---|---|---|
| Product | Gross Price | Price Increase | Net Price | Unit COGS | Gross Mar $ | Gross Mar % |
| Pocket Pal Open Stock | $1.14 | N/A | $0.98 | $0.64 | $0.30 | 30.5% |
| Pocket Pal Counter Unit | $1.14 | | $0.98 | $0.67 | $0.27 | 27.1% |
| Costco Pocket Pal Club Pack | $1.08 | | $0.93 | $0.74 | $0.15 | 16.3% |
| Little Drug Pocket Pal | $0.93 | | $0.80 | $0.64 | $0.13 | 15.8% |
| Mechanical Serv Pocket Pal | $0.97 | | $0.83 | $0.64 | $0.16 | 19.1% |
| Select Corp. Pocket Pal | $0.97 | | $0.83 | $0.64 | $0.16 | 19.1% |
| POCKET PAL TOTAL | | | $12,778,919 | $9,369,867 | $2,872,709 | 22.5% |

| Product | FY 2015 Units | % of Volume |
|---|---|---|
| Pocket Pal Open Stock | 232,848 | 2% |
| Pocket Pal Counter Unit | 6,719,441 | 47% |
| Costco Pocket Pal Club Pack | 403,920 | 3% |
| Little Drug Pocket Pal | 4,199,847 | 29% |
| Mechanical Serv Pocket Pal | 1,681,023 | 12% |
| Select Corp. Pocket Pal | 1,000,000 | 7% |

| No Reduced Costs - 5% Only (For Comparison Purposes Only) | | | | |
|---|---|---|---|---|
| Incremental | $638,946 | $0 | $612,129 | 3.5% |

| Reduced Costs Only (Adding Feet & Bulk Pack - No PI) | | | | |
|---|---|---|---|---|
| Incremental | $0 | -$276,100 | $276,100 | 2.2% |

## Scenario - Change Price (Includes Cost Reductions)

| Product | Gross Price | Price Increase | Net Price | Unit COGS | Gross Mar $ | Gross Mar % |
|---|---|---|---|---|---|---|
| Pocket Pal Open Stock | $1.17 | 2.6% | $1.01 | $0.64 | $0.32 | 32.2% |
| Pocket Pal Counter Unit | $1.20 | 5.3% | $1.03 | $0.66 | $0.32 | 31.4% |
| Costco Pocket Pal Club Pack | $1.13 | 4.6% | $0.97 | $0.73 | $0.20 | 20.7% |
| Little Drug Pocket Pal | $0.95 | 2.2% | $0.82 | $0.61 | $0.17 | 21.3% |
| Mechanical Serv Pocket Pal | $0.99 | 2.1% | $0.85 | $0.61 | $0.21 | 24.3% |
| Select Corp. Pocket Pal | $0.99 | 2.1% | $0.85 | $0.61 | $0.21 | 24.3% |
| POCKET PAL TOTAL | | | $13,267,071 | $9,093,768 | $3,616,472 | 27.3% |
| Incremental | | | $488,152 | -$276,100 | $743,763 | 4.8% |

MEDTECH002530 CONFIDENTIAL - ATTORNEY'S EYES ONLY

| Scenario - Change PI% (Includes Cost Reductions) | | | | | | |
|---|---|---|---|---|---|---|
| Product | Gross Price | Price Increase | Net Price | Unit COGS | Gross Mar $ | Gross Mar % |
| Pocket Pal Open Stock | $1.170 | 2.6% | $1.01 | $0.64 | $0.32 | 32.2% |
| Pocket Pal Counter Unit | $1.200 | 5.3% | $1.03 | $0.66 | $0.32 | 31.4% |
| Costco Pocket Pal Club Pack | $1.130 | 4.6% | $0.97 | $0.73 | $0.20 | 20.6% |
| Little Drug Pocket Pal | $0.950 | 2.2% | $0.82 | $0.61 | $0.17 | 21.4% |
| Mechanical Serv Pocket Pal | $0.991 | 2.2% | $0.85 | $0.61 | $0.21 | 24.4% |
| Select Corp. Pocket Pal | $0.989 | 2.0% | $0.85 | $0.61 | $0.21 | 24.3% |
| POCKET PAL TOTAL | | | $13,272,394 | $9,093,768 | $3,621,572 | 27.3% |
| Incremental | | | $493,475 | -$276,100 | $748,863 | 4.8% |

| From: | Joseph Bilello <jbilello@prestigebrands.com> |
|---|---|
| Sent: | Thursday, September 15, 2016 5:09 PM |
| To: | Jacob Grehn <jgrehn@PrestigeBrands.com> |
| Subject: | RE: Costco - Clear Eyes |

Thanks...do you know what their everyday price will go to after the price increase?

How often will you run the $3.00 off after the price increase?

I'm asking only so I can try to coordinate my promotional plan around the same time, to help alleviate some of the problem.

Thanks,
Joe

Joseph S. Bilello | Prestige Brands, Inc | Director of Sales | jbilello@prestigebrands.com
386 N. Montgomery Street, Newburgh, NY 12550 | P: 845-565-9063 | C: 914-715-9196

**From:** Jacob Grehn
**Sent:** Thursday, September 15, 2016 12:07 PM
**To:** Joseph Bilello
**Subject:** RE: Costco - Clear Eyes

Let me ask my broker. Our price increase takes effect in a week and a half (last week of September).

Thanks,

Jacob

**Jacob Grehn**
Director of Sales
Prestige Brands, Inc
Email: jgrehn@prestigebrands.com
Office: 763-657-7664
Cell: 651-271-9047

**From:** Joseph Bilello
**Sent:** Thursday, September 15, 2016 8:53 AM
**To:** Jacob Grehn
**Subject:** Costco - Clear Eyes

Hi Jacob,

Regarding the CE Pocket Pal at the Costco business centers, is there a way you can see how much inventory the new business center in NJ has on hand? The reason I ask is that I'm starting to hear from our inner city customers about the price they can get it there versus what I can sell them direct. Before I try to put together a solution for them, I want to try to determine if that location even has enough inventory to meet the needs of these customers, which from last September was about $250K. We are hearing the limit of 6 is not actually being adhered to.

Thanks for any information you can provide.

Joe

Joseph S. Bilello | Prestige Brands, Inc | Director of Sales | jbilello@prestigebrands.com
386 N. Montgomery Street, Newburgh, NY 12550 | P: 845-565-9063 | C: 914-715-9196



EXHIBIT
71
8-16-19
PENGAD 800-631-6989

CONFIDENTIAL

MEDTECH002428

**From:** Alex McCauley <alex.mccauley@advantagesolutions.net>
**Sent:** Thursday, June 28, 2018 9:55 PM
**To:** Jacob Grehn <jgrehn@PrestigeBrands.com>
**Cc:** Randi Foreman <randi.foreman@advantagesolutions.net>
**Subject:** Re: Clear Eyes Inventory Q

Awesome, thanks for confirming. I would say cap it at 60K? As you heard Larry say at the opening he would like to respect the cap as much as possible and in reading thru the email chain that was sent to me from internal at Costco I would hesitate to increase it anymore because they will likely just go back to the same diverter and say "we have XYZ thousand units you can take, want them?"

Thoughts?

**Alex McCauley**
Business Development Manager
O: 425-394-5953 | C: 608-446-0858
5825 221st Place SE, Suite 202 | Issaquah, WA 98027 alex.mccauley@advantagesolutions.net



*This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.*

**From:** Jacob Grehn <jgrehn@PrestigeBrands.com>
**Date:** Thursday, June 28, 2018 at 4:05 PM
**To:** Alex McCauley <alex.mccauley@advantagesolutions.net>
**Cc:** Randi Foreman <randi.foreman@advantagesolutions.net>
**Subject:** RE: Clear Eyes Inventory Q

Should have no issues fulfilling the PO's. We had 27K cases on hand on the 19th so that's only 9 days ago (=108,000 Costco Sell Units).

Yes, I'm good with increasing the cap, how much are you thinking?

Jacob Grehn
Director Of Sales

PrestigeBrands
7224 Logan Ave N., rooklyn Center, MN 55430
t: 763-657-7684 | : 651-271-9047
jgrehn@prestigebrands.com
www.prestigebrands.com

**From:** Alex McCauley [mailto:alex.mccauley@advantagesolutions.net]
**Sent:** Thursday, June 28, 2018 3:54 PM
**To:** Jacob Grehn
**Cc:** Randi Foreman
**Subject:** Clear Eyes Inventory Q

Jacob,

Business Centers just placed 2 additional POs for 3000 and 3,920 units respectfully. This event was capped at 55k units and these totals will put us at 58,010 units of ordered and on-hand.

Most importantly are you ok increasing this cap? If you are, do you foresee any issues with fulfilling these POs?

Thanks,

Alex McCauley
C: 608-446-0858



This email message, including any attachment(s), is intended only for the named recipient(s) and may contain confidential, proprietary or attorney-client privileged information. Unauthorized individuals or entities are not permitted access to this information. Any dissemination, distribution, disclosure, or copying of this information by other than the intended recipient(s) is unauthorized and strictly prohibited. If you have received this message in error, please advise me by reply email, and delete this message and any attachments. If you need to update your email address or any other personal information, or if you wish to withdraw your consent to have your personal information, such as your

**From:** Dianne Jordan
**Sent:** Thursday, June 30, 2016 6:35 PM
**To:** Larry Fell; Jonathan Christian
**CC:** Todd Fricker; Randi Foreman; Sandi Murphy; Phyllis Kraft
**Subject:** Price Adjustment on Clear Eyes 748002 Eff Sept 26
**Attachments:** Costco Price Increase Letter FINAL 6 28 216 rev 2.docx

All,

Attached is the price increase letter we discussed this week on Clear Eyes. It will go into effect with orders placed September 26, 2016 for orders shipped on or after October 1, 2016.

| Product | Form | Size | Item UPC# | Costco Item # | Current Tray (12ct) | Unit | New Tray (12ct) | Unit | % Increase |
|---|---|---|---|---|---|---|---|---|---|
| Clear Eyes Handy Pocket Pal 12 ct | Drops | 0.2 oz. | 6-78112-25418-7 | 748002 | $ 12.96 | $ 1.08 | $ 14.04 | $ 1.17 | 8% |

Thank you

Dianne Jordan

Sales Director

**Resource Marketing**
*A division of Advantage Solutions*

C: +1 425-372-3262 | M: 206-794-5000

dianne.jordan@advantagesolutions.net | www.advantagesolutions.net

This e-mail message, including any attachments, is for the sole use of the intended recipient(s) and may contain information that is confidential and protected by law from unauthorized disclosure. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.



**SER-119**

COSTCO_PLAINTIFF_SUB_00000151



MEDTECH

A PrestigeBrands COMPANY

June 28th, 2016

Dear Costco:

The purpose of this letter is to announce a price increase on Clear Eyes® Pocket Pal®, effective *for orders placed September 26, 2016.*

To meet increasing consumer demands, Prestige Brands Inc., has made investments over the past year which has required additional capital. These investment plans have included expanding our current lines to provide as much throughput as possible resulting in higher costs overall.

While our costs have continued to increase, we have absorbed these additional costs. However, it has now become necessary for us to pass along this increase to our customers.

Therefore, the following item will be affected *for orders placed September 26, 2016.* :

| Product | Form | Size | Item UPC # | Costco Item # | Current Tray (12ct) | Unit | New Tray (12ct) | Unit | % Increase |
|---------|------|------|-----------|---------------|---------------------|------|-----------------|------|------------|
| Clear Eyes Handy Pocket Pal 12 ct | Drops | 0.2 oz. | 6-78112-25418-7 | 748003 | $ 12.96 | $ 1.08 | $ 14.04 | $ 1.17 | 8% |

This price increase was implemented nationally effective April 1st, 2016.

Thank you for your continued support of our brands.

Sincerely,

*Willi Pah*

Bill Maher
Vice President, Sales

660 White Plains Road ♦ Tarrytown, NY 10591
phone: (914) 524-6892 fax: (914) 524-7421

Attorneys' Eyes Only

COSTCO_PLAINTIFF_SUB_00000153



MEDTECH

Prestige Consumer
HEALTHCARE

May 7, 2021

Dear Costco,

The purpose of this letter is to announce a price increase on Clear Eyes® Pocket Pal products, effective July 15, 2021. All purchased orders received beginning on July 15 will be invoiced at the new price. Since 2018 we have experienced +12.8% increase in our overall product costs. The most substantial cost increases impacting the brand over that time are:

- A 35% increase in packaging components driven by increases in all materials including bottles/tips/caps as well as corrugate.
- A significant increase in formula costs, driven by:
  - Naphazoline hydrochloride (API): +84%
  - Glycerin (API): +5.5%
  - Raw Materials (excipients): +5-12%
    - Benzalkonium Chloride: +12.1%
    - Sodium Borate: +5.6%
    - Disodium EDTA: +4.9%
- A 9% increase in direct labor costs over a three-year period

Over the last several years, we have absorbed these large increases in product costs while holding our pricing flat. We have also absorbed a 96% increase in freight & warehousing as well as significant increases in health and safety-related expenses.  Unfortunately, it has now become necessary for us to pass along a portion of these costs to our customers. While the above cost increases are impacting the total brand, we have chosen to increase the price on just a few select SKUs.

| Clear Eyes | | COSTCO # | Current | | New EFFECTIVE 7.15.21 | |
|---|---|---|---|---|---|---|
| PBH Item Number | Description | | List price per case | List price per unit | List price per case | List price per unit |
| 10678112000231A | CE RED RLF PCKT 0.2OZ PLT DSP 81 | 748003 | $4,548.96 | $ 1.17 | $ 4,860.00 | $ 1.25 |

This price increase will be implemented with all customers.

Prestige Consumer Healthcare is dedicated to supplying the highest quality products to our valued customers.  We will continue to invest to support the production, supply, and marketing of these brands in the marketplace.
Thank you for your continued support.

Sincerely,

Tom Holloway
Vice President, Sales

EXHIBIT
477

Confidential

MEDTECH076602

## AKR Corp. Clear Eyes Sales

(Line chart. Y-axis: "4-Pack 'Cases'" from 0 to 6000. X-axis: years 2017 through 2022. Values decline from approximately 4900 in 2017, to about 1100 in 2018, to about 150 in 2019, near 0 in 2020, slight rise around 2021, near 0 in 2022.)

Source: AKR000025, AKR000192
Note: No data from 4/23/19 to 11/13/19



EXHIBIT
491

## Border Cash & Carry Clear Eyes Sales



EXHIBIT
494

## Excel Wholesale Clear Eyes Sales



**EXHIBIT 498**

## LA International Clear Eyes Sales

The chart plots 12-Packs (y-axis, 0 to 60000) against years 2017–2020:
- 2017: ~56000
- 2018: ~22000
- 2019: ~25500
- 2020: ~18000



EXHIBIT
500

SOURCE: LAINT000964, LAINT001476, LAINT001522

**SER-125**

## LA Top Clear Eyes Sales

_Chart: "LA Top Clear Eyes Sales" — 12-Packs (y-axis) versus year 2014–2022 (x-axis). Sales decline from about 25,500 in 2014 to a low near 300 in 2019, then rise to about 3,200 in 2022._



SOURCE: LATOP000401, LATOP000577, LATOP000601

**SER-126**

EXHIBIT
507



EXHIBIT
511

## Pitco Clear Eyes Sales



**12-Packs**

| | |
|---|---|
| 25000 | |
| 20000 | |
| 15000 | |
| 10000 | |
| 5000 | |
| 0 | |

2014  2015  2016  2017  2018  2019  2020  2021  2022

SOURCE: PIT000256, PIT001412

EXHIBIT
**515**



SOURCE: VALUE000001, VALUE000002, VALUE000402

EXHIBIT
518