Nos. 24-3776, 24-5009, 24-5227

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

L.A. INTERNATIONAL CORP., ET AL.

*Plaintiffs-Appellees*

v.

PRESTIGE BRANDS HOLDINGS, INC. AND MEDTECH
PRODUCTS, INC.

*Defendants-Appellants.*

Appeal from the U.S. District Court for the Central District of
California, Case No. 2:18-cv-06809-MWF-MRW
Hon. Michael W. Fitzgerald

**Combined Reply and Answering Brief of Appellants
Prestige Consumer Healthcare Inc. (fka Prestige Brands
Holdings, Inc.) and Medtech Products, Inc.**

<div style="display:flex">

Michael L. Fox
C. Sean Patterson
Christine Cusick Ross
DUANE MORRIS LLP
One Market Plaza, Ste. 2200
San Francisco, CA 94105
(415) 957-3092

Robert M. Palumbos
William Shotzbarger
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1111

</div>

*Counsel for Appellants Prestige Consumer Healthcare Inc. (fka
Prestige Brands Holdings, Inc.) and Medtech Products, Inc.*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................... 1

SUMMARY OF THE ARGUMENT ................................................ 2

ARGUMENT .................................................................................. 3

I.  The District Court Erred in Its Instruction on Competition........... 3

    A.  Plaintiffs Ignore That Sam's Club—Which Was Not At Issue In *U.S. Wholesale*—Fits Directly Under *Volvo*. ............ 3

    B.  Costco Is Also Akin to The Dealers in *Volvo* ........................... 6

II.  The District Court Erred in Its Instructions on Functional Discounts. ................................................................................. 11

    A.  The District Court Compounded Its Error Through Its Supplemental Oral Instruction. ........................................... 16

    B.  The District Court Erred in the Verdict Form ...................... 20

    C.  The Functional Discounts Instructional Error Was Prejudicial ............................................................................ 21

III.  The District Court Erred in Not Instructing on Substantial Harm to Competition. .................................................................... 24

    A.  The District Court Erred in Not Including "Substantial" in Its Instructions. ........................................ 24

    B.  The Error Was Not Harmless. .............................................. 28

IV.  The District Court Erred in Counting the $3/Unit IRC Rebate Toward the "Net Price" Paid by Costco. ............................ 30

V.  The UPA Judgment Should Be Reversed ...................................... 37

VI.  Prestige *Does* Challenge the RPA Section 2(d) Judgment. ........... 39

i

VII. Even If the Verdict Survives Appeal, the District Court Abused its Discretion in Issuing a Permanent Injunction. ........... 40

VIII. The District Court's Attorneys' Fees Award was Unreasonably High, and the Cross-Appeal is Baseless ................. 43

    A.    The District Court's Fee Award was Too High. .................... 43

    B.    Plaintiffs' Arguments for a Higher Hourly Rate Are Meritless. ................................................................... 46

    C.    The District Court Properly Denied an Enhancement to the Lodestar under California Law. ...................................... 52

CONCLUSION ...................................................................... 55

CERTIFICATES OF COMPLIANCE ..................................... 56

STATEMENT OF RELATED CASES ..................................... 57

# TABLE OF AUTHORITIES

**Cases**

*ABC Distrib., Inc. v. Living Essentials LLC,* 2017 WL 3838443 (N.D. Cal. Sept. 1, 2017) ........................................................ 32

*Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031 (N.D. Cal. 2001) ........................................................ 38

*Antoninetti v. Chipotle Mexican Grill, Inc.*, 49 F. Supp. 3d 710 (S.D. Cal. 2014), *aff'd sub nom. Goldkorn v. Chipotle Mexican Grill, Inc.*, 669 F. App'x 920 (9th Cir. 2016) ........................................................ 53

*Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990) ........ 36

*In re Automotive Parts Antitrust Litigation*, 2016 WL 8201483 (E.D. Mich. Dec. 28, 2016) ........................................................ 48, 50

*BladeRoom Group Limited v. Emerson Electric Co.*, 20 F.4th 1231 (9th Cir. 2021) ........................................................ 5, 24

*Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993) ........................................................ 11, 25

*Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973 (9th Cir. 2008) ............ 45

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202 (2d Cir. 2015) ........................................................ 26, 29

*Cunningham v. County of Los Angeles*, 879 F.2d 481 (9th Cir. 1988) ........................................................ 47

*eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388 (2006) ........................ 40

*Edmo v. Corizon, Inc.*, 97 F.4th 1165 (9th Cir. 2024) ............................ 53

*Envtl. Prot. Info. Ctr. v. California Dep't of Forestry & Fire Prot.*, 190 Cal. App. 4th 217 (2010), *as modified on denial of reh'g* (Dec. 15, 2010) ........................................................ 44

*F.T.C. v. Fred Meyer, Inc.*, 390 U.S. 341 (1968) ........................................ 32

*Feesers, Inc. v. Michael Foods, Inc.*, 498 F.3d 206 (3rd Cir. 2007) ......... 31

*Feesers, Inc. v. Michael Foods, Inc.*, 591 F.3d 191 (3d Cir. 2010) ...... 50-51

*Feesers, Inc. v. Michael Foods, Inc.*, No. 04-cv-576 (M.D. Pa.) .............. 50

*Fischel v. Equitable Life Assurance Soc'y*, 307 F.3d 997 (9th Cir. 2002) ...................................................................................... 52

*Fred Meyer, Inc. v. FTC*, 359 F.2d 351 (9th Cir. 1966) ..................... 32-33

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ....................................... 44-45

*Hiken v. Dep't of Defense*, 836 F.3d 1037 (9th Cir. 2016) ..................... 47

*Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354 (9th Cir. 1998) ..................................................................................... 45

*Indian Coffee Corp. v. Procter & Gamble Co.*, 482 F. Supp. 1104 (W.D. Pa. 1980) ................................................................. 33-34

*Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67 (9th Cir. 1975) ...................................................................................... 52-53

*L.A. Police Protective League v. Gates*, 995 F.2d 1469 (9th Cir. 1993) ............................................................................................ 39

*Miller v. Fairchild Indus.*, 885 F.2d 498 (9th Cir. 1989), *cert. denied*, 494 U.S. 1056 (1990) .............................................. 39

*Moreno v. Fey Manufacturing Co.*, 149 Cal. App. 3d 23 (1983) ............. 23

*Nat'l Music Ctrs. of Am., Inc., v. Kimball Int'l, Inc.*, 1990 WL 157374 (M.D. Pa. Aug. 29, 1990) ......................................... 30

*O'Bannon v. National Collegiate Athletic Association*, 739 F. App'x 890 (9th Cir. 2018) ...................................................... *Passim*

*Olympia Co., Inc. v. Celotex*, 597 F. Supp. 285 (E.D. La. 1984) ...................................................................................... 27, 30

*Parsons v. Ryan*, 949 F.3d 443 (9th Cir. 2020) ..................................... 53

iv

*Perkins v. Standard Oil Co. of Ca.*, 474 F.2d 549 (9th Cir. 1973) .......... 44

*Ridgeway v. Walmart Inc.*, 946 F.3d 1066 (9th Cir. 2020)
............................................................................................... 18, 26

*Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378 (9th Cir. 1984) ............. 47

*Sidibe v. Sutter Health*, 103 F.4th 675 (9th Cir. 2024) ...................... 5, 14

*Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734 (9th Cir. 2016)
(per curiam) ............................................................................. 52

*Swinton v. Potomac Corp.*, 270 F.3d 794 (9th Cir. 2001) ....................... 26

*Texaco, Inc. v. Hasbrouck*, 496 U.S. 543 (1990) ................................ 11, 20

*Toledo Mack Sales & Service, Inc. v. Mack Trucks, Inc.*, 530 F.3d
204 (3d Cir. 2008) .................................................................... 50

*Trendsettah USA Inc. v. Swisher International Inc.*, No. 14-CV-
1664-JVS (DFMx), 2023 WL 8263365 (C.D. Cal. Nov. 17, 2023) ....... 49

*Tri-Valley Packing Ass'n v. FTC*, 329 F.2d 694 (9th Cir. 1964) .............. 6

*U.S. Wholesale Outlet & Distribution, Inc. v. Innovation Ventures,
LLC*, 89 F.4th 1126 (9th Cir. 2023) ............................................ *Passim*

*Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc.*, 546
U.S. 164 (2006) ...................................................................... *Passim*

*Whitaker Cable Corp. v. FTC*, 239 F.2d 253 (7th Cir. 1956) ........... 27, 30

*Yonemoto v. Dep't of Veterans Affs.*, 549 Fed. Appx. 627 (9th Cir.
2023) ...................................................................................... 44

**Statutes**

15 U.S.C. § 13(a) ............................................................................. 24

15 U.S.C. § 15(a) ...................................................................... 46, 54

15 U.S.C. § 26 ..........................................................................45-46

## INTRODUCTION

Plaintiffs' answering brief underscores why the district court's judgment should be vacated and remanded for a new trial. Rather than protect *competition* in the market for Clear Eyes, Plaintiffs' entire case hinges on using the Robinson–Patman Act ("RPA") to protect themselves as *competitors* of Costco and Sam's Club and only enrich their attorneys. But there was no substantial harm to competition, and the jury was improperly instructed on the elements of the RPA, so the judgment must be reversed.

The district court's jury instructions on the functional discounts defense were also erroneous. These errors in the instructions led the jury to believe that it was not a complete defense, as evidenced by the jurors' question to the district court during deliberations.

Plaintiffs' arguments also do nothing to advance the notion that this case is unlike *Volvo Trucks North America, Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164 (2006). The market in that case is much more similar to this one than Plaintiffs would have the Court believe. Additionally, if the Court is inclined to follow *U.S. Wholesale Outlet & Distribution, Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126 (9th Cir.

2023), as Plaintiffs urge, then it should also require use of the same jury instructions given in that case—which, tellingly, resulted in a defense verdict.

The district court's permanent injunction should be overturned because Plaintiffs did not prove that they are likely to suffer an irreparable injury. Finally, the district court's attorneys' fee award should be reduced, not enhanced, as Plaintiffs argue in their cross-appeal.

## SUMMARY OF THE ARGUMENT

In addition to Prestige's prior arguments, the district court's attorneys' fee award to Plaintiffs should not be increased. Rather, any fee award—which would be mooted by a ruling for Prestige on the merits—should be decreased. Plaintiffs' limited success and monetary recovery at trial cannot be squared with its astronomical attorneys' fee request. While a fee award is mandatory, approving a plaintiff's full fee request is not. The district court may certainly exercise discretion to limit any fee-shifting.

# ARGUMENT

## I. The District Court Erred in Its Instruction on Competition.

The district court erred by declining to instruct the jury that, in order to find harm to competition, the Supreme Court's decision in *Volvo* required the jury to find that Plaintiffs were competing "after the same dollar" with Sam's Club or Costco. (OB, Section II, at 37-44; *see also* 5-ER-1123-24, 5-ER-1052.) Plaintiffs contend that such an instruction is not required under *U.S.* Wholesale, which Plaintiffs argue "arose in indistinguishable circumstances." (AB at 27-30.) But Plaintiffs are incorrect. *U.S. Wholesale* is distinguishable from this case in critical ways that make *Volvo* the controlling authority.

### A. Plaintiffs Ignore That Sam's Club—Which Was Not At Issue In *U.S. Wholesale*—Fits Directly Under *Volvo*.

Sam's Club was not an allegedly "favored purchaser in *U.S. Wholesale*—only Costco was. *U.S. Wholesale*, 89 F.4th at 113; *U.S. Wholesale*, 2021 WL 3418584, at *1-2. This distinction is critical because Sam's Club unquestionably fits within the *Volvo* paradigm.

At trial, the jury heard testimony from Storm Quattlebaum, Sam's Club's corporate representative and the individual who negotiated Sam's Club's promotional contract with Prestige for the sale of Clear

Eyes. (5-ER-1080-1109.) Mr. Quattlebaum testified that, starting in 2016, Sam's Club's sales representatives for Sam's Club's business division began receiving inquiries from Sam's Club's business members about Clear Eyes. (5-ER-1083-84.) Sam's Club then contacted Prestige and began negotiating a price on behalf of its members. (5-ER-1085.) The initial price from Prestige was rejected by Sam's Club's members. (*Id.*) Sam's Club continued to negotiate with Prestige, and ultimately reached an agreement on a promotional price. (*Id.*) That price was negotiated based on what Sam's Club's members said they were willing to pay for this product at a specific minimum volume for purchase (i.e., the "truckload promotion"). (*Id.*)

In other words, Sam's Club members—like the customers in *Volvo*—retained Sam's Club to negotiate for specific discounts on Clear Eyes, which Sam's Club then obtained and sold to its members (5-ER-1084-86, 1100, 14-ER-3597, 3661-63). Plaintiffs contend that *Volvo* is only applicable "if there were evidence that Costco's customers first submitted a bid to Costco for Clear Eyes, and then Costco turned around and petitioned Prestige for discounts to fulfill each such bid as it

4

came in." (AB at 32, citing *Volvo*, 89 F.4th at 1144.)  That is exactly what the evidence in this case showed with regard to Sam's Club.

Because the jury instructions on actual competition between Plaintiffs and Sam's Club (5-ER-1052) did not apply the standard set by *Volvo*, they were erroneous.  Once an instructional error is established, prejudice is presumed.  *BladeRoom Group Limited v. Emerson Electric Co.*, 20 F.4th 1231, 1243 (9th Cir. 2021).  The burden then shifts to the respondent to demonstrate that it is "more probable than not that the jury would have reached the same verdict had it been properly instructed."  *Id.*; *see also Sidibe v. Sutter Health*, 103 F.4th 675, 687 (9th Cir. 2024).

Plaintiffs do not even attempt to do so here, as their brief is devoid of any discussion of the record presented as to Sam's Club.  And indeed, the record in *U.S. Wholesale* is instructive on this point, as the instruction given to that jury on finding actual competition was based on the standard set forth in *Volvo*, and that jury returned a verdict for the defendant.  *U.S. Wholesale*, 2021 WL 3418584, at *3; *see also U.S. Wholesale*, 2:18-cv-01077-CBM-E, ECF No. 397, p. 17 (Competitive

5

Injury – Actual Competition); 5-ER-1115 (proposed Instruction); 5-ER-1052 (given Instruction).

Because the instructions were in error, and that error was prejudicial, this Court should vacate the judgment and remand for a new trial.

## B. Costco Is Also Akin to The Dealers in *Volvo*.

Although there is an "assumption" that "two customers in the same geographic area are competing for resales to the same buyer or group of buyers," *U.S. Wholesale*, 89 F.4th at 1147 (citing *Tri-Valley Packing Ass'n v. FTC*, 329 F.2d 694, 708 (9th Cir. 1964)), *Volvo* established "circumstances" where this presumption does not apply. *Id*.

In *Volvo*, the Supreme Court found that competition was not affected by differential pricing because (a) Volvo only extended offers to dealers after they had been retained by a customer to submit a bid; and (b) the alleged disfavored dealer-purchaser failed to present evidence that it was ever in direct competition ***after*** being retained by the same customer. *Volvo*, 546 U.S. at 178-179. The evidence at trial here showed that a similar framework applies to the relationship between Costco and its members.

6

For example, Jeff Mansour, the owner/operator of San Diego Cash & Carry (who was a plaintiff in *U.S. Wholesale*), testified that he pays an annual membership to Costco in order to have access to Costco's promotional savings events. (11-ER-2738-41, 2751-52.) Mansour also testified that he and his employees—who are also Costco members—only buy Clear Eyes from Costco when it is on promotion (*i.e.*, when they can receive the $3.00 IRC), and that the promotion alone was worth the membership. (*Id.*; *see also* 2748-49, 2752-53.) Mansour acknowledged that he buys Clear Eyes from Plaintiffs when it is not on promotion (11-ER-2751-52), and that the price offered by Plaintiffs is better than Costco, when Costco is not offering the promotion. (11-ER-2747-48.)

Likewise, Anas Farooq, the only other purported "lost customer" to testify in the underlying action, confirmed that he pays Costco to be a member, and that the main reason he pays this membership is to obtain the discounts that Costco procures from sellers such as Prestige, *i.e.*, Costco's promotional savings events. (10-ER-2516-17.) Farooq also testified: that he only buys Clear Eyes from Costco when he is able to obtain Costco's promotional price (the $3.00 IRC) (10-ER-2506, 2508,

2511, 2514, 2519-20); that he uses his employees' memberships to buy Clear Eyes on promotion (10-ER-2508-10); and that he still buys Clear Eyes from Plaintiffs because, outside of Costco's promotion, Plaintiffs have a better price (10-ER-2511-13).

Farooq and Mansour's testimony shows that, like the dealers in *Volvo*, there is a requisite act that must occur here before any price differential is relevant. In *Volvo*, that prerequisite was the retention of dealers to seek a bid for a customer; in this case, it is the payment of Costco's membership fee so Costco can negotiate and obtain discounts for its members. (*See also, e.g.*, 9-ER-2162-63, 2359, 14-ER-3646.)

Farooq and Mansour testified that they pay their membership to have access to these promotional savings events, and only buy Clear Eyes from Costco during these events. (10-ER-2505-06, -08, -16-17; 11-ER-2737-41, 47-49.) Indeed Plaintiffs themselves acknowledged that this was the case. (9-ER-2162, 2327, 2342; 10-ER-2551-52, 2561-62, 2573-74, 12-ER-2991-92.) Accordingly, the evidence here is sufficient to establish that Prestige's sales to Costco were like the circumstance considered in *Volvo*, and the district court erred in its instruction on the standard necessary to establish actual competition.

Plaintiffs contend that Costco is "just like any other chainstore" because "Costco bought Clear Eyes for its sales inventory, and sold it to all comers." (AB at 32.) But Plaintiffs' cited evidence does not show that Costco sells to "all comers."

Plaintiffs rely on testimony from Prestige's employee, Jacob Grehn, and statements made about that testimony in Prestige's closing argument. (*Id.*, citing 11-ER-2827-28, 14-ER-3657.) But Grehn's testimony addressed the impact of a 2016 list price increase on Prestige's supply chain, and the anticipated increase in purchases by ***Prestige's buyers*** in advance of that price increase. (*Id.*, 11-ER-2827-28.) This evidence is wholly irrelevant to the identity of the customers who buy Clear Eyes from Costco. Further, Plaintiff's argument is simply not true, as a customer cannot buy Clear Eyes from Costco or Sam's Club without first paying for a membership. (*See, e.g.*, 9-ER-2359.) Thus, by definition, neither buyer sells Clear Eyes to "all comers."

Finally, Plaintiffs contend that the bargaining power of the members of Costco and Sam's Club results in "higher prices to family businesses" and is "antithetical to the RPA's very purpose." (AB at 32.)

9

Plaintiffs' appeal to sympathy as "family businesses" belies the fact that Plaintiffs are multi-million dollar operations that generate millions of dollars in revenue every year. (9-ER-2153-55 (PITCO, $650 million in sales revenue for 2021), -2308 (L.A. International, $18 million), -2315 (Value, $30 million), 10-ER-2453-54 (U.S. Wholesale, $60-$70 million), -2529 (AKR, $38-$42 million), 11-ER-2926 (Excel, $13 million), 12-ER-2989-00 (Manhattan Wholesalers, $16 million).) Regardless, Plaintiffs' argument again misses the point.

Prestige did not discuss the size and membership of Costco and Sam's Club in its opening brief to prove a competitive advantage based on purchasing ability, as Plaintiffs suggest. Rather, this discussion highlights the key factor that demonstrates that these club stores are more like the dealers in *Volvo*, than the "typical chainstore paradigm"—*i.e.*, the requisite memberships paid by these customers. This fact distinguishes the club store relationship with its members, and demonstrates that the district court erred in its instruction on competition. Any discrepancy in the size or buying power between Plaintiffs, Costco and Sam's Club is irrelevant if Plaintiffs cannot

10

establish that they are actually in competition with these club stores for sales to the same customers.

As set forth above, the RPA cannot and should not be construed to protect the individual competitor over competition. *Volvo,* 546 U.S. at 180-181; *see also Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209, 220 (1993) ("Congress did not intend to outlaw price differences that result from or further the forces of competition."). Unlike Plaintiffs, millions of members pay Costco and Sam's Club annual membership fees to retain these buyers to go out and get them the best prices possible, just as the customers in *Volvo* retained dealers to seek the best bids possible from Volvo. The district court erred in relying on the dicta in *U.S. Wholesale* to preclude application of *Volvo* and instructing the jury accordingly.

## II. The District Court Erred in Its Instructions on Functional Discounts.

A discount on price that is a "reasonable reimbursement" for "services performed by the purchaser is a "functional discount" that does not violate the RPA. *U.S. Wholesale*, 89 F.4th at 1138–39 (quoting *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 571 (1990)). Plaintiffs acknowledge, as they must, that they bear the burden of demonstrating

11

that evidence of a functional discount does not "negate the probability of competitive injury, an element of a prima facie case of violation" of the RPA. (AB at 17-18.)[1]

At trial, Prestige presented more than ample evidence that the discounts provided to Costco and Sam's Club were such functional discounts. (14-ER-3538-39.) The district court agreed, denying Plaintiffs' motion to preclude jury instructions on this defense. (14-ER-3538-39 ("There most certainly is sufficient evidence for a rational jury to decide in favor of the defendants.").) Prestige requested that the district court use the functional discount instruction recommended by the ABA. (5-ER-1175-76, 14-ER-3540-42.)[2] While much of this

---

[1] *See* ABA Model Jury Instructions in Civil Antitrust Cases A-263, n.1 ("The burden of proof on the functional discount issue remains on plaintiff since defendant relies upon it to 'negat[e] the causation element in the case against' it and not as an affirmative defense.") (citations omitted); *see also* n.5 ("This instruction is structured so that, after plaintiff has created an issue as to competitive injury, defendant will have an initial burden of coming forward with evidence to raise the functional discount justification, which rests on matters particularly within its knowledge; the instruction, however, leaves the ultimate burden of proof on plaintiff.") (citation omitted).

[2] *See* ABA Model Jury Instructions in Civil Antitrust Cases A-263 ("Plaintiff bears the ultimate burden to prove that defendant's lower prices were not justified as a functional discount. If you find that the lower prices granted by defendant to [*customer A*] were justified as a

instruction was adopted, the district court erroneously changed key

language in the final passage recommended by the ABA as follows:

> Requested Instruction: Plaintiff bears the ultimate burden to prove that Defendants' lower prices were not justified as a functional discount. If you find that the lower prices granted by Defendants to Costco Wholesale Corporation, Sam's Club and Select Corporation were justified as a functional discount, then you must return a verdict for Defendants on the Robinson-Patman Act claim.

> Actual Instruction: The Plaintiffs bear the ultimate burden to prove that the Defendants' lower prices were not justified as a functional discount. If you find that the differences in prices here were functional discounts, then any discriminatory pricing did not have a reasonable possibility of harming competition.

Plaintiffs claim that this particular deviation should be ignored,

as "these two formulations mean exactly the same thing." (AB at 17.)

Plaintiffs' dismissal of this deviation from the model instruction is

contrary to their subsequent argument that compliance with other

model instructions (e.g., on harm to competition) is proof against error.

(AB at 25.) Regardless, Plaintiffs' argument is incorrect.

First, Plaintiffs had no objection to the model instruction's

language at trial. (14-ER-3537.) Nor have they previously argued that

---

functional discount, then you must return a verdict for defendant on the Robinson-Patman Act claim.").

the model instruction misstates the law. *See U.S. Wholesale*, 89 F.4th at 1139 ("The wholesalers do not dispute that the jury instructions accurately stated the law governing functional discounts."). Second, Plaintiffs attempt to dismiss all arguments raised by Prestige under the aegis of this Court's decision in *U.S. Wholesale*. (*See, e.g.*, AB at 29-31, 37.) And while Prestige disagrees that the circumstances giving rise to these cases are "indistinguishable" (*see*, *supra*, Section I), the fact that the jury in *U.S. Wholesale* found for the defendants after receiving the model instruction on functional discounts is a strong indicator that the jury was misled on the law here. *U.S. Wholesale*, 89 F.4th at 1136; *see also Sidibe*, 103 F.4th at 682-686 (omission of a single word included in the otherwise adopted CACI model instruction was sufficient to establish prejudicial error).

Plaintiffs also contend that "the district court's formulation more closely tracks Ninth Circuit and Supreme Court precedent than Prestige's formulation does." (AB at 17). Again, this claim is contrary to Plaintiffs' argument elsewhere that the model instructions follow precedent and disprove error. (AB at 22, 25.) It is also not supported by an examination of the record cited by Plaintiffs, *i.e.*, the district court's

post-trial rationale for this formulation. (*Id.* at 18, citing 14-ER-3750-51.) Plaintiffs' argument also makes little sense when the instructions on the other "concepts"—actual competition (No. 20) and competitive injury (Nos. 21-22)—are compared to the given functional discount instruction.

The instructions given to the jury on actual competition and competitive injury are entirely framed on what Plaintiffs must prove in order to establish the third element of their RPA claim. (*See, e.g.*, 5-ER-1052-1054.) By contrast, the instruction on functional discounts is framed as what Defendants must prove, and then Plaintiffs must overcome. (5-ER-1055.) Accordingly, while functional discounts may not be considered an "affirmative defense," it is certainly framed as such for the jury. (*See also* the Instructions on Cost Justification and Meeting Competition, 5-ER-1056-58.)

Plaintiffs' argument also necessarily seeks to have the Court ignore a common-sense comparison of the language. Here, the given instruction does not use the critical passage, *i.e.*, if the jurors find that the price differences were functional discounts, they "must return a verdict for" Prestige. (14-ER-3540-42.) Instead, the given instruction

15

used language that can only be understood through the instructions on the elements of Plaintiffs' RPA claim (Instruction No. 17).  (5-ER-1049.)[3]  That instruction, however, does not tell the jury that a finding of functional discounts mandates a verdict for Prestige.  Rather, it only instructs the jury that functional discounts are a "concept" to be considered in evaluating whether Plaintiffs have proved "a reasonable possibility of harming competition."  (*Id*.)  Such instruction clearly diminished this critical and complete bar to Plaintiffs' claims.  (*See also* OB at 21-23.)

### A.  The District Court Compounded Its Error Through Its Supplemental Oral Instruction.

Plaintiffs next contend that the district court did not err in its supplemental oral instruction.  (AB at 18.)  In support, Plaintiffs advance two arguments.  First, they contend that the jury's note does

---

[3]  Instruction on Elements of RPA (No. 17):  there is a reasonable possibility that the discriminatory pricing may harm competition. ***This element includes the concepts of*** (a) actual competition (Instruction No. 20); (b) competitive injury (Instruction Nos. 21–22); and (c) ***functional discounts (Instruction No. 23)***.  These elements are further explained in Instruction Nos. 18–23.  If you find that the evidence is insufficient to prove any one or more of these elements, then you must find for the Defendants and against the Plaintiff on that Plaintiff's claim under the Robinson-Patman Act.

not prove confusion on application of the functional discount doctrine, which, in turn, relies on the district court's observation in denying Prestige's motion for a new trial. This argument explicitly ignores the record of the discussion engendered in response to the jury's question. (*See* 14-ER-3748-59.) As set forth therein, it was acknowledged by all parties and the district court that the jury's question likely evinced confusion on how to reconcile the language in the instructions on functional discounts (No. 23), when compared to the instruction on the elements of the RPA (No. 17). (*Id*.)

Indeed, Plaintiffs' counsel repeatedly and explicitly commented on the likelihood that the jury was confused about how to apply the functional discounts doctrine. (*See* 14-ER-3750 ("I mean, it also strikes me that the problem with that second sentence is that it includes both – well, by including the functional discounts point, which is actually, you, we bear a burden, but it's, in essence, a defense from the defendant."); 14-ER-3754-55 ("I was just thinking. It strikes me, because something that could be going on is just because of the way that the functional discounts instruction is phrased, because it has kind of those two different parts. First it says, 'The defendant must present proof of'' –

17

you know, these things, and then, 'but the plaintiff bears the ultimate burden.'".) Accordingly, the record explicitly contradicts Plaintiffs' argument to the contrary.

Plaintiffs also contend that Prestige misrepresented the district court's oral instruction. (AB at 18-19.) Not true. Prestige included the same passage from the record reproducing the district court's oral instruction. (*Id.*; *see also* OB at 25, quoting 14-ER-3759.) Plaintiffs believe that the oral instruction can be construed differently. This does not, however, demonstrate any "fabrication" by Prestige. And again, the oral instruction is neither adequate nor accurate, as it fails to clearly and plainly explain to the jury that this is a complete defense to Plaintiffs' claim. *See Ridgeway v. Walmart Inc.*, 946 F.3d 1066, 1081 (9th Cir. 2020) (instructions must provide "a clear, accurate and adequate statement of the applicable law. . . .").

Critically, Plaintiffs' argument ignores the import of the jury's question: "Regarding Instruction Number 17, page 19, lines 9 through 20, does the jury have to be in unanimous agreement on each point *and subpoint*?" (14-ER-3748 (emphasis added).) The law mandates that the answer is yes as to both points, as each of these "subpoints" is a

threshold burden that Plaintiffs must prove (or in the case of functional discounts, disprove) before a jury can find that they have proven the third element of their RPA claim. (*See* AB at 18, citing *U.S. Wholesale*, 89 F.4th at 1139; 14-ER-3750-51.) To instruct otherwise would suggest that the jury can have dissenting views on one or more of these subpoints, and still find that Plaintiffs have proven the third element of their RPA claim. And that is exactly what Prestige urged the district court to do in its response to the jury's question. Despite urging from Prestige to instruct the jury that it must be unanimous on these subpoints (14-ER-3751-52), the district court failed to do so, and instead further compounded its error:

> If you unanimously agree that those three elements are met, all three elements are met, then there is liability. And that is what is reflected in answering Question Number 1 [on the special verdict form] to a particular plaintiff. If you agree that one or more of them has not been proven, then the answer to the question would be "no," and that is it. ***But as to the subpoints***, those are -- that is how the law is defining that third element. So that is why I refer to them as ***concepts instead of as elements***. ***They are just ways to guide you in answering the ultimate question of has this element, Number 3, been proven by the plaintiff? Yes or no***. So as to here, the unanimity that you are being asked extends to Elements 1, 2 and 3. And beyond that, those instructions are to explain the law to you, so you can determine whether Element 3 has been proven by the plaintiffs or not.

(14-ER-3758-59.)  Accordingly, the oral instruction does not clearly or accurately state the law, and this error further compounded the inadequate and misleading instructions on the functional discount doctrine.

### B.     The District Court Erred in the Verdict Form.

Plaintiffs next contend that the district court's decision to not include a separate question on the issue of functional discounts was not reversible error.  (AB at 19-20.)  In support, Plaintiffs rely on (a) the district court's "broad discretion" in constructing the verdict form; and (b) the fact that the functional discounts doctrine is not an affirmative defense.  (*Id.*)[4]  Plaintiffs' argument ignores the fundamental issue raised on appeal—that, when considered as a whole, the failure to include a separate question on the functional discount defense—despite

---

[4] Plaintiffs' argument ignores the fact that this court and many others have struggled with the application of the functional discounts doctrine. (*See e.g.*, 14-ER-3750 ("the fact is, it might function as a defense, . . ."); *U.S. Wholesale*, 89 F.4th at 1140 ("The wholesalers argue that the functional discount defense is unavailable. . ."). Indeed, earlier drafts of the RPA did include functional discounts as an affirmative defense. *See Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 555, n. 12 (1990).  The Supreme Court also explicitly referred to the functional discount doctrine as a "causation defense." *Id.* at 565 ("As already noted, a causation defense in a functional discount case does not demand the rigorous accounting associated with a cost justification defense.").

so doing for the other defenses raised by Prestige—further diminishes this critical challenge to Plaintiffs' claims. ***Functional discounts are not a "concept" but a complete defense.*** Omitting this question from the verdict form reinforces this misleading statement of the law, and further compounded the district court's error on this defense.

### C. The Functional Discounts Instructional Error Was Prejudicial.

Finally, Plaintiffs claim that—even if the district court erred in its instruction and treatment of the functional discount defense—the error was harmless. (AB at 20-21.) Plaintiff's support for their contention is without merit. Plaintiffs attempt to relitigate their Rule 50(a) motion, contending that the functional discount instruction should not have been given at all. (*Id.*, at 21.) This exact same argument was raised in *U.S. Wholesale.* *See* 89 F.4th at 1140 ("The wholesalers argue that the functional discount defense is unavailable because Living Essentials separately compensated Costco for promotional, marketing, and advertising services, so 'the entirety of the price-gap cannot be chalked up to a unitary 'functional discount.'"). This Court disagreed, finding that there was sufficient evidence to justify this instruction. *Id.* at 1141. Here, the same conclusion must be reached because, as noted

21

above, the district court found more than sufficient evidence to justify this instruction. (*See* 13-ER-3470-75.) Plaintiffs also misstate the testimony of Jacob Grehn as proof that Costco was "fully compensated" for the services rendered to Prestige by payment of the 3.95% DOW discount. (AB at 20-21.) The cherry-picked testimony of Grehn is an inaccurate representation of the record.

At trial, Grehn testified at length regarding the services provided to Prestige by Costco, including those services that were reimbursed through the DOW discount. (*See e.g.*, 11-ER-2784-2791, 2814-19.) He also testified, however, about the additional value in efficiency that Costco's services provided to Prestige—testimony that Plaintiffs ignore entirely. For instance, Grehn testified that the unique, floor-ready packaging requested by Costco allows for increased brand promotion, decreased spoilage, and increased labor and shipping efficiency. (11-ER-2808-14, 2839.) He also testified that Prestige does not need to negotiate for individual Business Center placement. (11-ER-2805-06.) This allows Prestige access to new geographic markets automatically, each time Costco opens a new location. (*Id*.) Costco's contracts for Prestige's participation in Costco's promotion (the "Business Savings

22

Event") also ensured stability in Prestige's complex supply chain for this product. (*Id*. 2825-29.) Adel Mekhail, Prestige's Executive Vice President of Sales & Marketing, also testified at length regarding the challenges to Prestige in its supply chain for Clear Eyes, and the critical role in ensuring its stability provided by Costco through its advance forecasting. (13-ER-3264-69.) All of which are additional savings for Prestige outside of the DOW payment. And again, Plaintiffs' argument to the contrary was also raised and found lacking in *U.S. Wholesale*. 89 F.4th at 1140-41.

Plaintiffs also studiously ignore the evidence presented regarding the distribution services provided by Sam's Club, which justified the promotional discount provided to that buyer's members. (5-ER-1100, 1106-07.) Indeed, Plaintiffs acknowledged the efficiency provided by Sam's Club to Prestige in their closing argument. (14-ER-3595.)

"All instructions to the jury are important, so that careful and conscientious jurors can apply the proper law to the facts they find to have been proven. However, few instructions are of greater importance than that which informs the jury which party bears the burden of proof on the issues in dispute." *Moreno v. Fey Manufacturing Co*., 149 Cal.

App. 3d 23, 27-28 (1983).  Here the district court erred in its given
instruction on functional discounts, and Plaintiffs' arguments do not
rebut the presumption that this error was prejudicial.  *BladeRoom
Group*, 20 F.4th at 1243.  As such, the district court's errors resulted in
a miscarriage of justice requiring that this Court reverse judgment and
order a new trial on Plaintiffs' 2(a) claim.

## III.  The District Court Erred in Not Instructing on Substantial Harm to Competition.

### A.  The District Court Erred in Not Including "Substantial" in Its Instructions.

Price differences are only illegal under the RPA "where the effect
of such discrimination may be substantially to lessen competition . . ., or
to injure, destroy or prevent competition with any person who either
grants or knowingly receives the benefit of such discrimination, or with
customers of either of them."  15 U.S.C. § 13(a).

As set forth in its opening brief, Prestige urged the district court
to instruct the jury, in accordance with the plain language of the RPA,
that Plaintiffs must demonstrate "substantial" harm to competition.
(OB at 27.)  In opposition, Plaintiffs initially contend that "a natural
reading of the language" demonstrates that "substantially" was not
intended to modify the language added to Section 2 of the Clayton Act

24

by the RPA. (AB at 22.) In support, Plaintiffs cite to pre-RPA decisions that only apply "substantially" to the pre-RPA "lessen competition" language in Section 2. (*Id*.)

Plaintiffs' argument may be accurate for application of Section 2 prior to the enactment of the RPA. It fails, however, post-RPA, as there is a critical difference: the new language added by the RPA implemented a new use of the term "competition" (*i.e.*, "to injure, destroy or prevent competition*").* *See Brooke Group*, 509 U.S. at 230 ("We adhere to 'the normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning.'"). Accordingly, the contention that pre-RPA cases demonstrate that "substantial" is limited to the first phrase ("substantially to lessen competition") ignore that "competition" is replicated in the RPA amendment.

Plaintiffs also cite *Volvo* as proof that "substantial" should not be applied to the clause "injure, destroy or prevent competition." (AB at 25, citing *Volvo*, 546 U.S. at 175.) Plaintiffs' argument, in turn, hinges on the Supreme Court's "placement of the ellipsis" as proof that the Supreme Court agrees with their argument. Of course, Plaintiffs

25

cannot cite to any specific reasoning set forth in that decision in support, leaving a lot of weight hanging on that ellipsis. Nor can they, as it was decided on other grounds, *i.e.*, that the alleged disfavored purchaser failed to establish sufficient evidence of actual competition. *Volvo*, 546 U.S. at 180.

Plaintiffs next contend that the authority cited by Prestige can be ignored because certain decisions only applied the term "substantial" to appeals from summary judgment. (AB at 26.) This argument lacks merit. These opinions demonstrate that the applicable law requires a finding of "substantial harm to competition." *See, e.g.*, *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202 (2d Cir. 2015). And, as set forth above, instructions must accurately and clearly state the applicable law. *See Ridgeway*, 946 F.3d 1066 at 1081. Accordingly, it would be paradoxical to find that a key component of the applicable law can be omitted from the jury's instructions on same. *See Swinton v. Potomac Corp.*, 270 F.3d 794, 802 (9th Cir. 2001) ("In evaluating jury instructions, 'prejudicial error results when, 'looking to the instructions as a whole, the substance of the applicable law was [not] fairly and correctly covered.'")

26

Plaintiffs attempt to dismiss other authority cited by Prestige based on their self-serving conclusion that these decisions did not consider or address the language added by the RPA. (AB at 26, discussing *Whitaker Cable Corp. v. FTC*, 239 F.2d 253 (7th Cir. 1956) and *Olympia Co., Inc. v. Celotex*, 597 F. Supp. 285 (E.D. La. 1984).) This conclusion is not supported by any examination of those opinions, nor can it, as both decisions address claims brought under the RPA. *Whitaker Cable Corp.*, 239 F.2d at 256; *Olympia Co.*, 597 F. Supp. at 297.

Finally, Plaintiffs contend that all of the authority cited by Prestige can be dismissed because these courts allegedly failed to undertake the "statutory analysis" conducted by Plaintiffs. (AB at 27.) Again, Plaintiffs offer no direct critique of the reasoning set forth in these decisions as proof of their assertion. Further, as set forth above, Plaintiffs' statutory analysis merely proves, at best, that "substantial" was only intended to apply to the phrase "lessen competition" prior to the RPA amendment. It does not demonstrate that "substantial" was not intended to be used in conjunction with the language added by the RPA, especially when that amendment expanded the avenue for finding

27

harm to competition.  Accordingly, the clear weight of the authority demonstrates that the law requires a finding of "substantial harm to competition," and the district court erred in omitting this key component from the jury's instructions.

### B.  The Error Was Not Harmless.

In an effort to avoid reversal, Plaintiffs argue that even if there was error, it was harmless.  (AB at 27-29.)  Not true.  In support, Plaintiffs cite to the district court's post-trial finding that any error was harmless.  (AB at 27-28, citing 1-ER-45.)  Respectfully, however, the post-trial reasoning of the district court should not sway this Court in its evaluation.  Plaintiffs also contend that the damages awarded by the jury proves that the harm to competition was substantial.  (AB at 27.)  In support, Plaintiffs cite to the award given to two of the nine Plaintiffs (L.A. International and Value Distributor), which was higher than the average of the award across all Plaintiffs.  (*Id.*)  Plaintiffs also imply that these nominal damages are substantial because Plaintiffs are "a family business."  (*Id.*)  As set forth above, these "family businesses" sell millions of dollars of product every year.  (*See, e.g.*, 9-ER-2154-55.)  And the sale of Clear Eyes represent only a fraction of overall sales.  (*See*

*e.g.*, 9-ER-2155.)  Further, in seeking to focus on harm to individual competitors, and not competition, Plaintiffs' argument construe the RPA in contravention to the directive issued by the Supreme Court. *Volvo,* 546 U.S. at 180-181 ("[W]e would resist interpretation geared more to the protection of existing *competitors* than to the stimulation of *competition*.").  And indeed, ***stimulation of competition*** is what happened here, as Plaintiffs acknowledged that their use of their Costco memberships allowed them buy Clear Eyes on promotion at a better price, and sell to new customers.  (*See, e.g.*, 9-ER-2327, 59, 72-73, 10-ER-2551-52, 61-62, 71-74, 12-ER-2990, 92-93, 3004-11, 16.)

Finally, Plaintiffs make the conclusory contention that a finding that the error was not harmless would necessarily entitle Prestige to judgment in its favor.  (AB at 27-28.)  Plaintiffs also contend that the only way this Court could find that the error was not harmless is to set a "substantiality threshold for RPA liability."  (AB at 28.)  Neither contention is true.  First, as set forth in Prestige's opening brief and discussed above, several courts have ruled that certain alleged violations are not substantial enough to harm competition under the RPA.  (OB at 30-34, citing *Cash & Henderson*, 799 F.3d at 212;

*Whitaker Cable Corp.*, 239 F.2d at 256; and *Olympia Co.*, 597 F. Supp. at 285; *Nat'l Music Ctrs. of Am., Inc., v. Kimball Int'l, Inc.*, 1990 WL 157374, *6 (M.D. Pa. Aug. 29, 1990).) Accordingly, there would be no novelty here, much less a holidng that would create a "substantiality threshold."  Second, a finding of reversible error here would, at best, only afford Prestige a new trial with the appropriate instructions—which necessarily gives Plaintiffs a second opportunity to seek greater damages from a jury.

As such, the district court committed reversible error, and this Court must reverse and remand this matter so that Prestige can defend itself on the applicable law.

## IV. The District Court Erred in Counting the $3/Unit IRC Rebate Toward the "Net Price" Paid by Costco.

The parties agree that *de novo* review applies to the issue of whether the district court erred in ruling that the $3.00 manufacturer's coupon Costco (the IRC) periodically offered its members during "Business Savings Events" must be counted toward the "net price" paid by Costco under Section 2(a).  (AB, 33-34.)  Prestige has been unduly prejudiced in its defense of this case because of the district court's rulings that it must equate two fundamentally different things: the

price that includes the value of a manufacturer's rebate passed on to downstream consumers, and other discounts to the price that provide no assurance of pass-through value to the downstream consumers.

Plaintiffs' argument that the value of the coupon must count toward net price rests on a mistaken presumption (and error of the district court) that Costco and Plaintiffs sell Clear Eyes to the *same customers.* They do not. Costco sells Clear Eyes to its *members,* who have each paid a membership fee in order to have access to the deals Costco is able to negotiate, much like the customers in *Volvo.* (9-ER-2162-63; 11-ER-2793; *see, supra*, Section I.)

Plaintiffs, by contrast, have no membership structure, and are therefore open to a *different set* of customers, who unlike Costco members, must present a *resale license* in order to purchase products. (10-ER-2569; 11-ER-2952; 9-ER-2360-2361 (L.A. International); 10-ER-2482 (U.S. Wholesale); 10-ER-2661-2662 (L.A. Top); 11-ER-2945 (Excel); 12-ER 2993 (Manhattan Wholesalers).) Case law supports that there may be no actual competition where customers are selling to "two separate and discrete groups" of buyers. *Feesers, Inc. v. Michael Foods, Inc.*, 498 F.3d 206, 214 (3rd Cir. 2007).

31

This case is therefore further distinguishable from the "chain-store paradigm" set forth in *Fred Meyer, Inc. v. FTC,* 359 F.2d 351 (9th Cir. 1966). Plaintiffs and Costco are not operating on the same functional level selling to the same customers. *See U.S. Wholesale Outlet & Distribution*, 89 F.4th at 1150-1154 (9th Cir. 2023) (Miller, J., dissenting). The district court and other cases Plaintiffs rely on each in turn misapplied *Fred Meyer* when *Volvo* should have controlled. (AB at 37-38, citing *U.S. Wholesale*, 2019 WL 4452966, at *4, and *ABC Distrib., Inc. v. Living Essentials LLC,* 2017 WL 3838443, at *4 (N.D. Cal. Sept. 1, 2017).)

Moreover, as outlined in the Opening Brief, *Fred Meyer* is factually distinguishable on the structure of the promotional allowances. (OB at 48-49.) Here, Plaintiffs contend otherwise, arguing that the "third can free" allowance from vendor Tri-Valley in *Fred Meyer* is the same as the rebates at issue here. (AB 37.) Not so. In *Fred Meyer,* vendor Tri-Valley agreed to pay Fred Meyer $350 for a coupon-page featuring Tri-Valley's canned peaches "and by replacing in merchandise every third can sold by Meyer on the coupon's offer of three cans for the price of two." *F.T.C. v. Fred Meyer, Inc.,* 390 U.S. 341,

345 (1968); *see also Fred Meyer,* 359 F.2d at 359. This resulted in redemptions to Fred Meyer of 20,750 coupons, and redeemed merchandise worth approximately $4,814 ($0.232 per coupon). *See Fred Meyer,* 359 F.2d at 362. But there is no mention in either the Ninth Circuit decision or the Supreme Court decision of Fred Meyer passing on the $4,814 to its customers; it may have given its customers a "free" can, but it just as likely charged a higher price for the other two, making the value of the "free" can different than the value that it received from Tri-Valley. In other words, there was no assurance that Fred Meyer acted as a redemption agent for a manufacturer's coupon. Instead, Fred Meyer acted (or could act) like an intermediary that could set its own prices based off deals it received from the manufacturer.

In contrast, the logic expressed by the district court in *Indian Coffee Corp. v. Procter & Gamble Co.*, 482 F. Supp. 1104 (W.D. Pa. 1980) is sound, even if the case is not controlling and has been subsequently criticized. In *Indian Coffee*, the district court held that the consumer coupons at issue "reduced the price of coffee solely to the *ultimate consumer*, and not to Folger's customers, who under § 2(a) are the retailers, since those retailers received absolutely no price concession

and served merely as redemption agents for Folger." *Id.* at 1109 (emphasis added). The court reasoned that "[t]here were simply no price reductions to retailers who might thereafter choose between increasing their own profit margin or voluntarily passing along the savings to consumers" and that "[o]n the contrary, the retailer received nothing from Folger *until that retailer had first made a refund to a coupon-bearing consumer.*" *Id.* (emphasis added.) As a result, "[t]he retailer's margin of profit remained the same regardless of whether the featured product was purchased with or without a coupon" such that "the consumer coupon promotion was a transaction between Folger and the consuming public, not Folger and its retail customers." *Id.* at 1109-10.

Here, it is undisputed that Costco's profit margin remained the same regardless of whether a particular unit of Clear Eyes was purchased with or without the $3.00 coupon. This was not a case of allowing discretion in pricing two cans in order to make a third one "free."

Plaintiffs contend that the profit margin is meaningless because the competitive injury occurred by Costco's passing on of the discounted

price, making the consumer choose Costco instead of Plaintiffs during promotional events. (AB 35-36.) This argument fails for three reasons.

First, it ignores the fact that in order to buy at Costco, the consumer would need to pay a Costco membership fee. Thus, not every consumer would buy Clear Eyes from Costco instead of Plaintiffs during Business Savings Events if the savings from Costco did not justify the membership fee. (12-ER-2992 (Plaintiff estimating Costco annual membership fee is $125).)

Second, Plaintiffs ignore the fact that there was a limit on the total number units any Costco member could purchase during any promotional event and a total cap on the amount of units that could be sold with the coupon per event. (11-ER-2820-22; 15-ER-3824.) These limited promotions were made to reach a different set of customers from Plaintiffs' customer based of other wholesalers. (*See, e.g.*, 10-ER-2563 ["Q. Before AKR stopped selling [Clear Eyes], the majority of your sales were to other wholesalers and distributors, correct? A. Yes."]; 13-ER-3376 (Prestige's expert Dr. Meitzen testifying: "It could be that AKR is purchasing and basically acting as an agent for other wholesalers."); 11-ER-2944 (Excel); 12-ER-2993-95 (Manhattan Wholesalers); 9-ER-2314-

35

15 (Value); 9-ER-2334 (L.A. International: "Q. Do any wholesalers, as far as you know, do manufacturers' rebates where someone has to turn in a coupon in order to get the rebate? A. No …").)

Third, the evidence at trial was that Plaintiffs had no desire to run a similar instant coupon; instead, they wanted a lower *acquisition price* in order to increase their own profit margins, because they knew they did not have to lower their sales price of Clear Eyes to their own customers. For example, the owner of Plaintiff L.A. Top testified, "[t]he rebate program doesn't really work with our business, because that is usually for businesses that serve retailers." (11-ER-2675; *see also* 12-ER-3009 -0011 (Manhattan Wholesalers, "Q. So whether you got the [Clear Eyes] product cheaper or not, you kept the price to them [i.e., your customers] the same? A. Yes. Looks like it.").)

Under Plaintiffs' view, the RPA would be upheld to the detriment of the consumers because it would discourage companies from offering manufacturer's coupons unless it offered a similar price concession to other purchasers who would not pass on any sort of discount or coupon, resulting in higher prices for consumers. *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328, 340 (1990) ("Low prices benefit consumers

36

regardless of how those prices are set, and so long as they are above predatory levels, they do not threaten competition. . . . We have adhered to this principle regardless of the type of antitrust claim involved."). That is bad as a matter of public policy and contrary to the greater antitrust policy. *Volvo,* 546 U.S. at 180-181.

The district court erred in holding that the value of the periodic $3.00 coupon be included in net price, which started at summary judgment and persisted throughout the case, including the rulings on motions in limine and jury instructions. This error unduly prejudiced Prestige's defense and should be reversed.

## V.    The UPA Judgment Should Be Reversed.

Plaintiffs narrowly interpret and thus misstate Prestige's arguments regarding the error with the UPA judgment. Plaintiffs contend Prestige cannot claim error with the UPA judgment based on the omission of the word "substantial" from the jury instructions on the RPA claim because the UPA and associated CACI jury instructions do not include the word "substantial." (AB 39.)

As noted in Prestige's' Opening Brief, the issue is "[w]hether the district court's erroneous jury instructions *tainted* the California UPA

claim." (OB at 4, emphasis added.) Prestige is not arguing that the CACI instructions on the UPA claim were erroneous. Instead, Prestige contends that because Plaintiffs could not show they suffered actual injury for purposes of the RPA, the UPA claims likewise fail. *Am. Booksellers Ass'n, Inc. v. Barnes & Noble, Inc.*, 135 F. Supp. 2d 1031, 1043 (N.D. Cal. 2001) (noting that if actual injury could not be shown under RPA, the "injury to competitor" element of UPA would also fail).

This is supported by the record at trial, where it was reiterated that the UPA liability was partially derivative of the RPA liability. For example, the district court held that "[t]he jury's verdict on the Section 2(a) claim necessarily means Plaintiffs **were in actual competition with Costco**, that the product was of like grade and quality, and that Prestige's sales to Plaintiffs and to Costco were reasonably contemporaneous." (4-ER-889 (emphasis added); *see also* 1-ER-57.) During Plaintiffs' closing argument, counsel told the jury: "The elements, if they're established for the RPA, also established for the UPA." (14-ER-3614.) Thus, if the RPA judgment is reversed, so too should the UPA judgment.

## VI. Prestige *Does* Challenge the RPA Section 2(d) Judgment.

In passing, Plaintiffs assert that Prestige is not contesting its liability for violating section 2(d). (AB 40.) Not so. As Plaintiffs know, the district court relied upon the jury verdict on the section 2(a) claim in order to find elements of the section 2(d) claim satisfied, including that Plaintiffs, Sam's Club, and Costco were in competition. (1-ER-57; 4-ER-889.) "[I]n a case where legal claims are tried by a jury and equitable claims are tried by a judge, and the claims are 'based on the same facts,' in deciding the equitable claims 'the Seventh Amendment requires the trial judge to follow the jury's implicit or explicit factual determinations.'" *L.A. Police Protective League v. Gates*, 995 F.2d 1469, 1473 (9th Cir. 1993) (citing *Miller v. Fairchild Indus.*, 885 F.2d 498, 507 (9th Cir. 1989), *cert. denied*, 494 U.S. 1056 (1990)). The district court's hands were therefore tied, and the errors that led to the verdict on the section 2(a) claim were infused into the 2(d) judgment. Thus, if the jury verdict is reversed on the 2(a) judgment on the grounds that Costco, Sam's Club, and Plaintiffs were not in competition, the section 2(d) judgment must be vacated as well.

## VII. Even If the Verdict Survives Appeal, the District Court Abused its Discretion in Issuing a Permanent Injunction.

As discussed in the Opening Brief, even if the verdict stands, the district court abused its discretion in entering the permanent injunction because Plaintiffs failed to establish that they are likely to suffer an irreparable injury. (OB 54-59, citing *eBay Inc. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006) (noting that irreparable injury is part of the four-factor test needed to be satisfied for permanent injunction to be granted).) The opening brief also explained how the pricing structures for Clear Eyes have significantly changed, which means there is no evidence that price discrimination is likely to reoccur. (OB 54-59.)

Plaintiffs mischaracterize Prestige's arguments and the evidence, stating that it is Prestige's "implied proposition" that Prestige's pricing drove Plaintiffs out of the Clear Eyes market, and thus injunctive relief is unnecessary. (AB 41-42.) That is neither Prestige's position nor supported by the record. For support, Plaintiffs' point to the trial testimony of Border Cash & Carry—the one Plaintiff that was awarded zero damages by the jury—regarding why Border allegedly stopped selling Clear Eyes based on Sam's Club (but not Costco) sales. (*Id.*) Such testimony is inherently unreliable given that the jury awarded Border

40

no damages *at all* (1-ER-0020), and because the district court further found "Plaintiffs adduced no evidence of promotional payments that Prestige makes to Sam's Club and adduced no evidence that Plaintiff Border Cash & Carry is in actual competition with Costco (as opposed to Sam's Club) for sales of Clear Eyes." (4-ER-0890.)

Instead, the evidence at trial was that, at least for some Plaintiffs, Costco entering the market actually *increased* Plaintiffs' sales of Clear Eyes. (12-ER-3005-06 (Manhattan Wholesalers affirmed that when local Costco opened in 2016, its sales and revenues go up); 12-ER-3015-17 (once Manhattan Wholesalers started purchasing Clear Eyes from Costco it acquired new Clear Eyes customers for itself that it then claimed as "lost" customers in discovery); 13-ER-3355-56 (expert testified that "after the Costco Business Center opened, we see an increase in plaintiffs' sales for the New York plaintiffs.").)

Thus, the fact that some Plaintiffs stopped purchasing from Prestige and began instead to purchase from Costco is not evidence of the need for an injunction.[5] Plaintiffs' expert presented two damages

---

[5] If anything, this fact demonstrates that Prestige's pre-injunction model benefitted all parties (e.g., Prestige saved on freight costs by

models to the jury, one of which showed no damages if Plaintiffs did not purchase from Prestige. (OB 54; AB 43; 12-ER-3096.)  Under the second approach, the "Costco benchmark" method presumed Plaintiffs sales' of Clear Eyes would have grown the same as Costco, despite the fact that *Plaintiffs themselves* were purchasing from Costco. (12-ER-3102-03.)

Next, Plaintiffs mischaracterize the change in Prestige's pricing structure as a short-term supply shortage issue.  (AB 44.)  As discussed in the opening brief, Prestige's pricing structure is subject to ongoing external challenges separate and apart from this lawsuit. (5-ER-0989.) For example, the pricing structures changed due to the capacity of the limited number of ophthalmic manufacturing suppliers who can meet Prestige's quality requirements for Clear Eyes, as well as changes in the FDA standards for eye care products, leading to lower supply and higher prices. (*Id.*)

There is no evidence that the purported price discrimination is likely to recur outside of Plaintiffs' conjecture. The undisputed evidence provided to the district court shows that Prestige no longer participates

---

shipping more product to fewer competitors; and Plaintiffs got a better price through their Costco membership).

in Costco's Business Savings Events[6] such that the only discount available to Costco is a 3.95% discount off list price, as payment to continue participating in Costco's DOW program. The evidence also shows that Prestige has offered Plaintiffs and other wholesalers an equivalent promotional program offering a 4% discount on purchases of Clear Eyes. (5-ER-0987-88.) If Plaintiffs wished to provide comparable promotional services as Costco, they could obtain the same discount available to Costco.

## VIII. The District Court's Attorneys' Fees Award was Unreasonably High, and the Cross-Appeal is Baseless.

Plaintiffs' attorneys' fee award should be vacated to the extent the Court grants Prestige relief on the merits. If that happens, Plaintiffs' cross-appeal of that award would have to be dismissed.

### A.    The District Court's Fee Award was Too High.

If the Court affirms the judgment on the merits, then the fee award should still be decreased to a reasonable amount given Plaintiffs' limited success at trial. "[W]here the plaintiff achieved only limited

---

[6] Nor could it, for if the verdict stands, Prestige would be subject to further claims from non-competing "disfavored" purchasers seeking exorbitant attorney's fees awards, without any substantial harm to competition.

success, the district court should award only that amount of fees that is reasonable in relation to the results obtained." *Yonemoto v. Dep't of Veterans Affs.*, 549 Fed. Appx. 627, 630 (9th Cir. 2023) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 440 (1983));[7] *see also Envtl. Prot. Info. Ctr. v. California Dep't of Forestry & Fire Prot.*, 190 Cal. App. 4th 217, 238 (2010), *as modified on denial of reh'g* (Dec. 15, 2010) ("California law, like federal law, considers the extent of a plaintiff's success a crucial factor in determining the amount of a prevailing party's attorney fees.").

While shifting of attorneys' fees is mandatory under the Clayton Act, awarding the exact amount requested by the plaintiff is certainly not. "The ultimate question in every inquiry into the fee award is what contribution the defendant should make toward the fees of plaintiff's counsel." *Perkins v. Standard Oil Co. of Ca.*, 474 F.2d 549, 553 (9th Cir. 1973) (reducing district court's excessive fee award after plaintiff's jury verdict in RPA case). "The fact that section 4 [of the Clayton Act] is concerned with awarding a fee which is reasonable for defendant to pay

---

[7] The Supreme Court's guidance in *Hensley*—quoted in Prestige's opening brief—is also quoted in antitrust cases from this Circuit, including *O'Bannon v. National Collegiate Athletic Association*, 739 F. App'x 890, 892 (9th Cir. 2018).

plaintiff does not preclude the court from concerning itself with what is excessive for plaintiff to pay his attorney." *Image Tech. Serv., Inc. v. Eastman Kodak Co.*, 136 F.3d 1354, 1358 (9th Cir. 1998) (quotation omitted). "Although in most cases, the lodestar figure is presumptively a reasonable fee award, the district court may, if circumstances warrant, adjust the lodestar to account for other factors which are not subsumed within it." (1-ER-0005 (quoting *Camacho v. Bridgeport Fin., Inc.*, 523 F.3d 973, 978 (9th Cir. 2008)).

Under the Clayton Act, a district court "shall award the cost of suit, including a reasonable attorney's fee" to a plaintiff that "substantially prevails" in an antitrust action seeking injunctive relief. *See* 15 U.S.C. § 26. "The district court should 'provide a concise but clear explanation of its reasons for the fee award,' but the amount of a fee award ultimately is within the district court's discretion." *O'Bannon*, 739 F. App'x at 894-95 (quoting *Hensley*, 461 U.S. at 437). "'This is appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters.'" *Id.* (quoting *Hensley*, 461 U.S. at 437).

Accordingly, a district court clearly has discretion to reduce a successful plaintiff's requested attorneys' fee. This is because, even with mandatory fee-shifting, the fees must be "reasonable." 15 U.S.C. § 15(a); 15 U.S.C. § 26.

In their answering brief, Plaintiffs do not have a good answer as to why their counsel should receive over $7 million in fees when the total award to Plaintiffs after trebling ($1.17 million) is only a fraction of that amount. (*See* 1-ER-0002 (noting that Plaintiffs sought $7,651,766.80 in attorneys' fees); 1-ER-0023-25.) It also ignores the fact that Plaintiffs' award is further reduced by their counsel's contingency fee portion. Plaintiffs' success was limited because they were awarded a fraction of their alleged damages. For the Plaintiffs who were awarded damages, the amounts were not close to those opined at trial by Plaintiffs' expert Dr. DeForest McDuff. (12-ER-3105-3110.) Indeed, the jury awarded Border no damages whatsoever on its RPA Section 2(a) claim. (5-ER-1025.)

## B. Plaintiffs' Arguments for a Higher Hourly Rate Are Meritless.

Even if the Court does not reduce Plaintiffs' fee award, it certainly should not increase it. "Congress vested trial courts with the discretion

46

to undertake [fee] analyses because they are by their nature inexact. Reasonable people may differ as to what number of hours was reasonable to spend on this case. But once we are satisfied that the district court has considered the appropriate factors for the appropriate reasons, our reviewing function is finished." *Cunningham v. County of Los Angeles*, 879 F.2d 481, 486 (9th Cir. 1988). "To determine a 'reasonable hourly rate,' the district court should consider: 'experience, reputation, and ability of the attorney; the outcome of the results of the proceedings; the customary fees; and the novelty or the difficulty of the question presented.'" (1-ER-0006 (quoting *Hiken v. Dep't of Defense*, 836 F.3d 1037, 1044 (9th Cir. 2016)).)

As in *O'Bannon*, the district court neither "accepted uncritically plaintiff's representations concerning the time expended on this case, [nor] awarded the entire amount requested by plaintiff." *O'Bannon*, 739 F. App'x at 895 (quoting *Sealy, Inc. v. Easy Living, Inc.*, 743 F.2d 1378, 1385 (9th Cir. 1984)). Rather, the district court was presented and considered substantial information on rates by both Plaintiffs and Prestige, via their experts' declarations and supporting data. (1-ER-0006-0007.)

47

Considering "the rates in the relevant community, Plaintiffs' counsel experience, and the complexity of this action," the district court held that "the hourly rates requested by Plaintiffs are unreasonable." (1-ER-0002-0003.) While Plaintiffs complain about their awarded hourly rates, they cannot dispute that the district court considered the Real Rate Report relied on by the parties' experts. (1-ER-0009.) Just as the district court refused to apply 2023 rates for Los Angeles-based firms with 50 or fewer lawyers as being too low, it also held that 2023 rates for corporate litigation partners at very large firms were too high. (*Id.*) Still, Plaintiffs contend that the 2023 Real Rate report for Antitrust – *Corporate* work is the most accurate benchmark in a *litigation* matter. (AB at 51 (citing SER-69).) The Real Rate Report's use of Antitrust and Competition as a "Corporate" subarea has it alongside other transactional specialties such as "Corporate Development," "Governance," "Partnerships and Joint Ventures," "Tax," and "Treasury." (SER-69.) Plaintiffs' counsel's firm does not have any lawyers focusing on transactional work such as this, nor were any of these subareas relevant to this litigation. Thus, the district court's

48

award of general litigation-specific rates instead of corporate—plus an upward adjustment—was more appropriate. (1-ER-0009.)

In arguing for use of *quartiles* in the Real Rate report, Plaintiffs rely on prior cases involving their counsel where the report was used. (AB at 51.) One of these is *Trendsettah USA Inc. v. Swisher International Inc.*, No. 14-CV-1664-JVS (DFMx), 2023 WL 8263365 (C.D. Cal. Nov. 17, 2023), which Plaintiffs argue is not an accurate benchmark for hourly rates (but is for quartiles). (AB at 51, 54-55.) But the fact that the same lawyers were being evaluated in *Trendsettah* make it persuasive authority in this litigation on rates. And like the district court in our case, the court applied general litigation rates, not corporate. *Trendsettah*, 2023 WL 8263365, *14 ("Without a more robust showing that a rate increase is warranted, the Court finds the 2022 Real Rate Report third quartile Los Angeles rate for general litigation to be a reasonable basis for Gaw|Poe's rates."). Plaintiffs also complain that the district court did not make a finding on the prevailing rate for antitrust work in the Central District of California. (AB at 55.) Yet, based on the analysis performed, the Court can easily glean that from

49

what was awarded: $1,070 and $975 per hour rates for Plaintiffs'
counsel. (1-ER-0009.)

Plaintiffs cannot eschew the "mom-and-pop business" labels they
consistently referred to throughout this litigation. (8-ER-1810)
Additionally, it is not "very unusual" for antitrust plaintiffs to be
represented by big law firms. *See Toledo Mack Sales & Service, Inc. v.
Mack Trucks, Inc.*, 530 F.3d 204 (3d Cir. 2008) (Duane Morris LLP
represented plaintiff in antitrust trial and through appeal)*; In re
Automotive Parts Antitrust Litigation*, 2016 WL 8201483, *9 (E.D. Mich.
Dec. 28, 2016) (Duane Morris LLP appointed as settlement class
counsel in antitrust MDL).

In moving for fees before the district court, Plaintiffs relied on the
fee award issued in *Feesers, Inc. v. Michael Foods, Inc.*, No. 04-cv-576
(M.D. Pa.), which was mooted when the plaintiff's RPA judgment was
reversed on appeal. (2-ER-0109-10, citing *Feesers, Inc. v. Michael Foods,
Inc.*, 591 F.3d 191 (3d Cir. 2010).) In that case, the plaintiff corporation
retained a large firm, Dewey & LeBoeuf LLP, on an hourly basis. (2-ER-
0130.) That law firm generated billing statements with fees incurred
each month—and ***actually billed the plaintiff for that work***. (2-ER-

0131, -39 ("The remaining sum of $8,773,221.89 was billed to Feesers.").[8]

Unlike *Feesers*, Plaintiffs' counsel here is operating on a contingent fee basis. (2-ER-0123.) Thus, the Plaintiffs will receive a fraction of their trebled damages—after their counsel takes their contingency fee—and only their attorneys will be substantially enriched by the judgment sought to be affirmed.

Further, in awarding fees lower than what was requested, the district court was not blindly ignoring the law. Rather, it was properly evaluating the quality of the lawyering. Like any busy Article III court, the district court here is exposed to varying levels of advocacy. At trial, the district court admonished Plaintiffs' lead trial counsel for misstating the law in this Circuit. (10-ER-2438.) The legal principle in question was an aspect of the RPA: the same law counsel touts themselves as having "unrivaled" experience in litigating. (AB at 52.) Accordingly, Judge Fitzgerald "conducted a careful review of the records and made numerous deductions" in reducing the award. *See O'Bannon*, 739 F.

---

[8] The plaintiff's lead counsel was Jeffrey Kessler, who remains one of the most well-known lawyers in the antitrust bar. (2-ER-0142.)

App'x at 895. The only issue with that review is that the awarded fees were too high.

### C. The District Court Properly Denied an Enhancement to the Lodestar under California Law.

The district court did not err in refusing to enhance the Plaintiffs' already high lodestar. In arriving at an award to Plaintiffs of $3,142,268.45 in attorneys' fees, the district court applied a haircut for counsel's failure to properly staff the case. (1-ER-0011.)

"Because there is a strong presumption that the lodestar amount represents a reasonable fee, adjustments to the lodestar 'are the exception rather than the rule.'" *Stanger v. China Elec. Motor, Inc.*, 812 F.3d 734, 738 (9th Cir. 2016) (per curiam) (quoting *Fischel v. Equitable Life Assurance Soc'y*, 307 F.3d 997, 1007 (9th Cir. 2002)). Nevertheless, the Court in its discretion may adjust the lodestar figure upward or downward based on the factors first enunciated in *Kerr v. Screen Extras Guild, Inc.*, 526 F.2d 67, 70 (9th Cir. 1975), including:

> (1) the time and labor required, (2) the novelty and difficulty of the questions involved, (3) the skill requisite to perform the legal service properly, (4) the preclusion of other employment by the attorney due to acceptance of the case, (5) the customary fee, (6) whether the fee is fixed or contingent, (7) time limitations imposed by the client or the circumstances, (8) the amount involved and the results obtained, (9) the experience, reputation, and ability of the attorneys, (10) the "undesirability" of the case, (11) the nature and length of the

52

professional relationship with the client, and (12) awards in similar cases.

*Antoninetti v. Chipotle Mexican Grill, Inc.*, 49 F. Supp. 3d 710, 715–16 (S.D. Cal. 2014), *aff'd sub nom. Goldkorn v. Chipotle Mexican Grill, Inc.*, 669 F. App'x 920 (9th Cir. 2016).

"Any reliance on factors that have been held to be subsumed in the lodestar determination will be considered an abuse of the trial court's discretion." (1-ER-0012 quoting *Parsons v. Ryan*, 949 F.3d 443, 467 (9th Cir. 2020)). Therefore, "an enhancement can be justified only in 'rare' and 'exceptional' cases where the presumption is overcome." (1-ER-0012 quoting *Edmo v. Corizon, Inc.*, 97 F.4th 1165 (9th Cir. 2024)).[9]

In rejecting Plaintiffs' request for a 2.0x multiplier, the district court correctly held that most of the *Kerr* factors had been subsumed in the court's lodestar analysis. (1-ER-0012.) It stated that the complexity and novelty of the case had been addressed and were no basis for an enhancement. (1-ER-0013.) It explained that the potential for treble damages and Plaintiffs' ability to afford a fixed fee provided several

---

[9] Even under Plaintiffs' own cited authorities, downward adjustments from the lodestar are "far more common under California law than under federal law." (AB at 62-63).

incentives for Plaintiffs' counsel to take on the case. (1-ER-0013.) In assessing the payment arrangement, it noted that the fee was "not truly contingent" because Plaintiffs' counsel's remuneration "does not hinge in any way on the monetary value of Plaintiffs' recovery." (1-ER-0013.) This meant that if the jury awarded Plaintiffs $350,000 or $350 million, the Plaintiffs were entitled to a reasonable fee award pursuant to 15 U.S.C. § 15(a). (1-ER-0013 ("So long as Plaintiffs were the prevailing party, counsel was guaranteed recovery of fees for the reasonable hours worked.").)

The district court also found uncompelling Plaintiffs' argument that their counsel was precluded from pursuing other cases because of this one. (1-ER-0013.) While the case's trial schedule suffered from several COVID-related delays—allowing Plaintiffs' firm to bill more in fees—counsel could have taken on additional cases in that time. The judge aptly recognized that the Plaintiffs are serial litigators when it comes to the RPA. (1-ER-0013 ("The cases that Plaintiffs had to forego are all RPA cases concerning the same clients in this action and likely would have involved similarly complicated legal issues, protracted years of litigation, and contingency risks.").) Thus, the Court should affirm

54

the district court's denial of an enhancement to the lodestar. That lodestar already dwarfs the monetary and other recovery to Plaintiffs themselves, even after trebling.

## CONCLUSION

The jury's verdict should be vacated, and a new trial should be ordered. Plaintiffs' attorneys' fee award should also be vacated, or at minimum, reduced.

Respectfully submitted,

February 7, 2025

*/s/ Michael L. Fox*
Michael L. Fox
C. Sean Patterson
Christine Cusick Ross
DUANE MORRIS LLP
One Market Plaza, Suite 2200
San Francisco, CA 94105

Robert M. Palumbos
William Shotzbarger
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103

*Counsel for Defendants-Appellants Prestige Consumer Healthcare Inc. (fka Prestige Brands Holdings, Inc.) and Medtech Products, Inc.*

## CERTIFICATES OF COMPLIANCE

1.      I certify that this document complies with the word limit of Federal Rule of Appellate Procedure 32 and Circuit Rule 28.1-1(b) because, excluding the parts of the document exempted by Rule 32(f), this document contains 10,853 words.

2.      I certify that this filing complies with the formatting requirements of Federal Rule of Appellate Procedure 32(c)(2) and Circuit Rule 32(b) because this brief has been prepared in 14-point Century Schoolbook font.

February 7, 2025            */s/ Michael L. Fox*
Michael L. Fox
C. Sean Patterson
Christine Cusick Ross
DUANE MORRIS LLP
One Market Plaza, Suite 2200
San Francisco, CA 94105

## STATEMENT OF RELATED CASES

Other than the three appeals that have been consolidated in this case, counsel is unaware of any other related cases pending in the Ninth Circuit.

February 7, 2025

*/s/ Michael L. Fox*
Michael L. Fox
C. Sean Patterson
Christine Cusick Ross
DUANE MORRIS LLP
One Market Plaza, Suite 2200
San Francisco, CA 94105