**Nos. 24-3776, 24-5009, 24-5227**
Published opinion issued February 24, 2026
Before: Kim McLane Wardlaw, Salvador Mendoza, Jr., and Anthony D. Johnstone, Circuit Judges

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

---

**L.A. INTERNATIONAL CORP., ET AL.**
*Plaintiffs-Appellees/Cross-Appellants,*

v.

**PRESTIGE BRANDS HOLDINGS, INC.
AND MEDTECH PRODUCTS, INC.**
*Defendants-Appellants/Cross-Appellees.*

---

On appeal from an Amended Final Judgment
Central District of California No. 2:18-cv-06809-MWF-MRW
Michael W. Fitzgerald, District Judge,
Presiding

---

**PETITION FOR PANEL REHEARING AND
REHEARING *EN BANC***

---

Michael L. Fox
Benjamin G. Shatz
Robert Kum
C. Sean Patterson
DUANE MORRIS LLP
One Market Plaza,
Ste. 2200
San Francisco, CA
94105
(415) 957-3092

Robert M. Palumbos
William Shotzbarger
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA
19103
(215) 979-1111

*Counsel for Appellants/Cross-Appellees
Prestige Consumer Healthcare Inc. (fka
Prestige Brands Holdings, Inc.) and Medtech
Products, Inc.*

# CORPORATE DISCLOSURE

Pursuant to Federal Rule of Appellate Procedure 26.1, Defendant-Appellant Prestige Consumer Healthcare Inc. (fka "Prestige Brands Holdings, Inc.") is a Delaware Corporation, and is publicly traded on the New York Stock Exchange under the ticker symbol PBH. Defendant-Appellant Medtech Products, Inc. is a wholly-owned indirect subsidiary of Prestige Consumer Healthcare, Inc.

Date: March 10, 2026

*s/Michael L. Fox*
Michael L. Fox

## TABLE OF CONTENTS

**Page**

Introduction ...................................................................... 1

Background & Procedural Posture ..................................... 3

Reasons for Granting Panel and *En Banc* Rehearing ............................ 6

    I.    The panel's opinion conflicts with *Volvo* ................................ 7

    II.   The panel wrongly interpreted Section 2(a) of the RPA and effectively removed the word "substantially" from the statute ................................................................... 13

Conclusion ...................................................................... 19

Opinion Filed February 24, 2026 ...................................... 20

Certificate of Compliance .............................................. 55

Certificate of Service ..................................................... 56

i

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*BladeRoom Group Limited v. Emerson Electric Co.*
20 F.4th 1231 (9th Cir. 2021) ..................................................... 10

*Cash & Henderson Drugs, Inc. v. Johnson & Johnson*
799 F.3d 202 (2d Cir. 2015) ................................................. 16-17

*Coston v. Nangalama*
13 F.4th 729 (9th Cir. 2021) ...................................................... 15

*Olympia Co., Inc. v. Celotex Corp.*
597 F. Supp. 285 (E.D. La. 1984)............................................... 16

*Sidibe v. Sutter Health*
103 F.4th 675 (9th Cir. 2024) ..................................................... 11

*Texaco, Inc. v. Hasbrouck*
496 U.S. 543 (1990)................................................................... 15

*TRW Inc. v. Andrews*
534 U.S. 19 (2001)...................................................................... 15

*U.S. Wholesale Outlet & Distribution, Inc. v. Innovation Ventures, LLC*
89 F.4th 1126 (9th Cir. 2023) ........................................... passim

*Van Buren v. United States*
593 U.S. 374 (2021)................................................................... 15

*Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*
546 U.S. 164 (2006)........................................................... passim

*Whitaker Cable Corp. v. FTC*
239 F.2d 253 (7th Cir. 1956)..................................................... 16

STATUTES

Robinson-Patman Act, 15 U.S.C § 13 ................................... passim

Cal. Bus. & Prof. Code § 17045 ....................................................4-6

Cal. Bus. & Prof. Code § 17200 ....................................................4-5

OTHER AUTHORITIES

14 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law
    § 2331c (4th ed. 2019) .................................................................. 15

Steven Cernak & Cansu Gunel, *Ninth Circuit Affirms
    Robinson-Patman Victory — But Is There Now a Circuit
    Split?*, The Antitrust Attorney Blog (Mar. 5, 2026),
    https://www.theantitrustattorney.com/ninth-circuit-
    affirms-robinson-patman-victory-but-is-there-now-a-
    circuit-split/................................................................................. 17

## INTRODUCTION

Appellants and Cross-Appellees Prestige Consumer Healthcare, Inc. (f.k.a. Prestige Brands Holdings, Inc.) and Medtech Products, Inc. (collectively "Prestige") seek panel and *en banc* rehearing to clarify the standard for secondary-line price discrimination cases under the Robinson-Patman Act ("RPA"). The panel's published opinion conflicts with the Supreme Court's most recent pronouncement of the law for secondary-line RPA cases in *Volvo Trucks N. Am., Inc. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164 (2006). Rather than applying this Court's opinion in *U.S. Wholesale Outlet & Distribution, Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126 (9th Cir. 2023), the panel should have applied *Volvo*.

This is not a case of small shops being driven out of business and needing a fighting chance to compete against large grocery chains. The plaintiff-wholesalers are multi-million-dollar enterprises who seek the same discounts as the non-competitor club-stores (Costco and Sam's Club), without the membership, ability, or willingness to pass discounts from Prestige on to their customers. Indeed, if anything, the district court's and panel's failure to recognize the benefits of the club-store model and the discounts negotiated for those clubs' members—generally small shops who paid membership fees to receive those discounts— serves only to enrich Plaintiffs' bounty-hunter attorneys to the

detriment of smaller, independent shops, who can no longer take advantage of the promotions they paid the clubs to obtain.

The Supreme Court has made clear that the requisite competitive injury is the diversion of sales from a disfavored purchaser to a favored purchaser in order to prevail in a secondary-line RPA Section 2(a) case. *Volvo*, 546 U.S. at 181. The RPA proscribes "price discrimination only to the extent that it threatens to injure competition."' *Id.* at 175 (internal citations omitted). "Secondary-line cases, of which this is one, involve price discrimination that injures competition among the discriminating seller's customers . . .; cases in this category typically refer to 'favored' and 'disfavored' purchasers." *Id.* at 176. The panel's analysis of *Volvo* misses the mark by not recognizing that the membership fees paid by club store members are different from the average big box retailer (and akin to the dealers in *Volvo*).

Further, the panel's opinion conflicts with the text of the RPA itself. The district court should have instructed the jury that it had to find *substantial* harm to competition before they could return a verdict for the plaintiff-wholesalers. However, the district court ignored the express language of Section 2(a) of the RPA and the weight of authority supporting a disjunctive interpretation of the most important provision of the RPA.

This appeal presents the following question: Whether the district court improperly denied Prestige's motion for a new trial when it

disregarded the text of Section 2(a) of the RPA and misapplied Supreme Court precedent that a secondary-line RPA claim requires proof of actual competition and substantial harm to competition. This Court should grant rehearing to clarify the answer to this issue and to secure and maintain the uniformity of prior decisions surrounding the RPA. The panel's opinion undercuts the market certainties that have existed for the manufacturers and distributors of these products. Consistent application of RPA law is necessary for realizing the efficiencies of the club stores such as Costco and Sam's club and their millions of fee-paying members. Rehearing should be granted.

## BACKGROUND & PROCEDURAL POSTURE

Prestige manufactures and distributes Clear Eyes Redness Relief eye drops in the trial sized 0.2-ounce Pocket Pal container ("Clear Eyes"). (4-ER-0886.) Plaintiffs are regional wholesalers that sell Clear Eyes: L.A. International, L.A. Top, U.S. Wholesale, and Value Distributor (Los Angeles); Pitco (San Francisco); AKR, Excel Wholesale, and Manhattan Wholesalers (New York); and Border Cash & Carry (Texas). (4-ER-0886.)

Among Prestige's other direct-purchasing customers of Clear Eyes are Costco, and, since March 2017, Sam's Club. (*Id.*) Costco and Sam's Club are large retailers who sell exclusively to their "club" members. (9-ER-2162-63; 11-ER-2793.) Unlike Costco or Sam's Club, Plaintiffs

never offered a fee-based membership of any kind to their customers during the relevant time period (August 2014 through post-trial briefing). (10-ER-2569; 11-ER-2952.)

Plaintiffs filed this lawsuit against Prestige in August 2018. Plaintiffs asserted four claims: (1) damages claims for violations of Section 2(a) of the RPA, 15 U.S.C § 13(a); (2) injunctive relief claims for violations of Section 2(d) of the RPA, 15 U.S.C § 13(d); (3) damages claims for violations of California's Unfair Practices Act ("UPA"), Cal. Bus. & Prof. Code § 17045; and (4) injunctive relief claims for violations of California's Unfair Competition Law, ("UCL"), Cal. Bus. & Prof. Code § 17200. (8-ER-1817-19.) Plaintiffs also sought treble damages, injunctive relief, and attorneys' fees and costs. (*Id*.)

The case proceeded to trial in December 2023. The parties presented over a dozen fact witnesses. Plaintiffs and Prestige also called economists to testify as experts. The jury ultimately found that Plaintiffs prevailed on their RPA Section 2(a) claims for price discrimination, and the California Plaintiffs prevailed on their UPA claims. (5-ER-1021.) The jury awarded minimal damages:

| Plaintiff | RPA Section 2(a) Damages | UPA Damages |
|---|---|---|
| AKR | $25,000 | N/A |
| Border Cash & Carry | $0 | N/A |

| Excel Wholesale | $25,000 | N/A |
|---|---|---|
| L.A. International | $95,000 | $90,000 |
| L.A. Top Distributor | $25,000 | $30,000 |
| Manhattan Wholesalers | $25,000 | N/A |
| Pitco Foods | $30,000 | $75,000 |
| U.S. Wholesale | $25,000 | $5,000 |
| Value Distributor | $100,000 | $130,000 |

Only two Plaintiffs obtained a verdict on the Section 2(a) claim greater than $30,000. (5-ER-1025.) For the five Plaintiffs who were awarded $25,000 on the RPA claim, that award (before trebling) averages out over the nine-year damages period to $2,777.78 per year, per plaintiff.

Prestige moved for a new trial on February 12, 2024, which the district court denied. (1-ER-0038.) At the same time, Plaintiffs moved for a permanent injunction, which the district court granted in part. (1-ER-0038.) The district court entered findings of fact and conclusions of law on Plaintiffs' claim under Section 2(d) of the RPA, the UPA, and the UCL on May 20, 2024. (4-ER-0884.) It then entered judgment on May 28, 2024 (1-ER-0027), and an amended judgment on June 5, 2024 (1-ER-0016).

Plaintiffs moved for attorneys' fees and costs. (2-ER-0097.) In that motion, Plaintiffs sought $7,651,766.80 in attorneys' fees after a

lodestar multiplier, as well as $35,546.99 in costs. (1-ER-0002, -12.) The district court awarded 41% of the requested fees and all of the requested costs. (1-ER-0002, -15.)

On February 24, 2026, the panel issued a published opinion affirming the district court's judgment and the jury's verdict in favor of the Plaintiffs on their Section 2(a) damages claims.[1] It also granted Plaintiffs' cross-appeal and vacated the district court's award of attorneys' fees with instructions to reconsider certain factors and issue a new attorneys' fee award to Plaintiffs.

## REASONS FOR GRANTING PANEL AND *EN BANC* REHEARING

The Court should grant rehearing to bring the decision in this case in line with the Supreme Court's binding precedent in *Volvo*, ensure meaning to the word "substantial" within the text of the RPA, and secure and maintain the uniformity of prior decisions surrounding the RPA.

---

[1] On the merits, Prestige had also appealed the district court's jury instructions on Plaintiffs' UPA claims, Prestige's functional discount defense, calculation of instant rebates, and entry of permanent injunctive relief. Prestige also appealed the district court's award of attorneys' fees. Although the panel did not address Prestige's appeal on fees—and instead only addressed the Plaintiffs' cross-appeal—Prestige is not including these issues in its request for rehearing except to point out this is an egregious result in light of the nominal damages awarded.

## I. The panel's opinion conflicts with *Volvo*.

In *Volvo*, the Supreme Court held that secondary-line RPA liability requires proof that the alleged disfavored purchaser was in actual competition for the same sale as a favored purchaser, and rejected liability where the relevant market had already been narrowed to a selected intermediary. 546 U.S. at 177-79. The Supreme Court concluded that the alleged disfavored purchaser, a Volvo truck dealer in Arkansas, did not meet this standard, as it failed to satisfy the third and fourth prongs required to prove a secondary-line claim. According to the Court, that dealer had "not identified any differentially priced transaction in which it was both a 'purchaser' under the Act and 'in actual competition' with a favored purchaser for the same customer." *Id.* at 177 ("We decline to permit an inference of competitive injury from evidence of such a mix-and-match, manipulable quality."). The Court concluded that no competitive injury could be inferred once the retail customer had selected a limited set of dealers to compete for a specific transaction, because competition is not affected by differential pricing after the market is narrowed. *Id.* at 178-79.

The Supreme Court concluded that Reeder and other Volvo truck dealers may have competed at the initial bidding stage, but that "competition is not affected by differential pricing." *Volvo*, 546 U.S. at 179. Moreover, competition at this stage "is based on a variety of factors, including the existence vel non of a relationship between the

potential bidder and the customer." *Id.* ("Once a retail customer has chosen the particular dealers from which it will solicit bids, 'the relevant market becomes limited to the needs and demands of a particular end user, with only a handful of dealers competing for the ultimate sale.'"). This is directly applicable to membership-based purchasers such as Costco and Sam's Club, where customers pay to designate the club as their bargaining representative.

Costco and Sam's Club's members pay these companies annual membership fees explicitly to go out and negotiate the best deal they can get for them for various products, including Clear Eyes. By paying this fee, Costco and Sam's Club's members are: (a) agreeing to have those club stores bargain on their behalf; and (b) empowering and subsidizing that bargaining power. Applying *Volvo's* reasoning here, there is no competition between Plaintiffs and Costco or Sam's Club, as the "market" was already narrowed to the clubs through the payment of the membership fee.

After this Court decided *U.S. Wholesale*, however, the district court essentially held that *Volvo* no longer controls the applicable law in RPA cases, particularly as it relates to the actual competition element. Rather, *U.S. Wholesale* does. (5-ER-1124 ["Plaintiffs contend that *U.S. Wholesale* is on point and, therefore, *Volvo*'s framework for determining whether two customers are in competition is inapplicable. Based on the

factual and legal similarities between *U.S. Wholesale* and this action, the Court agrees."].)

The panel agreed—finding Plaintiffs' arguments more persuasive—because there was no "narrowing of the market as in *Volvo*." Opn-24. The panel noted that the retail truck buyer in *Volvo* narrowed the market by selecting specific dealers from which to obtain bids, and the bidding process limited the relevant market to needs and demands of a particular end user with only a handful of dealers competing. *Id*. Despite this acknowledgment, the panel erroneously dismissed key evidence distinguishing this case from *U.S. Wholesale*: *i.e.*, the evidence of how and why Sam's Club started selling Clear Eyes.

Unlike Costco, Sam's Club was not an allegedly "favored purchaser" in *U.S. Wholesale*—only Costco was. *U.S. Wholesale*, 89 F.4th at 113; *U.S. Wholesale*, 2021 WL 3418584, at *1-2. At trial in this case, the jury heard testimony from Storm Quattlebaum, Sam's Club's corporate representative and the individual who negotiated Sam's Club's promotional contract with Prestige for the sale of Clear Eyes. (5-ER-1080-1109.) Mr. Quattlebaum testified that, starting in 2016, Sam's Club's sales representatives for Sam's Club's business division began receiving inquiries from Sam's Club's business members about Clear Eyes. (5-ER-1083-84.) Sam's Club then contacted Prestige and began negotiating a price on behalf of its members. (5-ER-1085.)

9

The initial price from Prestige was rejected by Sam's Club's members. (*Id*.) Sam's Club continued to negotiate with Prestige, and ultimately reached an agreement on a promotional price. (*Id*.) That price was negotiated based on what Sam's Club's members said they were willing to pay for this product at a specific minimum volume for purchase (*i.e.*, the "truckload promotion"). (*Id*.)

In other words, Sam's Club members—like the customers in *Volvo*—retained Sam's Club to negotiate for specific discounts on Clear Eyes, which Sam's Club then obtained and sold to its members (5-ER-1084-86, 1100, 14-ER-3597, 3661-63.) Plaintiffs contended that *Volvo* is only applicable "if there were evidence that Costco's customers first submitted a bid to Costco for Clear Eyes, and then Costco turned around and petitioned Prestige for discounts to fulfill each such bid as it came in." (AB at 32, citing *Volvo*, 89 F.4th at 1144.) That is exactly what the evidence in this case showed with regard to Sam's Club.

Because the jury instructions on actual competition between Plaintiffs and Sam's Club (5-ER-1052) did not apply the standard set by *Volvo*, they were erroneous. Once an instructional error is established, prejudice is presumed. *BladeRoom Group Limited v. Emerson Electric Co.*, 20 F.4th 1231, 1243 (9th Cir. 2021). The burden then shifts to the respondent to demonstrate that it is "more probable than not that the jury would have reached the same verdict had it been properly

instructed." *Id.*; *see also Sidibe v. Sutter Health*, 103 F.4th 675, 687 (9th Cir. 2024).

Plaintiffs did not even attempt to do so here, as their brief was devoid of any discussion of the record presented as to Sam's Club. And indeed, the record in *U.S. Wholesale* is instructive on this point, as the instruction given to that jury on finding actual competition was based on the standard set forth in *Volvo*, and that jury returned a verdict for the defendants. *U.S. Wholesale*, 2021 WL 3418584, at *3; *see also U.S. Wholesale*, 2:18-cv-01077-CBM-E, ECF No. 397, p. 17 (C.D. Cal.) (Competitive Injury – Actual Competition); 5-ER-1115 (proposed Instruction); 5-ER-1052 (given Instruction).

Without explanation, the panel makes the conclusory assertion that, "although Sam's Club members expressed interest in Clear Eyes and indicated what price they would be willing to pay for the product, [the members] were not soliciting bids or narrowing the market to a select few wholesalers." Opn-24. But Sam's Club's fee-paying members actively lobbied for Sam's Club to approach Prestige and obtain favorable pricing on Clear Eyes, were directly involved in that subsequent negotiation process, and then bought the product from Sam's Club at the negotiated price. These facts are directly analogous to the facts in *Volvo* and were not raised in *U.S. Wholesale*. The panel's premises regarding the application of *Volvo* to Costco's sales are similarly misguided.

The panel contends that there was no "narrowing of the market" like *Volvo* because Costco members are free to purchase goods elsewhere, as evidenced by the fact that "some of [the plaintiffs] customers were also members of Costco." Opn-24. However, the mere fact that there were sales by Costco to some of Plaintiffs' customers is insufficient to establish a violation of the RPA. Rather, as explained in *Volvo*, Plaintiffs and Costco must be in competition for the same sale to the same customer. *Id*. at 1166. A discount given to a customer who has already selected a dealer to represent them for that sale is not a sale that violates the RPA.

Here, the testimony of both Plaintiffs and their purported "lost customers" conclusively established that they only purchased Clear Eyes from Costco when the product was on promotion during Costco's "Business-Savings Events." This promotion was secured through the collective bargaining power paid for by Costco's members, including certain Plaintiffs and their "lost customers." (*See e.g.*, 10-ER-2516-2517, 2571-2572, 2666; 11-ER-2697, 2741-2742, 2752-2753, 2799-2800; 12-ER-2992-93.)

The analogous bargaining power based on club membership was not advanced in the trial of *U.S. Wholesale*, much less raised and considered by this Court in reaching its decision. Indeed, it is clear from the dissent by Justice Miller in that decision, who discussed at length why *Volvo* controls, that no such evidence or argument was present on

12

appeal. *See U.S. Wholesale*, 89 F.4th at 1151-1154. Rather, in addressing the claim that Costco falls within the "typical chainstore paradigm," both the majority and dissent focused almost exclusively on the evidence or argument of "operational differences" between Costco and the plaintiffs (*e.g.*, online sales, set prices, sales to end-consumers, credit and inventory differences). *U.S. Wholesale,* at 1151-1152. And indeed, the district court incorrectly focused only on this same question of "operational differences" in addressing Prestige's motion for new trial. (1-ER-0053 ["[M]any of these facts were similar to those in *U.S. Wholesale* as it also involved Costco as a favored buyer. Additionally, the differences between Plaintiffs and the Favored Purchasers that Prestige highlights are exactly the "operational differences" that the Ninth Circuit ignored in *U.S. Wholesale*."] (internal citations omitted).) Thus, the "typical chainstore-paradigm" characterization in *U.S. Wholesale* is inapplicable based on the evidence and argument advanced here. The panel committed error in relying on *U.S. Wholesale* to preclude application of *Volvo*.

## II. The panel wrongly interpreted Section 2(a) of the RPA and effectively removed the word "substantially" from the statute.

The panel incorrectly affirmed the district court's clear error in failing to instruct the jury that it had to find "substantial" harm to competition before returning a Plaintiffs' verdict. Section 2(a) of the RPA states:

> It shall be unlawful for any person . . . to discriminate in price between different purchasers of commodities . . . where the effect of such discrimination may be ***substantially*** to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them[.]

15 U.S.C. § 13(a) (emphasis added). Prestige had urged the district court to instruct the jury that Plaintiffs must demonstrate "substantial" harm to competition. (5-ER-1115, 1155-64, 1195-1203; 14-ER-3533-34.)[2] However, the district court (and now the panel) adopted Plaintiffs' argument that the term "substantial" was unnecessary because the use of this term in the statute was "intended to be read in the disjunctive." (13-ER-3236; 14-ER-3534, 3567-3272; *see also* 1-ER-0043.) The panel's reasoning was that canons of construction and precedent required it to treat the clauses in Section 2(a) separately. Opn-18-19.[3]

But the panel has ignored the explicit text of the RPA. The word "substantial" actually precedes any prohibited effects of unlawful price discrimination under the RPA. It was written before the first instance of the word "to" which also appears in multiple places in the statute. *See* 15 U.S.C. § 13(a). The Supreme Court has instructed courts that in

---

[2] Prestige's five-page Amended Proposed Special Verdict Form contained "substantial" in two sections. (5-ER-1127, 5-ER-1129.) This would have allowed the jury to render a verdict without having to decipher "concepts" of Section 2(a) of the RPA.

[3] It also relied on the legislative history of the RPA. Opn-20-21.

14

interpreting legislation they must "start where we always do: with the text of the statute." *See Van Buren v. United States*, 593 U.S. 374, 381 (2021). "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (internal quotation marks omitted). Of course, jury instructions must accurately state the law. *See Coston v. Nangalama*, 13 F.4th 729, 732 (9th Cir. 2021).

The word substantial cannot be ignored in the context of a secondary-line Section 2(a) claim. Under the panel's current construction, there could never be an instance where the term "substantially" would be applicable to a secondary-line claim. This would contravene the explicit intent of Congress and authority on statutory interpretation. *See TRW Inc.*, 534 U.S. at 29. Leading secondary authority also supported Prestige's proposed jury instruction that courts have "assumed that the word 'substantially' modifies all three forms of injury.'" 14 Philip E. Areeda & Herbert Hovenkamp, Antitrust Law § 2331c (4th ed. 2019).

The Supreme Court, this Court, and other circuits have noted that liability under Section 2(a) requires *substantial* harm to competition. *See, e.g.*, *Texaco, Inc. v. Hasbrouck*, 496 U.S. 543, 561 & n.18 (1990) ("A legitimate functional discount will not cause any *substantial* lessening

of competition. The concept of *substantiality* permits the causation inquiry to accommodate a notion of economic reasonableness with respect to the pass-through effects of functional discounts, and so provides a latitude denied by the cost justification defense."); *Hasbrouck*, 842 F.2d at 1041 n.6, *aff'd supra* ("The district court in fact instructed the jury that plaintiffs needed to 'establish by a preponderance of the evidence that the effect of the discrimination in price . . . had the reasonable *probability of substantially lessening competition*, or of injuring or destroying or preventing competition.'"); *Volvo*, 546 U.S. at 180 ("[I]f price discrimination between two purchasers existed at all, it was not of such magnitude as *to affect substantially competition* between [the plaintiff] and the 'favored' Volvo dealer."); *Cash & Henderson Drugs, Inc. v. Johnson & Johnson*, 799 F.3d 202, 212 (2d Cir. 2015) ("The Act itself thus requires at least the potential for *substantial* harm to competition."); *Whitaker Cable Corp. v. FTC*, 239 F.2d 253, 256 (7th Cir. 1956) ("The Act was not intended to reach every remote, adverse effect on competition. The *effect must be substantial*."), *cert. denied*, 353 U.S. 938 (1957); *see also Olympia Co., Inc. v. Celotex Corp.*, 597 F. Supp. 285, 297 (E.D. La. 1984) ("As previously stated, the Robinson-Patman Act is only violated where the effect of price discrimination may be to *substantially* lessen competition. It is inconceivable that the de minimus price differential at issue could

be said to have such a *substantial*, if any, effect on competition."), *aff'd and remanded*, 771 F.2d 888 (5th Cir. 1985).

Here, the issue of "substantial" presents a question of exceptional importance because it involves an issue on which the panel's decision conflicts with authoritative decisions of other United States Courts of Appeals. *See Cash & Henderson Drugs*, 799 F.3d at 210; *see also* Steven Cernak & Cansu Gunel, *Ninth Circuit Affirms Robinson-Patman Victory — But Is There Now a Circuit Split?*, The Antitrust Attorney Blog (Mar. 5, 2026), https://www.theantitrustattorney.com/ninth-circuit-affirms-robinson-patman-victory-but-is-there-now-a-circuit-split/. In *Cash & Henderson Drugs*, the Second Circuit explained that the Supreme Court's discussion of substantiality in *Volvo* focused "on the existence and degree of actual competition among different purchasers." *Cash & Henderson Drugs*, 799 F.3d at 210 (citing *Volvo*, 546 U.S. at 177, 179–80). In making this point, the Second Circuit specifically relied on the language in Section 2(a) prohibiting price discrimination where the effect "may be substantially to lessen competition . . . ." *Id.* (quoting 15 U.S.C. § 13(a)). The Second Circuit further explained that "that if the loss attributable to impaired competition is *de minimis*, then the challenged practice cannot be said to have had a 'substantial' affect on competition." *Id.* at 210. The panel failed to address *Cash & Henderson Drugs* anywhere in its opinion.

In the trial of the *U.S. Wholesale* case, the plaintiffs (which include some of the same companies as here with the same plaintiffs' attorneys) made the same argument that "substantial" should be read in the disjunctive, and should not be included in the instructions to the jury. (6-ER-1504-06.) The district court rejected that argument, and the terms "substantially" and "substantial" were included in the jury instructions in that action. (*See* 6-ER-1237, 41-42.) The district court declared on the record in that case that the word "substantial" appears in the statute and that is why it is included in the jury instructions. (6-ER-1506.) The jury returned a verdict in favor of the defendants in that action, and the plaintiffs did not challenge the use of "substantial" in the instructions on appeal. *U.S. Wholesale*, 89 F.4th at 1136.[4]

Although Plaintiffs claimed harm from lost sales of Clear Eyes to Costco, their overall businesses grew during the period at issue. The evidence at trial was that, at least for some Plaintiffs, Costco entering the market actually *increased* Plaintiffs' sales of Clear Eyes. (12-ER-3005-06; 12-ER-3015-17; 13-ER-3355-56 (expert testified that "after the Costco Business Center opened, we see an increase in plaintiffs' sales for the New York plaintiffs.").) This indicates there was

---

[4] On remand in that case, the district court refused the plaintiffs' request for a permanent injunction based on a finding there was no threat of antitrust injury. *See U.S. Wholesale*, 2:18-cv-01077-CBM-E, ECF No. 675, pp. 7-9. Those plaintiffs have taken another appeal, which is pending before this Court at Docket No. 25-3460.

no substantial harm to competition. The case should be reheard to ensure consistent interpretations of the RPA. This is particularly true in the context of a wholesale supply chain for Clear Eyes and other consumer products that has been in place for many years.

## CONCLUSION

Rehearing should be granted.

Respectfully submitted,

s/ Michael L. Fox
Michael L. Fox
Benjamin G. Shatz
Robert Kum
C. Sean Patterson
DUANE MORRIS LLP
One Market Plaza, Ste. 2200
San Francisco, CA 94105
(415) 957-3092

Robert M. Palumbos
William Shotzbarger
DUANE MORRIS LLP
30 South 17th Street
Philadelphia, PA 19103
(215) 979-1111

*Counsel for Appellants/Cross-Appellees Prestige Consumer Healthcare Inc. (fka Prestige Brands Holdings, Inc.) and Medtech Products, Inc.*

March 10, 2026

19

**Opinion filed February 24, 2026**
***L.A. International Corp. et al. v. Prestige Brands***
***Holdings, Inc. et al.*, — F.4th — (9th Cir. 2026)**

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

LA INTERNATIONAL CORP.;
MANHATTAN WHOLESALERS,
INC.; EXCEL WHOLESALE
DISTRIBUTORS, INC.; VALVE
DISTRIBUTOR, INC.; AKR
CORPORATION; U.S.
WHOLESALE OUTLET &
DISTRIBUTION, INC.; SANOOR,
INC., doing business as L.A. Top
Distributor; PITTSBURG
WHOLESALE GROCERS, INC.;
PACIFIC GROSERVICE, INC.;
BORDER CASH & CARRY, INC.,

       *Plaintiffs – Appellees /
       Cross – Appellants*,

  v.

PRESTIGE BRANDS HOLDINGS,
INC.; MEDTECH PRODUCTS,
INC.,

       *Defendants – Appellants /
       Cross – Appellees*.

Nos. 24-3776,
24-5009,
24-5227

D.C. No.
2:18-cv-06809-
MWF-MRW

OPINION

2      LA INT'L CORP. V. PRESTIGE BRANDS HOLDINGS, INC.

Appeal from the United States District Court
for the Central District of California
Michael W. Fitzgerald, District Judge, Presiding

Argued and Submitted July 15, 2025
Pasadena, California

Filed February 24, 2026

Before: Kim McLane Wardlaw, Salvador Mendoza, Jr., and
Anthony D. Johnstone, Circuit Judges.

Opinion by Judge Mendoza

## SUMMARY[*]

### Robinson-Patman Act / Attorneys' Fees

The panel (1) affirmed the district court's judgment in favor of wholesale purchasers in their action under the Robinson-Patman Act ("RPA") alleging that Prestige Consumer Healthcare, Inc. and its subsidiary Medtech Products, Inc. (together "Prestige") sold Clear Eyes Redness Relief Eye Drops at an impermissibly lower price to their larger competitors; and (2) vacated the district court's award of attorney's fees to the wholesale purchasers and remanded with instructions to enter a new fee award.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

The wholesale purchasers brought this action under the RPA, which prohibits sellers of goods from discriminating among competing buyers in certain circumstances, and California's Unfair Practices Act and Unfair Competition Law.  The district court entered judgment for the wholesale purchasers, awarded damages, and granted a permanent injunction.

The panel rejected Prestige's challenges to the district court's jury instructions.  Specifically, the panel rejected Prestige's arguments that the district court (1) did not correctly present the functional discount defense to the jury, (2) erred by failing to instruct the jury that the wholesale purchasers needed to demonstrate substantial harm to competition to demonstrate a violation of Section 2(a) of the RPA, and (3) erred by rejecting Prestige's request for an instruction that the jury must find that the wholesale purchasers were in competition with Costco for "the same dollar."

The panel agreed with the district court that rebates given to Costco customers at the checkout register must be counted toward the calculation of the net price at which Prestige sold Clear Eyes to Costco, and must be included in the Section 2(a) damages calculation.

The panel held that the district court's issuance of a permanent injunction was an appropriate remedy for Prestige's anticompetitive conduct.

The panel held that the district court abused its discretion in awarding attorney's fees. The district court abused its discretion when it declined to base its lodestar calculation on the rate in the 2023 Real Rate Report because "it is simply unreasonable to award big law rates to a four-person firm representing mom-and-pop warehouses."  A law firm's size

4    LA INT'L CORP. v. PRESTIGE BRANDS HOLDINGS, INC.

alone cannot determine its market rate for the purposes of a lodestar calculation. Accordingly, the panel vacated the district court's award of attorney's fees to the wholesale purchasers, and remanded for the district court to recalculate fees consistent with the opinion.

**COUNSEL**

Mark Poe (argued), Victor Meng, and Randolph Gaw, Gaw Poe LLP, San Francisco, California, for Plaintiffs-Appellees.

Michael L. Fox (argued), C. Sean Patterson, and Christine C. Ross, Duane Morris LLP, San Francisco, California; Robert Kum, Duane Morris LLP, Los Angeles, California; Robert M. Palumbos and William Shotzbarger, Duane Morris LLP, Philadelphia, Pennsylvania; for Defendants-Appellants.

## OPINION

MENDOZA, Circuit Judge:

When the country was in the throes of the Great Depression, Congress grew concerned that large grocery chains could use their immense purchasing power to demand and receive special pricing and allowances from suppliers. Katherine Van Dyck, *Price Discrimination and Power Buyers: Why Giant Retailers Dominate the Economy and How to Stop It*, 53 U. Balt. L. Rev. 297, 299–301 (2024). Fearing that this advantage would enable chains to drive smaller, independent shops out of business, Congress amended Section 2 of the Clayton Act with the Robinson-Patman Act ("RPA"), 15 U.S.C. §§ 13–13b, 21a, to combat the "evil that a large buyer could secure a competitive advantage over a small buyer solely because of the large buyer's quantity purchasing ability." *FTC v. Morton Salt Co.*, 334 U.S. 37, 43 (1948). Therefore, Congress decided to help the little guys have a fighting chance by awarding reasonable fees to attorneys who help small shops prevail over Goliaths on RPA claims. 15 U.S.C. § 15(a).

In this case, a jury returned a verdict finding that the manufacturer of Clear Eyes Redness Relief Eye Drops had discriminated against ten wholesale purchasers by providing discounts to larger buyers in violation of Section 2 and California's Unfair Practices Act ("UPA") and Unfair Competition Law ("UCL"). 15 U.S.C. §§ 13(a), (d); Cal. Bus. & Prof. Code §§ 17045, 17200. The district court issued a permanent injunction and awarded damages and attorney's fees to Plaintiffs, whose lawyers hail from a small firm that specializes in bringing RPA claims to curtail price discrimination.

On appeal, Defendants challenge several jury instructions. They say the district court's instructions mischaracterized one of their defense theories, that payments discriminatorily offered to Costco but not to Wholesalers were "functional discounts." Next, they say the district court got the law wrong when it did not require jurors to find that price discrimination caused substantial harm to Wholesalers. Finally, they say the district court should have required jurors to make an explicit finding that Wholesalers were competing with giants for the same dollar. Defendants also challenge the district court's calculation of the net price purchasers paid the manufacturer for eye drops and issuance of a permanent injunction. In their cross-appeal, Plaintiffs challenge only the district court's award of attorney's fees. They argue that, when the district court calculated Plaintiffs' attorney's fees, it erred by diminishing the rate they were due based on the small size of their firm.

We affirm the district court with respect to Defendants' claims. We vacate the district court's award of attorney's fees and remand with instructions to enter a new fee award consistent with this opinion.

## I.

### A.

Defendants Prestige Consumer Healthcare, Inc. and its subsidiary Medtech Products, Inc. (together, "Prestige") manufacture Clear Eyes Redness Relief eye drops. Prestige does not distribute Clear Eyes directly to retail outlets but instead sells to wholesalers for distribution. Plaintiffs are ten such wholesale businesses (together, "Wholesalers") that purchased Clear Eyes from Prestige for resale to retailers like convenience stores, gas stations, and liquor stores. Wholesalers allege that Prestige sold Clear Eyes at an

impermissibly lower price to their larger competitors, namely, Costco Wholesale Corporation and the Sam's Club division of Walmart, Inc.

For many years Prestige has charged Wholesalers a higher invoice price for Clear Eyes than it charges to Costco and Sam's Club because, according to Prestige, these larger purchasers are eligible for deductions that Wholesalers are not.[1] In typical years, Costco's annual price advantage was around 5%, which allowed Costco to offer 12-packs of Clear Eyes to consumers at a net price of $1.00 to $2.00 less than Wholesalers could.

On top of this 5% price differential, Prestige offered Costco customers instant rebate coupons of $3.00 per 12-pack during select business savings events that happened two to four times a year. These rebates were given directly to Costco customers, deducted from the sale price they paid at the register, rather than to Costco. Even so, the rebates allowed Costco to take a larger margin on sales than Wholesalers could. In 2016, Prestige sold boxes of Clear Eyes to Costco for $14.04, which Costco then sold to customers for $14.99—a $0.95 markup—although the price customers actually paid at the register was only $11.99 after the $3.00 rebate. By contrast, in the same period, Prestige sold Clear Eyes to Wholesalers for $14.76 per box. At this price, if Wholesalers were to match Costco's post-rebate price of $11.99, they would lose $2.77 on every sale. And

---

[1] For instance, the RPA allows manufacturers to pass on some of their savings from efficiencies in dealing with the large buyer. 15 U.S.C. § 13(a) ("[N]othing herein contained shall prevent differentials which make only due allowance for differences in the cost of manufacture, sale, or delivery resulting from the differing methods or quantities in which such commodities are to such purchasers sold or delivered.").

Prestige did not offer a similar rebate program to Wholesalers.

Prestige also participated in Costco's "delivery, operations, and web services" ("DOW") program. Under the DOW program, Prestige made quarterly payments to Costco—in the amount of 3.95% of Costco's acquisition cost for Clear Eyes—to secure Costco's advertising and promotional services. At the same time, Prestige did not offer to pay any Wholesalers for advertising and promotional services like the DOW remittance.

**B.**

Wholesalers brought this action under the Robinson-Patman Act ("RPA"), which "prohibits sellers of goods from discriminating among competing buyers in certain circumstances," *U.S. Wholesale Outlet & Distrib., Inc. v. Innovation Ventures, LLC*, 89 F.4th 1126, 1134 (9th Cir. 2023), and California's UPA and UCL, 15 U.S.C. §§ 13(a), (d); Cal. Bus. & Prof. Code §§ 17045, 17200.

Wholesalers sought relief under Section 2(a) of the RPA, which "bars a seller from discriminating in price between competing purchasers of commodities of like grade and quality." *U.S. Wholesale*, 89 F.4th at 1134 (citing 15 U.S.C. § 13(a)). One form of discrimination under this section is secondary-line price discrimination, which occurs when "a seller gives one purchaser a more favorable price than another." *Id.* (quoting *Aerotec Int'l, Inc. v. Honeywell Int'l, Inc.*, 836 F.3d 1171, 1187 (9th Cir. 2016)). To establish secondary-line discrimination, "a plaintiff must show that (1) the challenged sales were made in interstate commerce; (2) the items sold were of like grade and quality; (3) the seller discriminated in price between the disfavored and the favored buyer; and (4) the effect of such discrimination may

be [substantially to lessen competition or tend to create a monopoly in any line of commerce, or] to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination." *Id.* (internal quotation marks and citation omitted); 15 U.S.C. § 13(a).

A plaintiff may establish the fourth element by showing either a "diversion of sales or profits from a disfavored purchaser to a favored purchaser," or "that a favored competitor received a significant price reduction over a substantial period of time." *Volvo Trucks N. Am. v. Reeder-Simco GMC, Inc.*, 546 U.S. 164, 177 (2006) (citation omitted).

Prestige mounted several defenses, arguing that (1) Wholesalers and Costco were not competing purchasers; (2) any price differential reflects Prestige's savings from the "differing methods" by which Clear Eyes was packaged and delivered; (3) Section 2(a) requires Wholesalers to show *substantial* harm to competition, which is absent here; and (4) payments to Costco were justifiable "functional discounts," which do not violate the RPA under *Texaco Inc. v. Hasbrouck*, 496 U.S. 543, 571 (1990).

A functional discount is a "reasonable" reimbursement to compensate a purchaser for "its role in the supplier's distributive system, reflecting, at least in a generalized sense, the services performed by the purchaser for the supplier." *Hasbrouck*, 496 U.S. at 554 n.11. To qualify as a functional discount, a buyer must "*actually* perform[] certain functions, assuming all the risk, investment, and costs involved." *Id.* at 560 (emphasis in original). The doctrine does not "countenance a functional discount completely untethered to

either the supplier's savings or the wholesaler's costs." *Id.* at 563.

Wholesalers also sought injunctive relief under Section 2(d), which "makes it unlawful for a manufacturer to discriminate in favor of one purchaser by making payments to that purchaser 'in connection with the sale, or offering of any products unless such payment or consideration is available on proportionally equal terms to all other customers competing in the distribution of such products.'" *U.S. Wholesale*, 89 F.4th at 1134 (quoting 15 U.S.C. § 13(d)) (citation modified).  To prevail on such a claim, a plaintiff "must establish that it is in competition with the favored buyer and 'must show a threat of antitrust injury.'"  *Id.* (quoting *Cargill, Inc. v. Monfort of Colo., Inc.*, 479 U.S. 104, 122 (1986)).

Wholesalers additionally sought damages under the UPA and UCL.  The UPA prohibits

> [t]he secret payment or allowance of rebates, refunds, commissions, or unearned discounts, whether in the form of money or otherwise, or secretly extending to certain purchasers special services or privileges not extended to all purchasers purchasing upon like terms and conditions, to the injury of a competitor and where such payment or allowance tends to destroy competition.

Cal. Bus. & Prof. Code § 17045.

The UCL prohibits "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising," and would be triggered by

violations of the RPA or UPA.  Cal. Bus. & Prof. Code § 17200.

### C.

The case proceeded to trial.  The jury returned a verdict in favor of Wholesalers on their Section 2(a) claims and awarded damages in varying amounts to all Wholesalers except Border Cash & Carry, which the jury determined was too far from any Costco locations to be in direct competition with them. [2]  The jury also found in favor of the five California-based Wholesalers on their UPA claims and the district court concluded that Prestige violated the UCL.

The district court entered judgment for Wholesalers, awarding damages and granting a permanent injunction. Wholesalers then sought $7,651,766.80 in attorney's fees. Calculating hourly rates lower than those proposed by Wholesalers but higher than those put forward by Prestige, the district court awarded $3,142,268.45 in attorney's fees.

On appeal, Prestige challenges (1) the district court's jury instructions, (2) calculation of net price, (3) issuance of a permanent injunction, and (4) award of attorney's fees. Wholesalers challenge only the district court's award of attorney's fees.

### II.

We begin by considering Prestige's three challenges to the jury instructions. Prestige asserts that the district court: first, did not correctly present Prestige's functional discount defense to the jury; second, erroneously declined to instruct the jury that Wholesalers needed to demonstrate substantial

---

[2] The district court granted Prestige partial summary judgment on the non-California Wholesalers' UPA and UCL claims.

harm to competition; and third, wrongly rejected Prestige's request for an instruction that the jury must find that Wholesalers competed with Costco for the same dollar. We review errors in the formulation of a jury instruction for abuse of discretion and review an instruction's misstatement of the law de novo. *Hunter v. County of Sacramento*, 652 F.3d 1225, 1232 (9th Cir. 2011).

## A.

We start with Prestige's first challenge, that the district court did not correctly present the functional discount defense to the jury. Prestige contends that the district court made three specific errors in its presentation. First, that the jury instructions did not make it clear that, if the jury were to find that payments made to Costco were functional discounts, then those payments necessarily did not violate Section 2; second, that the district court abused its discretion by failing to require jurors to answer on a special verdict form whether they found that Prestige's payments were functional discounts; and third, that the district court's response to a question from the jury compounded the jurors' possible confusion about functional discounts.

## i.

It was paramount to Prestige's defense that the jury understood that a finding that Prestige's payments to Costco were functional discounts would necessarily mean that those payments did not violate Section 2. To convey this, Prestige proposed the following instructions:

> Plaintiff bears the ultimate burden to prove that Defendants' lower prices were not justified as a functional discount. If you find that the lower prices granted by Defendants

> to Costco Wholesale Corporation, Sam's
> Club and Select Corporation were justified as
> a functional discount, then you must return a
> verdict for Defendants on the Robinson-
> Patman Act claim.  If you find that the prices
> to the Costco Wholesale Corporation, Sam's
> Club and Select Corporation were not
> justified as a functional discount, then you
> must consider the remainder of the court's
> instructions before reaching your verdict.

The district court instead instructed the jury with this formulation:

> The Plaintiffs bear the ultimate burden to
> prove that the Defendants' lower prices were
> not justified as a functional discount. If you
> find that the differences in prices here were
> functional discounts, then any discriminatory
> pricing did not have a reasonable possibility
> of harming competition.

Prestige contends that the last sentence in the district court's instruction suggested to the jury that "functional discount" is merely a "concept" for them to consider rather than a complete defense to a Section 2(a) claim.  So, Prestige argues, the district court misstated the law in its jury instruction.  We disagree.

While the district court did not use Prestige's preferred formulation to explain to the jury the legal consequences of their finding on functional discounts, the district court crafted an instruction that achieved Prestige's desired effect. The district court correctly instructed the jury that it was

required to find for Prestige if any element of Section 2(a) was not met.  The district court also instructed the jury that, if "differences in prices here were functional discounts, then any discriminatory pricing did not have a reasonable possibility of harming competition."   15 U.S.C. § 13(a). Because harm to competition is an element of Section 2(a), it was clear to the jury that, if they believed the price differences were functional discounts, then an element of Section 2(a) was not met.

In  *U.S.  Wholesale*,  we  endorsed  this  syllogism, explaining that finding a payment is a functional discount "negates the probability of competitive injury, an element of a prima facie case of violation."  89 F.4th at 1139 (quoting *Hasbrouck*, 496 U.S. at 561 n.18).  In the present case, the jury instructions made it clear that, if Wholesalers failed to prove that price differences were not justified as functional discounts, then Wholesalers had also failed to prove harm to competition,  and  their  Section  2(a)  claims  must consequently fail.  Therefore, the district court's instructions did not misstate the law.

### ii.

Prestige proposed that the district court require the jury to  complete  a  one-hundred-forty-seven-page  novella, disguised as a special verdict form.  On appeal, Prestige contends that the district court abused its discretion by having the jury complete a shorter, seven-page verdict form that did not require the jury to specifically state its finding on the functional discount defense.

District courts have "broad discretion in deciding whether to send the case to the jury for a special or general verdict." *United States v. Real Prop. Located at 20832 Big Rock Drive, Malibu, Cal. 902655*, 51 F.3d 1402, 1408 (9th

Cir. 1995); *see also Floyd v. Laws*, 929 F.2d 1390, 1395 (9th Cir. 1991) ("As a general rule, the court has complete discretion over whether to have the jury return a special verdict or a general verdict."). "[T]his discretion extends to determining the form of the special verdict, provided the questions asked are adequate to obtain a jury determination of the factual issues essential to judgment." *Mateyko v. Felix*, 924 F.2d 824, 827 (9th Cir. 1990).

Here, the district court included separate questions for each claim of liability, causation, and the affirmative defenses but declined to include separate questions for each element of Wholesalers' claims or Prestige's affirmative defenses. By crafting the special verdict form in this way, the district court summarized the law in a manageable and comprehensible manner and tried to avoid creating a special verdict form "spanning 147 pages and 369 questions," like the special verdict form that Prestige proposed. The question before us is whether the special verdict form, "when considered with the instruction as a whole, fully and fairly presented to the jury the issues it was called upon to decide." *Mateyko*, 924 F.2d at 827. We hold that it did.

The judge opted for a straight line instead of taking Prestige's scenic route, which would have both wasted jurors' time and risked them missing the forest for the trees. The key is to view the instructions together, rather than as fragments. Viewing the district court's instructions as a whole, we see that they fully and fairly presented the complicated issues in this case to the jury.

### iii.

As is common with complicated issues, during deliberations, the jury submitted a question to the district court: "Regarding Instruction Number 17, page 19, lines 9

through 20, does the jury have to be in unanimous agreement on each point and subpoint?"

Instruction Number 17 outlined the elements of Wholesalers' Section 2(a) claim.  The instructions for the third element (on lines 13 to 16) said:

> 3.    there is a reasonable possibility that the discriminatory pricing may harm competition. This element includes the concepts of (a) actual competition (Instruction No. 20); (b) competitive injury (Instruction Nos. 21–22); and (c) functional discounts (Instruction No. 23).

The district court concluded that the jury's mention of "subpoint[s]" must have referred to the three concepts within element three.  Outside the presence of the jury, the district court and the parties agreed that the jury must unanimously find all three elements were met.  The district court reminded the jury that "there must be unanimous agreement on each of the three elements."

Prestige argues that the district court "acknowledged" that the jury's question "likely resulted from confusion on how to apply the question of functional discounts."  It then argues that the district court's supplemental instruction in response to the question misled the jury because it implied that, even if the jury found that price differences were functional discounts, such a finding would not mandate a verdict for Prestige.

But the district court did not give the jury license to ignore the subparts of element three.  To the contrary, the district court clarified that the jury was to consider each

subpart "in answering the ultimate question of" whether element three has been proven. In response to the jurors' question, the district court instructed that "to prove liability, [the jury] must unanimously agree that those three elements have been met. . . . If [they] unanimously agree that those three elements are met, all three elements are met, then there is liability." The court added that, "as to the subpoints, . . . that is how the law [] defin[es] that third element. So that is why I refer to them as concepts instead of elements. . . . [T]hose instructions are to explain the law to you, so you can determine whether Element 3 has been proven by the plaintiffs or not."

We find that the district court's supplemental instruction did not suggest to the jury that it could return a verdict for Wholesalers if the payments were functional discounts. Rather, the supplemental instruction correctly clarified that, if Prestige's payments were functional discounts, that would "negate[] the probability of competitive injury" and thus require the jury to find that Wholesalers failed to establish an element of their Section 2(a) claim. *U.S. Wholesale*, 89 F.4th at 1139.

## B.

Prestige next argues that the district court erred by failing to instruct the jury that Wholesalers needed to demonstrate *substantial* harm to competition to demonstrate a Section 2(a) violation. We disagree. A showing of substantial harm is not required to establish competitive injury.

Section 2(a) provides in relevant part:

> It shall be unlawful for any person . . . to discriminate in price between different purchasers of commodities . . . where the

> effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them.

15 U.S.C. § 13(a).

Before trial, Prestige contended that the jury instructions should require Wholesalers to establish "substantial harm to competition" rather than "harm to competition" because the word "substantially" in 15 U.S.C. § 13(a) modifies the phrase "to injure, destroy, or prevent competition." Disagreeing, the district court denied this request and drew on the formulation from the American Bar Association Model Jury Instructions in Civil Antitrust Cases, which requires the plaintiff to establish "a reasonable possibility of harm to competition." ABA Model Instructions, Robinson-Patman Act, Seller Liability—Section 2(a), Instruction No. 10, Competitive Injury.

Interpreting Section 2(a), we hold that the district court correctly excluded "substantial" from the jury instructions because "substantially" does not modify the phrase "to injure, destroy, or prevent competition." 15 U.S.C. § 13(a). Congress strung together the clauses in Section 2(a) with the disjunctive "or," which requires that we treat the clauses separately. *United States v. Nishiie*, 996 F.3d 1013, 1023 (9th Cir. 2021) ("As a general rule, the use of a disjunctive in a statute indicates alternatives and requires that they be treated separately." (internal quotation marks and citation omitted)). Thus, "substantially" modifies "to lessen

competition" but does not modify "tend to create a monopoly" or "to injure, destroy, or prevent competition."

"Canons of construction ordinarily suggest that terms connected by a disjunctive be given separate meanings, unless the context dictates otherwise." *Reiter v. Sonotone Corp.*, 442 U.S. 330, 339 (1979). Here, context supports giving the clauses separate meanings because it would make little sense to say, "substantially tend to create a monopoly," as Prestige's proposed reading would have us do. And, prior to the amendment of the Clayton Act by the RPA, courts did not read "substantially" as modifying "tend to create a monopoly." *See George Van Camp & Sons Co. v. Am. Can Co.*, 278 U.S. 245, 253 (1929) ("The effect of the discrimination is to substantially lessen competition, and its tendency is to create a monopoly."); *Lipson v. Socony Vacuum Corp.*, 76 F.2d 213, 216 (1st Cir. 1935) (asking whether the discrimination "may substantially lessen competition in interstate commerce, or which tends to create a monopoly"); *Sidney Morris & Co. v. Nat'l Ass'n of Stationers, Off. Outfitters & Mfr's*, 40 F.2d 620, 625 (7th Cir. 1930) ("If the effect of such discrimination is to substantially lessen competition, there is no necessity for plaintiff to establish the alternative, to wit, that the effect tended to create a monopoly.").

A disjunctive reading also accords with our precedents interpreting the RPA. Although we have never before squarely addressed the question at issue in this case, in *Hasbrouck v. Texaco, Inc.* we stated that "[t]he Supreme Court has interpreted this portion of the statute as requiring an antitrust plaintiff to show only 'a reasonable possibility that a price differential may harm competition.'" 842 F.2d 1034, 1041 (9th Cir. 1987) *aff'd*, 496 U.S. 543 (1990) (quoting *Falls City Indus., Inc. v. Vanco Beverages, Inc.*, 460

U.S. 428, 434–35 (1983)).  In *U.S. Wholesale*, we listed the requirements of secondary-line discrimination and did not include the word "substantial."  89 F.4th at 1134.  Likewise, as the district court discussed,  the Supreme Court in *Volvo* "omitted the word 'substantially' when recounting the elements for secondary-line injury, requiring that a plaintiff need only show that 'the effect of [the price] discrimination may be to injure, destroy, or prevent competition' to the advantage of the favored purchaser." *Volvo*, 546 U.S. at 176 (internal quotation marks and citation omitted).

Moreover, this reading fits with our previous inquiries into the legislative history of the RPA, where we noted that the purpose of adding the "injure, destroy, or prevent" passage was "to relieve secondary-line plaintiffs—small retailers who are disfavored by discriminating suppliers— from having to prove harm to competition marketwide, allowing them instead to impose liability simply by proving effects to individual competitors." *Rebel Oil Co., Inc. v. Atl. Richfield, Co.*, 51 F.3d 1421, 1446 n.18 (9th Cir. 1995). Both the House and Senate Reports from the passage of the RPA explained that the amendment was necessary because the Clayton Act's standard of "substantially to lessen competition" had been "too restrictive, in requiring a showing of general injury to competitive conditions." S.Rep. No. 1502, 74th Cong., 2d Sess. 4 (1936); H.R. Report No. 2287, 74th Cong., 2d Sess. 8 (1936); *see Rebel Oil*, 51 F.3d at 1446 n.18.  The Senate Report explained that the innovation of the RPA was to protect "the competitor victimized by the discrimination," based on Congress's belief that doing so would help "catch the weed in the seed [to] keep it from coming to flower." S.Rep. No. 1502, 74th Cong., 2d Sess. 4 (1936).  In other words, one of the RPA's

purposes is to address competitor harms before they become widespread.

Given this statutory history and context, which fits together with our construction of Section 2(a)'s disjunctive text, we have no trouble concluding that Wholesalers needed to show only that the effects of Prestige's discriminatory actions "may be . . . to injure, destroy, or prevent competition." 15 U.S.C. § 13(a). So the district court did not err when it instructed the jury that the plaintiff was required to establish "a reasonable possibility of harm to competition."

## C.

Finally, Prestige argues that the district court erred by rejecting Prestige's request for an instruction that the jury must find that Wholesalers were competing with Costco for "the same dollar." The district court understood Costco and Sam's Club as fitting within the typical chain store paradigm presented in *U.S. Wholesale* and, consequently, determined that such an instruction was unnecessary in this case. Prestige, however, argues that because these chains require memberships, they serve a different market than Wholesalers.

Prestige urges us to apply a different paradigm to this case, drawn from *Volvo*. There, Volvo dealers resold trucks through a competitive bidding process, where a retail customer would describe "its specific product requirements and invite[] bids from several dealers it selects." *Volvo*, 546 U.S. at 170. Once a retail customer requested a bid, the Volvo dealer would then go to Volvo and request a discount or concession off the wholesale price. *Id.* Volvo would decide on a case-by-case basis whether to offer a discount and at what rate. *Id.* The Volvo dealer would then "use[]

the discount offered by Volvo in preparing its bid," and would only purchase from Volvo if the retail customer accepted its bid. *Id.* at 170–71. Retail customers rarely solicited bids from more than one Volvo dealer. *Id.* at 171.

The Supreme Court concluded that the plaintiff offered insufficient evidence to permit an inference that any dealer or group of dealers was "favored," where the plaintiff largely relied on comparisons between its competition with non-Volvo dealers and other Volvo dealers' competition with the entirely separate non-Volvo dealers. *Volvo*, 546 U.S. at 178. The Court reasoned that a bidding process, in which retail customers narrowed the relevant market by choosing the particular dealers from which they would solicit bids, is not "comparable to a chainstore or a large independent department store." *Id.*

The Ninth Circuit considered *Volvo* when it decided *U.S. Wholesale*. In that case, a set of wholesalers alleged that the producer of 5-hour Energy offered Costco Business Centers more favorable pricing, discounts, and reimbursements than it offered the other wholesalers. *U.S. Wholesale*, 89 F.4th at 1133. Relying on *Volvo*, the district court concluded that the wholesalers and Costco were not in actual competition because they competed for different customers. *Id.* at 1136. On appeal, we reversed the district court decision and concluded that *Volvo* was inapplicable. We explained that "*Volvo* tells us that there may be circumstances where the evidence shows that each customer is selling to a 'separate and discrete' buyer . . . eliminating the possibility of competition between customers." *Id.* at 1147. But we concluded that "this case is a typical chainstore-paradigm case where the Wholesalers and Costco carried and resold an inventory of 5-hour Energy to all comers." *Id.*

We reiterated that:

> to establish that two customers are in general competition, it is sufficient to prove that: (1) one customer has outlets in geographical proximity to those of the other; (2) the two customers purchased goods of the same grade and quality from the seller within approximately the same period of time; and (3) the two customers are operating on a particular functional level such as wholesaling or retailing.

*U.S. Wholesale*, 89 F.4th at 1142 (internal quotation marks and citation omitted).

Prior to trial in this case, the district court held that *Volvo* was inapplicable and declined to provide Prestige's requested instruction on actual competition. It instead instructed the jury on the elements outlined in *U.S. Wholesale*.

Prestige argues that the district court erred because *Volvo* is applicable to this case. It asserts that the district court failed to consider an important distinguishing fact: "the members of Costco and Sam's Club pay those purchasers a membership fee to go out and secure the best price for the goods the members are interested in purchasing." For that reason, Prestige says, "Costco and Sam's Club act like unique buyers and therefore do not fit within the 'typical chainstore-paradigm' as contemplated in *U.S. Wholesale*." Rather, Prestige contends, a club member of Costco and Sam's Club "is much more akin to the model considered by the Supreme Court in *Volvo*, where a retail buyer would

engage a dealer to go out and get that buyer the best price on the vehicle from the manufacturer."

In response, Wholesalers assert that this case "would only be like *Volvo* if there were evidence that Costco's customers first submitted a bid to Costco for Clear Eyes, and then Costco turned around and petitioned Prestige for discounts to fulfill each such bid as it came in." But, unlike in *Volvo*, here, "Costco bought Clear Eyes for its sales inventory, and sold it to all comers."

When the dust settles, Wholesalers' arguments are more persuasive. In *Volvo*, the retail customer chose to solicit bids from specific dealers and, through this bidding process, "the relevant market [became] limited to the needs and demands of a particular end user, with only a handful of dealers competing for the ultimate sale." *Volvo*, 546 U.S. at 179 (quoting *Reeder-Simco GMC, Inc. v. Volvo GM Heavy Truck Corp.*, 374 F.3d 701, 719 (8th Cir. 2004), *rev'd and remanded sub nom.*). Here, by contrast, there was no narrowing of the market as in *Volvo*. Costco members do pay membership fees, but they are still free to purchase goods elsewhere—and, indeed, Wholesalers produced evidence that some of its customers were also members of Costco.

Similarly, although Sam's Club members expressed interest in Clear Eyes and indicated what price they would be willing to pay for the product, they were not soliciting bids or narrowing the market to a select few wholesalers. "[T]his case is a typical chainstore-paradigm case," like *U.S. Wholesale*, where Wholesalers and Costco both "carried and resold an inventory of [a product] to all comers." 89 F.4th at 1147. Because *Volvo* is inapplicable, the district court did

not err by instructing the jury on the factors to determine actual competition as laid out in *U.S. Wholesale*.

## III.

Prestige challenges the district court's summary judgment ruling that Costco's $3.00 instant rebate on 12-packs of Clear Eyes must be included in the Section 2(a) damages calculation. The district court further excluded "evidence or argument that the rebates did not affect the net price paid by [Costco, and] that they are not discounts." We review a district court's ruling at summary judgment de novo. *Zetwick v. County of Yolo*, 850 F.3d 436, 440 (9th Cir. 2017).

We agree with the district court that rebates given to Costco customers at the checkout register must be counted toward the calculation of the net price at which Prestige sold Clear Eyes to Costco. In *Fred Meyer, Inc. v. FTC*, we evaluated a Section 2(a) claim and concluded that a supplier's "[b]uy two cans and get one free" promotion was a "price concession[] cognizable under section 2(a)." 359 F.2d 351, 359, 362 (9th Cir. 1966), *rev'd in part on other grounds*, 390 U.S. 341 (1968). The promotion allowed customers of the favored wholesaler to buy three cans for the price of two and the supplier then reimbursed the favored wholesaler for the cost of the third can. *Id.* at 359. The supplier did not offer that promotion to other competitors. *Id.* We concluded that, where a manufacturer's reimbursement "amounts were directly related to and dependent upon the amount of goods purchased and resold by [the favored wholesaler]," they amounted to a "price concession" and thus should be included in the calculation of the favored wholesaler's net price. *Id.* at 362.

Prestige argues that *Fred Meyer* is distinguishable because, in that case, "there was no indication that the *full promotional value* of goods at issue were passed on to the supermarket's customers." In other words, Prestige argues that there, the favored wholesaler in *Fred Meyer* may have given its customers a free third can but then "charged a higher price for the other two, making the value of the 'free' can different than the value that it received from [the supplier]." Thus, Prestige asserts, the favored wholesaler may have operated as an "intermediary" rather than a "redemption agent," which it argues is a significant distinction.

In our view, this distinction is without a difference. At bottom, the rebate at issue here reduced Costco's net price for a box of Clear Eyes. And Costco used that cost reduction to lower the prices of Clear Eyes for its customers to $11.99. A favored purchaser bestowing upon consumers the benefits it receives through a manufacturer's discriminatory pricing is a kind of competitive injury that Section 2(a) addresses. If Costco did not pass along its lower price to customers and instead kept the rebate for itself and sold Clear Eyes for $14.99, then it would be harder to see how Prestige's price discrimination would injure Wholesalers in the competitive sense. But here the injury stems precisely from the fact that customers are more likely to flock to Costco to take advantage of a roughly twenty-percent-off promotion: this benefit is realized by the customers themselves, rather than by Costco.

## IV.

Prestige challenges the district court's decision to grant a permanent injunction. We review a "district court's issuance of a permanent injunction under three standards:

'factual findings for clear error, legal conclusions de novo, and the scope of the injunction for abuse of discretion.'" *Galvez v. Jaddou*, 52 F.4th 821, 829 (9th Cir. 2022) (quoting *United States v. Washington*, 853 F.3d 946, 962 (9th Cir. 2017)).

Section 16 of the Clayton Act provides the following:

> Any person, firm, corporation, or association shall be entitled to sue for and have injunctive relief, in any court of the United States having jurisdiction over the parties, against threatened loss or damage by a violation of the antitrust laws, including sections 13, 14, 18, and 19 of this title, when and under the same conditions and principles as injunctive relief against threatened conduct that will cause loss or damage is granted by courts of equity.

15 U.S.C. § 26.

To receive injunctive relief under Section 16, a private plaintiff must show "threatened loss or damage 'of the type the antitrust laws were designed to prevent and that flows from that which makes defendants' acts unlawful.'" *Cargill*, 479 U.S. at 113 (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977)).  A plaintiff "need only demonstrate a significant threat of injury from an impending violation of the antitrust laws or from a contemporary violation likely to continue or recur." *Zenith Radio Corp. v. Hazeltine Rsch., Inc.*, 395 U.S. 100, 130 (1969).

Prestige argues that the district court abused its discretion in entering the injunction because Wholesalers failed to establish that they suffered an injury or that the injury is likely to recur. This argument is unavailing because the jury returned a verdict for Wholesalers on their Section 2(a) claims and the district court correctly concluded that Prestige's conduct toward Wholesalers, except for Border Cash & Carry, violated Section 2(d). Prestige's contention that an injunction is unwarranted because Wholesalers have stopped purchasing Clear Eyes is particularly puzzling. At least four of the Wholesalers testified that they stopped purchasing Clear Eyes from Prestige and began purchasing from Costco because of the lower price at Costco that resulted from Prestige's unlawful price discrimination. Thus, Prestige's argument is essentially that it should be free from an injunction because its discrimination was so pronounced that it converted Costco's independent *competitors* into *customers*. We are not persuaded. Issuance of a permanent injunction is an appropriate remedy for Prestige's anticompetitive conduct.

## V.

Wholesalers appeal the district court's award of attorney's fees. The district court calculated attorney's fees using the lodestar method, whereby the court:

> must start by determining how many hours were reasonably expended on the litigation, and then multiply those hours by the prevailing local rate for an attorney of the skill required to perform the litigation. The district court may then adjust upward or downward based on a variety of factors. The number of hours to be compensated is

> calculated by considering whether, in light of
> the circumstances, the time could reasonably
> have been billed to a private client.

*Moreno v. City of Sacramento*, 534 F.3d 1106, 1111 (9th Cir. 2008) (citations omitted).

We review the district court's award of attorney's fees for an abuse of discretion. *Moskowitz v. Am. Sav. Bank, F.S.B.*, 37 F.4th 538, 542 (9th Cir. 2022).

Wholesalers argue that the district court erred by failing to identify and apply the correct prevailing rate for comparable work in the Central District of California in its lodestar calculation. The hourly rates a district court uses in its fee calculation must be "in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience[,] and reputation." *Blum v. Stenson*, 465 U.S. 886, 895 n.11 (1984). In addition, "fee awards must be 'based on current rather than merely historical market conditions,'" and "the adjudicator should rely on[] the most current information available." *Seachris v. Brady-Hamilton Stevedore Co.*, 994 F.3d 1066, 1077–78 (9th Cir. 2021) (quoting *Christensen v. Stevedoring Services of Am.*, 557 F.3d 1049, 1055 (9th Cir. 2009)).

Wholesalers requested rates of $1,314 per hour for the named partners of Gaw | Poe, and $1,001 for their three more junior colleagues who worked on the case. They supported these requests with a declaration and analysis from Gerald Knapton, an expert with thirty years of experience calculating attorney's fees and particular expertise regarding antitrust cases. Knapton based his expert opinion in part on the 2023 edition of the Real Rate Report, a Wolters Kluwer publication that compiles rates from actual law firm

invoicing for legal work performed from July 2020 through June 2023.  Prestige engaged its own expert who agreed that an appropriate prevailing rate for the lodestar analysis would be the rate for third quartile litigators in Los Angeles from the 2023 Real Rate Report.

The district court, however, declined to base its fees calculation on the prevailing market rate—that is, the rate "for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Seachris*, 994 F.3d at 1076 (quoting *Blum*, 465 U.S. at 895 n.11).  Instead, the district court set counsel's rates based on what the attorneys had been awarded for handling a prior contract dispute, with a slight adjustment for the complexity of the case and inflation.  In doing so, the district court abused its discretion.

In *Gonzalez v. City of Maywood*, we vacated a fee award where "there [was] no indication that the district court computed Plaintiffs' lodestar figure using the market rate prevailing in the Central District of California for attorneys and paralegals of similar 'experience, skill, and reputation' to members of Plaintiffs' legal team working on similarly complex matters." 729 F.3d 1196, 1206 (9th Cir. 2013).  In this case, the district court should have based its lodestar calculation on the prevailing market rate for similar services rather than looking to the rates a court had awarded in a previous contract dispute.

The parties' experts agreed that the prevailing rate for Wholesalers' attorneys in this litigation would be the rate for third quartile litigation partners in Los Angeles drawn from the 2023 Real Rate Report.  Wholesalers' attorneys argue that such a rate is more than justified, asserting that their experience with RPA litigation is unrivaled by any firm in the country.  Their small firm has litigated at least six RPA

cases since 2015.  Indeed, they were trial counsel and lead appellate counsel in *U.S. Wholesale*, 89 F.4th. at 1132.  They have also ably achieved a favorable outcome in the present litigation.

In response, Prestige contends that the district court did consider the prevailing market rates, as it explicitly referenced the Real Rate Report and concluded that the 2023 rate for Los Angeles-based firms with 50 or fewer lawyers was too low but found that the 2023 rate for large firms was too high.  The district court noted that Plaintiffs relied heavily on cases involving fee awards to "big law" firms and found it "unreasonable to award big law rates to a four-person firm representing mom-and-pop warehouses."  But district courts may not reduce fee awards based on the size of counsel's firm.   As we have held before, the district court is meant to compare *lawyers*, not *firms*:

> the court may permissibly look to the hourly rates charged by comparable attorneys for similar work, but may not attempt to impose its own judgment regarding the best way to operate a law firm, nor to determine if different staffing decisions might have led to different fee requests. The difficulty and skill level of the work performed, and the result achieved—not whether it would have been cheaper to delegate the work to other attorneys—must drive the district court's decision.

*Moreno*, 534 F.3d at 1115.

The Second Circuit has persuasively spoken on the reasons that underlie this rule in *McDonald ex rel.*

*Prendergast v. Pension Plan of the NYSA-ILA Pension Trust Fund*, 450 F.3d 91 (2d Cir. 2006). There, the court reviewed a district court's attorney's fees award, noting that the district court found it "[o]f great significance" that an attorney "was a solo practitioner with lower overhead costs than attorneys associated with large firms." *Id*. at 97 (alteration in original). The Second Circuit found enough in the record to support the district court's fee award but "caution[ed]" that firm size is not "grounds for an automatic reduction in the reasonable hourly rate," reasoning that:

> Overhead is not a valid reason for why certain attorneys should be awarded a higher or lower hourly rate. Rather, overhead merely helps account for why some attorneys charge more for their services. Indeed, it may be that in certain niche practice areas, attorneys of the highest "skill, expertise, and reputation" have decided to maintain a solo practice instead of affiliating themselves with a firm. The reasons for doing so may be numerous, including the inherent problems of higher overhead, fee-sharing, and imputed conflicts of interest. The focus of the inquiry into the reasonable hourly rate must instead be determined by reference to "prevailing [rates] in the community for similar services by lawyers of reasonably comparable skill, expertise, and reputation."

*Id.* at 97 n.6 (alteration in original) (citations omitted).

We agree. A firm's small size should not automatically result in its attorneys receiving a reduced hourly rate. A

firm's size does not directly bear on the factors we must consider when awarding fees—the lawyers' skill, experience, and reputation. *Blum*, 465 U.S. at 895 n.11. Indeed, some of the most skillful, experienced, and reputable attorneys strike out on their own or with several colleagues. History reminds us that brilliance at the bar is not measured by the number of associates a lawyer commands; Abraham Lincoln, Clarence Darrow, Thurgood Marshall, Ruth Bader Ginsburg, and Gerry Spence are just a few luminaries who perfected their skills and made enduring marks on our profession without joining the ranks of large law firms. We should not reduce fees awards to lawyers simply because of how they have structured their workplaces. And, conversely, the fact that a firm is larger and has a larger overhead should not automatically entitle its attorneys to higher fees. For example, while a larger firm may have higher total overhead expenses, its costs per case may in fact be lower. Indeed, in both economic theory and antitrust doctrine, larger firms are often associated with greater efficiencies. *See e.g.*, Alan A. Fisher & Robert H. Lande, *Efficiency Considerations in Merger Enforcement*, 71 Cal. L. Rev. 1580, 1605 (1983) ("recent studies, both theoretical and empirical, suggest that large firms very often are more efficient than small firms in a given market, so mergers to create market leaders on average may lower costs"). So a law firm's size alone cannot determine its market rate for the purposes of a lodestar calculation.

With that in mind, the district court abused its discretion when it declined to base its lodestar calculation on the rate in the 2023 Real Rate Report because "it is simply unreasonable to award big law rates to a four-person firm representing mom-and-pop warehouses." First-rate attorneys who prevail in litigation are entitled to receive fees

commensurate with their skill, experience, and reputation, even if their clients are mom-and-pop businesses that don't have Fortune 500 budgets to hire big law firms to represent them.  We vacate the district court's award of attorney's fees to Wholesalers and remand for the district court to recalculate fees consistent with this opinion.

## VI.

We affirm the district court with respect to the jury instructions, net price calculation, and permanent injunction. We vacate the district court's award of attorney's fees and remand with instructions to enter a new fee award consistent with this opinion.

**AFFIRMED in part; VACATED and REMANDED in part.**

## CERTIFICATE OF COMPLIANCE
### 9th Cir. Case Nos. 24-3776, 24-5009, 24-5227

I am the attorney of record for Appellants / Cross-Appellees Prestige Consumer Healthcare Inc. and Medtech Products, Inc.

I certify that pursuant to Circuit Rule 40-1, the attached petition for panel rehearing/petition for rehearing *en banc* is:

Prepared in a format, typeface, and type style that complies with Fed. R. App. P. 32(a)(4)-(6) and contains the following number of words: 4,099 words (within the 4,200 words permitted), exclusive of the corporate disclosure statement, the table of contents, the table of authorities, as counted by Microsoft Word.

March 10, 2026

> s/Michael L. Fox
> DUANE MORRIS LLP
> One Market Plz., Ste. 2200
> San Francisco, CA 94105
> (415) 957-3092
>
> *Counsel for Appellants / Cross-Appellees Prestige Consumer Healthcare Inc. (fka Prestige Brands Holdings, Inc.) and Medtech Products, Inc.*

# CERTIFICATE OF SERVICE
## 9th Cir. Case Nos. 24-3776, 24-5009, 24-5227

I, Michael L. Fox, certify that on March 10, 2026, I served the foregoing Petition for Rehearing *En Banc* or Panel Rehearing with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system, which will send notice to all registered CM/ECF users. Counsel for all participants in this case are registered CM/ECF users and will be served by the CM/ECF system.

s/Michael L. Fox
DUANE MORRIS LLP
One Market Plz., Ste. 2200
San Francisco, CA 94105
(415) 957-3092

*Counsel for Appellants / Cross-Appellees Prestige Consumer Healthcare Inc. (fka Prestige Brands Holdings, Inc.) and Medtech Products, Inc.*